IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

—————————————————————

DAVID CINTRON,

                    Plaintiff,        Civil Action No.
                                       9:14-CV-0116 (TJM/DEP)

    v.

NURSE DENISE REOME, *et al.*,

                    Defendants.

—————————————————————

APPEARANCES:

FOR PLAINTIFF:

DAVID CINTRON, *Pro se*
1010 E. 178th Street
Apt. 8-2
Bronx, NY 10460-2973

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN      CHRISTOPHER W. HALL, ESQ.
New York State Attorney General     Assistant Attorney General
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

This is a civil rights action brought by *pro se* plaintiff David Cintron, a former New York State prison inmate, against a physician and three nurses employed at the corrections facility in which he was incarcerated at the relevant times, pursuant to 42 U.S.C. § 1983. In his complaint, as twice amended, plaintiff alleges that he cut his tongue on a piece of glass while eating dinner, causing his tongue to bleed, and that the defendants failed to provide him with pain medication and a means to stopping the bleeding, and further refused to have him x-rayed to determine whether he had swallowed additional pieces of glass. Plaintiff contends that by their actions, defendants violated his rights under the Eighth Amendment to the United States Constitution.

The parties have cross-moved for summary judgment in their favor. For the reasons set forth below, I recommend that the portions of defendants' summary judgment motion that seeks dismissal on the basis that plaintiff failed to properly exhaust available administrative remedies be denied, but that the motion be granted on the merits, and that plaintiff's motion be denied.

I.    BACKGROUND[1]

Prior to October 2015, plaintiff was a prison inmate being held in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). *See generally* Dkt. No. 89; *see also* Dkt. No. 105. At the times relevant to his claims, plaintiff was housed in the Upstate Correctional Facility ("Upstate"), a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined for twenty-three hours each day, primarily for disciplinary reasons. Dkt. No. 89; *see Samuels v. Selsky*, No. 01-CV-8235, 2002 WL 31040370, at *4 n.11 (S.D.N.Y. Sept. 12, 2002). It appears that in addition to being confined in a SHU cell, at the relevant times plaintiff was subject to a restrictive diet and a "safe distance order." *See* Dkt. No. 98-4 at 7.

On April 10, 2011, while eating his kosher loaf for dinner, plaintiff experienced a sharp pain and crunching sound, and discovered that the loaf contained a small piece of glass. Dkt. No. 89 at 12. Plaintiff was able to spit out the glass, and noticed that his tongue was bleeding. *Id.* Plaintiff reported the incident to Corrections Sergeant T. Debyah, who advised plaintiff that

---

[1]    In light of the procedural posture of the case, and my ultimate recommendation, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

he was going to summon a nurse. *Id.* Sergeant Debyah returned with defendant Reome, a corrections nurse, as well as another corrections officer. Dkt. No. 89 at 13. The second corrections officer photographed the piece of glass that plaintiff had removed from his mouth, but did not take photographs of the plaintiff's tongue. *Id.*

After being told what happened, defendant Reome examined the plaintiff and observed that he had a less than one-quarter inch superficial abrasion on the right side of his tongue. Dkt. No. 98-4 at 2, 7-8. Nurse Reome did not observe any drainage or bleeding from the tongue at that time. *Id.*

Concerned that the plaintiff may have swallowed a piece of glass, Nurse Reome contacted the on-call physician, defendant Dr. Ira Weissman, for his advice. Dkt. No. 98-4 at 2. Dr. Weissman responded to Nurse Reome that no treatment was necessary and that if plaintiff did swallow glass, "it just has to pass." *Id.* at 2.

During her examination of the plaintiff, Nurse Reome observed that the tongue abrasion did not appear to have any affect on his ability to conduct daily activities, nor did it appear to her that plaintiff was in substantial pain. Dkt. No. 98-4 at 3. Accordingly, based upon her observations and examination, Nurse Reome concluded that plaintiff had a

minor tongue abrasion for which no treatment or further evaluation was warranted or necessary. *Id.*

Plaintiff was seen on April 11, 2011 by defendant Nurse J. Bergeron. Dkt. No. 89 at 15; Dkt. No. 98-4 at 8. At that time, plaintiff requested that he be provided with something to stop his tongue from bleeding, and that he be allowed to see a doctor and sent for x-rays, believing that he had swallowed glass. *Id.* Upon examination, Nurse Bergeron observed no bleeding and, based upon the entry in plaintiff's medical records from April 10, 2011, found no need to order x-rays. Dkt. No. 98-4 at 8.

Plaintiff was seen by defendant Nurse Marla Travers on April 12, 2011. Dkt. No. 89 at 16; Dkt. No. 98-5 at 2. Upon examining the plaintiff, Nurse Travers concluded that plaintiff had a very minor tongue abrasion for which no treatment or further evaluation was warranted or necessary. Dkt. No. 98-5 at 2. After reviewing plaintiff's medical records, defendant Travers determined that there was no substantial change in plaintiff's condition, and observed that the tongue abrasion did not appear to have any affect on plaintiff's ability to conduct daily activities, nor did plaintiff appear to be in substantial pain. *Id.*

Plaintiff's medical records reflect that he was visited by medical personnel at his cell on April 13, 15, 19, and 20, 2011. Dkt. No. 98-4 at 9-11.

There is no reference in the medical record entries for those dates to continued bleeding of plaintiff's tongue. *Id.* at 3, 9-11.

II.    PROCEDURAL HISTORY

Plaintiff commenced this action on February 3, 2014. Dkt. No. 1. Named as defendants in plaintiff's original complaint were Nurse Denise Maas, now known as Denise Reome, Nurse Marla Travers, and Dr. Evelyn Weissman. *Id.* Plaintiff filed an amended complaint on March 23, 2015, adding Nurse J. Bergeron as a defendant. Dkt. No. 68. With permission of the court, plaintiff filed a second amended complaint ("SAC"), the currently operative pleading, on August 24, 2015. Dkt. No. 89. That SAC eliminated plaintiff's claims against Dr. Evelyn Weissman and added Dr. Ira Weissman as a defendant, also asserting claims against Nurses J. Bergeron, Denise Reome, and Marla Travers. *Id.*

On November 21, 2015, plaintiff filed a motion for summary judgment requesting a finding of liability on the part of the defendants on his deliberate medical indifference claims. Dkt. No. 93. Defendants responded in opposition to that motion and cross-moved for summary judgment in their favor on October 16, 2015. Dkt. No. 98. In their motion, defendants have argued that (1) plaintiff's deliberate medical indifference claims are precluded based upon his failure to exhaust available administrative

remedies before commencing suit; (2) the deliberate medical indifference claims are legally deficient on the merits; and (3) in any event, they are entitled to qualified immunity from suit. *Id.* Despite being notified of the deadline of October 30, 2015 for responding to defendants' cross-motion, plaintiff has failed to file an opposition to that motion. Dkt. No. 1, 2. The parties' cross-motions, which are now ripe for determination, have been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

A.    Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at

248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A

material fact is genuinely in dispute "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson*,

477 U.S. at 248.

A party moving for summary judgment bears an initial burden of

demonstrating that there is no genuine dispute of material fact to be decided

with respect to any essential element of the claim in issue; the failure to

meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250

n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the

opposing party must show, through affidavits or otherwise, that there is a

material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at

324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any

ambiguities, and draw all inferences, in a light most favorable to the

non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553;

*Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of

summary judgment is justified only in the event of a finding that no

reasonable trier of fact could rule in favor of the non-moving party. *Bldg.*

*Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir.

2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment

appropriate only when "there can be but one reasonable conclusion as to the verdict"). In a case such as this, where parties have interposed cross-motions for summary judgment, each motion must be independently assessed, using this standard as a backdrop. *See Light Sources, Inc.v. Cosmedico Light, Inc.*, 360 F. Supp. 2d 432, 434 (D. Conn. 2005).

    B.    <u>Exhaustion of Remedies</u>

In his SAC, plaintiff alleges that he filed a grievance concerning the medical deliberate indifference complained of in this action, and pursued the grievance through all available steps. Dkt. No. 89 at 2. While acknowledging the filing of a grievance concerning the restricted diet loaf served to the plaintiff in April 2011, defendants note that the focus of that grievance was upon an alleged adulteration of his food, including with pieces of glass causing bleeding of his tongue. Dkt. No. 98-8 at 4-7; Dkt. No. 98-1 at 1-2. Defendants maintain that plaintiff's complaint is therefore subject to dismissal on the procedural basis that he failed to properly exhaust available administrative remedies concerning the medical attention that followed his ingestion of the adulterated loaf before commencing this action.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the

ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo*, 548 U.S. 81, 84 (2006) ("Exhaustion is . . . mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley*, No. 04-CV-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983.").[2] The Supreme Court recently reaffirmed that mandatory nature of the exhaustion requirement in its decision in *Ross v. Blake*, __St. Ct.__, 2016 WL 3128839, at *6 (2016).

"[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). In the event the defendant

---

[2]     Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

establishes that the inmate plaintiff failed "to fully complete[] the administrative review process" prior to commencing the action, the plaintiff's complaint is subject to dismissal. *Pettus v. McCoy*, No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford*, 548 U.S. at 95; *accord, Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007).

In accordance with the PLRA, the DOCCS has instituted a grievance procedure, entitled the Inmate Grievance Program ("IGP"), and made it available to inmates. The IGP is comprised of three steps that inmates must satisfy when they have a grievance regarding prison conditions. 7 N.Y.C.R.R. § 701.5; *Mingues v. Nelson*, No. 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004). Embodied in 7 N.Y.C.R.R. § 701, the IGP requires that an inmate first file a complaint with the facility's IGP clerk within twenty-one days of the alleged occurrence. 7 N.Y.C.R.R. § 701.5(a)(1). If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. *Id.* Representatives of the facility's inmate grievance resolution committee ("IGRC") have up to sixteen days after the

grievance is filed to informally resolve the issue. *Id.* at § 701.5(b)(1). If there

is no such informal resolution, then the full IGRC conducts a hearing within

sixteen days after receipt of the grievance. *Id.* at § 701.5(b)(2).

A grievant may then appeal the IGRC's decision to the facility's

superintendent within seven days after receipt of the IGRC's written

decision. *Id.* at § 701.5(c). The superintendent must issue a written decision

within a certain number of days after receipt of the grievant's appeal.[3] *Id.* at

§ 701.5(c)(i), (ii).

The third and final step of the IGP involves an appeal to the DOCCS

Central Office Review Committee ("CORC"), which must be taken within

seven days after receipt of the superintendent's written decision. *Id.* at §

701.5(d)(1)(i). The CORC is required to render a written decision within

thirty days of receipt of the appeal. *Id.* at § 701.5(d)(2)(i).

Accordingly, at each step of the IGP process, a decision must be

rendered within a specified time period. Significantly, "[a]ny failure by the

IGRC or the superintendent to timely respond to a grievance or first-level

appeal, respectively, can – and must – be appealed to the next level,

_____

[3]     Depending on the type of matter complained of by the grievant, the
superintendent has either seven or twenty days after receipt of the grievant's appeal to
issue a decision. *Id.* at § 701.5(c)(3)(i), (ii).

including CORC, to complete the grievance process." *Murray v. Palmer*, No. 03-CV-1010, 2010 WL 1235591, at *2 (N.D.N.Y. Mar. 31, 2010) (Hurd, J., *adopting report and recommendation by* Lowe, M.J.) (citing, *inter alia*, 7 N.Y.C.R.R. § 701.6(g)(2)).

Generally, if a plaintiff fails to follow each of the required three steps of the above-described procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *See Ruggerio v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks omitted)).

The grievance referenced by the plaintiff in his SAC as having been filed regarding the incident in question is Grievance No. UST-45844-11. Dkt. No. 93-1; *see* Dkt. No. 93-3; *see also* Dkt. No. 98-3 at 4-6. In that grievance plaintiff complains of the adulteration of his food, beginning from the morning of April 7, 2011, and the failure of corrections officers to take photographs of his tongue after his report, on April 10, 2011, of having been cut by glass. Dkt. No. 98-3 at 4-6. The only reference to medical attention rendered by any of the defendants is found in the following statements:

> I told Nurse Maas [Reome] that I think that I swallow [sic] some glass as well she said when she comes back from talking with the Doctor she is going to let me know. What she is going to do she saide [sic] that to dont [sic] worry the tongue is ok but my tongue is still bleeding… even Nurse Travers violated my Eighth Amendment Right [sic] by leaving me with a swollen and infected upper bleeding lip . . .[.]

Dkt. No. 98-3 at 5.

In his decision concerning the grievance, the superintendent at Upstate found no evidence of staff misconduct. Dkt. No. 98-3 at 8. In arriving at his finding, the superintendent appears to have focused upon the actions of corrections officials, including, as stated by a corrections sergeant, "that he had the grievant seen by medical staff and Inmate Injury Report was completed, . . .". *Id.* The superintendent's decision makes no reference to allegations that the defendants failed to provide adequate medical attention. *Id.* In his statement to the CORC appealing that determination, plaintiff stated the following:

> On the non kosher loaf it comes wrap [sic] two time one on the loaf and another over plastic and loaf why not the kosher loaf they [sic] way doing that befor [sic] intil [sic] CO Marshell and CO Hermam started playing with the loaf then CO Labarge.

*Id.* The only reference in the CORC's decision to any request for medical attention is the following except:

14

> CORC notes that Nurse F. . . states that the grievant did not request to have his blood pressure taken on 4/10/11. It is further noted that the grievant's concerns regarding Nurse T . . . and his upper lip were addressed by CORC in UST-45646-11, dated 6/29/11.

Dkt. No. 98-3 at 10.

Notwithstanding the paucity of references to the medical treatment issued to plaintiff, an extremely generous reading of plaintiff's grievance and subsequent appeal to the CORC, in combination with the decisions of the superintendent and the reviewing body, could support a finding that those investigating the matter were on notice of plaintiff's claim that his cut and bleeding tongue were not adequately addressed by medical personnel at the facility. Accordingly, and in light of my recommendation on the merits, I recommend against dismissal of plaintiff's deliberate medical indifference claims on this procedural basis.

C.     Merits of Claims

Defendants maintain that in the event plaintiff is allowed to puruse his deliberate indifference claims on the merits, summary judgment dismissing those claims is nonetheless appropriate because, based upon the record now before the court, no reasonable factfinder could conclude that plaintiff

has proven both the objective and subjective elements of a deliberate medical indifference cause of action.

Plaintiff's deliberate medical indifference claims implicate the Eighth Amendment to the United States Constitution, which prohibits punishment that is "incompatible with the evolving standards of decency that mark the progress of a maturing society[,] or which involve the unnecessary and wanton infliction of pain[.]" *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (quotation marks and citations omitted)). While the Eighth Amendment "does not mandate comfortable prisons, . . . neither does it permit inhumane ones[.]" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quotation marks and citation omitted). "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle*, 429 U.S. at 103. Failure to provide inmates with medical care, "[i]n the worst cases, . . . may actually produce physical torture or lingering death, [and] . . . [i]n less serious cases, . . . may result in pain and suffering which no one suggests would serve any penological purpose." *Id.* (quotation marks and citations omitted).

A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements. *Wright v. Goord*, 554 F.3d 255,

268 (2d Cir. 2009); *Price v. Reilly*, 697 F. Supp. 2d 344, 356 (E.D.N.Y.

2010). To meet the objective requirement, the alleged deprivation must be

"sufficiently serious." *Farmer*, 511 U.S. at 844; *see also Salahuddin v.*

*Goord*, 467 F.3d 263, 280 (2d Cir. 2006) ("[T]he objective test asks whether

the inadequacy in medical care is sufficiently serious."). Factors informing

this inquiry include "whether a reasonable doctor or patient would find it

important and worthy of comment, whether the condition significantly affects

an individual's daily activities, and whether it causes chronic and substantial

pain." *Salahuddin*, 467 F.3d at 280 (quotation marks and alterations

omitted). Determining whether a deprivation is sufficiently serious requires a

court to examine the seriousness of the deprivation, and whether the

deprivation represents "a condition of urgency, one that may produce death,

degeneration, or extreme pain[.]" *Hill v. Curcione*, 657 F.3d 116, 122 (2d

Cir. 2011) (quotation marks omitted). Importantly, it is "the particular risk of

harm faced by a prisoner due to the challenged deprivation of care, rather

than the severity of the prisoner's underlying medical condition, considered

in the abstract, that is relevant for Eighth Amendment purposes." *Smith v.*

*Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003).

　　　To satisfy the subjective requirement, a plaintiff must demonstrate

that the defendant had "the necessary level of culpability, shown by actions

characterized by 'wantonness.'" *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). "In medical-treatment cases . . ., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.*; *see also Farmer*, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 839-40).

By plaintiff's own account, the full extent of his injury from biting into glass was a cut and bleeding on his tongue. *See* Dkt. No. 89 at 15. Upon examination of plaintiff's tongue on the day of the incident, Nurse Reome, observed only a less than one quarter inch superficial abrasion on the right side of his tongue. Dkt. No. 98-4 at 2. A similar observation was made two days later by defendant Travis, another nurse at the facility. Dkt. No. 98-5 at 2. Plaintiff has offered no evidence to show that his injury was anything

more. In addition, plaintiff's medical records show no sign (or complaints) of any injury to plaintiff's tongue beginning three days after his first complaint. *See* [Dkt. No. 98-4 at 9-11](#).

It is well-established that such minor injuries do not normally rise to the level of seriousness required to support a viable claim medical indifference under the Eighth Amendment. *See, e.g., Harris v. Morton*, No. 9:05-CV-1049, 2008 WL 596891, at *3, n.2 (N.D.N.Y. Feb. 29, 2008) (Kahn, J. and Treece, M.J.) ("We note that although Plaintiff states he suffered from a 'snapped' neck, he does not indicate he suffered from anything other than a generic neck injury."); *Bennett v. Hunter*, No. 9:02-CV-1365, 2006 WL 1174309, *3 (N.D.N.Y. May 1, 2006) (Scullin, S.J. and Lowe, M.J.) (pinched nerve not a serious medical need); *Jones v. Furman*, No. 02-CV-939F, 2007 WL 894218, at *10 (W.D.N.Y. Mar. 21, 2007) (soreness, pain in and a lump behind his right ear, lump on the back of his head, small abrasions on his nose and knuckle, and bruising to his back, ribs do not constitute the requisite serious medical need) (citing *Hemmings v. Gorczyk*, 134 F.3d 104, 109 (2d Cir.1998)); *Tapp v. Tougas*, No. 9:05-CV-0149, 2008 WL 4371766, at * 9 (N.D.N.Y. Aug. 11, 2008) (Peebles, M.J.) (citing *Peterson v. Miller*, No. 9:04-CV-797, 2007 WL 2071743, at *7 (N.D.N.Y. July 13, 2007) (noting that a "dull pain" in plaintiff's back and persistent rash on plaintiff's foot did not

raise a constitutional issue) (citing *Hathaway Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994), *cert. denied*, 513 U.S. 1154, 115 S. Ct. 1108 (1995))), *Report and Recommendation Adopted in Part and Rejected in Part,* 2008 WL 4371762 (N.D.N.Y. Sep 18, 2008) (Mordue, C.J.); *Salaam v. Adams*, No. 03-CV-0517, 2006 WL 2827687, *10 (N.D.N.Y. Sept. 29, 2006) (Kahn, J. and Lowe, M.J.) (intermittent back pain requiring pain relievers and physical therapy, a gastrointestinal problem with stomach pains, and a psychological problem requiring Wellbutrin and/or Neurontin did not constitute serious medical condition); *see also Ford v. Phillips*, No. 05 Civ. 6646, 2007 WL 946703, at *12 & n.70 (S.D.N.Y. Mar. 27, 2007) (finding that plaintiff's allegations of bruises, abrasions, and blood in his urine for a few weeks did not constitute a sufficiently serious condition giving rise to a medical indifference claim); *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 311 (S.D.N.Y.2001) (cut finger with "skin ripped off" is insufficiently serious); *Bonner v. N.Y. City Police Dep't*, No. 99 Civ. 3207, 2000 WL 1171150, at *4 (S.D.N.Y. Aug. 17, 2000) (inability to close hand due to swelling insufficiently serious to constitute Eighth Amendment violation); *Gomez v. Zwillinger*, 1998 U.S. Dist. LEXIS 17713, at *16 (S.D.N.Y. November 6, 1998) (back pain and discomfort not sufficiently serious); *Jones v. New York City Health & Hosp. Corp.*, 1984 U.S. Dist.

LEXIS 21694 at *3-4 (S.D.N.Y. November 28, 1984) (deliberate indifference claim dismissed where plaintiff challenged treatment for bruises on head and body); *Thaxton v. Simmons*, No. 9:10-CV-1318, 2013 WL 4806457, at *13 (N.D.N.Y. May 23, 2013) (Treece, M.J.) (finding that "no rational juror could conclude that [a cut tongue] which healed on its own in a matter of days was objectively sufficiently serious to sustain an Eighth Amendment deliberate indifference claim"), *Report and Recommendation Adopted,* 2013 WL 4806457 (N.D.N.Y. Sep 9, 2013) (D'Agostino, D.J.).[4]

In addition to being unable to meet the objective prong of the Eighth Amendment deliberate indifference test, plaintiff cannot demonstrate subjective indifference by any of the named defendants in the action. Plaintiff was seen and examined by medical personnel concerning his complaints of a cut on his tongue on April 10, 11, and 12, 2011. Dkt. No. 98-4 at 3. In addition, prison physician Dr. Weisman was consulted concerning the matter. *Id.* at 2. Although plaintiff alleges that Nurse Reome

---

[4]     Plaintiff also demanded that he be x-rayed to determine whether he had swallowed additional pieces of glass, which request was denied. However, there is no evidence currently in the record before the court to suggest that plaintiff suffered any symptoms that would raise even the possibility that he swallowed glass, let alone the existence of a serious medical condition associated with that fact. Indeed, the only evidence in the record concerning that matter is a statement, albeit hearsay, made by Dr. Ira Weismann to Nurse Reome, to the effect that if glass was swallowed it would have to pass, a process that would be enhanced by the nutritional loaf served to the plaintiff. Dkt. No. 98-4 at 2.

"walked away smiling" after examining him on April 10, 2011, Dkt. No. 89 at 14, even assuming this is true, such a fact is insufficient to establish that, subjectively, Nurse Reome was both aware of facts from which an inference could be drawn that a substantial risk of serious harm existed and also, by inference, demonstrated subjective recklessness with respect to that risk.

Because I conclude, based on the record now before the court, that no reasonable factfinder could determine that plaintiff has met either the objective or subjective prong of the deliberate medical indifference standard, I recommend that his complaint be dismissed on the merits.

IV.    SUMMARY AND RECOMMENDATION

Both plaintiff and defendants have moved for summary judgment with respect to the merits of plaintiff's deliberate indifference claim. In addition, defendants have argued that plaintiff's Eighth Amendment claims should not be entertained by the court in light of his alleged failure to exhaust available administrative remedies before commencing suit. Although the medical treatment plaintiff received is by no means the centerpiece of plaintiff's grievance concerning glass being found in his food, the grievance does make passing reference to medical attention received by him after his tongue was allegedly cut on a piece of glass. Accordingly, drawing all inferences and resolving all ambiguities in plaintiff's favor, I am unable to

recommend that his complaint be dismissed for failure to exhaust available administrative remedies. I have determined, however, that no reasonable factfinder could conclude defendants were deliberately indifferent to his serious medical needs. Accordingly, it is respectfully

RECOMMENDED that plaintiff's motion for summary judgment in this action (Dkt. No. 93) be DENIED, that defendants' cross-motion for summary judgment dismissing plaintiff's second amended complaint (Dkt. No. 98) be GRANTED, and that plaintiff's second amended complaint be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.   28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated: June 29, 2016
       Syracuse, NY

2006 WL 1174309
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Donald Mack BENNETT, Plaintiff,
v.
T. HUNTER, Administrative Director of Medical,
Riverview Correctional Facility, Defendant.

No. 9:02-CV-1365 (FJS/GHL).
|
March 31, 2006.
|
May 1, 2006.

**Attorneys and Law Firms**

Donald Mack Bennett, White Plains, NY, for Plaintiff, pro se.

Hon. Eliot Spitzer, Attorney General for the State of New York, Nelson Sheingold, Assistant Attorney General, of counsel, Albany, NY, for Respondent Department of Law.

## *ORDER*

FREDERICK J. SCULLIN, JR., S.D.J.

 **\*1** The above-captioned matter having been presented to me by the Report-Recommendation of Magistrate Judge George H. Lowe filed March 31, 2006, and the Court having reviewed the Report-Recommendation and the entire file in this matter; and Judge Lowe's Report-Recommendation which was mailed to plaintiff's last known address, but was returned to the Clerk's office marked "Return to Sender". Under Local Rule 41.2(b), failure to notify the Court of a change of address as required by Local Rule 10.1(b) may result in dismissal of the action. Therefore, in light of Plaintiff's failure to notify the Court of his change of address, it is hereby

**ORDERED,** that the Report-Recommendation filed by Magistrate Judge George H. Lowe filed on March 31, 2006, is, for the reasons stated therein, **ACCEPTED** in its entirety; and it is further

**ORDERED,** that Defendant's motion for summary judgment is **GRANTED,** and it is further

**ORDERED,** that the Clerk of the Court is to enter judgment in favor of Defendant and **CLOSE** this case.

**IT IS SO ORDERED.**

GEORGE H. LOWE, United States Magistrate Judge.

## *REPORT-RECOMMENDATION*

This matter has been referred to me for Report and Recommendation by the Honorable Frederick J. Scullin, Senior U.S. District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule N.D.N.Y. 72.3(c). Generally, in this *pro se* civil rights complaint brought under 42 U.S.C. § 1983, Donald Mack Bennett ("Plaintiff"), formerly an inmate at the Riverview Correctional Facility ("Riverview C.F."), alleges that the Administrative Director of the Medical Department at Riverview C.F., Thomas B. Hunter ("Defendant"), violated Plaintiff's rights under the First, Eighth and Fourteenth Amendments to the United States Constitution when, between July and December of 2000, he was deliberately indifferent to Plaintiff's serious medical needs (which included a heart condition known as "atrial fibrillation," a seizure disorder, a disc problem in his back known as "spondylolisthesis," and a pinched nerve in his right wrist). (Dkt. No. 29 [Plf.'s Second Am. Compl.].)

Currently before the Court is Defendant's motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 59.) Generally, Defendant's motion raises three issues: (1) whether Plaintiff has failed to establish the elements for a claim of deliberate indifference to a serious medical need; (2) whether Plaintiff has failed to establish any personal involvement by Defendant in the alleged constitutional deprivations, and (3) whether Defendant is protected by qualified immunity. (Dkt. No. 59 [Def.'s Mem. of Law].) For the reasons discussed below, I answer each of these questions in the affirmative. As a result, I recommend that Defendant's motion be granted.

## I. SUMMARY JUDGMENT STANDARD

Under Fed.R.Civ.P. 56(c), summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [1] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (citation omitted); *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citation omitted). However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986).

**\*2** To "specifically controvert[ ]" each of the statements of material fact in a defendant's Rule 7.1(a)(3) Statement of Material Facts, a plaintiff must file a *response* to the Statement of Material Facts that "mirror[s] the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs" *and* that "set[s] forth a specific citation to the record where the factual issue arises." [2]

"If the adverse party does not so respond, summary judgment, *if appropriate,* shall be entered against the adverse party." Fed.R.Civ.P. 56(e) (emphasis added). "The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically." *Champion v.. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). "Such a motion may properly be granted only if the facts as to which there is no genuine dispute 'show that ... the moving party is entitled to a judgment as a matter of law.' " *Champion,* 76 F.3d at 486 (quoting Fed.R.Civ.P. 56[c] ). [3] Therefore, the Court must review the merits of the motion. *Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 232 (N.D.N.Y.2001).

Where a plaintiff has failed to respond to a defendant's Rule 7.1 Statement of Material Fact, the facts as set forth in that Rule 7.1 Statement are accepted as true to the extent those facts are supported by the record. [4] A district court has no duty to perform an independent review of the record to find proof of a factual dispute. [5] In the event the district court chooses to conduct such an independent review of the record, any verified complaint filed by

the plaintiff should be treated as an affidavit. [6] I note that, here, while Plaintiff's Second Amended Complaint ("Complaint") is *not* verified, he has submitted what purports to be an "affidavit" in opposition to Defendant's motion. (Dkt.Nos.29, 72.)

However, to be sufficient to create a factual issue, an affidavit (or verified complaint) must, among other things, be based "on personal knowledge." [7] An affidavit (or verified complaint) is not based on personal knowledge if, for example, it is based on mere "information and belief" or hearsay. [8] In addition, such an affidavit (or verified complaint) must not be conclusory. [9] An affidavit (or verified complaint) is conclusory if, for example, its assertions lack any supporting evidence or are too general. [10] Moreover, "[a]n affidavit must not present legal arguments." [11]

Finally, even where an affidavit (or verified complaint) is based on personal knowledge and is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." [12]

## II. ANALYSIS

**\*3** Before I analyze each of the three issues presented by Defendant in his motion, I would like to make a general observation. In support of each of his arguments, Defendant relies on certain record citations and legal citations. I find that these citations indeed support Defendant's arguments. My resulting conclusion that Defendant's motion has merit is not rebutted by Plaintiff's opposition papers. His papers are woefully deficient, despite the fact that he was twice warned of the potential consequences of failing to properly respond to Defendant's motion, and was granted numerous extensions of time in which to do so. [13]

Specifically, because Plaintiff fails to include in his opposition papers a Rule 7.1 Response which specifically controverts Defendant's factual assertions in matching numbered paragraphs with specific citations to the record, Defendant's factual assertions in his Rule 7.1 Statement

are deemed admitted by Plaintiff. [14] In addition, because in his opposition papers Plaintiff fails to address the legal arguments advanced by Defendant, Plaintiff is deemed to have consented to the granting of Defendant's motion based on those legal arguments. [15]

### A. Whether Plaintiff Has Failed to Establish the Elements for a Claim of Deliberate Indifference to a Serious Medical Need

Defendant recites the correct legal standard that governs Plaintiff's claim of inadequate medical care under the Eighth Amendment. (Dkt. No. 59, Mem. of Law at 9-12.) Generally, to prevail on such a claim, Plaintiff must show two things: (1) that Plaintiff had a sufficiently serious medical need; and (2) that Defendant was deliberately indifferent to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

### 1. Serious Medical Need

Defendant acknowledges, and the record establishes, that, during some or all of the time in question, Plaintiff had a heart condition (atrial fibrillation), [16] a seizure disorder, [17] a disc problem in his lower back (spondylolysis), [18] a pinched nerve in his right wrist, [19] and callouses on his feet. [20] However, Defendant argues that, while some of these health conditions may have constituted "serious medical needs" (e.g., Plaintiff's heart condition, his seizure disorder, etc.), other of these health conditions did not constitute "serious medical needs" (e.g., any callouses on his foot, etc.). [21]

Setting aside the fact that I can find no reference to any foot callouses in Plaintiff's Amended Complaint, [22] I am persuaded by Defendant's argument. Depending on the precise nature of the disease, generally a heart condition, a seizure disorder, and a disc problem in one's back are "serious medical needs, [23] while a pinched nerve in one's wrist, and callouses on one's feet are not "serious medical needs." [24]

As a result, for purposes of summary judgment, I find that Plaintiff has established a serious medical need only with regard to his heart condition, seizure disorder, and back problem (but not with regard to his wrist pain

and calloused feet). However, I note that, even if I were to consider all of Plaintiff's health problems *together* as constituting one "serious medical need" over the entire relevant time period, it would not change my ultimate recommendation in this report, for the reasons stated below

### 2. Deliberate Indifference

**\*4** Defendant asserts, and the record establishes, that Riverview C.F. provided a considerable amount of medical care to Plaintiff during his incarceration there. [25] Generally, Riverview C.F. (1) responded to Plaintiff's medical requests by examining and treating him (e.g., through the prescription of more than six medications, and the administration of "foot soaks," etc.), (2) investigated his complaints, and (3) kept comprehensive and detailed records regarding Plaintiff's various health problems and complaints.

Based on this evidence, Defendant argues that (1) Plaintiff was receiving more than adequate care for his various health problems at Riverview C.F., and (2) even if he was not receiving adequate care for some of those health problems, absolutely no evidence exists suggesting that Defendant was deliberately indifferent to those health problems (whether they constituted "serious medical needs" or not). [26]

I agree with Defendant, for the reasons stated in his Memorandum of Law. Simply stated, there is no evidence that Defendant's state of mind was equivalent to the sort of *criminal recklessness* necessary for liability under the Eighth Amendment. [27] At most, the evidence indicates there may have been a difference of opinion between the medical staff at Riverview C.F. and Plaintiff, or *conceivably* a hint of negligence on the part of someone on the medical staff at Riverview C.F. However, even if true, neither of those facts implicate Defendant or (if they did implicate Defendant) would be enough to make Defendant liable to Plaintiff under the Eighth Amendment. [28]

As a result, I find that Plaintiff has not established that Defendant acted with deliberate indifference to any of Plaintiff's various health conditions, including his heart condition, seizure disorder, and back problem.

**B. Whether Plaintiff Has Failed to Establish any Personal Involvement by Defendant in the Alleged Constitutional Deprivation**

A defendant's personal involvement in the alleged unlawful conduct is a prerequisite for a finding of liability in an action under 42 U.S.C. § 1983. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087 (1978). To prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). If the defendant is a supervisory official a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior )* is insufficient to show his or her personal involvement in that unlawful conduct. *Richardson v. Goord,* 347 F .3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

Rather, for a supervisory official to be personally involved in unlawful conduct, he or she must have (1) directly participated in that violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Richardson,* 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986).

**\*5** Here, even after conducting an independent review of the record, I can find no evidence of any such personal involvement by Defendant in the alleged unlawful conduct (which primarily consisted of Nurse Holden's dispensing the wrong medication to Plaintiff). Plaintiff has not established (or even alleged) that Defendant directly participated in Nurse Holden's (alleged) misconduct. [29] Nor has Plaintiff established (or even alleged) the existence of a policy or custom under which Nurse Holden's (alleged) misconduct occurred.

Rather, liberally construed, Plaintiff's sole theories of personal involvement appear to be that (1) Defendant knew of various of Plaintiff's complaints about Nurse Holden before and during the misconduct, but negligently failed to act on those complaints, and (2) Defendant failed to remedy Nurse Holden's misconduct (and indeed sought to cover it up) after learning of it through Plaintiff's complaints. (Dkt. No. 29, ¶¶ VII, VIII, IX.) The problem with these theories of personal involvement is that they are completely devoid of any evidentiary support in the record.

At most, the record shows that Defendant supervised Nurse Holden (a part-time employee), and dutifully investigated Plaintiff's *sole* complaint about Nurse Holden, which was contained in Grievance No. RV-5422-01 (filed on January 2, 2001). In pertinent part, Plaintiff's grievance alleged that (1) on December 25, 2000, Nurse Holden gave Plaintiff the wrong liquid in which to soak his feet, making his calloused feet uncomfortable, and (2) on August 27, 2000, Nurse Holden failed to give Plaintiff a new pill after dropping that pill on the floor, and improperly took his pulse.

I can find no evidence in the record that Plaintiff made any complaints to Defendant about Nurse Holden before August 27, 2000, or even before December 25, 2000 (such that Defendant could possibly be said to have been "grossly negligent" or "deliberately indifferent" for failing to act on those complaints before the dates of the alleged misconduct in question). Indeed, he had arrived at Riverview C.F. only in July of 2000. Nor do I have any reason to believe that, if there existed any such complaints, they would have been sufficient to put Defendant on notice of the potential for misconduct by Nurse Holden, given Plaintiff's prolix and confusing use of language. [30]

The crux of Plaintiff's theory of personal involvement appears to be that Defendant failed to *remedy* Nurse Holden's misconduct during the "foot soak," dropped pill, and pulse reading. Setting aside the issue of whether any discipline of Nurse Holden would even be warranted for such "misconduct," the fact remains that Plaintiff wanted a remedy other than discipline of Nurse Holden. [31] Rather, Plaintiff wanted Defendant to somehow undo the (alleged) results of Nurse Holden's misconduct, namely the worsening of Plaintiff's medical conditions, which (allegedly) included having his heart condition, seizure disorder and back problem "upgraded." I do not understand this extraordinary feat of medicine (bordering on a supernatural act) to be the sort of "remedy" referred

to in the above-described personal involvement test for supervisors.

 *6 All that was required of Defendant, under the circumstances, was what he did. He investigated Plaintiff's grievance (reviewing his medical records, and talking to both Plaintiff and Nurse Holden), and determined Plaintiff's complaints about Nurse Holden to be without merit. Even if Defendant's determination had been incorrect, there is no evidence that Nurse Holden's misconduct (if it indeed occurred) constituted a violation of Plaintiff's constitutional rights (i.e., that it occurred during the treatment of a serious medical need, and that it resulted from anything more than negligence by Nurse Holden). This absence of evidence is especially noteworthy, considering that Plaintiff was provided the opportunity to obtain such evidence during this action's discovery period, which closed long ago. [32] Under analogous circumstances, other district courts within the Second Circuit have refused to find personal involvement by a nurse supervisor. [33]

As a result, I find that, even if Plaintiff had established the elements of a claim for deliberate indifference to a serious medical need, Plaintiff has not established that Defendant was personally involved in any constitutional deprivation.

## C. Whether Defendant Is Protected by Qualified Immunity

Finally, Defendant argues that he is entitled to dismissal because he is protected by qualified immunity. Regardless of the merits of this defense, I have already concluded that Plaintiff's Amended Complaint should be dismissed on two alternative grounds (failure to establish the elements of an Eighth Amendment claim, and failure to establish the personal involvement of Defendant in any

constitutional deprivation). As I result, I need not address this issue. However, in the interest of thoroughness, I will do so briefly.

Defendant recites the correct legal standard with regard to the qualified immunity defense. (Dkt. No. 59, Mem. of Law at 14-16.) Generally, Defendant has established facts showing that (1) his investigation of Plaintiff's January 2, 2001, grievance was reasonably conducted, and (2) as a result of that investigation, he found no evidence that Nurse Holden had been deliberately indifferent to any of Plaintiff's medical needs (whether those needs were serious or not). Under the circumstances, I can find no violation of a "clearly established" right, much less a right of which a reasonable person would have known.

As a result, I find that Defendant is entitled to qualified immunity.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendant's motion for summary judgment (Dkt. No. 59) be ***GRANTED.***

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Svcs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

### All Citations

Not Reported in F.Supp.2d, 2006 WL 1174309

---

Footnotes

1    A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

2    N.D.N.Y. L.R. 7.1(a)(3); *see, e.g., Jones v. Smithkline Beecham Corp.,* 309 F.Supp.2d 343, 346 (N.D.N.Y.2004) (McAvoy, J.) ("[W]here Plaintiff has failed to provide specific references to the record in support of her denials or has otherwise failed to completely deny Defendant's assertions of fact, those assertions will be taken as true."); *Lee v. Alfonso,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *15 (N.D.N.Y. Feb. 10, 2004) (Scullin, C.J.) ("Plaintiff does not offer any facts to support his claims that would raise an issue of fact. Nor has he overcome his failure to respond to Defendants' Rule 7.1(a)(3) Statement. Therefore, Defendants' version of the facts remains uncontroverted."); *Margan v. Niles,* 250 F.Supp.2d 63, 67 (N.D.N.Y.2003) (Hurd, J.) ("Plaintiff's Rule 7.1(a)(3) statement, which contains numerous denials, does not contain a single citation to the record. Because plaintiff's response Rule 7.1(a)(3) statement does not comply with the local rules,

it has not been considered."); *Mehlenbacher v. Slafrad,* 99-CV-2127, 2003 U.S. Dist. LEXIS 9248, at *4 (N.D.N.Y. June 4, 2003) (Sharpe, M.J.) ("Since [the plaintiff] has failed to respond to the defendant's statements of material fact, the facts as set forth in the defendants' Rule 7.1 Statement ... are accepted as true."); *Adams v. N.Y. State Thruway Auth.,* 97-CV-1909, 2001 U.S. Dist. LEXIS 3206, at *2, n. 1 (N.D.N.Y. March 22, 2001) (Mordue, J.) ("[T]o the extent plaintiff's responses violate Local Rule 7. 1, and are not properly admitted or denied, the Court will deem defendant's statement of fact admitted by plaintiff."); *see also Holtz v. Rockefeller,* 258 F.3d 62, 74 (2d Cir.2001) ("[A] Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record."). N.D.N.Y. L.R. 7.1(b)(3).

3    Local Rule 7.1(b)(3) recognizes this requirement (that the motion have merit) when it provides that "the non-moving party's failure to file or serve ... [opposition] papers ... shall be deemed as consent to the granting ... of the motion ... unless good cause is shown," only where the motion has been "properly filed" and "the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein." N.D.N.Y. L.R. 7.1(b)(3).

4    *See* N.D.N.Y. L.R. 7.1(a)(3) ("*Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.*") [emphasis in original]; *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243-245 (2d Cir.2004) ("If the evidence submitted in support of the motion for summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.... [I]n determining whether the moving party has met this burden ..., the district court may not rely solely on the statement of undisputed material facts contained in the moving party's Rule 56.1 statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [citation omitted]; *see, e.g ., Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) ("In this case, [the plaintiff] did not file a statement of undisputed facts in compliance with Local Rule 7.1(a)(3). Consequently, the court will accept the *properly supported* facts contained in the defendants' 7.1 statement.") [emphasis added].

5    *See Amnesty Am. v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") (citations omitted); *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment; *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) (granting motion for summary judgment; *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

6    *See Patterson v. County of Oneida,* 375 F.2d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted]; Fed.R.Civ.P. 56(c) ("The judgment sought shall be rendered forthwith if the ... affidavits ... show that there is no genuine issue as to any material fact....").

7    Fed.R.Civ.P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to the matters stated therein."); *see also U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.,* 44 F.3d 1082, 1084 (2d Cir.1995) [citations omitted], *cert. denied sub nom, Ferrante v. U.S.,* 516 U.S. 806 (1995).

8    *See Patterson,* 375 F.3d at 219 ("[Rule 56(e)'s] requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'... [Furthermore, the Rule's] requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavits also means that the affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial."); *Sellers v. M .C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988) ("[Defendant's] affidavit states that it is based on personal knowledge *or* upon information and belief.... Because there is no way to ascertain which portions of [Defendant's] affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is insufficient under Rule 56 to support the motion for summary judgment."); *Applegate v. Top Assoc., Inc.,* 425 F.2d 92, 97 (2d Cir.1970) (rejecting affidavit made on "suspicion ... rumor and hearsay"); *Spence v. Maryland Cas. Co.,* 803 F.Supp. 649, 664 (W.D.N.Y.1992) (rejecting affidavit made on "secondhand information and hearsay"), *aff'd,* 995 F.2d 1147 (2d Cir.1993).

9    *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate,* 425 F.2d at 97 (stating that the purpose of Rule 56[e]

is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

10    *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

11    N.D.N.Y. L.R. 7.1(a)(2).

12    *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-555 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,* 136 Fed. Appx. 383 (2d Cir.2005) (unreported decision).

13    (Dkt.Nos.59, 63, 67, 70.)

14    N.D.N.Y. L.R. 7.1(a)(3).

15    N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown."); N .D.N.Y. L.R. 7.1(a) (requiring opposition to motion for summary judgment to contain, *inter alia,* a memorandum of law); *Beers v.. GMC,* 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3] ); *cf.* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's *response ...* must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so *respond,* summary judgment, if appropriate, shall be entered against the adverse party.") [emphasis added].

16    (*See, e.g.,* Dkt. No. 59, Def.'s Rule 7.1 Statement, ¶ 4; Dkt. No. 59, Appendix to Def.'s Rule 7.1 Statement, Ex. D-2 at 589, 590-594, 639-642, 653, 678-679, 683.)

17    (*See, e.g.,* Dkt. No. 59, Def.'s Rule 7.1 Statement, ¶ 4; Dkt. No. 59, Appendix to Def.'s Rule 7.1 Statement, Ex. D-2 at 591, 594, 639.)

18    (*See, e.g.,* Dkt. No. 59, Def.'s Rule 7.1 Statement, ¶ 5; Dkt. No. 59, Appendix to Def.'s Rule 7.1 Statement, Ex. D-2 at 95, 536.)

19    (*See, e.g.,* Dkt. No. 59, Def.'s Rule 7.1 Statement, ¶ 6; Dkt. No. 59, Appendix to Def.'s Rule 7.1 Statement, Ex. D-2 at Dkt. 536.)

20    (*See, e.g.,* Dkt. No. 59, Def.'s Rule 7.1 Statement, ¶ 12; Dkt. No. 59, Appendix to Def.'s Rule 7.1 Statement, Ex. D-2 at 6 .)

21    (Dkt. No. 59, Mem. of Law at 9-10.)

22    Rather, Plaintiff's claim that he had foot calluses that constituted a "serious medical condition" appears to have been asserted in an administrative grievance filed by Plaintiff on January 2, 2001. (*Compare* Dkt. No. 29 *with* Dkt. No. 59, Appendix to Def.'s Rule 7.1 Statement, Ex. D-2.)

23    *See Mejia v. Goord,* 03-CV-0124, 2005 WL 2179422, at *7 (N.D.N.Y. Aug. 16, 2005) (Peebles, M.J.) ("The record in this case is strongly suggestive of a coronary condition which, though medically unspecified, could qualify as a serious medical need."); *Boomer v. Lanigan,* 00-CV-5540, 2001 WL 1646725, at *3 (S.D.N.Y. March 31, 1999) ("Epilepsy, or an epileptic seizure, is a serious medical injury."); *Williams v. M.C.C. Institution,* 97-CV-5352, 1999 WL 179604, at *10 (S.D.N.Y. March 31, 1999) ("There can be no question that epilepsy, and in particular an epileptic fit that runs unchecked, is a serious medical condition, even if for a half-hour.") [citation omitted]; *Veloz v. State of New York,* 339 F.Supp.2d 505, 522-524 (S.D.N.Y.2004) (spinal condition that included spondylosis was a serious medical need); *Faraday v. Lantz,* 03-CV-1520, 2005 WL 3465846, at *5 (D.Conn. Dec. 12, 2005) ("persistent [ ] ... back pain caused by herniated, migrating discs [and] sciatica" was a serious medical need).

24    *See Dixon v. Nusholtz,* No. 98-1637, 1999 U.S.App. LEXIS 13318, at *1, 5 (6th Cir.1999) (foot calluses that required orthopedic shoes were not a "grave medical need"); *Jackson v. O'Leary,* 89-CV-7139, 1990 U.S. Dist. LEXIS 17249, at *2, 4 (1990) (N.D.Ill.Dec. 17, 1990) ("[Plaintiff's] medical problem [of having callouses on his feet which allegedly required him to be able to wear gym shoes] is not one of especially grave concern."); *Green v. Senkowski,* 99-CV-1523, Decision & Order at 6-7 (N.D.N.Y. Aug. 5, 2003) (Hood, J.) (granting defendants' motion for summary judgment because, in part, plaintiff's wrist pain was not a "serious medical need"), *aff'd,* No. 03-250, 2004 U.S.App. LEXIS 11454 (2d Cir. June 10, 2004) (unpublished opinion); *Warren v. Purcell,* 03-CV-8736, 2004 U.S. Dist. LEXIS 17792, at *26 (S.D .Y. Sept. 3, 2004) ("[I]t appears highly unlikely that the injuries plaintiff alleges to have suffered ... namely pain in his wrists and pain, numbness and swelling in his foot and ankle, would be considered sufficiently serious to rise to the level of an Eighth Amendment violation.").

25    (Dkt. No. 59, Def.'s Rule 7.1 Statement, ¶¶ 4, 5, 6, 12, 13, 14, 15, 16, 17, 20, 21, 23, 24, 25, 26, 27, 28, 29, 30; *see generally* Dkt. No. 59, Appendix to Def.'s Rule 7.1 Statement.)

26    (Dkt. No. 59, Mem. of Law, at 10-12.)

27    *See Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) ( "The required state of mind [under the Eighth Amendment is] equivalent to criminal recklessness....").

28    *See Estelle v. Gamble,* 429 U.S. 97, 106 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."); *see, e.g., Veloz v. New York,* 339 F.Supp.2d 505, 522-24 (S.D.N.Y.2004) (granting defendants' motion for summary judgment on plaintiff's claim for deliberate indifference because defendants denied plaintiff's request for a stronger pain medication to treat his back condition based on a mere disagreement as to treatment, and medical malpractice is not actionable under the Eighth Amendment); *Connors v. Heywright,* 02-CV-9988, 2003 WL 21087886, at *3 (S.D.N.Y. May 12, 2002) (granting defendants' motion to dismiss because plaintiff's allegations that defendants forgot to give him his medications, altered his medications, and did not give him his monthly examinations, despite his epileptic seizures, failed to state a claim for deliberate indifference but stated a claim only for negligence).

29    For example, in his opposition papers, Plaintiff acknowledges that "Defendant Hunter was not present for the pill incident." (Dkt. No. 72, ¶ 6.)

30    (*See, e.g.,* Dkt. No. 29; Dkt. No. 59, Appendix to Def.'s Rule 7.1 Statement, Ex. D-2 [attaching Plaintiff's Grievance No. RV-5422-01.)

31    (*See* Dkt. No. 29, ¶ IX [complaining that Defendant merely informed Plaintiff that Nurse Holden "will either be suspended or fired"].)

32    (*See* Dkt. No. 39 at 1 [Scheduled Order of 6/22/04, setting discovery deadline as 10/30/04].)

33    *See, e.g., Gates v. Goord,* 99-CV-1378, 2004 U.S. Dist. LEXIS 12299, at *32-35 (S.D.N.Y. July 1, 2004) (granting summary judgment to nurse supervisor, because-despite inmate's conclusory allegations that nurse supervisor was "repeatedly notified" of inmate's allegedly inadequate medical care but refused to take appropriate action-inmate had offered no facts showing personal involvement by nurse supervisor in any constitutional violation, and discovery was closed); *Patterson v. Lilley,* 02-CV-6056, 2003 U.S. Dist. LEXIS 11097, at *19-22 (S.D.N.Y. June 30, 2003) (granting

motion to dismiss filed by nurse administrator, because fact that inmate sent complaint letter to nurse administrator about subordinate nurse's allegedly inadequate medical care was not sufficient to personally involve nurse administrator in alleged misconduct, especially where no facts indicated any constitutional deprivation); *Gadson v. Goord,* 96-CV-7544, 2000 U.S. Dist. LEXIS 3944, at *20-21 (S.D.N.Y. March 28, 2000) (granting summary judgment to nurse supervisor, because no evidence existed showing he was personally involved in physical therapist's alleged denial of adequate wheel chair, even though he attended meetings at which issue of wheel chair was discussed, and because no evidence existed that alleged misconduct constituted a constitutional deprivation); *Rosales v. Coughlin,* 10 F.Supp.2d 261, 267 (W.D.N.Y.1998) (granting summary judgment to nurse supervisor because of lack of personal involvement, where record did not include any evidence that nurse supervisor failed to take appropriate action in response to inmate's complaints of inadequate medical care); *Muhammad v. Francis,* 94-CV-2244, 1996 U.S. Dist. LEXIS 16785, at *25 (S.D.N.Y. Nov. 13, 1996) (granting summary judgment to nurse supervisor because of lack of personal involvement, where evidence showed merely that nurse supervisor had been contacted during investigation of inmate's grievance complaint regarding his medical care); *Holmes v. Fell,* 856 F.Supp. 181, 183-184 (S.D.N.Y.1994) (granting summary judgment to nurse supervisor because of lack of personal involvement in subordinate nurse's allegedly inadequate medical care of inmate, and because of lack of any evidence that the allegedly inadequate medical care constituted a constitutional violation).

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by    Charter Oak Fire Ins. Co. v. Trio Realty Co.,
S.D.N.Y.,    January 31, 2002

2000 WL 1171150
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Dennis BONNER, Plaintiff,

v.

NEW YORK CITY POLICE DEPT.; Michael
Orlowski, 5577; New York City Department of
Corrections; Jame Sanchex, 5769, Defendants.

No. 99 Civ. 3207(AGS).
|
Aug. 17, 2000.

**Attorneys and Law Firms**

Michael D. Hess, Corporation Counsel of the City of New
York, by Lisa J. Black, for Defendants.

*OPINION AND ORDER*

SCHWARTZ, J.

 **\*1** Plaintiff Dennis Bonner, appearing *pro se,* brings this
action pursuant to 42 U.S.C. § 1983 against defendants
New York City Police Department ("NYPD"), New
York City Department of Corrections ("DOC"),
Michael Orlowski ("Orlowski"), and Jame Sanchez
("Sanchex") (collectively: "defendants"). Before the Court
is defendants' motion to dismiss the complaint pursuant to
Federal Rule of Civil Procedure ("Fed. R. Civ.P.") 12(b)
(6). For the reasons stated below, defendants' motion is
GRANTED.

FACTUAL BACKGROUND [1]

Plaintiff alleges that, on March 12, 1997, while in police
custody at the 46th Precinct in the Bronx, he requested
medical treatment "for [a] hand that was extremely
swolle[n]". (Complaint at 3, section IV.) Allegedly,
plaintiff was denied medical treatment for a period of
time. (Complaint at 3, section IV.) Plaintiff further alleges
that, on April 4, 1997, a bus conveying plaintiff was

involved in an accident and plaintiff's head and back
were injured. (Complaint at 4, section IV.) The bus was
allegedly operated by the DOC. (Complaint at 4, section
IV.) Plaintiff asserts that he was "given pain killer" but
still suffers discomfort. (Complaint at 4, section IV-A.) He
further asserts that he is still in need of medical attention
because a finger on his right hand "does not close".
(Complaint at 4, section IV-A.)

On May 4, 1999, plaintiff filed this action seeking
approximately five million dollars in damages. Plaintiff
brings this action pursuant to 42 U.S.C. § 1983 ("section
1983"), alleging that, by denying him adequate medical
treatment and by deliberately disregarding his safety,
defendants violated his Eighth Amendment right to be
free from cruel and unusual punishment. (Plaintiff's
Memorandum in Opposition to Defendants' Motion to
Dismiss ("Pl's.Mem.Law") at 1, 6.) In addition, the
complaint is construed to assert a pendent claim for
negligence under New York common law. Defendants
filed the instant motion to dismiss, which was fully
submitted on May 17, 2000. [2]

DISCUSSION

I. LEGAL STANDARD GOVERNING DISMISSAL
PURSUANT TO FED. R. CIV. P. 12(b)(6)
Defendants move to dismiss the complaint for failure to
state a claim upon which relief can be granted pursuant
to Fed.R.Civ.P. 12(b)(6). On such a motion, the court is
required to accept the material facts alleged in the
complaint as true and to construe all reasonable inferences
in plaintiff's favor. *See Grandon v. Merril Lynch & Co.,* 147
F.3d 184, 188 (2d Cir.1998); *Caspar v. Lew Lieberbaum
& Co., Inc.,* No. 97 Civ. 3016(JGK), 1998 WL 150993, *1
(S.D.N.Y. Mar. 31, 1998).* Further, the court's function
on a motion to dismiss "is not to weigh the evidence
that might be presented at trial but merely to determine
whether the complaint itself is legally sufficient." *Caspar,
1998 WL 150993,* *1 (citation omitted). Therefore, a
defendant's motion should be granted only if the court
determines that "it appears beyond doubt that the plaintiff
can prove no set of facts in support of his claim which
would entitle him to relief." *Automated Salvage Transp.,
Inc. v. Wheelabrator Envtl. Sys., Inc.,* 155 F.3d 59, 67
(2d Cir.1998) (quoting *Conley v. Gibson,* 35 U.S. 41,
45-46 (1957)). Where, as here, the plaintiff is proceeding

*pro se,* courts must apply a "more flexible standard in determining the sufficiency of [the] complaint than they would in reviewing a pleading submitted by counsel." *Platsky v. CIA,* 953 F.3d 26, 28 (2d Cir.1991) (*per curiam* ); *see Haines v. Kernier,* 404 U.S. 519, 520-21 (1972).

**\*2** However, "while *Conley* permits a pleader to enjoy all favorable inferences from facts that have been pleaded, it does not permit conclusory statements to substitute for minimally sufficient factual allegations". *Electronics Communications Corp. v. Toshiba America Consumer Prods., Inc.,* 129 F.3d 240, 243 (2d Cir.1997) (citation omitted). The Court is not required to uphold the validity of a claim supported only by conclusory allegations. *See Gant,* 69 F.3d at 673 ("It is well settled in this Circuit that a complaint consisting of nothing more than naked assertions, and setting forth no facts upon which a court could find a violation ... fails to state a claim under Rule 12(b)(6).").

## II. CLAIM PURSUANT TO SECTION 1983
Plaintiff asserts a claim under section 1983, alleging that his Eighth Amendment right to be protected from cruel and unusual punishment was violated by inadequate medical care and defendants' deliberate disregard for his safety. Defendants contend that the section 1983 claim must be dismissed because: (i) defendants NYPD and DOC are not suable entities; (ii) plaintiff has failed to allege facts upon which a court could find that defendants Orlowski and Sanchex were personally involved in the alleged misconduct; and (iii) plaintiff has failed to allege facts upon which a court could find that a constitutional violation had occurred.

A. *Section 1983 claim as against the NYPD and the DOC is barred*
Defendants argue that the section 1983 claim as asserted against defendants NYPD and DOC must be dismissed because these defendants are not suable entities. Chapter 17 § 396 of the New York City Charter provides that "[a]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the City of New York and not that of any agency, except where otherwise provided by law." The NYPD and the DOC are agencies of the City of New York and, consequently, may not be sued independently. *See Baird v. Perez,* No. 98 Civ. 3762(SAS), 1999 WL 386746, \*4 (S.D.N.Y. Jun. 10, 1999) (recognizing that the NYPD

is an agency and pursuant to § 396 may not be sued independently); *Adams v. Galletta,* 996 F.Supp. 210, 212 (S.D.N.Y.1997) (recognizing that the DOC is an agency and pursuant to § 396 may not be sued independently) (collecting cases). Accordingly, plaintiff's section 1983 claim as asserted against the NYPD and the DOC must be dismissed. *See Perez,* 1999 WL 386746, \*4 (dismissing section 1983 claim as against the NYPD pursuant to § 396); *Adams,* 966 F.Supp. at 212 (dismissing section 1983 claim as against the DOC pursuant to § 396).

B. *Section 1983 claim as against defendants Orlowski and Sanchex is barred*
Defendants argue that the section 1983 claims as asserted against defendants Orlowski and Sanchex must be dismissed because plaintiff has failed to allege that these defendants were personally involved in the allegedly unconstitutional activity. It is well established in the Second Circuit that to state a claim under section 1983 a plaintiff must allege facts showing that the defendant was directly and personally involved in the alleged constitutional deprivations. *See McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977) (cited by *Ella v. Jackson,* No. 95 Civ. 2314(AGS), 1996 WL 673819, \*2 (S.D.N.Y. Nov. 20, 1996) (Schwartz, J.); *cf. Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986) (holding that doctrine of *respondeat superior* cannot be applied to impute liability to a supervisor under section 1983). The only circumstances under which allegations of direct participation may not be necessary arise when a supervisory official has had "actual or constructive notice of unconstitutional practices and demonstrates 'gross negligence' or 'deliberate indifference' by failing to act." *Ella,* 1996 WL 673819, \*2 (quoting *Al-Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989) (citation omitted)).

**\*3** Here, under the most liberal construction of the complaint, plaintiff merely alleges that Orlowski and Sanchex were supervisors. This allegation is inadequate to establish personal involvement. *See Pritchett v. Artuz,* No. 99 Civ. 3957(SAS), 2000 WL 4157, \*6-7 (S.D.N.Y. Jan. 3, 2000) (finding that plaintiff had failed to establish personal involvement where "plaintiff has simply alleged that [defendant] should be held liable because he is in charge"). Plaintiff's complaint is entirely devoid of allegations that defendants Orlowski and Sanchex (i) were directly involved in the alleged violation of plaintiff's

civil rights; or (ii) were supervisors who had actual or constructive notice of unconstitutional practices and had demonstrated gross negligence or deliberate indifference in failing to act. Accordingly, plaintiff's claims against Orlowski and Sanchex must be dismissed. *See Ella,* 1996 WL 673819, [*] 2 (dismissing section 1983 claim for failure to state a claim where complaint was "entirely devoid of allegations of any personal involvement" by individual defendants and "there [wa]s no evidence of actual or constructive notice of unconstitutional practices demonstrating gross negligence or deliberate indifference in the failure to act"); *see also Simmons v. Artuz,* No. 98 Civ. 777(SAS), 1999 WL 287366, [*] 5 (S.D.N.Y. May 6, 1999) (dismissing section 1983 claim for failure to allege each defendant's personal involvement in the alleged constitutional deprivation).

C. *Plaintiff has failed to allege facts upon which a court could find that plaintiff's Eighth Amendment rights have been violated*

Even were the complaint amended to name the City of New York as a defendant and to allege personal involvement by Orlowski and Sanchex, plaintiff's section 1983 claim would be dismissed for failure to allege facts showing a constitutional violation. Neither *Monell v. Department of Soc. Serv.,* 436 U.S. 658, 690-91 (1978), nor its progeny "authorize the award of damages against a municipal corporation based on the actions of one of its officers when in fact ... the officer inflicted no constitutional harm." *City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986); *see Pitchell v. Callan,* 13 F.3d 545, 549 (2d Cir.1994). In order to assert a claim pursuant to section 1983, a plaintiff must allege that a constitutional violation has occurred. *See Paul v. Davis,* 424 U.S. 693 (1976); *Batista v. Rodriquez,* 702 F.2d 393, 397 (2d Cir.1983). Here the constitutional violation alleged is that defendants violated the Eighth Amendment both by providing inadequate medical care and by deliberately disregarding plaintiff's safety.

1. *Inadequate Medical Care*

In order to state an Eighth Amendment claim arising out of inadequate medical treatment, a prisoner must set forth facts showing "deliberate indifference to [his] serious medical needs." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Estelle v. Gamble,* 429 U.S. 97, 104 (1976)) (brackets in original). This standard

includes an objective and a subjective component. The objective component, a "serious medical need", involves "a condition of urgency, one that may produce death, degeneration, or extreme pain". *See Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). The subjective component, the defendant's "deliberate indifference", requires that the defendant "knows [of] and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837 (1994) (cited by *Henderson v. Doe,* No. 98 Civ. 5011(WHP), 1999 WL 378333, [*] 4 (Jun. 10, 1999)). "Negligence, even if it constitutes medical malpractice, does not without more, engender a constitutional claim" *Chance,* 143 F.3d at 703; *see also Estelle,* 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.").

**\*4** Here, however liberally this Court construes plaintiff's allegations, the complaint falls short of meeting these pleading requirements. First, plaintiff has not alleged facts that show that there was a sufficiently serious medical need. Plaintiff's asserts that, as a result of allegedly inadequate treatment of his swollen hand, one of his fingers "does not close" and he "still suffers discomfort." These assertions do not set forth facts upon which the Court could conclude plaintiff suffered or suffers from a condition that may produce death, degeneration, or extreme pain. *Cf. Henderson,* 1999 WL 378333, [*] 4 (finding that broken right pinky finger was not a medical condition that might "produce death, degeneration, or extreme suffering"); *Rivera v. Johnson,* 1996 WL 549336, [*] 2 (W.D.N.Y. Sept. 20, 1996) ("A broken finger without more, simply does not present a condition of urgency of the type that may produce death, degeneration or extreme pain which correspondingly merits constitutional protection."). [3]

Second, even were the Court to conclude that plaintiff had alleged a serious medical need existed, plaintiff has failed to plead facts that establish "deliberate indifference." Plaintiff entirely fails to set forth facts showing that defendants had been "aware of the facts from which the inference could be drawn [that serious harm existed]", had, in fact, "drawn the inference," and

had, nevertheless, disregarded such harm. *Chance, 143 F.3d at 703.* Consequently, plaintiff has failed to allege facts upon which the Court could find that a constitutional violation arising out of inadequate medical care has occurred.

#### 2. *Deliberate disregard for safety of plaintiff*

In order to state a claim for violation of the Eighth Amendment arising out of disregard for prisoner safety, a plaintiff must allege facts showing that the defendants acted toward him with "deliberate indifference." *Rangolan v. County of Nassau,* No. 99 Civ. 9343, 2000 WL 827312, *2 (2d Cir. Jun. 26, 2000)* (quoting *Wilson v. Seiter, 501 U.S. 294, 297 (1991)*). Under that standard, plaintiff must show, *inter alia,* that defendants must have known of and disregarded an excessive risk to plaintiff's health and safety. *See Branham v. Meachum, 77 F.3d 626, 631 (2d Cir.1996); Pritchett v. Artuz,* No. 99 Civ. 3957(SAS), 2000 WL 4157, *2 (S.D.N.Y. Jan. 3, 2000)* ("Similarly, with respect to a prisoner's safety, a prison official may be held liable if the official: (1) knows that the inmate faces a substantial risk of serious harm; and (2) disregards that risk by failing to take reasonable measures to abate it.").

Here, plaintiff fails to allege any facts demonstrating that defendants knew of and disregarded an excessive risk to plaintiff's safety. The sole reference to disregard for plaintiff's safety in the complaint is the terse allegation that the DOC motor vehicle conveying plaintiff was involved in an accident. This brief assertion that a motor vehicle accident occurred does not set forth facts showing deliberate indifference. *Cf. Stewart v. McMickens, 677 F.Supp. 226 (S.D.N.Y.1988)* (finding that plaintiff had *failed* to state a claim pursuant to *section 1983* alleging deliberate disregard for safety in violation of the Eighth Amendment where plaintiff had not only alleged that the DOC bus conveying him had been involved in a motor vehicle accident, but also had alleged that his back had been injured as a result of "excessive speeding, no screws in the seat cushions, and a general lack of concern by the correction officers operating the vehicle").

**\*5** In fact, in the only reference to the claim of deliberate disregard for plaintiff's safety that appears in plaintiff's motion papers, plaintiff himself asserts that the operation of the vehicle was merely negligent. (Pl's. Mem. Law at 6.) Negligence is not actionable under *section 1983. See Rucco*

*v. Howard,* No. 91 Civ. 6762(RPP), 1993 WL 299296, *3 (S.D.N.Y. Aug. 4, 1993)* (citing *Williams v. Vincent, 508 F.2d 541, 546 (2d Cir.1974)*) ("Mere negligence on the part of the prison guard will not give rise to a claim under *section 1983.*"). Consequently, plaintiff has failed to allege facts upon which a court could find that a constitutional violation arising out of deliberate disregard for plaintiff's safety has occurred.

Having failed to allege facts showing that a constitutional violation has occurred, plaintiff has failed to state a claim pursuant to *section 1983.* Accordingly, even had plaintiff named the City of New York as a defendant and alleged facts showing Orlowski's and Sanchex's personal involvement, plaintiff's *section 1983* claim would be dismissed.

### III. CLAIM FOR NEGLIGENCE UNDER NEW YORK COMMON LAW

Given the liberal reading of the pleadings required on a motion to dismiss, particularly where a plaintiff is proceeding *pro se,* the Court construes the complaint to assert a claim for negligence, arising out of the alleged inadequacy of medical treatment defendant received or the alleged motor vehicle accident. However, insofar as the complaint may be construed to assert a pendent claim under New York law for negligence, such claim must be dismissed. Pursuant to *28 U.S.C. § 1367(c)(3),* a district court may decline to exercise supplemental jurisdiction over a state claim where "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. C. *§ 1367(c)(3).* The Court, having dismissed plaintiff's federal claim, declines to exercise supplemental jurisdiction over plaintiff's state claim. *See Polar International Brokerage Corp. v. Reeve,* No. 98 Civ. 6915(SAS), 2000 WL 827667, *18 (S.D.N.Y. Jun. 27, 2000)* (declining to exercise supplemental jurisdiction over state claims where no federal claims remained) (citing *Martinez v. Simonetti, 202 F.3d 625, 636 (2d Cir.2000)*).

### CONCLUSION

For the foregoing reasons, defendants' motion to dismiss the complaint pursuant to *Fed.R.Civ.P. 12(b)(6)* is GRANTED. The Clerk of the Court is directed to close the file in this action.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2000 WL 1171150

Footnotes

1    On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the Court is required to accept as true the allegations stated by the non-moving party. *SeeGant v. Wallingford Board of Educ.,* 69 F.3d 669, 673 (2d Cir.1995). Further, in deciding the motion under 12(b)(6), the court may consider "facts stated on the face of the complaint and in documents appended to the complaint or incorporated in the complaint by reference, as well as [ ] matters of which judicial notice may be taken." *Automated Salvage Transport, Inc. v. Wheelabrator Environmental Systems, Inc.,* 155 F.3d 59, 67 (2d Cir.1998) (citation omitted). Accordingly, the facts discussed herein are accepted as true for the purposes of this motion and are drawn from the allegations of the complaint or are otherwise reflected in the record.

2    Defendants filed the instant motion to dismiss on January 5, 2000. By letter dated January 6, 2000, defendants apprised the Court that although they had filed their own papers, plaintiff's opposition papers had been rejected by the Clerk of the Court for failure to set forth the correct docket number. Plaintiff, who is incarcerated, was ultimately successful in filing his opposition papers to the instant motion on May 17, 2000.

3    Plaintiff further alleges that he "suffered a back and head injury" as a consequence of a motor vehicle accident. Given the liberal reading of the pleadings required on a motion to dismiss, the Court liberally construes this to be an additional allegation intending to establish the inadequacy of the medical care plaintiff has received. However, the terse allegation that plaintiff was injured, bereft of any facts that would indicate incipient death, degeneration, or extreme pain, likewise fails to support the existence of a "serious medical need".

**End of Document**      © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 946703
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Corey FORD, Plaintiff,

v.

William E. PHILLIPS, Superintendent of Green
Haven Correctional Facility; Guiney, Deputy
Superintendent; Matthew Miller, Corrections
Officer; Franklin W. Middleton, Corrections Officer;
S. Phillip, Corrections Officer; D. McClenning,
Corrections Officer, J. Erns, Corrections Officer; D.
Huttel, Corrections Officer; C. Austin, Corrections
Officer; L. Czyzewski, Corrections Officer; R.
Myers, Sergeant; D. Carey, Sergeant; John Doe #
1, Corrections Officer; John Doe # 2, Corrections
Officer; Joseph T. Smith, Superintendent of
Shawangunk Correctional Facility; John Maly,
Deputy Superintendent; Bipin Bhavsar, Medical
Doctor; Kimbler, Sergeant; Jewett, Sergeant;
Alfred Vacca, Inspector General, individually

and in their official capacities, Defendants. [1]

No. 05 Civ. 6646(NRB).
|
March 27, 2007.

**Attorneys and Law Firms**

Corey Ford, Walkill, NY, Plaintiff, pro se.

Efthimios Parasidis, Assistant Attorney General, Office of
the Attorney General, State of New York, New York, NY,
for Defendants.

MEMORANDUM AND ORDER

BUCHWALD, J.

 **\*1** *Pro se* plaintiff Corey Ford ("Ford"), who is currently
incarcerated, brings this action against employees of
the Department of Correctional Services ("DOCS"),
pursuant to 42 U.S.C. § 1983, alleging: (1) excessive
force; (2) denial of recreation, showers, special meals and
property; (3) deliberate indifference to a serious medical
need; and (4) mail interference, all in violation of his

constitutional rights. Ford moved for summary judgment
on July 24, 2006 and defendants cross-moved for summary
judgment on December 22, 2006. [2] For the reasons stated
below, we deny Ford's motion for summary judgment and
grant defendants' motion for summary judgment in part.

*BACKGROUND* [3]

A. Ford's Attack on Officer Miller
Plaintiff's Complaint arises from events at the Green
Haven and Shawangunk correctional facilities in April
and May of 2004. [4] In the early afternoon of April 14,
2004, at approximately 12:30 p.m., Ford exited his cell
without permission when a corrections officer unlocked
the door for Ford's cellmate. [5] After leaving his cell, Ford
headed directly for Officer Miller, who was writing passes
for inmates. [6] As Ford later admitted, [7] Ford then threw
hot oil on Officer Miller, burning his face, head, eye, neck,
shoulders and chest, and repeatedly stabbed Officer Miller
with a homemade shank measuring approximately nine
inches in length. As he was attacked by Ford, Officer
Miller repeatedly screamed, "Get him off me!" [8]

Officers Phillips, Middleton and Todriff responded to
Officer Miller's call, attempting to restrain Ford. [9] After
slipping in the oil and falling with Ford to the ground,
the officers pried the shank out of Ford's hand, placed
him in mechanical restraints, stood him up, and faced
him against a wall. [10] Once the officers had Ford under
control, an ambulance rushed Officer Miller to St.
Francis Hospital in Poughkeepsie, New York, where he
remained over night. [11] Officers Todriff and Middleton
were also treated at the St. Francis emergency room for
injuries sustained while restraining Ford. [12] Ford was
later convicted by a jury for his assault on Officer Miller
and is currently awaiting sentencing. [13]

In his Complaint, Ford provides a somewhat different
version of the events of April 14, 2004. Specifically,
Ford asserts that Officer Miller denied him recreation,
an alternative meal, and showers on April 5, 12, 13 and
14 of 2004 [14] and that, on the morning of April 14,
2004, prior to his attack on Officer Miller, Officers Miller,
Erns, and McClenning kicked and punched Ford in the
face, head, chest and back without provocation. [15] Ford

further asserts that later, at 12:30 p.m., approximately the time of Ford's assault on Officer Miller, Officers Miller, Erns, Middleton and Phillips used excessive force against him.[16]

Thus, Ford does not directly challenge the facts provided above, but adds that Officer Miller deprived him of certain entitlements over four days, that Officers Miller, Erns and McClenning used excessive force against him on the morning of April 14, 2004, and that Officers Miller, Erns, Middleton and Phillips used excessive force against him again when he attacked Officer Miller.

**B. Ford's Escort to Special Housing**
 **\*2** After Ford attacked Officer Miller, Officers Huttel, Czyzewski, Myers and Austin escorted Ford to Special Housing (also known as "SHU"). During the escort, defendants contend that plaintiff was combative and uncooperative, kicking Officer Huttel and attempting to kick the other officers.[17] As is evident from a videotape showing parts of Ford's transfer to Special Housing, Ford fell twice during his escort and was picked up by the officers each time.[18] Ford claims that he was again the victim of excessive force during this transfer, calling the officers' conduct "unwarrantly malicious sadistic and unprovoked" and alleging that his head was repeatedly rammed into a wall and steel bars, and that he was punched and kicked in the face and back.[19]

**C. Ford's Post-Incident Medical Treatment**
Upon his arrival at Special Housing, Ford was examined by medical staff, which found him to have a minor bruise on his forehead; reddened abrasions with a slight amount of bleeding on his left temple; reddened abrasions on his right upper chest, abdomen, and right underarm; and superficial scratches on his right upper back.[20] The staff found no other injuries and the medical records indicate that Ford did not suggest that he had any other injuries at that time.[21]

During the next few weeks, Ford received additional medical attention. On the morning of April 16, for instance, Ford was examined by a triage nurse and complained the he was urinating and spitting up blood.[22] The nurse scheduled an appointment for Ford to meet with a doctor and he was examined by Dr. Bipin Bhavsar

that afternoon.[23] After examining Ford, Dr. Bhavsar ordered a urine analysis[24] and prescribed Tylenol.[25] Dr. Bhavsar also treated Ford on April 21, 2004, as Ford again complained of blood in his urine, and ordered a second urine analysis.[26] Both urine analyses found evidence of blood.[27]

On April 29, 2004, medical staff examined Ford because Ford complained of pain in his wrists.[28] The staff determined that Ford had "no obvious loss of dexterity."[29] The next day, on April 30, 2004, Dr. Bhavsar reexamined Ford, observing that Ford's ribs and abdomen had no tenderness, that his glands were not enlarged, that his abrasions were healed, and that his wrist was not swollen or restricted in movement.[30] As Ford still complained of blood in his urine, Dr. Bhavsar ordered a third urine analysis and ordered that x-rays be taken of Ford's hands as a precaution.[31] The x-rays were taken on May 3, 2004 and revealed no "fracture, dislocation or arthritic change."[32]

Finally, since Ford continued to complain of pain and other problems, and since the urine tests persisted in revealing blood at level "3+", Dr. Bhavsar ordered that Ford undergo a CAT-scan of his abdomen and kidneys on May 7, 2004.[33] The CAT-scan results were negative.[34] In addition to this and the other treatments he received, Ford had daily opportunities for medical assistance from the Special Housing nurse who, in accordance with DOCS policy, made regular rounds of the entire Special Housing unit.[35]

 **\*3** Notwithstanding the medical attention he received, Ford contends that he was denied necessary medical treatment during April and May of 2004.[36] Specifically, he asserts that he "was denied medical treatment on arrival to [Special Housing]" and, despite numerous complaints made to Sgt. Jewett, Sgt. Kimbler and others that he was in excruciating pain, "never received medical attention".[37] Ford claims that, to this day, he suffers from a weak bladder and leaks blood from his penis on occasion.[38]

**D. Post-Incident Restrictions on Ford**
Ford was placed under certain restrictions upon his admission to Special Housing. According to defendants,

Ford was under a restraint order as a result of his assault on the staff at Green Haven and, accordingly, was not permitted out-of-cell activities. [39] As well, Ford was initially denied certain property because of the danger he posed to himself and to others. [40] The order restraining Ford remained in effect until May 3, 2004, and the order regarding Special Housing property remained in effect until April 25, 2004. [41] Ford was permitted to leave his cell on April 20, 2004 to retrieve his personal property and, according to defendants' affidavits, was permitted out of his cell to shower on a regular basis starting on April 23, 2004. [42]

Ford offers a slightly different, if only more specific, version of these restrictions. Ford repeatedly claims that, in violation of his rights, his cell was covered with plexi-glass and he was denied bed sheets, a pillow case, a towel, a wash cloth, soap, toothpaste, a toothbrush, pens and writing paper. [43] He also claims that he was not permitted to shower or to have outside recreation for fourteen days. [44] Ford states that he complained of these deprivations to Sgts. Kimbler and Jewett on April 15, 2004, the day after his attack on Officer Miller and before some of the deprivations allegedly occurred, but that the Sargeants ignored his complaints. [45]

E. Ford's Mail Watch

Following his attack on Officer Miller, Shawangunk officials also implemented a mail watch for Ford pursuant to DOCS policy. [46] During the mail watch, DOCS employees discovered a letter from Ford in which he boasts about his attack on Officer Miller: "I had to let one of those crazy ass pink boys have a balance kit of steel & an hot oil treatment." [47] The mail watch also revealed a letter in which Ford apparently tried to convince his girlfriend and others to improperly influence a witness in his trial for that attack: "I'm trying to establish a way to try & beat this case, some way so (sic) how we have to make Mr. Hill do what we want him to do not what he wants to do." [48]

In his Complaint, Ford contends that Superintendent Joseph T. Smith authorized a mail watch on his personal and legal mail, which prevented Ford's girlfriend from receiving Ford's mail and prevented Ford from receiving mail from his girlfriend. [49] Ford further claims that DOCS employees and others conspired to deprive him

of his privacy and to hamper his access to the courts by confiscating his incoming and outgoing legal mail, stating that incoming legal documents were taken and never returned to him. [50]

## DISCUSSION

A. Legal Standard

**\*4** Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 55(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317 (1986); *Gallo v. Prudential Residential Srvcs., Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994). The moving party bears the initial burden of "informing the district court of the basis for its motion" and of identifying the matter that "it believes demonstrates the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323. In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

When, as here, both parties seek summary judgment, the Court must consider each party's motion on its own merits, "taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Schwabenbauer v. Board of Educ.,* 667 F.2d 305, 314 (2d Cir.1981); *accord Abrams v. United States,* 797 F.2d 100, 103 (2d Cir.1986). However, the submissions of a *pro se* plaintiff are held to a less stringent standard than those drafted by an attorney and must be liberally construed for the benefit of the plaintiff. *Estelle v. Gamble,* 429 U.S. 97 (1976); *Patrick v. LeFevre,* 745 F.2d 153, 160 (2d Cir.1984).

B. Analysis

1. Eleventh Amendment

As a preliminary matter, defendants note that they are sued for damages in their official as well as individual capacities and argue that Ford may only sue defendants

for damages in their individual capacities. Defendants are correct. *See Al-Jundi v. Estate of Rockefeller, 885 F.2d 1060, 1065 (2d Cir.1989)* ("[S]ection 1983 claim for damages against a state official can only be asserted against that official in his or her individual capacity"); *accord Davis v. New York, 316 F.3d 93 (2d Cir.2002); see also Kentucky v. Graham, 473 U.S. 159 (1985)* (a claim for damages against state officials in their official capacity is considered to be a claim against the state and is therefore barred by the Eleventh Amendment); *Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89 (1984)* (agencies and departments of the state are entitled to assert the state's Eleventh Amendment immunity); *Santiago v. New York State Dep't of Corr. Servs., 945 F.2d 25, 28 n. 1 (2d Cir.1991)* (department that is an agency of the state is entitled to assert Eleventh Amendment immunity); *cf. Hafer v. Melo, 502 U.S. 21, 27-31 (1991)* (Eleventh Amendment does not bar actions for damages against state officials sued in their personal or individual capacities). Accordingly, Ford's claims for damages against defendants in their official capacities are dismissed.

## 2. Excessive Force

**\*5** Regarding his claims for excessive force, Ford describes three instances of abuse in his Complaint, which he alleges he occurred: (1) on the morning of April 14, 2004; (2) after his assault on Officer Miller; and (3) during his transfer to Special Housing. Defendants argue that Ford was not the victim of excessive force and that any force used against him was appropriate given his attack on Officer Miller and his combative behavior following that attack.

To prevail on a claim for excessive force constituting cruel and unusual punishment under the Eighth Amendment, a plaintiff must show the unnecessary and wanton infliction of pain. *Hudson v. McMillian et al., 503 U.S. 1 (1992)* (citing *Whitley v. Albers, 475 U.S. 312 (1986)*). Whether an infliction of pain is unnecessary and wanton depends on the context in which force is used. *Whitley, 475 U.S. at 320.* Where prison officials use force to quell a prison disturbance, the question is whether force was applied in a good faith effort to maintain or restore discipline or, instead, if it was applied maliciously and sadistically for the purpose of causing harm. *Id. at 320-21; Hudson, 503 U.S. at 7* (prison officials must act quickly when responding to a prison disturbance, balancing the need to "maintain and restore discipline" against "the risk of

injury to inmates."). When an individual attacks with a deadly weapon, for instance, corrections officers may respond with commensurate force. *Diggs v. New York Police Dep't et al., 2005 U.S. Dist. LEXIS 38244, \*1 (E.D.N.Y.2005)* (citing *Tennessee v. Garner, 471 U.S. 1, 11-12 (1985)* and *Estate of Kenneth Jackson v. Rochester, 705 F.Supp. 779, 783 (W.D.N.Y.1989)*).

### a. The Morning of April 14, 2004

Ford alleges that Officers Miller, Erns and McClenning, without provocation, kicked and punched him in the face, head, chest and back, while using racial epithets, on the morning of April 14, 2004. Defendants respond that Ford was abusive and disruptive on the morning of April 14, 2004 and that corrections officers "verbally counseled" Ford without using any force. [51]

Having reviewed the parties' submissions and the evidence presented to the Court, we hold that no reasonable jury could find in favor of Ford on this claim. First, Ford's evidence is very weak and primarily suggests only a *de minimus* use of force. Ford offers no direct medical evidence supporting his claim [52] and his documentary evidence is limited to affidavits from other inmates, which contradict one another and are otherwise problematic. [53] The only affidavit submitted by Ford that offers any specific allegations of potentially excessive force is signed by inmate Eric Tolliver. That affidavit states, somewhat ambiguously, that Tolliver saw Officers Miller and McClenning attack Ford with "solid fist and kicks" after 9:40 a.m. on April 14, 2004. [54] However, in addition to being ambiguous in its description of the morning's events, Tolliver's affidavit suffers from the following problems: (1) it contradicts statements in the other affidavits submitted by Ford, including inmate Shaun Harris' sworn recollection of what Ford told Harris about that morning; (2) it makes no mention of Officer Erns, in contrast to the version of the events offered in Ford's Complaint; and (3) it was signed and dated by Tolliver on September 12, 2006, more than two years after the incident allegedly took place.

**\*6** Second, defendants offer evidence that Ford faced no excessive force on the morning of April 14, 2004, having submitted a number of sworn affidavits to this effect, [55] and Ford's own statements, made shortly after the alleged abuse, confirm this position. In a statement

signed on April 14, 2004, and in another statement signed on April 15, 2004 ("Ford's Post-Incident Statements"), Ford does not accuse Officers Miller, McClenning and Erns of punching and kicking him during the morning of April 14, 2004. On the contrary, Ford makes no mention of any force used by Officers McClenning and Erns and only alleges that Officer Miller used a *de minimus* amount of force against him: "At this point, Miller slapped me on each side of my face ..." [56] *Candelaria v. Coughlin,* 787 F .Supp. 368, 374 (S.D.N.Y.1992) (use of force *de minimus* when officer "pushed his fist against [plaintiff's] neck so that [he] couldn't move and was losing [his] breath"), *aff'd* 979 F.2d 845 (2d Cir.1992).

Third, given the different versions of the April 14 events offered by Ford and the inconsistencies between the affidavits submitted by Ford to support his Complaint, no reasonable jury could credit Ford's latest allegations. *See e.g. Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.,* 925 F.2d 566, 572 (2d Cir.1991) (plaintiff may not "create a material issue of fact by submitting ... affidavit[s] disputing his own prior sworn testimony" in order to defeat defendants' summary judgment motion) (quoting *Mack v. United States,* 814 F.2d 120, 124 (1987)); *Jeffreys v. City of New York,* 426 F.3d 549, 553 (affirming district court's grant of summary judgment for defendants in section 1983 case brought by *pro se* prisoner-where plaintiff relied almost exclusively on his own testimony, district court could make assessments about whether a reasonable jury could credit plaintiff's testimony); *Shabazz v. Pico,* 994 F.Supp. 460, 470 (S .D.N.Y.1998) (Sotomayor, J.) (granting summary judgment for defendants where "plaintiffs allegations of the events at issue [were] replete with inconsistent and contradictory statements" and "plaintiff's version of the events ... [had] undergone at least one significant revision"). Ford has offered no fewer than four versions of what happened on the morning of April 14, 2004 through his submissions to the Court, at least three of which allege only a *de minimus* use of force and many of which, as discussed, are inconsistent with one another. [57] Moreover, Ford's signed and personal version of the events, without any explanation from Ford, has undergone at least one significant and self-serving revision, changing from a story about a *de minimus* use of force to one about a brutal, unprovoked beating.

In sum, given the sheer lack of evidence to support Ford's new version of the April 14 morning events,

the substantial evidence against that version, and the fact that Ford's initial, signed statements contradict the allegations in his Complaint and confirm defendants' position, no reasonable jury could find in favor of Ford on this claim. Accordingly, we deny Ford's motion for summary judgment and grant summary judgment in favor of defendants.

b. Attack on Officer Miller

*7 Regarding the afternoon of April 14, 2004, Ford alleges that Officers Miller, Erns, Middleton and Phillips kicked and punched him, and that Sgt. Carey watched this happen without taking action. Having reviewed the parties' submissions, we hold that, even accepting Ford's allegations as true, no reasonable jury could find that defendants responded with excessive force when attempting to save Officer Miller.

The genesis of Ford's claim is his own brutal attack on Officer Miller. As Ford admits, he rushed Officer Miller, threw hot oil on his face and then stabbed him repeatedly with a nine inch shank. Given this use of potentially lethal force, and given that defendants had to react quickly to save Officer Miller, defendants were legally authorized to respond to Ford with significant force of their own, perhaps including deadly force. *See e.g. Tennessee,* 471 U.S. at 11-12; *see also Diggs v. New York Police Dep't et al.,* 2005 U.S. Dist. LEXIS 38244, *1 (E.D.N.Y.2005). Most significantly, Ford does not allege that defendants used force even commensurate with the force that he used against Officer Miller. Instead, he only alleges that the officers punched and kicked him as they got him under control. [58] No reasonable jury could deem this force to have been wanton, unnecessary or otherwise excessive under the circumstances. Accordingly, we deny judgment for Ford and grant it for defendants. [59]

c. Transfer to Special Housing

Regarding his transfer to Special Housing, immediately following his attack on Officer Miller, Ford alleges that he was kicked and punched by the officers escorting him, that Sgt. Myers punched him in the right side of his face, that the officers tried to break his wrist while he was on the elevator to Special Housing, that the officers repeatedly rammed his head into the steel bars at the entrance to Special Housing, and that the officers rammed his head into the wall of the strip/frisk room. [60] Defendants

respond that they did not use excessive force against Ford and that Ford was uncooperative and violent throughout the transfer to Special Housing.

We deny Ford's motion for summary judgment on this claim. Ford offers no meaningful evidence, other than his own version of the events, to support the putative attacks during his transfer to Special Housing, and the medical evidence submitted by defendants tends to contradict Ford's claims. For instance, Ford asserts that his face and head were repeatedly rammed into steel bars, that the officers tried to break his wrist, and that Ford was otherwise beaten severely throughout the transfer-beatings that ostensibly followed Ford's alleged beating that morning at the hands of Officers Miller, Erns and McClenning as well as Ford's alleged beating during his attack on Officer Miller. Yet, the medical record of Ford's injuries upon his entrance to Special Housing reveals only the minor abrasions and scratches discussed *supra,* and the subsequent CAT-scan and x-rays revealed no injuries to Ford's abdomen or wrist. Moreover, Ford's transfer to Special Housing came immediately after, and because of, his assault on Officer Miller, making it objectively reasonable for the officers to use some amount of force to keep him under control.

**\*8** Despite the apparent weakness of Ford's evidence regarding this claim, we also deny defendants' motion for summary judgment. Defendants offer the medical evidence, which tends to contradict Ford's story, their sworn affidavits that Ford was not beaten during the transfer, their claims that Ford was combative throughout the transfer, and a video tape of the transfer that shows no violence being committed against Ford (but also does not show Ford being noticeably combative). Nevertheless, this evidence is not sufficient to preclude a reasonable jury from finding in Ford's favor. First, Ford offers his own sworn statement of the events in his Complaint, which describes a malicious, unprovoked beating accomplished while using racial epithets and, unlike his version of the morning attack, this version is consistent with Ford's Post-Incident Statements.[61]

Second, although the Court might find the low level of injuries in Ford's medical reports to strongly contradict Ford's claims, we cannot rely on that evidence alone to enter summary judgment against him. *See e.g. Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999) (genuine issues of material fact existed concerning what

transpired after appellant was handcuffed and whether the guards maliciously used force against him; district court mistakenly concluded that because appellant's injuries were not severe, appellant's claim failed as a matter of law); *Estelle,* 429 U.S. at 102-105 ("inmates have the right to be free from the 'unnecessary and wanton infliction of pain' at the hands of prison officials").[62]

Finally, although the video tape shows Ford being escorted to and from the elevator to Special Housing and shows him entering the strip/frisk room and being stripped and frisked without apparent incident, the video has periodic breaks and interruptions. Whereas a complete video might dispel all issues of fact regarding Ford's transfer, an incomplete video cannot.[63] Accordingly, summary judgment is denied for defendants as well as for Ford on this claim.[64]

### d. Due Process

Liberally construed, Ford's Complaint also alleges that the aforementioned uses of excessive force violated his due process rights under the Fourteenth Amendment. For prisoners, however, the Eighth Amendment "serves as the primary source of substantive protection ... in cases ... where the deliberate use of force is challenged as excessive and unjustified." *Whitley v. Albers,* 475 U.S. 312, 327 (1986). "Any protection that 'substantive due process' affords convicted prisoners against excessive force is, [the Supreme Court] has held, at best redundant of that provided by the Eighth Amendment." *Graham v. Connor,* 490 U.S. 386, 395 (1989). Accordingly, Ford is only entitled to pursue his claims for excessive force under the Eighth Amendment. *Cf. Rodriguez v. Phillips,* 66 F.3d 470, 477 (2d Cir.1995) (in the non-prisoner, non-seizure context, the due process right to be free from excessive force is alive and well). Thus, we grant summary judgment for defendants on this claim.

### 3. Deprivations

**\*9** Ford also alleges that he suffered a number of deprivations upon being transferred to Special Housing and that these deprivations amounted to cruel and unusual punishment under the Eighth Amendment and to a violation of his due process rights under the Fourteenth Amendment. Defendants argue that Ford has failed to offer sufficient support for these claims.

a. Cruel and Unusual Punishment

"The constitutional prohibition against cruel and unusual punishments is intended to protect inmates from serious deprivations of basic human needs such as adequate food, clothing, shelter and medical care." *Malsh v. Garcia,* 971 F.Supp. 131, 138 (S.D.N.Y.1997). An Eighth Amendment claim challenging prison deprivations requires proof of subjective and objective components. Subjectively, the prison officials must have acted with deliberate indifference toward an inmate's health or safety and, objectively, the inmate's deprivation must have been sufficiently serious to have denied that inmate "the minimal civilized measure of life's necessities." *Branham v. Meachum,* 77 F.3d 626 (2d Cir.1996) (citing *Wilson v. Seiter,* 501 U.S. 294, 297-98 (1997) and *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied* 513 U.S. 1154 (1995)). The "minimal civilized measures of life's necessities" is not a low standard. Indeed, "conditions that are restrictive and even harsh are part of the penalty that criminal offenders pay for their offenses against society." *Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir.1985) (internal quotations omitted).

To support his Eighth Amendment claim, Ford alleges a number of deprivations. He complains that, on April 5, 12, 13, and 14, he was denied special meals, outside exercise and showers by Officer Miller and that, upon his arrival at Special Housing and until April 28, he was forced to have a plexi-glass shield on his cell, was denied recreation, was denied showers, did not trust the food given to him on one or two occasions, and was denied various personal items.

Defendants respond that Special Housing prisoners are limited in the number of belongings they may possess, that they are further limited in their recreation and shower privileges, and that these limitations may be extended if members of DOCS staff determine that the inmate poses a threat to himself or to others. [65] Defendants further state that Ford's vicious attack on Officer Miller precipitated his placement in Special Housing, that DOCS staff placed the restrictions on Ford expressly in response to that attack, and in response to the danger that Ford posed to himself and to others, and that the restrictions, which were temporary in nature and made in accordance with DOCS policy, did not amount to a constitutional violation.

We agree with defendants that Ford's deprivation claims do not begin to demonstrate deliberate indifference toward Ford's need for the minimal necessities of life. Ford does not allege or explain why the temporary placement of a plexi-glass shield threatens his minimum needs and, as a matter of law, minor and temporary deprivations of property, showers and recreation do not violate the Eighth Amendment. *See e.g. Chapple v. Coughlin,* 1996 U.S. Dist. LEXIS 12960, *1 (S.D.N.Y 1996) (temporary deprivations of shower, recreation and legal papers "in no way involved the severity of treatment which must be shown to make out a case of cruel and unusual punishment") (citing *Majid v. Scully,* No. 83 Civ. 7409, 1985 WL 1408 *6 (S.D.N.Y. May 21, 1985) (unpublished)); *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (prisoners must receive nutritiously adequate food that does not endanger their health and safety); *Cruz v. Jackson,* 1997 U.S. Dist. LEXIS 1093 (S.D.N.Y. Feb. 5, 1997) (two weeks without showers, cold food for four weeks and unspecified incidents of receiving rusty drinking water did not violate Eighth Amendment rights) (citing *Williams v. Greifinger,* 918 F.Supp. 91, 95 n. 3 (S.D.N.Y.1996)).

**\*10** Moreover, defendants have provided evidence that the deprivations were not a result of malice or of deliberate indifference to Ford's health or safety but, instead, served legitimate security and safety needs following Ford's attack on Officer Miller and were imposed during a period of time when Ford received food and medical care. [66] Accordingly, Ford's motion for summary judgment on his Eighth Amendment claim is denied and summary judgment is granted for defendants.

b. Due Process

Ford also suggests that his confinement to Special Housing, given the deprivations discussed above, violated his right to due process under the Fourteenth Amendment. We construe Ford's Complaint as asserting his liberty interest to be free from confinement involving atypical and significant hardships without due process of law.

A prisoner's confinement to Special Housing in a New York prison may implicate that prisoner's legally recognized interest in being free from restraints imposing atypical and significant hardships relative to the ordinary incidents of prison life. *Sandin v. Connor,* 515 U.S. 472 (1995) (thirty days in Special Housing does not, by itself, violate prisoner's due process rights); *Frazier v.*

*Coughlin,* 81 F.3d 313, 317 (2d Cir.1996) (prisoner failed to demonstrate a significant deprivation of a liberty interest where he spent approximately twelve days in Special Housing and was denied "certain privileges that prisoners in the general population enjoy"); *Lee v. Coughlin,* 26 F.Supp.2d 615 (S.D.N.Y.1996) (Sotomayor, J.) (376 days in Special Housing implicated liberty interest recognized by the State of New York). However, to prevail under section 1983, a plaintiff must allege not only that his confinement to Special Housing implicated a recognized liberty interest, but also that the liberty interest was infringed without due process of law. *See e.g. Cespedes v. Coughlin,* 956 F .Supp. 454, 469 (S.D.N.Y.1997).

Regarding Ford's claim that he was denied recreation, showers, and a special meal on four occasions before and on April 14, 2004, we deny summary judgment for Ford and grant it in favor of defendants. These minor and temporary denials clearly do not constitute significant hardships implicating a constitutionally protected liberty interest. *See e.g. Frazier,* 81 F.3d at 317. We also deny summary judgment for Ford and grant it for defendants on Ford's claim arising from his confinement in Special Housing.

There are three significant problems with Ford's due process claim based on his confinement in Special Housing. First, it is far from clear that the alleged confinement, even if accurately depicted by Ford, implicates a protected liberty interest given the temporary nature of the deprivations. *See e.g. Frazier,* 81 F.3d at 317. Second, Ford has failed to allege that he was denied due process of law in connection with this ostensible liberty interest. Ford does not allege that he was denied a hearing or that his hearing officer was not objective, and he does not allege that defendants did not explain to him why he faced the deprivations he did. *Cf. Sandin,* 515 U.S. at 487-88 (summary judgment granted for defendants where plaintiff claimed violation of due process because defendants "refus[ed] to allow him to present witnesses at his hearing, and [sentenced] him to disciplinary segregation for thirty days.").

**\*11** Third, although Ford does allege that defendants deprived him of privileges and Special Housing property in violation of DOCS directive 4933, this allegation fails to state a violation of due process. For one, the text of Directive 4933 shows that Ford was not necessarily entitled to the claimed property and privileges under the

circumstances of his confinement: "An order depriving an inmate of a specific item, privilege or service may be issued when it is determined that a threat to the safety or security of staff, inmates, or State property exists". Moreover, defendants offer a mass of evidence demonstrating that they followed Directive 4933 with respect to Ford and that Ford received full consideration and a hearing in connection with Directive 4933. A "Deprivation Order", dated April 14, 2004 and authorized by Sgt. Maly, for example, states:

> In accordance with 7 NYCRR Section 305.2, you are being deprived of the following specific item(s), privilege(s), or service(s): All out of cell activities (including showers) because it is determined that a threat to the safety or security of staff, inmates or State property exists and for the following specific reason(s): You seriously assaulted a corrections officer. [67]

A lengthy statement reviewing Ford's April 19, 2004 grievance regarding his Special Housing confinement further provides: "Upon full hearing of the facts and circumstances in the instant case, the action requested herein is hereby denied with clarification to the extent that the matter was investigated and the issue of the complaint has been found to be without merit." [68]

Since Ford has failed to allege any cognizable violation of due process of law relating to his Special Housing confinement, and since defendants have provided the Court with ample, uncontroverted evidence that Ford received such process, summary judgment is denied for Ford and granted for defendants on this claim. [69]

4. Deliberate Indifference to a Serious Medical Need
Ford argues that defendants Joseph Smith, John Maly, Sgt. Kimbler and Dr. Bhavsar violated his constitutional rights by failing to provide adequate medical care for the injuries to his face, head, back, kidneys, groin area and penis during April of 2004. Defendants respond that Ford's pleadings are not sufficient to support a claim for constitutionally deficient medical care.

To maintain a claim for deliberate medical indifference, Ford must prove "deliberate indifference to [his] serious medical needs." *Hathaway,* 37 F.3d at 63 (quoting *Estelle,* 429 U.S. at 102 (medical indifference claim brought by prisoner pursuant to section 1983 alleging violation of Eighth Amendment as applied to the states via Fourteenth Amendment)). This standard requires proof of objective and subjective prongs. *Id.*

The objective prong of the deliberate indifference standard requires proof of a medical deprivation "sufficiently serious" to create a condition of urgency that might produce death, degeneration or extreme pain. *Id.; see also Williams v. Vincent,* 508 F.2d 541 (2d Cir.1974) (easier and less efficacious treatment of throwing away prisoner's ear and stitching the stump may be deliberate indifference); *cf. Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001) (cut finger with "skin ripped off" is insufficiently serious); *Bonner v. N.Y. City Police Dep't,* No. 99 Civ. 3207, 2000 WL 1171150, at *4 (S.D.N.Y. Aug. 17, 2000) (inability to close hand due to swelling insufficiently serious to constitute Eighth Amendment violation); *Gomez v. Zwillinger,* 1998 U.S. Dist. LEXIS 17713 at *16 (S.D.N.Y. November 6, 1998) (back pain and discomfort not sufficiently serious); *Jones v. New York City Health & Hosp. Corp.,* 1984 U.S. Dist. LEXIS 21694 at *3-4 (S.D.N.Y. November 28, 1984) (deliberate indifference claim dismissed where plaintiff challenged treatment for bruises on head and body).

**\*12** The subjective prong of the deliberate indifference standard requires proof that the accused defendant knew of and disregarded "an excessive risk to inmate health or safety." *Hathaway,* 37 F .3d at 66 ("The official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and must also draw the inference."). Specifically, the plaintiff must prove that the accused defendant acted, or declined to act, with a state of mind equivalent to criminal recklessness. *See Boomer v. Lanigan,* 2002 WL 31413804, *1 (S.D.N.Y.2002) (Cote, J.) (unreported) (citing *Hathaway,* 99 F.3d at 553); *Cunningham v. City of New York,* 2006 U.S. Dist. LEXIS 35607 at *6 (S.D.N.Y. June 1, 2006) (mere disagreement between treating physician and patient about course of treatment does not give rise to a constitutional claim).

Having reviewed the pleadings and evidence submitted with the motions for summary judgment, we agree with defendants that Ford cannot prevail on his claim for deliberate medical indifference stemming from his treatment during April and May of 2004. First, most of the injuries asserted by Ford were not sufficiently serious to satisfy the objective prong of the deliberate indifference standard. Ford claims, and the prison's medical reports confirm, that Ford suffered from a minor bruise on his forehead; reddened abrasions with a slight amount of bleeding on his left temple; reddened abrasions on his right upper chest, abdomen, and right underarm; and superficial scratches on his right upper back when he was admitted to Special Housing. Abrasions, a minor bruise, slight bleeding and scratches are not injuries that may produce death, degeneration or extreme pain, and no reasonable jury could find to the contrary. *See e.g. Jones,* 1984 U.S. Dist. LEXIS 21694 at *3-4 (allegations of bruises about head and body do not shock the conscience and are inadequate to state claim for deliberate medical indifference in section 1983 suit). [70]

Second, in light of the evidence submitted by defendants, Ford also cannot satisfy the subjective prong of the deliberate indifference standard. Various medical forms submitted by defendants reveal that Ford was evaluated on no fewer than eight occasions between April 14, 2004 and early May of 2004, including examinations by a triage nurse and visits with Dr. Bhavsar, and not including the regular opportunities Ford had to speak with a Special Housing nurse. As Ford admits, Dr. Bhavsar, in addition to examining Ford personally, ordered three different urine analyses, a set of x-rays, and a CAT-scan, calling for the latter two procedures even though Ford's wrist and abdomen showed no apparent signs of problems. Dr. Bhavsar's records further reveal that he explained to Ford the proper course of treatment for his various injuries, that he prescribed Tylenol for his minor injuries, and that he continued to monitor Ford's possible internal injuries, such as the blood in his urine, until those symptoms subsided. [71]

**\*13** As such, no reasonable jury could find that the medical staff demonstrated deliberate indifference to Ford's medical condition and certainly Ford has not offered any evidence to suggest that the medical care he received amounted to criminal recklessness. On the contrary, a reasonable jury would readily find that Ford, in receiving x-rays for a non-swollen wrist with full movement, a CAT-scan for an abdomen showing no tenderness, and three urine tests for a problem that shortly

resolved itself, obtained more thorough medical attention while incarcerated than he would have outside of prison. For these reasons, we deny Ford's motion for summary judgment and grant defendants' motion for summary judgment on Ford's medical indifference claim. [72]

### 5. Mail Interference

Ford further complains that the DOCS staff instituted a mail-watch on his personal mail and confiscated some of his mail in violation of his constitutional rights, denying him access to the courts and preventing him from communicating with his girlfriend. Defendants admit that they instituted a mail watch on Ford following his attack on Officer Miller and argue that Ford has not sufficiently alleged any constitutional violation based on mail interference.

### a. Denial of Access to the Courts

In order to state a constitutional claim for denial of access to the courts, a plaintiff must show deliberate and malicious action resulting in an actual injury, such as the dismissal of an otherwise meritorious claim. *Cancel v. Goord,* 2001 U.S. Dist. LEXIS 3440, *16 (S.D.N.Y. Mar. 29, 2001) (plaintiff must show frustration of non-frivolous claim as a result of official action) (citing *Washington v. Jones,* 782 F.2d 1134, 1138 (2d Cir.1986)); *see also Lewis v. Casey,* 518 U.S. 343, 351 (1996); *Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997). Actions causing mere delay in a prisoner's ability to work on a legal action or to communicate with the courts do not rise to the level of a constitutional violation. *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995) (citing *Jones v. Smith,* 784 F.2d 149, 151-52 (2d Cir.1986)).

We agree with defendants that Ford cannot prevail on his denial of access claim. Ford's only allegations that defendants' interference with his mail caused him an actual legal injury are his vague statements that the interference made him lose papers that were "very important" to his motion to set aside the verdict in his criminal trial and that the interference hurt his preparation for sentencing. [73] Ford has not alleged that he missed any deadlines or faced any other, specific legal injuries as a result of the alleged interference, and the mere suggestion, without any supporting argument or evidence, that Ford would have succeeded on his motion to set aside the verdict or that he would have received a lighter sentence but-for defendants'

mail-watch clearly does not state that Ford lost an otherwise meritorious claim. [74] This is especially true in light of Ford's conviction for the offense charged, the substantial evidence supporting that conviction discussed *supra,* the fact that Ford has not yet been sentenced for his attack on Officer Miller, and the fact that Ford, far from proceeding *pro se,* has been represented by counsel throughout his criminal and post-trial proceedings. [75] Thus, we deny Ford's motion for summary judgment on this claim and grant summary judgment in favor of defendants.

### b. First Amendment

**\*14** Ford's Complaint does not expressly assert a First Amendment claim based on interference with his non-legal mail, but a liberal reading of that document suggests that Ford intended to do so since he complains that DOCS staff took mail going to and coming from his girlfriend. [76] In order to state a First Amendment claim based on mail interference, a prisoner must show that the interference either did not further one or more substantial government interests, such as security, order and rehabilitation, or that the interference was greater than necessary to the protection of that interest. *Davis,* 2003 U.S.App. LEXIS 13030 at *8-10 (citing *Washington v. James,* 782 F.2d 1134 (2d Cir.1986)); *U.S. v. Felipe et al.,* 148 F.3d 101 (2d Cir.1998) (interception of prison correspondence does not violate First Amendment if prison officials had "good or reasonable cause" for inspection) (citing *U.S. v. Workman,* 80 F.3d 688, 699 (2d Cir.1996) ("We think it clear that-at least where prison officials have reasonable cause for suspicion-surveillance of inmate mail is unobjectionable; investigation and prevention of illegal activity among inmates is "a legitimate penological interest, which has a logical connection to the decision to impose a mail watch on a prisoner").

We agree with defendants that no reasonable jury could find for Ford on his First Amendment claim. To the extent that Ford complains about a mail watch, it is evident from defense submissions and from the facts discussed *supra* that defendants had legitimate reasons for monitoring Ford's mail, namely: (1) to investigate Ford's assault on Officer Miller; (2) to prevent Ford from instigating further violence following that assault; and (3) to monitor efforts by Ford to improperly influence his trial for that assault. [77] In fact, the mail watch revealed one letter in which Ford admits to stabbing and throwing hot oil on

Officer Miller, which proved to be useful to the prison's investigation of that attack, and at least one letter wherein Ford discusses and recommends efforts to improperly influence a witness in his trial. [78]

Moreover, although destroying Ford's incoming and outgoing mail would likely go beyond the measures necessary to protect the prison's interests in security and in investigating Ford's assault, Ford has failed to plead any instance of mail interference wherein defendants improperly confiscated his mail. Ford generally alleges that defendants took mail going to and from his girlfriend, but he does not allege any specific occurrence of confiscation and does not specify whether DOCS staff confiscated just the two letters discussed above or whether they took other letters as well. Clearly, if defendants only confiscated the letters admitting to the assault on Officer Miller and attempting to improperly influence Ford's trial for that assault, the confiscation did not go beyond what was necessary to protect the prison's legitimate penological interests. Without any specific allegation regarding some other confiscation by DOCS staff, without any evidence offered to support such an allegation, and given defendants' affidavits and documents stating that defendants merely implemented an appropriate mail watch in accordance with DOCS policies and procedures, [79] no reasonable jury could find that defendants violated Ford's constitutional rights by improperly interfering with his non-legal mail.

**\*15** Accordingly, Ford has not sufficiently alleged any violation of his rights regarding the mail to state a constitutional claim. Ford's summary judgment motion for his mail claims is denied and summary judgment is granted in favor of defendants.

6. Responsibility of Individual Defendants
Defendants' Memorandum of Law concludes by arguing that Ford fails to allege that certain defendants were personally involved in or responsible for the constitutional violations he alleges, entitling those defendants to judgment as a matter of law. Specifically, defendants argue that Ford fails to allege: (1) that Sgt. Carey, Superintendent Phillips and Sgt. Guiney used any force against him; (2) that Inspector Vacca violated his constitutional rights by ordering a mail watch; and (3)

that Sgt. Kimbler and Sgt. Jewett are responsible to him for any deliberate indifference to his medical needs. Defendants are correct that Ford must allege and support personal involvement in the constitutional violations to prevail against these defendants. *See e.g. Woods v. Goord,* 2002 U.S. Dist. LEXIS 7157, *23 (S.D.N.Y.2002) (Section 1983 plaintiff must allege personal involvement of each defendant); *see also Montero v. Travis,* 171 F.3d 757, 761-62 (2d Cir.1999) (requiring allegation of direct personal involvement against supervisory official to state section 1983 claim) (citing *Sealey v.. Giltner,* 116 F.3d 47, 51 (2d Cir.1997)).

Having reviewed Ford's submissions, we agree that Sgt. Carey, Superintendent Phillips and Superintendent Guiney are entitled to summary judgment. Ford does not accuse these defendants of using excessive force against him. We also agree that Inspector Vacca is entitled to summary judgment given that we grant defendants' motion for summary judgment on Ford's mail interference claims, and that Sgts. Kimbler and Jewett are entitled to summary judgment on Ford's claims for medical indifference and for lack of due process.

*CONCLUSION*

For the reasons stated above, we deny all aspects of Ford's motion for summary judgment and grant summary judgment for defendants on all of Ford's claims except for his excessive force claim arising from his transfer to Special Housing on April 14, 2004 . [80] Thus, Ford may pursue his claim for excessive force against defendants C.O. Huttel, C.O. Austin, C.O. Czyzewski and Sgt. Myers, [81] but his Complaint is dismissed as to the following defendants: Superintendent Phillips, Deputy Superintendent Guiney, C .O. Miller, C.O. Middleton, C.O. McClenning, C.O. Erns, Sgt. Carey, Superintendent Smith, Deputy Superintendent Maly, Dr. Bhavsar, Sgt. Kimbler, Sgt. Jewett and Inspector General Vacca.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 946703

Footnotes

1   This caption reflects the caption in plaintiff's Complaint. Defendants did not provide the Court with a full, corrected caption.

2   Although the title of Ford's motion is "Motion for Partial Summary Judgment", his papers clearly argue for judgment on all of the claims raised in his Complaint. Defendants' motion for summary judgment expressly applies to Ford's entire Complaint.

3   Unless otherwise noted, the following facts are not in controversy.

4   Plaintiff is currently incarcerated and serving a sentence of twelve and one-half to twenty-five years, having plead guilty to attempted murder, kidnapping and a weapons violation. *See* Declaration of Efthimios Parasidis ("Parasidis Decl."), dated December 22, 2006.

5   *See* Parasidis Decl., Ex. B, FORD 42. Earlier that day, Officer McClenning observed Ford yelling from his cell gate and generally being disrespectful. *Id.* at FORD 39.

6   *See id.* at FORD 1, 15, 17-18, 27, 34, 40, 42, 44, 66.

7   *Id.,* Ex. E., FORD IG 26-29, 290-295.

8   *Id.,* Ex B., April 14, 2004 Statement of Officer J. Erns ("I heard officer Miller begin to scream.... I saw Officer Miller being attacked by an inmate and Officer Miller screaming 'Get him off me Get him off me' ').

9   *Id.*

10  *Id.* at FORD 1, 10-12, 16, 27, 29, 42, 77, 80.

11  *Id.* at FORD 45-46.

12  *Id.* at FORD 1-2, 21-22, 43.

13  *See id.,* Ex. F, FORD 130-131. *See also* Supreme & County Courts of the State of New York, Dutchess County, Certificate of Disposition Indictment (certifying that Ford was convicted of one count of first degree attempted assault, two counts of second degree assault, two counts of third degree criminal possession of a weapon, and one count of promoting prison contraband in the first degree).

14  Ford Complaint, received June 20, 2005 at the S.D.N.Y. Pro Se Office, at 6. Ford contends that he is entitled to non-meat meals.

15  *Id.* (alleging cruel and unusual punishment, harassment, excessive force, deprivation of outside exercise, threats of bodily harm, and other grievances). As discussed *infra,* these claims are contradicted by statements made and signed by Ford shortly after the putative attack.

16  *Id.* at 7.

17  Parasidis Decl., Ex. B, FORD 2, 42, 48, 52, 60-63; Ex. H (videotape of officers escorting Ford to Special Housing).

18  *Id.*

19  Compl. at 6-10. Apparently quoting the report from his medical examination, Ford asserts that he sustained "extreme and numerous abriasions (sic), with bleeding Lt temple (sic), redenes abriasion (sic) on both right and left sides of plaintiff face. 2 redden abriasions areas (sic) RT upper chest, superficial scratches on RT upper back" from the April 14 attacks.

20  Parasidis Decl., Ex. B, FORD 2, 8-9 (April 14, 2004 Physical Examination of Corey Ford), 51-53.

21  *See id.,* Ex. C, FORD GRIEVANCE 43-46 (SHU Entrance Exam, stating "Use of force exam done.").

22  *Id.,* Ex. B, 47; Ex. D, FORD MEDICAL 26.

23  *Id.*

24  *Id.;* Ex. G (Bhavsar Decl.) at 1.

25  *Id.*

26  *Id.* at FORD MEDICAL 25; Ex. G at 2.

27  *Id.*

28  *Id.*

29  *Id.*

30  *Id.* at FORD MEDICAL 24; Ex. G at 9.

31  *Id.* at FORD MEDICAL 37.

32  *Id.* at FORD MEDICAL 41.

33  *Id.* at FORD MEDICAL 22-3, 69; Ex. G at 2.

34    *Id.* (Ford's "renal parenchyma and collecting system [were] normal on all series" and there was "no evidence of renal stone, filling defect, or mass lesion". Ford's liver, adrenals, pancreas, spleen and bowels were also found to be "unremarkable". No free fluid or air was detected and, more generally, there was no evidence of any medical abnormality).

35    *Id.,* Ex. C, FORD GRIEVANCE 34.

36    *See e.g.* Ford' Motion for Partial Summary Judgment, dated July 24, 2006, at 18.

37    *Id.*

38    *Id.*

39    Parasidis Decl., Ex. C, FORD GRIEVANCE 34-35, 50-57.

40    *Id.*

41    *Id.*

42    *Id.*

43    *See e.g.* Complaint at 10.

44    *Id.*

45    *Id.* at 10-11.

46    Parasidis Decl., Ex. B, 126, 128-129, 131-137; Ex. J, FORD MAIL 1-12.

47    *Id.,* Ex. E, FORD IG 316-324.

48    *Id.,* at FORD IG 316, 325-333.

49    Compl. at 13-14.

50    *Id.* at 15.

51    *See e.g.* Parasidis Decl., Ex. E., FORD IG 303.

52    Ford could have sustained any and all of the medical injuries evidenced in the record during his attack on Officer Miller or during his transfer to Special Housing.

53    Specifically: the May 19, 2004 affidavit of Shaun Harris offers no personal knowledge of the alleged attack, stating only that Ford told Harris that Officer Miller had pushed Ford into his cell after yelling at Ford; the July 22, 2004 affidavit of Jermaine Page offers personal knowledge of Ford being "up on the wall" on April 14, 2004, but says nothing about a push or any other violence; the September 14, 2004 affidavit of Jesse Guess states that Mr. Guess saw Officer Miller push Ford into his cell, consistent with what Harris claims Ford told Harris, but inconsistent with Jermaine Page's statement; the April 28, 2004 affidavit of Ralph Nieves only alleges general harassment of Ford by Officer Miller; and the August 24, 2004 affidavit of Allen Griffin generally alleges that he saw Officer Miller "verbally, mentally, emotionally, and physically" assault Ford on April 14, 2004, but does not specify whether the assault occurred in the morning or in the afternoon on April 14 and does not specify what kind of physical assault took place. The Court found these affidavits amidst a stack of disorganized papers in the case file kept by the clerk's office.

54    Paragraph 8 of the Tolliver affidavit states exactly as follows: "On April 14, 2004 I was out of my cell as usual to clean up after keeplock recreation went out approx. 9:30 AM, I was talking to the dubble (sic) bunk cell above 143, 4 company, for about 10 minutes, The cell on 4-company 143 opened up around 9:40 AM I locked in and called the guy whom I heard his name was "C" which I found out was actually Corey Ford, I told him to watch himself I seen C.O. Miller use the exact tactics that I warned [him] about yesterday, the Guy Corey Ford was called over to the [B] post first and the gate to 4-company was then locked, I seen solid fist and kicks being thrown by officer M. Miller and c.o. McClenning connecting against the inmate Corey ford FACE and body, The inmate was yelling for help, I witness the whole excessive force incident."

55    *See supra* note 51.

56    Parasidis Decl., Ex. E, FORD IG 26-28 (quoting Ford's April 14, 2004 statement); *see also id.* at FORD IG 290-93 ("This is where he yells at me and slap me (sic) across my face"), dated April 15, 2004 at 9:00 a.m.

57    *See supra* note 53. Versions of the events offered in Ford's submissions include: (1) Ford was pushed into his cell; (2) Ford was held up on a wall; (3) Ford was slapped in the face by Officer Miller; (4) Ford was punched and kicked by Officers Miller, McClenning and Erns; and (5) Ford was punched and kicked by Officers Miller and McClenning.

58    *See e.g.* Parasidis Decl., Ex. B, FORD 1-2, 22, 43.

59    Additionally, the officers are protected by the doctrine of qualified immunity for this allegation of excessive force as it would be objectively reasonable to respond to Ford's apparent attempt to seriously injure or kill Officer Miller with force much greater than that alleged by Ford. *See e.g. Cerrone v. Brown,* 246 F.3d 194, 199 (2d Cir.2001) (officers entitled to qualified immunity as it was objectively reasonable for them to believe that their actions were lawful at the time of the challenged act).

60    Compl. at 9.

61    Ford makes no mention of abuse during his transfer to Special Housing in his April 14, 2004 statement. However, in his April 15, 2004 statement, Ford notes, "I also want to tell you about how I was assaulted in the elevator on my way to SHU. I was slammed in to the wall and taken to the floor a number of times. I did not resist. They had my hands cuffed behind my back and my pants were falling down. I had a hard time standing up-so I fell to the floor. When this happened they punched me in the balls. I think I got the bump on my head when they threw me into the wall....".

62    As well, the evidence that Ford had blood in his urine tends to support his allegation that he was punched and kicked in the back. If defendants needlessly punched Ford in the back causing him to have internal bleeding, they violated his Eighth Amendment rights.

63    Ford insists that defendants intentionally beat him when the cameras were off and during transitions between cameras. *See* Ford's Motion for Partial Summary Judgment at 8.

64    Defendants claim that they are entitled to qualified immunity on all claims raised by Ford. However, the doctrine of qualified immunity, which protects officers in the reasonable exercise of their duties, clearly would not cover a malicious beating as alleged by Ford during his transfer to Special Housing. *See supra* note 59.

65    See Defendants' Mem. of Law at 10-13.

66    *See e.g.* Parasidis Decl., Ex. C, FORD GRIEVANCE 34-35, 50-57; Ex. I, FORD ORDERS 1-8.

67    Parasidis Decl., Ex E., FORD GRIEVANCE 50. *See also id.* at FORD GRIEVANCE 50-58, 109, 118-20, 126, 128, 129, 131, 132, 133, 134, 135-37, 143; Ex. I, FORD ORDERS 1-8.

68    *Id.* at FORD GRIEVANCE 30.

69    We note further that the reasons and bases for Ford's confinement and deprivations in Special Housing should have been obvious to Ford immediately upon his transfer to Special Housing given that they arose immediately after his vicious attack on Officer Miller. Not only would such an attack make guards fearful for themselves and other prisoners should Ford be taken out of his Special Housing cell, but guards would also be fearful that Ford would use any property he obtained to hurt himself or others. In fact, this is the explanation provided in the deprivation orders and related documents submitted by defendants. *See supra* note 67.

70    The remaining injuries claimed by Ford, which might have appeared to be serious upon his initial complaints, also proved not to be serious. Ford complained that he found blood in his urine, that he vomited blood, that he suffered from persistent abdominal and groin pain, that his wrists hurt and that he had headaches and dizzy spells. Within a few weeks, however, Ford ceased to have blood in his urine; his bruises and abrasions were healed or healing normally; x-rays showed no damage to his wrist; and a CAT-scan revealed no injuries to the organs inside his abdomen or to his abdomen generally, confirming Dr. Bhavsar's finding that Ford had no tenderness in his ribs or abdomen. As well, Ford has not alleged that his vomiting, dizzy spells or headaches, for which there is no objective evidence to begin with, persisted or led to more serious problems, and though Ford claims that he now has a weak bladder, he has not alleged that it is degenerative or causes him extreme pain. *See generally* Parasidis Decl., Ex. G, Bhavsar Decl.

71    *Id.*

72    Even if one or more officers ignored Ford's complaints on one or more specific occasions, which Ford alleges without offering additional support, the fact that Ford actually received extensive and repeated medical attention demonstrates that those instances of indifference did not deny Ford adequate medical attention. Moreover, to prevail on the subjective element against those officers, Ford would have to demonstrate that the officers knew that Ford actually had a serious injury-as opposed to simply hearing Ford complain of such an injury-and nevertheless ignored it. Ford has not offered any evidence to this effect, beyond that he complained more than once that he suffered from severe pain. He does not, for instance, allege that the officers saw him bleeding or otherwise suffering some clearly serious injury.

73    *See* Ford Brief at 22-23; *see also* Complaint at 25.

74    Ford also generally alleges that he was denied the right to appear before a grand jury. However, Ford does not explain how interference with his mail caused this denial and he has also submitted documents to the Court suggesting that he did not intend to appear before the grand jury in his criminal case. *See infra* note 75 at 3-4.

75    *See* March 16, 2006 Order of Judge Hayes at 2-3 (Ford was initially represented by Assistant Public Defender James Hill and was later represented by Assistant Public Defenders George Hazel and David Martin. Kenneth J. Roden, Esq. represented Ford in connection with his CPL §§ 330.30 and 440.10 motions).

76    At times in Ford's submissions, he also complains of losing mail to his spouse. It is not entirely clear whether the spouse and girlfriend to whom Ford refers are the same person, but the pleadings, taken together, strongly suggest that this is the case.

77    *See* Parasidis Decl., Ex. C, FORD GRIEVANCE 126, 128-29, 131-37; Ex. J, FORD MAIL 1-12; Ex. E, FORD IG 316-24.

78    *Id.*

79    *See e.g.* Parasidis Decl., Ex C., FORD GRIEVANCE 128-29, 131-37; Ex. J, FORD MAIL 1-12.

80    Ford raises what purports to be an equal protection argument, for the first time, in his Motion for Partial Summary Judgment, dated July 24, 2006, at 26-27. The argument offers only minimal facts and conclusions of law, without providing any reason or argument as to why those facts support a violation of Ford's right to equal protection. To the extent that Ford seeks summary judgment on an equal protection claim, summary judgment is denied.

81    Although we do not grant summary judgment for defendants on Ford's one remaining claim, we note that our reluctance to do so should *not* be taken to reflect any view that Ford will prevail on that claim. On the contrary, Ford has only limited evidence to support the claim and defendants have considerable evidence against it. Moreover, for the plaintiff's edification, even if a jury were to find in his favor on that claim, it would be entitled to award Ford only nominal damages-as low as $1-if it found that Ford deserved nothing more.

---

**End of Document**                                     © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 596891
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

George HARRIS, Plaintiff,
v.
G. MORTON, et al, Defendants.

No. 9:05-CV-1049 (LEK/RFT).
|
Feb. 29, 2008.

**Attorneys and Law Firms**

George Harris, Marcy, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Risa L. Viglucci, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

### DECISION AND ORDER

LAWRENCE E. KAHN, District Judge.

 **\*1** This matter comes before the Court following a
Report-Recommendation filed on January 24, 2008 by the
Honorable Randolph F. Treece, United States Magistrate
Judge, pursuant to 28 U .S.C. § 636(b) and L.R. 72.3 of
the Northern District of New York. Report-Rec. (Dkt.
No. 36). After ten days from the service thereof, the Clerk
has sent the entire file to the undersigned, including the
objections by Plaintiff George Harris, which were filed on
February 26, 2008. Objections (Dkt. No. 38).

It is the duty of this Court to "make a de novo
determination of those portions of the report or specified
proposed findings or recommendations to which objection
is made." 28 U.S.C. § 636(b). "A [district] judge ...
may accept, reject, or modify, in whole or in part, the
findings or recommendations made by the magistrate
judge." *Id.* This Court has considered the objections and
has undertaken a de novo review of the record and has
determined that the Report-Recommendation should be
approved for the reasons stated therein.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No.
36) is **APPROVED** and **ADOPTED** in its **ENTIRETY;**
and it is further

**ORDERED,** that Defendants' Motion for summary
judgment (Dkt. No 28) is **GRANTED;** and it is further

**ORDERED,** that the Complaint (Dkt. No. 1) is
**DISMISSED;** and it is further

**ORDERED,** that the Clerk serve a copy of this Order on
all parties.

**IT IS SO ORDERED.**

### REPORT-RECOMMENDATION and ORDER

RANDOLPH F. TREECE, United States Magistrate
Judge.

*Pro se* Plaintiff George Harris brings this civil rights
action pursuant to 42 U.S.C. § 1983 claiming that his
constitutional rights under the Eighth Amendment were
violated when he was not properly treated for an injury
he suffered as a passenger in a car accident. Dkt. No.
1, Compl. Defendants have filed a Motion for Summary
Judgment (Dkt. No. 28) under Rule 56 of the Federal
Rules of Civil Procedure, to which Plaintiff has responded
in opposition (Dkt. No. 29). For the reasons that
follow, it is recommended that Defendants' Motion for
Summary Judgment be **granted,** and Plaintiff's Complaint
be **dismissed.**

### I. FACTS

The following facts were derived mainly from the
Defendants' Statement of Material Facts, submitted in
accordance with N.D.N.Y.L.R. 7. 1, which were not
specifically countered nor opposed by Plaintiff. *See*
N.D.N.Y.L.R. 7.1(a)(3) ( *"Any facts set forth in the
Statement of Material Facts shall be deemed admitted
unless specifically controverted by the opposing party."*
(emphasis in original)). In any event, most, if not all, of
the material facts are not in dispute, but rather, the issue is
whether those facts give rise to constitutional violations.

On October 24, 2003, Plaintiff was a passenger in a van driven by Defendant Corrections Officer (C.O.) Morton headed from Mid-State Correctional Facility to the SUNY Health Care Center in Syracuse, New York. Dkt. No. 28-4, Defs.' 7.1 Statement at ¶ 1. While attempting to back out of a parking space, Morton hit the rear driver side panel of another vehicle. *Id.* at ¶ 3. Both Morton and Defendant C.O. Irving, who was also present in the car, inspected the vehicles and noted minimal damages. *Id.* at ¶ 4. Plaintiff was wearing a seatbelt when the accident occurred. *Id.* at ¶ 5. Plaintiff arrived at Mid-State at approximately 11:20 a.m. and was seen in the infirmary at approximately 12:40 p.m., at which point he completed an inmate injury report. *Id.* at ¶ 6; Compl. at p. 5. Plaintiff complained of a "bumped" left knee and a "snapped" neck, but Defendant Nurse Hanley found that Plaintiff was not suffering from any injuries requiring medical treatment, and noted that Plaintiff had full range of motion and was alert and oriented. Defs' 7.1 Statement at ¶¶ 8-9. Plaintiff did not seek any further medical attention until October 31, 2003, when he complained of pain and discomfort in his neck and knee to Nurse Myers[1] at the flu shot clinic, which is provided for the purpose of administering flu shots only. *Id.* at ¶ 9; Compl. at p. 6. Nurse Myers instructed Plaintiff to sign up for sick call if he needed medical attention, to which Plaintiff responded that he intended to file a grievance. Defs' 7.1 Statement at ¶ 9; Compl. at p. 7.

**\*2** Plaintiff filed a grievance on November 6, 2003, which Superintendent James A. Nichols denied on November 11, 2003, after an investigation. Dkt. No. 28, Defs.' Mot. for Summ. J., Risa Viglucci, Esq., Affirm., dated Apr. 2, 2007, Ex. B at p. 3. Plaintiff's appeal to the Central Office Review Committee (CORC) was unanimously denied. *Id.* at p. 2; Defs' 7.1 Statement at ¶ 10. Plaintiff now brings this action claiming violation of his constitutional rights.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the movant. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) and *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790

(2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

**B. Eighth Amendment Claim**

**\*3** Plaintiff claims that the Defendants failed to adequately care for injuries he sustained to his neck and knee during a minor car accident. "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove deliberate indifference to [his] serious medical needs." *Smith v. Carpenter,* 316 F.3d 178, 183 (2d Cir.2003) (internal quotation marks and citations omitted) (alteration in original). This standard contains both objective and subjective elements. *Id.* "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Id.* at 183-84 (citing *Chance v. Armstrong,* 143 F.3d at 702 & *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)). The subjective element "entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Hathaway v. Coughlin,* 99 F.3d at 553 (quoting *Farmer v. Brennan,* 511 U.S. 825, 835 (1994)).

The record in this case shows that on the day of the accident, October 24, 2003, Plaintiff was attended to by Defendant Nurse Hanley, who found Plaintiff free of injury. Viglucci Affirm., Ex. A ., Rep. of Inmate Injury, dated Oct. 24, 2003. Plaintiff did not seek any further medical attention until October 31, 2003, when he complained of pain and discomfort in his neck and knee to Nurse Myers, who instructed him to utilize the sick call procedure in order to receive medical attention. Compl. at p. 6. Plaintiff's Ambulatory Health Record (AHR) shows that Plaintiff continued to complain of neck pain in the months that followed. *See* Viglucci Affirm., Ex. A, AHR. The medical staff questioned whether Plaintiff had possibly suffered from whiplash, and it was recommended that Plaintiff take Tylenol and apply heat to the afflicted area. *Id.* at entries dated Jan. 15 & Feb. 17, 2004.[2] An x-ray exam of Plaintiff's cervical spine revealed an "old apparent injury to [the] C6 spinous process." Dkt. No. 29, Pl.'s Resp. to Defs.' Mot. to Dismiss, Ex. 9, Cervical

Spine Exam Rep., dated Jan. 16, 2004. Plaintiff's regular physician received the x-ray report and recommended no changes to his prescriptions. AHR, entry, dated Jan. 22, 2004. This injury was later diagnosed as a pinched nerve in his neck. *Id.* at entry dated Mar. 5, 2004. Such a minor injury does not normally rise to the level of seriousness required to make a viable claim of medical indifference under the Eighth Amendment. *See Bennett v. Hunter,* 2006 WL 1174309, at *3 (N.D.N.Y.2006) (stating that a pinched nerve is not a serious medical need).

The record also reflects that Plaintiff has suffered from Degenerative Disc Disease[3] since 2002. Pl.'s Opp. to Defs.' Mot. to Dismiss, Ex. 9, Bone Scan Rep. dated Mar. 29, 2002 & Radiologic Consultation, dated Jan. 16, 2004. The January 16, 2004 report notes a "straightening and mild degenerative disc disease at C5-6 and C6-7." Degenerative Disk Disease itself might be considered a constitutionally significant injury, *see Moolenaar v. Champagne,* 2006 WL 2795339, at *6 n. 6 (N.D.N.Y. Sept. 26, 2006) (citation omitted), however, Plaintiff does not claim that he received inadequate treatment for this ongoing condition, but rather for the neck injury he allegedly suffered as a result of the car accident. *See generally* Compl.; *see also Smith v. Carpenter,* 316 F.3d at 186 (citations omitted) (stating Eighth Amendment claims concern "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract"). In addition, the Plaintiff has not asserted, nor does the record reflect, that his disease was somehow worsened as a result of the alleged injury he sustained in the car. Therefore, the Plaintiff's claim must fail under the objective prong of the Eighth Amendment deliberate indifference standard.

**\*4** Even assuming, *arguendo,* that Plaintiff sustained a serious medical injury, his claim would fail under the subjective prong as well. Defendants Irving, Morton, and Hanley are the only named Defendants who were directly involved in the care Plaintiff received after the accident. *See generally* Compl. C.O.'s Irving and Morton were present in the van during the accident, and upon their return to Mid-State, Defendant Morton sent Plaintiff to the infirmary to be checked out for any injury. *Id.* at p. 5. Thus, far from exhibiting a deliberate indifference to Plaintiff's medical needs or otherwise preventing Plaintiff from receiving medical attention, these officers ensured

that Plaintiff received medical attention in a timely fashion. *Id.*

Nurse Hanley examined Plaintiff on the day of the accident and found no injuries, noting that Plaintiff was alert and had a full range of motion. Rep. of Inmate Injury, dated Oct. 24, 2003. Plaintiff states in his Complaint that he requested to see a doctor, but that Hanley denied his request stating he would have to go to sick call to see a doctor. Compl. at p. 6. Plaintiff also states later that night he again complained of neck pain to C.O. Jordan [4] who informed Hanley of his complaints, but that Hanley refused to see Plaintiff. *Id.* Even accepting these statements as true, there is no evidence on the record to suggest that Hanley acted with deliberate indifference towards Plaintiff's alleged injuries. Prison officials act with deliberate indifference "when [they] 'know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official[s] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference.' " *Chance v. Armstrong,* 143 F.3d at 702 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837 (1970). Hanley did a "head to toe assessment" and found nothing wrong with Plaintiff, and then advised Plaintiff to utilize the sick call procedure if he wanted to see a doctor. Rep. of Inmate Injury, dated Oct. 24, 2003. Plaintiff admits that despite the severe pain he allegedly felt, he did not inform any medical staffer until October 31, 2003, seven days after the car accident. Compl. at p. 6. At worse then, Hanley failed to identify an injury that Plaintiff himself had not felt the effects of at the time of Hanley's assessment. *Id.* (stating that only after Hanley's examination did Plaintiff "really feel the effects of the accident upon his neck."). There is no accusation nor evidence on the record that Defendant Hanley consciously disregarded Plaintiff's medical needs. *See Farmer v. Brennan,* 511 U.S. at 836 (stating a plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm).

For the foregoing reasons, it is recommended that Summary Judgment be **granted** as to Defendants Hanley, Irving, and Morton.

### C. Personal Involvement

**\*5** The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement. Therefore, a prison official may not be found liable for a constitutional violation merely because of the acts of those under his control." *Kinch v. Artuz,* 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted).

If a plaintiff seeks to bring a § 1983 action for supervisory liability, liability on the part of the supervisor may exist

> in one or more of the following ways: 1) actual direct participation in the constitutional violation, 2) failure to remedy a wrong after being informed through a report or appeal, 3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, 4) grossly negligent supervision of subordinates who committed a violation, or 5) failure to act on information indicating that unconstitutional acts were occurring.

*Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003) (citing *Colon v. Coughlin,* 58 F.3d at 873) (further citations omitted).

In the case at bar, Plaintiff has failed to identify how the remaining Defendants, Baxter, Stine, Nichols, Berry, and Mohrman, were personally involved in his alleged Eighth Amendment claim. Plaintiff's statements about these Defendants concern the investigation of the Grievance he filed and the subsequent decisions rendered against him. Plaintiff takes issue with several alleged failures to follow correct procedure in reporting the car accident, and accuses these Defendants of failing to follow what Plaintiff asserts is correct protocol in the aftermath of a car accident. [5] *See* Compl. at pp. 5-9. However, aside from his Eighth Amendment claim, Plaintiff fails to explain, and the Court cannot itself fathom, how any of these

accusations amount to a violation of his constitutional rights.

For these reasons it is recommended that the Motion for Summary Judgment be **granted** as to the remaining Defendants.

### D. Qualified Immunity

Defendants raise the affirmative defense of qualified immunity. However, because we find that Plaintiff has suffered no constitutional violation, we need not address the merits of that defense. *See Saucier v. Katz,* 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for fruther inquiries regarding qualified immunity.").

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Summary Judgment (Dkt. No. 28) be **granted;** and it if further

**\*6 RECOMMENDED,** that Plaintiff's Complaint (Dkt. No. 1) be **dismissed;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 596891

### Footnotes

1   Nurse Myers is not a named Defendant in this action.

2   We note that although Plaintiff states he suffered from a "snapped" neck, he does not indicate he suffered from anything other than a generic neck injury. *See* Compl. at p. 9.

3   Degenerative Disc Disease (DDD) is "not really a disease but a term used to describe the normal changes in your spinal discs as you age ... [it] can take place throughout the spine, but it most often occurs in the discs in the lower back (lumbar region) and the neck (cervical region)." Information *available at* www.webmd.com. DDD involves the break down or degeneration of the spinal disks caused by the loss of fluid in the discs or tiny cracks or tears in the outer layer of a disc. *Id.* DDD can result in back or neck pain, depending on the location of the affected disc. *Id.*

4   C.O. Jordan is not a named Defendant in this action.

5   For example, Plaintiff states that Defendants Morton and Irvin failed to "speak with their superiors and get instructions as to what procedure was to be followed" in the wake of the car accident. Compl. at p. 5. Similarly, Plaintiff accuses Defendant Stine of failing to contact Plaintiff in order to make a written report of the accident. *Id.* at p. 7.

**End of Document**                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 894218
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Eugene JONES, Plaintiff,

v.

Sergeant FURMAN, C.O. Carpender, C.O. Bly,
C.O. Losito, C.O. John Doe # 1, C.O. John Doe
# 2, C.O. John Doe # 3, C.O. John Doe # 4,
Nurse John Doe, Nurse J. Brink, R. Murphy,
C.O., Lanasa, C.O., D. Hersh, Nurse, and T.
Lanasa, Correctional Officer, Defendants.

No. 02-CV-939F.
|
March 21, 2007.

**Attorneys and Law Firms**

Eugene Jones, Fallsburg, NY, pro se.

Andrew M. Cuomo, Attorney General, State of New
York, Stephen F. Gawlik, Assistant Attorney General, of
Counsel, Buffalo, NY, for Defendants.

**DECISION and ORDER**

LESLIE G. FOSCHIO, United States Magistrate Judge.

*JURISDICTION*

**\*1** On May 7, 2003, the parties to this action consented
pursuant to 28 U.S.C. § 636(c) to proceed before the
undersigned. The matter is presently before the court on
Defendants' motion for summary judgment (Doc. No. 58),
filed February 18, 2005.

*BACKGROUND*

Plaintiff Eugene Jones ("Plaintiff"), proceeding *pro se,*
commenced this civil rights action on December 27, 2002,
alleging that while incarcerated at Southport Correctional
Facility ("Southport"), Defendants Sergeant Furman
("Sgt.Furman"), C.O. Carpender [1] ("Carpender"), C.O.
Bly ("Bly"), C.O. Losito ("Losito"), C.O. John Does

1 through 4 and Nurse Jane Doe (together, "the Doe
Defendants"), and Nurse J. Brink ("Brink"), subjected
Plaintiff to excessive force, cruel and unusual punishment
and acted with deliberate indifference to Plaintiff's medical
needs, in violation of the Eighth Amendment. On March
27, 2003, an answer was filed by Defendants Sgt.
Furman, Carpenter, Bly, Losito and Brink. On October
21, 2003, Plaintiff filed an Amended Complaint (Doc.
No. 21) ("Amended Complaint"), asserting essentially
the same claims against the original named Defendants,
and naming new Defendants, including C.O. Lanasa
("Lanasa"), C.O. R. Murphy ("Murphy"), and Nurse D.
Hersh ("Hersh") in place of the Doe Defendants. Answers
to the Amended Complaint were filed on November 13,
2003, by Defendants Sgt. Furman, Bly, Brink, Carpenter,
and Losito (Doc. No. 22), and on October 14, 2004, by
Defendants Hersh, LaNasa and Murphy (Doc. No. 49).

On February 18, 2005, Defendant filed the instant motion
seeking summary judgment ("Defendants' motion").
Defendants also filed, on February 18, 2005, papers in
support of the motion a Memorandum of Law (Doc.
No. 59) ("Defendants' Memorandum"), a Statement
of Facts Not in Dispute (Doc. No. 60) (Defendants'
Statement of Facts"), and the Declarations of Defendants
Brink (Doc. No. 61) ("Brink Declaration"), Furman
(Doc. No. 62) ("Furman Declaration"), Lanasa (Doc.
No. 63) ("Lanasa Declaration"), Murphy (Doc. No.
64) ("Murphy Declaration"), Hersh, a/k/a Weed (Doc.
No. 65) ("Weed Declaration"), Carpenter (Doc. No.
66) ("Carpenter Declaration"), Bly (Doc. No. 67) ("Bly
Declaration"), and Losito (Doc. No. 68) ("Losito
Declaration").

In opposition to summary judgment, Plaintiff filed on
June 8, 2005, a Memorandum of Law (Doc. No. 72)
("Plaintiff's Memorandum"), a Statement of Disputed
Factual Issues and Questions (Doc. No. 73) ("Plaintiff's
Statement of Facts"), and the Declaration of Plaintiff
(Doc. No. 74) ("Plaintiff's Declaration"), attached to
which are exhibits A though X ("Plaintiff's Exh(s). ----").
In further support of summary judgment, Defendants
filed on June 16, 2005 the Reply Declaration of Assistant
Attorney General Stephen F. Gawlik ("Gawlik") (Doc.
No. 75) ("Gawlik Declaration"). Oral argument was
deemed unnecessary.

Based on the following, Defendants' motion for summary
judgment is GRANTED in part and DENIED in part.

### FACTS [2]

**\*2** Plaintiff's claims are based on separate incidents occurring on April 26, 2002 and June 4, 2002. Because Plaintiff's and Defendants' versions of the events concerning each incident vary greatly, and are critical to resolution of Defendants' motion, the court describes both.

#### The April 26, 2002 Incident

Plaintiff alleges that while incarcerated at the Southport Correctional Facility ("Southport"), on April 26, 2002, Defendants Sgt. Furman, and Corrections Officers Bly, Carpenter, and Lanasa, subjected Plaintiff to excessive force by engaging in an unprovoked physical attack on Plaintiff, and that following the attack, Defendants Thurman, Bly, Carpender, Lanasa and Nurse Brink ("Brink") acted with deliberate indifference to Plaintiff's medical needs by failing to treat Plaintiff for injuries allegedly sustained as a result of the attack. First Claim for Relief, Amended Complaint at 4. According to Plaintiff, on the morning of April 26, 2002, Plaintiff was released from his prison cell to attend recreation, and Sgt. Furman proceeded to pat-frisk Plaintiff, and remarked that Plaintiff "like[d] to write, huh? Well, we are going to give you something to write about." *Id.* Plaintiff maintains that after the pat-frisk concluded, Plaintiff "was directed back on to the company," and when Plaintiff reached the "shower area" he was struck on the right side of his head by Sgt. Furman, causing Plaintiff to fall to the floor, where Defendants Furman, Bly, Carpenter and Lanasa kicked, punched and jabbed at Plaintiff with batons. *Id.* According to Plaintiff, he was handcuffed and restrained with a wrist chain during the incident. *Id.*

According to Plaintiff, after the incident, Defendants Bly and Carpenter dragged Plaintiff to his cell and placed him inside. Amended Complaint at 4. Plaintiff requested that his injuries, including a sore and painful right ear, lumps behind his right ear and on the back of his head, small cuts on his nose and hand, and bruising on his ribs, back, and legs, be treated, but Sgt. Furman responded "Yeah, right!," and no treatment was provided at that time. *Id.*

Later, while Defendant Losito was on rounds, Plaintiff described his injuries to Losito and requested to see the nurse. Amended Complaint at 4. Losito responded that "the nurse will be around with medication and as long as you ['re] still breathing [it's] not a[n] emergency." *Id.* Plaintiff never saw the nurse on April 26, 2002. *Id.* Rather, on April 27 or 28, 2002, Plaintiff informed Defendant Nurse Brink of his injuries and blood in his urine while Brink was distributing medications to the inmates. *Id.* at 5. Plaintiff maintains Brink did not believe Plaintiff and, instead, responded by calling Plaintiff a "trouble maker and liar." *Id.*

Defendants deny any force was used against Plaintiff on April 26, 2002. Rather, Defendants maintain that Plaintiff, during his daily exercise run on April 26, 2002, refused to comply with exercise procedures by repeatedly turning his head while undergoing a pat-frisk. As a result, Sgt. Furman ordered Plaintiff to stop turning his head and warned that Plaintiff's continued refusal to comply with proper exercise procedures would constitute an exercise refusal necessitating Plaintiff's return to his cell. Because Plaintiff continued to turn his head, he was placed in restraints and escorted back to his cell where the restraints were removed without incident.

**\*3** According to Defendants, Plaintiff was seen by Nurse Brink on April 28, 2002 during Brink's regular rounds. Brink maintains that at that time, Plaintiff complained that since the previous evening, he had been passing blood in his urine, but made no other complaints and exhibited no other signs or symptoms, and there was no indication that Plaintiff suffered from any serious ailment requiring immediate attention. Brink Declaration ¶ 4. Brink advised Plaintiff to increase his fluids intake and report any change in signs or symptoms, and also requested a urinalysis be ordered. *Id.* The urinalysis order was approved by Southport Medical Director Dr. Alves. and, on April 30, 2002, Plaintiff's urine sample was collected for urinalysis which showed blood, bacteria and increased white blood cell count indicative of a mild urinary tract infection ("UTI"). *Id.* ¶¶ 4-5. Follow-up urinalysis on samples collected from Plaintiff on May 7 and 13, 2002 established that by May 13, 2002, Plaintiff's urine was normal. *Id.* ¶ 6.

On April 30, 2002, Plaintiff was seen by Nurse Peters [3] in connection with complaints of problems with his right ear. Upon examination, Nurse Peters observed no bruising or swelling and scheduled an ear examination.

When Nurse Brink next saw Plaintiff on May 1, 2002, Plaintiff complained that he was unable to hear out of his right ear. Brink found no outward sign of injury and discussed the matter with staff from Southport's mental health unit, advising of Plaintiff's recent allegations of paranoia. Brink noted in Plaintiff's medical chart that Plaintiff would sporadically refuse his morning psychiatric medications and that an ear examination was pending.

On May 2, 2002, Nurse Brink, at the request of Southport's security staff, examined Plaintiff in connection with Plaintiff's complaint that he had recently been the subject of an excessive use of force, which revealed a mark on Plaintiff's nose, a right swollen ear, a bump on the back of Plaintiff's head, a sore right rib, bilateral flank soreness, and a mark between Plaintiff's fourth and fifth left fingers. Upon a complete physical examination of Plaintiff in his underwear, Nurse Brink observed only a 3 cm superficial abrasion on Plaintiff's nose, and a 2 cm superficial abrasion on Plaintiff's knuckle. Otherwise, Plaintiff had no swelling or trauma about his ears, his ear canals were healthy, there were no bumps or bruising on Plaintiff's head, his lungs were clear, Plaintiff ambulated without difficulty and had full range of motion in all extremities, digits were normal, all skin was intact, and Plaintiff required no medication.

**The June 4, 2002 Incident**

As to the incident Plaintiff claims occurred on June 4, 2002, Plaintiff alleges Sgt. Furman advised that Plaintiff was being moved from C-Block, 2-Company, 6-Cell to C-Block, 1-Company, 15-Cell, and while escorting Plaintiff to the new cell, remarked that such cell "was technically our of order, but that was where [Plaintiff] was being placed." Second Claim for Relief, Amended Complaint at 6. Plaintiff describes his new cell as "not in living condition," as the toilet did not flush, the sink's cold water did not work, although the hot water was on and would not stop running, the cell's floor was covered with water and grime, and the cell mattress was wet with water or urine. *Id.* Plaintiff maintains that upon informing Furman of the cell's conditions, Furman ignored Plaintiff and walked away. *Id.*

*4 According to Plaintiff, later that day, Defendant Murphy dropped two of Plaintiff's books into Plaintiff's cell. Amended Complaint at 6. When Plaintiff asked about his other personal property, including legal materials, bed

sheets, letters, photographs, and other items, Murphy "just walked away." *Id.* Plaintiff also maintains that Murphy failed to provide Plaintiff with lunch, and when Plaintiff complained to Sgt. Furman about not receiving his luncheon meal, Furman acted as though he could not hear Plaintiff and walked away. *Id.*

Plaintiff asserts that the stress Defendants caused Plaintiff on June 4, 2002, "gave me a mental breakdown," such that after dinner, Plaintiff ate and smeared feces on his body, face and around his cell. Amended Complaint at 6-7. Plaintiff further maintains he slashed his wrist and forearm with a medication tube and that when he showed such wounds to Defendant Losito and requested help, Losito did nothing. *Id.* at 7. Defendants Losito and Nurse Hersh later stopped by Plaintiff's cell and, upon observing the blood and feces smeared on Plaintiff and around the cell, as well as the slash marks on Plaintiff's arms for which Plaintiff again requested help, Losito and Hersh laughed and Hersh stated "You want to kill yourself? Use your socks and hang yourself from the bars," and then walked away. *Id.*

On June 5, 2002, at 7:10 A.M., Nurse Peters stopped by Plaintiff's cell and advised that she was going to get Plaintiff some help. At 9:15 A.M. on June 5, 2002, two unidentified corrections officers and a sergeant removed Plaintiff, who was covered in feces and crying uncontrollably, from the cell and escorted to the infirmary. Plaintiff was never returned to the cell where the alleged actions on June 4th and 5th took place.

Defendants maintain that when Sgt. Furman placed Plaintiff in the new cell on June 4, 2002, Plaintiff did not inform Furman of any problems with the cell's conditions. Rather, according to Southport's logbook, [4] Plaintiff was placed in the new cell on June 4, 2002, at 2:30 P.M., after Plaintiff made threats against Defendant Murphy. The officer making rounds at 5:15 P.M. that same day observed that Plaintiff had wiped feces on the cell's walls. Southport's logbook indicates that on June 5, 2002, at 9:10 A.M., Mr. Militello, a mental health worker from the New York State Office of Mental Health, visited Plaintiff and, by 10:10 A.M. on June 5, 2002, Plaintiff had been transferred to Southport's infirmary.

According to Plaintiff's medical records, on June 4, 2002, Plaintiff was examined at 7:30 P.M., by Nurse Whedon [5] who noted that Plaintiff complained of a rash and dryness

on his lower legs. June 4, 2002 Medical Records, Weed Declaration Exh. A. On June 5, 2002, Plaintiff was transferred from Southport to the Elmira Correctional Facility ("Elmira").

According to Outpatient Psychiatric Progress Notes prepared by Militello and submitted by Plaintiff ("Outpatient Psychiatric Progress Notes"), Plaintiff's Exh. W, when Plaintiff was transferred to Elmira on June 5, 2002, Plaintiff exhibited anger, self-harm, threats to self-harm, was withdrawn, had regressed and had behavioral problems including scratching his wrists, and smearing feces on himself. Plaintiff was noted to have an extensive pyschiatric history. Plaintiff was diagnosed with schizophrenia and antisocial personality disorder, and was further noted with self-harm gestures, and tendencies toward exposing himself to females and violence. On June 24, 2003, Mr. H.E. Smith ("Smith"), Executive Director of Central New York Psychiatric Center filed a petition ("the Petition") in New York Supreme Court, Oneida County, seeking an order pursuant to New York Correction Law § 402, committing Plaintiff to a state hospital for the mentally ill. Plaintiff's Exh. X. According to Smith, the Petition was based on an examination of Plaintiff conducted by prison physicians [6] on June 23, 2002. *Id.*

## DISCUSSION

### 1. Summary Judgment

**\*5** Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a) and (b); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250-51 (1986); *Rattner v. Netburn,* 930 F.2d 204, 209 (2d Cir.1991). The court is required to construe the evidence in the light most favorable to the non-moving party. *Tenenbaum v. Williams,* 193 F.3d 58, 59 (2d Cir.1999) (citing *Anderson, supra,* 477 U.S. at 255; *Rattner,* 930 F.2d at 209. The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment. *Celotex,* 477 U.S. at 322; *see*

*Anderson,* 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.' Such a motion, whether or not accompanied by affidavits, will be 'made and supported as provided in this rule [FRCP 56],' and Rule 56(e) therefore requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex,* 477 U.S. at 323-24 (1986) (quoting Fed.R.Civ.P. 56). Thus, "as to issues on which the non-moving party bears the burden of proof, the moving party may simply point out the absence of evidence to support the non-moving party's case." *Nora Beverages, Inc. v. Perrier Group of America, Inc.,* 164 F.3d 736, 742 (2d Cir.1998). Once a party moving for summary judgment has made a properly supported showing as to the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor. *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995). Rule 56 further provides that

> [w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Fed.R.Civ.P. 56(e).

**\*6** Here, Plaintiff alleges Defendants violated his civil rights under 42 U.S.C. § 1983. Pursuant to § 1983, an individual may seek damages against any person who, under color of state law, subjects such individual to the deprivation of any rights, privileges, or immunities protected by the Constitution or laws of the United States. 42 U.S.C. § 1983. However, "Section 1983 'is not itself a source of a substantive rights,' but merely provides 'a method for vindication of federal rights elsewhere

conferred.' " *Albright v.. Oliver,* 510 U.S. 266, 271 (1994) (citing *Baker v. McCollan,* 443 U.S. 137, 144 n. 3 (1979)). Thus, "[t]he first step in any such claim is to identify the specific constitutional right allegedly infringed." *Id.* (citing *Graham v. Connor,* 490 U.S. 386, 394, (1989); and *Baker,* 443 U.S. at 140).

Based on the incident of April 26, 2002, Plaintiff claims violations of his Eight Amendment rights when Defendants Furman, Bly, Carpenter and Lanasa used excessive force on him, and when Defendants Furman, Bly, Carpenter, Lanasa and Brink acted with deliberate indifference to Plaintiff's medical needs. Amended Complaint at 5. Based on the incident of June 4, 2002, Plaintiff alleges violations of his Eighth Amendment rights against cruel and unusual punishment occurred when Defendant Sgt. Furman placed Plaintiff in an unsanitary cell and refused to resolve Plaintiff's complaints of not being served a meal and providing clean bedding, and Murphy withheld from Plaintiff food, clean bedding and Plaintiff's personal property. Amended Complaint at 7. Plaintiff further claims Losito and Hersh violated his Eighth Amendment rights by acting with deliberate indifference to Plaintiff's psychiatric and medical needs. *Id.* at 7-8. [7]

**2. Eighth Amendment**
Plaintiff's claims of excessive force, deliberate indifference to medical needs, and unsanitary conditions of confinement pertaining to the separate incidents on April 26, 2002 and June 4, 2002 all arise under the Eighth Amendment. In particular, the Eighth Amendment prohibits "cruel and unusual punishments" during imprisonment. U.S. Const. 8th amend.; *Wilson v. Seiter,* 501 U.S. 294, 296-97 (1991); *Romano v. Howarth,* 998 F.2d 101, 104 (2d cir.1993). Not every governmental action affecting the interests or well-being of a prisoner, however, is subject to Eighth Amendment protections. *Whitley v. Albers,* 475 U.S. 312, 319 (1986). Rather, only the unnecessary and wanton infliction of pain constitutes the cruel and unusual punishment forbidden by the Eighth Amendment. *Id.* Nevertheless, within the ambit of the Eighth Amendment are protections against the use of excessive force, deliberate indifference to an inmate's serious medical need, and inhumane conditions of confinement. *See Trammell v. Keane,* 338 F .3d 155, 162 (2d Cir.2003) (observing different tests for evaluating Eighth Amendment claims for excessive force, conditions of confinement, and denial of medical care).

**A. Excessive Force**
 **\*7** Defendants argue in support of summary judgment that despite Plaintiff's claims asserted in the Amended Complaint and by Plaintiff in his affidavit opposing summary judgment, there is a complete lack of any objective evidence supporting Plaintiff's assertion that on April 26, 2002, he was subjected to excessive force, resulting in injuries for which Plaintiff was subsequently denied medical treatment. Defendants' Memorandum at 3-9. In opposition to summary judgment, Plaintiff submits the affidavit of David Albelo ("Albelo") ("Albelo Affidavit"), an inmate who was also confined in Southport's C-Block on April 26, 2002, and who witnessed the incident. Albelo Affidavit, Plaintiff's Exh. A, ¶ 1-4.

In assessing an inmate's claims that prison officials subjected him to cruel and unusual punishment by using excessive force, courts must determine whether the prison officials acted "in a good-faith effort to maintain or restore prison discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillan,* 503 U.S. 1, 7 (1992). An inmate plaintiff claiming that prison officials subjected him to cruel and unusual punishment by use of excessive force must establish both an objective and subjective component of the claim. *Romano,* 998 F.2d at 105.

Objectively, a § 1983 plaintiff must establish that the alleged deprivation is sufficiently serious or harmful to reach constitutional dimensions. *Romano,* 998 F.S2d at 104, *see also Wilson,* 501 U.S. at 294. This objective component is "contextual and responsive to 'contemporary standards of decency.' " *Hudson,* 503 U.S. at 8. Thus, while a *de minimis* use of force will rarely suffice to state a constitutional claim, a plaintiff is not required to show that the application of force resulted in any serious injury. *Id.* at 9-10; *see also Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973) (noting that "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights."). An inmate's constitutional protections against excessive force by corrections officers "is nowhere nearly so extensive as that afforded by the common law tort action for battery ." *Johnson,* 481 F.2d at 1033; *Anderson v. Sullivan,* 702 F.Supp. 424, 426 (S.D.N.Y.1988).

In the instant case, Plaintiff has filed in opposition to summary judgment the affidavit of David Albelo ("Albelo") ("Albelo Affidavit"), an inmate who was also confined in Southport's C-Block on April 26, 2002, and who claims to have witnessed the incident. Albelo Affidavit, Plaintiff's Exh. A, ¶¶ 1-4. Albelo avers he observed Sgt. Furman strike Plaintiff in the side of the head, causing Plaintiff to fall to the floor, and then observed Furman, Bly, Carpenter and two other corrections officers punch and kick Plaintiff as he lay on the floor in handcuffs and chains. *Id.* ¶ 5. According to Albelo, he and other inmates screamed for the officers to stop assaulting Plaintiff, *id.* ¶ 6, but that "Plaintiff was then half dragged and half walked to his cell while officer Bly slapped him." *Id.* ¶ 7. Albelo further stated that he was concerned about Plaintiff's well-being and asked the "unit officer" to check on Plaintiff, but the unit officer told Albelo to "mind your business, it does not concern [ ] you." *Id.* ¶ 9.

 **\*8** The statements contained in the Albelo Affidavit contradicts the statements made by Defendants in support of summary judgment in which Defendants, while admitting that Plaintiff was placed in handcuffs and chained, deny that any force was used in returning Plaintiff to his cell on the morning of April 26, 2002, following Plaintiff's refusal to comply with Sgt. Furman's order to stop turning his head while being pat-frisked in preparation for the exercise run. Furman Declaration ¶¶ 5-10; Bly Declaration ¶¶ 5-7; Carpenter Declaration ¶¶ 5-8.

Nor is the fact that Plaintiff's medical records are devoid of any evidence that Plaintiff was injured in the April 26, 2002 dispositive of the claim. Rather, an Eighth Amendment excessive force claim does not require any serious injury. *Hudson,* 503 U.S. at 8; *Johnson,* 481 F.2d at 1028. Furthermore, the record on this motion establishes that Plaintiff was not thoroughly examined in connection with his complaints following the April 26, 2002 incident until May 2, 2002, almost a week later, during which time more minor injuries would likely become less apparent. Had Plaintiff undergone a thorough examination on April 26, 2002, the two abrasions observed on May 2, 2002, including the 3 cm superficial abrasion on Plaintiff's nose, and the 2 cm superficial abrasion on Plaintiff's knuckle, would likely have appeared more palpable and thus more serious. As such, there is a material issue of fact as to the first prong of Plaintiff's excessive force claim, and the

court next considers the second, subjective prong of the claim.

The subjective component of an Eighth Amendment excessive force claim requires that the defendants act malicious and with the intent to harm the inmate plaintiff. *Hudson,* 503 U.S. at 7; *Romano,* 998 F.2d at 105. To determine whether the defendants acted maliciously, the trier of fact should consider (1) the extent of the plaintiff's injuries; (2) the need for the application of force; (3) the correlation between the need for force and the amount of force used; (4) the threat reasonably perceived by the defendants; and (5) any efforts made by the defendants to temper the severity of a forceful response. *Whitley,* 475 U.S. at 321. Here, the record also establishes a material issue of fact as to whether Plaintiff was subjected to the use of any force in being returned to his cell on April 26, 2002 and, if so, whether the use of such force was reasonable.

Specifically, as discussed above, *supra,* at 5, Defendants admit that Plaintiff was both handcuffed and restrained with a wrist chain before being escorted to his cell on April 26, 2002, but deny any force was used against Plaintiff, in contrast to Plaintiff's allegations, corroborated by Albelo, that Defendants struck Plaintiff in the side of the head, knocking Plaintiff to the ground, and then continued to punch and kick plaintiff while he lay in on the floor, still restrained by handcuffs and the chain. Defendants' assertion that no force was used implies that any threat posed by Plaintiff was small, such that any use of force by Defendants could be disproportionate. It is significant that Defendants do not challenge the accuracy or authenticity of the Albelo Affidavit, which is both signed and notarized as required to be considered admissible evidence. This unresolved factual issue as to the subjective prong of Plaintiff's excessive force claim is not only material, but also sufficient to preclude summary judgment.

 **\*9** Summary judgment on Plaintiff's excessive force claim arising from the April 26, 2002 incident is DENIED.

## B. Deliberate Indifference to Serious Medical Need

Defendants also maintain that the record contains no objective evidence supporting Plaintiff's alleged injuries resulting from Defendants alleged use of excessive force on April 26, 2002, or that Plaintiff was denied necessary medical treatment for any serious injury. *Id.* at 9-12. According to Defendants, the record also fails to contain

any evidence that on June 4, 2002, Plaintiff experienced a mental breakdown for which he was denied appropriate psychiatric care. *Id.* at 17-19.

"In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Estelle v. Gamble,* 429 U.S. 97, 104 (1976) (bracketed text in original)). A serious medical condition exists where "the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Chance,* 143 F.3d at 702. The standard for determining whether there has been an Eighth Amendment violation based on deliberate indifference to a prisoner's serious medical needs

> incorporates both objective and subjective elements. The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison officials acted with a sufficiently culpable state of mind.

*Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003) (citing *Estelle,* 429 U.S. at 104, and *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)).

Denying or delaying access to medical care or intentionally interfering with prescribed treatment may constitute deliberate indifference. *Estelle,* 429 U.S. at 104; *see Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000) (holding dentist's outright refusal for one year to treat a cavity, a degenerative condition tending to cause acute and pain if left untreated, combined with imposition of an unreasonable condition on such treatment, could constitute deliberate indifference on the part of the prison dentist, precluding summary judgment in defendant's favor). Such delay in treatment violates the Eighth Amendment "whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards by intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle,* 429 U.S. at 104-05. Further, culpable intent requires the inmate establish both that a prison official "has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." *Hayes v. New York City Department of Corrections,* 84 F.3d 614, 620

(2d Cir.1996) (citing *Farmer v. Brennan,* 511 U.S. 825, 834-35 (1994). Nevertheless, neither "inadvertent failures to provide adequate medical care" nor "negligence in diagnosing or treating a medical condition" comprise Eighth Amendment violations. *Estelle,* 429 U.S. at 105-06 (holding medical malpractice does not become a constitutional violation merely because the victim is a prisoner); *Harrison,* 219 F.3d at 139 ("We agree that the mere malpractice of medicine does not amount to an Eighth Amendment violation."). Nor does a "mere disagreement" with a physician over the appropriate course of treatment arise to a constitutional violation, although in certain instances a physician may evince deliberate indifference by consciously choosing "an easier and less efficacious" treatment plan. *Chance,* 143 F.3d at 703.

**\*10** As to the objective prong, a sufficiently serious conditions is "a condition of urgency, one that may produce death, degeneration or extreme pain." *Hathaway,* 99 F.3d at 66. In the instant case, the record is devoid of any evidence establishing that Plaintiff, in connection with either incident, had any medical urgency that might produce death, degeneration or extreme pain. Rather, the record demonstrates that any injury inflicted on Plaintiff in connection with the April 26, 2002 incident was relatively minor, given that by the time Plaintiff underwent the thorough physical examination on May 2, 2002, only two small abrasions were discovered. As such, assuming, *arguendo,* that on April 26, 2002, Plaintiff did in fact suffer the alleged injuries, including soreness, pain in and a lump behind his right ear, lump on the back of his head, small abrasions on his nose and knuckle, and bruising to his back, ribs and legs, Amended Complaint at 4, such injuries do not constitute the requisite "serious medical condition" necessary to establish an Eight Amendment deliberate indifference claim. *Compare Hemmings v. Gorczyk,* 134 F.3d 104, 109 (2d Cir.1998) (reversing district court's grant of summary judgment in favor of defendants on inmate plaintiff's Eighth Amendment deliberate indifference to serious medical needs claim where inmate suffered from ruptured Achilles tendon, which remained swollen and painful, requiring plaintiff use crutches to walk, which was originally diagnosed as a bad sprain, yet defendants failed for two months to provide proper treatment despite fact that plaintiff's disabling condition was "easily observable"). That by May 2, 2002, such injuries had healed without any medical treatment further establishes

that the injuries were not likely to produce death, degeneration or extreme pain without urgent medical treatment. Additionally, that Plaintiff, on April 28, 2002, reported he was passing blood in his urine, yet failed at that time to make any other complaints, demonstrates that Plaintiff's claimed injuries had already sufficiently healed such that urgent treatment for them was never required. That Plaintiff received timely medical care in response to such complaint, including collecting a urine sample which, upon analysis, showed evidence of a mild UTI, rather than any trauma, further undermines Plaintiff's asserted denial of urgent medical care. The record thus fails to establish any factual issue which, if decided in Plaintiff's favor, could establish the objective prong of Plaintiff's deliberate indifference claim with regard to the April 26, 2002 incident.

The record is similarly deficient as to the June 4, 2002 incident. Specifically, although Plaintiff claims that he had a "mental breakdown" after he was placed in the allegedly unsanitary cell, which caused him to eat and smear feces on himself, and to attempt to slash his wrists with a medication tube, Amended Complaint, at 7, the record shows that Plaintiff was first observed to have wiped feces on himself and the walls of his cell at 5:15 P.M. on June 4, 2002, less than three hours after Plaintiff was moved to the cell. Prison Logbook, Furman Declaration Exh. A. At 7:10 P.M. that same day, Plaintiff was seen by Nurse Whedon in connection with Plaintiff's complaints of a rash and dryness on his lower legs. Weed Declaration ¶ 4 and Exh. A, Plaintiff's Ambulatory Health Record for June 4, 2002. In fact, two affidavits submitted by Plaintiff in opposition to summary judgment corroborate the fact that Plaintiff was seen by a nurse in the evening of June 4, 2002. *See* Plaintiff's Exhs. T (Affidavit of Inmate Bussey ("Bussey Affidavit")) and U (Affidavit of Inmate Douglas ("Douglas Affidavit")). [8] Significantly, Whedon did not note any injury to Plaintiff's wrists. Moreover, the very next morning, June 5, 2002, at 9:10 A.M., Plaintiff was seen by a mental health worker, Mr. Militello, who had Plaintiff transferred to the infirmary and then transferred to Elmira for reevaluation of Plaintiff's schizophrenia diagnosis because Plaintiff was exhibiting signs of mental illness. Furman Declaration ¶¶ 14-15; Outpatient Psychiatric Progress Notes, Plaintiff's Exh. W. Militello also reported that Plaintiff exhibited anger, was threatening to harm himself, had smeared feces on himself, and described Plaintiff as having "scratched wrists," Outpatient Psychiatric Progress Notes, but did

not report any physical or mental condition arising to a serious medical need for which treatment had been denied. Rather, the record establishes that Defendants realized in the evening of June 4, 2002 that Plaintiff was experiencing some mental issues for which help was provided the next morning. The record thus fails to establish any factual issue which, if decided in Plaintiff's favor, could establish the objective prong of Plaintiff's deliberate indifference claim with regard to the June 24, 2002 incident.

**\*11** Because Plaintiff has failed to establish the objective prong for his deliberate indifference claim as to either the April 26 or June 4, 2002 incident, the court need not address whether Plaintiff can establish the subjective prong as to either incident. Summary judgment as to Plaintiff's claim that Defendants acted with deliberate indifference to his serious medical needs is GRANTED as to Defendants.

### C. Conditions of Confinement

Defendants argue in support of summary judgment that the alleged unsanitary conditions of the cell to which Plaintiff was transferred on June 4, 2002, even if true, are insufficient to support Plaintiff's claims that he was subjected to cruel and unusual punishment in violation of the Eighth Amendment. Defendants' Memorandum at 13-15. Nor does Defendant Murphy's failure to serve Plaintiff lunch one day constitute any Eighth Amendment claim. *Id* . at 15-17. In opposition to summary judgment, Plaintiff submits the Bussey and Douglas Affidavits in which Southport inmates Bussey and Douglas corroborate Plaintiff's assertions that Plaintiff, upon being placed in a different cell on June 4, 2002, complained of the living conditions in the cell, or the fact that he was not served lunch, and that although Defendant Murphy dropped two of Plaintiff's books into Plaintiff's cell, Plaintiff's request for the rest of his personal belongings were ignored. Bussey Affidavit ¶¶ 3-6; Douglas Affidavit ¶¶ 3-6.

To establish an Eighth Amendment violation based on prison conditions, a plaintiff must demonstrate "that it is contrary to current standards of decency for anyone to be exposed against his will" to the challenged prison conditions. *Helling v. McKinney,* 509 U.S. 25, 35 (1993).

An Eighth Amendment claim based on prison conditions must satisfy

both an objective element-that the prison official's transgression was "sufficiently serious"-and an objective element-that the officials acted, or omitted to act, with a "sufficiently culpable state of mind," *i.e.,* with "deliberate indifference to inmate health or safety."

*Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir.2002) (quoting *Farmer,* 511 U.S. at 834).

As to the objective element, while the Constitution "does not mandate comfortable prisons," *Rhodes v. Chapman,* 452 U.S. 337, 346 (1981), prison inmates may not be denied "the minimal civilized measure of life's necessities." *Id.* at 347. The Supreme Court has held that the Eighth Amendment requires that inmates not be deprived of their "basic human needs-*e.g.,* food, clothing, shelter, medical care, and reasonable safety." *Helling,* 509 U.S. at 32 (internal citation and quotation omitted). "Nor may prison officials expose prisoners to conditions that 'pose an unreasonable risk of serious damage to [their] future health.' " *Phelps,* 308 F.3d at 185 (quoting *Helling,* 509 U.S. at 35). The Eighth Amendment's objective prong requires an inmate "prove that the conditions of his confinement violate contemporary standards of decency." *Id.*

**\*12** As to the subjective element, the Supreme Court has held that

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."

*Farmer,* 511 U.S. at 837.

The "deliberate indifference" element is equivalent to criminal law's reckless indifference standard. *Id.* at 839-40.

In the instant case, Plaintiff's Eighth Amendment claim fails to satisfy the objective element necessary to state a claim based on prison conditions. Although Plaintiff claims the cell to which he was moved on June 4, 2002 was dirty, the mattress was wet, no bedding was provided, the cell sink's cold water did not work, while the hot water continually ran, and Plaintiff missed receiving one meal, the amount of time for which Plaintiff endured such conditions, less than one full day, renders the claim without merit. *See Hutto v. Finney,* 437 U.S. 678, 687 (1978) ("the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards. A filthy, overcrowded cell and a diet of 'grue' *[sic]* might be tolerable for a few days and intolerably cruel for weeks and months."). As such, Defendant's motion for summary judgment is GRANTED as to Plaintiff's claim challenging the conditions of his confinement based on the June 4, 2002 incident.

**3. Deprivation of Property**

Although not asserted as such, Plaintiff's claim that upon being transferred to a different cell on June 4, 2002, Defendants failed to give Plaintiff his personal property is properly construed under the Fourteenth Amendment as asserting a deprivation of property without due process. Nevertheless, no claim under 42 U.S.C. § 1983 lies based on the negligent conduct of a state actor even though such conduct may result in deprivation of a property interest. *Daniels v. Williams,* 474 U.S. 327, 330-31 (1986). Further, even intentional, unauthorized deprivations of property by prison officials are not redressable pursuant to 42 U.S.C. § 1983 if "adequate state post-deprivation remedies are available." *Hudson v. Palmer,* 468 U.S. 517, 533 (1984). In New York, several adequate post-deprivation remedies are available such that even if Defendants either negligently or intentionally failed to provide Plaintiff with his personal property, no claim for relief under § 1983 lies.

Specifically, an administrative procedure for inmate personal property claims is provided by N.Y. Comp.Codes R. & Regs. Tit. 7, Pt. 1700. Plaintiff may also commence an action to recover the value of his lost property in New York Court of Claims. *See Butler v. Castro,* 896 F.2d 698, 700 (2d Cir.1990)(holding that New York court of claims presents adequate post-deprivation remedy which precludes § 1983 action only where alleged deprivation was result of random, unauthorized conduct rather than the result of operation of established state

procedure). Plaintiff alleges no state policy caused the alleged interference with his property. As such, Plaintiff may not sue under § 1983 to recover for deprivation of personal property. *Hudson,* 468 U.S. at 533.

**\*13** Summary judgment is thus GRANTED in favor of Defendants on Plaintiff's Fourteenth Amendment Due Process claim based on the June 4, 2002 incident.

### 4. Qualified Immunity

Alternatively, Defendants assert they are entitled to qualified immunity on all claims for damages. Defendants' Memorandum at 19-21. Plaintiff has not responded to this argument. Because the court is granting summary judgment on Plaintiff's claims alleging deliberate indifference to his serious medical needs and challenging the conditions of his confinement, as well as on Plaintiff's Fourteenth Amendment due process claim, the court addresses qualified immunity only as to Plaintiff's excessive force claim.

Qualified immunity shields law enforcement officials who perform discretionary functions from liability if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable prison official would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 806 (1982); *Washington Square Post No. 1212 v. Maduro,* 907 F.2d 1288, 1291 (2d Cir.1990). Even if the right at issue was clearly established, if it was objectively reasonable for the defendant to believe that his act did not violate the plaintiff's constitutional rights, the defendant may nevertheless be entitled to qualified immunity. *Saucier v. Katz,* 533 U.S.194, 201-02 (2001); *Anderson v. Creighton,* 483 U .S. 635, 641 (1987); *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 568-69 (2d Cir.1996); *Van Emrik v. Chemung County Dep't of Soc. Servs.,* 911 F.2d 863, 865-66 (2d Cir.1990); *Robison v. Via,* 821 F.2d 913, 920-21 (2d Cir.1987). "The availability of the defense depends on whether a reasonable officer could have believed his action to be lawful, in light of clearly established law and the information he possessed." *Weyant v. Okst,* 101 F.3d 845, 858 (2d Cir.1996) (internal quotation marks omitted).

A right is clearly established if (1) it was defined with reasonable specificity, (2) its existence has been affirmed by either the Supreme Court or the relevant court of appeals, and (3) a reasonable defendant official would have understood under the existing law that his acts were unlawful. *Brown v. City of Oneonta, N.Y. Police Dep't,*

106 F.3d 1125, 1131 (2d Cir.1997). If, however, it was objectively reasonable for the defendant to believe that his act did not violate the plaintiff's constitutional rights, the defendant may be entitled to qualified immunity. *Robison,* 821 F.2d at 920-21.

A defendant is entitled to summary judgment based on qualified immunity if the court finds that the asserted rights were not clearly established, or "if the defendant adduces[s] sufficient facts [such] that no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to the plaintiff ... could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not violate a federally protected right." *Robison,* 821 F.2d at 921 (internal quotation omitted). Stated another way, a defendant is entitled to qualified immunity under the objectively reasonable standard if "officers of reasonable competence could disagree" on the legality of the defendant's actions. *Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir.1995).

**\*14** Where, however, the objective reasonableness of an officer's actions depends on disputed facts, summary judgment based on qualified immunity is properly denied. *Rivera v. United States,* 928 F.2d 592, 607 (2d Cir.1991); *Brawer v. Carter,* 937 F.Supp. 1071, 1082 (S.D.N.Y.1996). Provided that no factual issues are disputed, the application of qualified immunity to the facts is a question of law for the court to decide. *Finnegan v. Fountain,* 915 F.2d 817, 821 (2d Cir.1990). Accordingly, as to Plaintiff's excessive force claim, the court must evaluate whether Defendants' actions, in light of clearly established law in existence as of April 26, 2002, violated Plaintiff's civil rights.

Prison inmates have a clearly established right to be free from the application of excessive force by prison employees. *Hudson,* 503 U.S. at 7. However, a prisoner does not have a clearly established right to be free from the use of force by corrections officers attempting to subdue the prisoner with regard to a physical altercation and whether Defendants' conduct violated a clearly established right is not dependent on whether identical conduct has been previously held to violate a prisoner's constitutional rights. *See Hope v. Pelzer,* 536 U.S. 730, 740-41 (2002) (for purposes of qualified immunity, notice that a corrections officer's conduct violates established law does not require facts of previous cases be materially or

fundamentally similar to situation in question, but that state of law at relevant time provides fair warning that conduct is unconstitutional).

Here, the same disputed issues of fact that preclude summary judgment on Plaintiff's excessive force claim also prevent the court from finding Defendants are qualifiedly immune from liability on such claim. Accordingly, determination of Defendants' qualified immunity defense must await a fact trier's resolution of the questions of fact presented. Summary judgment based on qualified immunity is DENIED.

### CONCLUSION

Based on the foregoing, Defendants' motion for summary judgment (Doc. No. 58) is DENIED in part and GRANTED in part. The action will proceed only on Plaintiff's Eighth Amendment excessive force claim asserted against Defendants Sgt. Furman, Bly, Carpenter and Lanasa based on the April 26, 2002 incident. The parties are directed to appear before the court on **April 18, 2007** at 10:30 A .M. to schedule a trial date. Defendants are directed to make arrangements for Plaintiff to participate in the conference by telephone.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 894218

Footnotes

1    Plaintiff incorrectly spells Carpenter's name as "Carpender".

2    Taken from the pleadings and motion papers filed in this action.

3    Nurse Peters is not a party to this action.

4    Copies of the relevant portions of Southport's logbook are attached as Exh. A to the Furman Declaration.

5    Nurse W hedon is not a party to this action.

6    The record does not specify whether such "physicians" included a psychiatrist.

7    Although Defendants assert as an affirmative defense that Plaintiff failed to exhaust administrative remedies for any of the instant claims, Answer filed by Defendants Sgt. Furman, Bly, Brink, Carpenter, and Losito (Doc. No. 22), ¶ 17; Answer filed by Defendants Hersh, Lanasa and Murphy (Doc. NO. 49) ¶ 18, Defendants have not moved for summary judgment on that ground. Further, it is unclear from the record whether Plaintiff has, in fact, exhausted his administrative remedies. *See* Amended Complaint, Inmate Grievance Program Superintendent Statement (advising Plaintiff his grievance was untimely and granting Plaintiff permission to appeal to the Superintendent's Office, but failing to disclose whether Plaintiff ever pursued such appeal). The court takes no position as to whether Defendants can now move for leave to amend the scheduling order to permit further dispositive motions as to the exhaustion issue after the cut-off date provided in the Scheduling Order (Doc. No. 53) for dispositive motions. Accordingly, for the purposes of the instant motion, no exhaustion of remedies defense is before the court.

8    Both Bussey and Douglas state that at 6:30 P.M. on June 24, 2002, Defendant Nurse Hersh, accompanied by C.O. Losito, stopped at Plaintiff's cell and while dispensing nighttime medications. Bussey Affidavit ¶ 10; Douglas Affidavit ¶ 10.

    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 894218
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Eugene JONES, Plaintiff,

v.

Sergeant FURMAN, C.O. Carpender, C.O. Bly,
C.O. Losito, C.O. John Doe # 1, C.O. John Doe
# 2, C.O. John Doe # 3, C.O. John Doe # 4,
Nurse John Doe, Nurse J. Brink, R. Murphy,
C.O., Lanasa, C.O., D. Hersh, Nurse, and T.
Lanasa, Correctional Officer, Defendants.

No. 02-CV-939F.
|
March 21, 2007.

**Attorneys and Law Firms**

Eugene Jones, Fallsburg, NY, pro se.

Andrew M. Cuomo, Attorney General, State of New
York, Stephen F. Gawlik, Assistant Attorney General, of
Counsel, Buffalo, NY, for Defendants.

**DECISION and ORDER**

LESLIE G. FOSCHIO, United States Magistrate Judge.

### *JURISDICTION*

**\*1** On May 7, 2003, the parties to this action consented
pursuant to 28 U.S.C. § 636(c) to proceed before the
undersigned. The matter is presently before the court on
Defendants' motion for summary judgment (Doc. No. 58),
filed February 18, 2005.

### *BACKGROUND*

Plaintiff Eugene Jones ("Plaintiff"), proceeding *pro se,*
commenced this civil rights action on December 27, 2002,
alleging that while incarcerated at Southport Correctional
Facility ("Southport"), Defendants Sergeant Furman
("Sgt.Furman"), C.O. Carpenter [1] ("Carpenter"), C.O.
Bly ("Bly"), C.O. Losito ("Losito"), C.O. John Does

1 through 4 and Nurse Jane Doe (together, "the Doe
Defendants"), and Nurse J. Brink ("Brink"), subjected
Plaintiff to excessive force, cruel and unusual punishment
and acted with deliberate indifference to Plaintiff's medical
needs, in violation of the Eighth Amendment. On March
27, 2003, an answer was filed by Defendants Sgt.
Furman, Carpenter, Bly, Losito and Brink. On October
21, 2003, Plaintiff filed an Amended Complaint (Doc.
No. 21) ("Amended Complaint"), asserting essentially
the same claims against the original named Defendants,
and naming new Defendants, including C.O. Lanasa
("Lanasa"), C.O. R. Murphy ("Murphy"), and Nurse D.
Hersh ("Hersh") in place of the Doe Defendants. Answers
to the Amended Complaint were filed on November 13,
2003, by Defendants Sgt. Furman, Bly, Brink, Carpenter,
and Losito (Doc. No. 22), and on October 14, 2004, by
Defendants Hersh, LaNasa and Murphy (Doc. No. 49).

On February 18, 2005, Defendant filed the instant motion
seeking summary judgment ("Defendants' motion").
Defendants also filed, on February 18, 2005, papers in
support of the motion a Memorandum of Law (Doc.
No. 59) ("Defendants' Memorandum"), a Statement
of Facts Not in Dispute (Doc. No. 60) (Defendants'
Statement of Facts"), and the Declarations of Defendants
Brink (Doc. No. 61) ("Brink Declaration"), Furman
(Doc. No. 62) ("Furman Declaration"), Lanasa (Doc.
No. 63) ("Lanasa Declaration"), Murphy (Doc. No.
64) ("Murphy Declaration"), Hersh, a/k/a Weed (Doc.
No. 65) ("Weed Declaration"), Carpenter (Doc. No.
66) ("Carpenter Declaration"), Bly (Doc. No. 67) ("Bly
Declaration"), and Losito (Doc. No. 68) ("Losito
Declaration").

In opposition to summary judgment, Plaintiff filed on
June 8, 2005, a Memorandum of Law (Doc. No. 72)
("Plaintiff's Memorandum"), a Statement of Disputed
Factual Issues and Questions (Doc. No. 73) ("Plaintiff's
Statement of Facts"), and the Declaration of Plaintiff
(Doc. No. 74) ("Plaintiff's Declaration"), attached to
which are exhibits A though X ("Plaintiff's Exh(s). ----").
In further support of summary judgment, Defendants
filed on June 16, 2005 the Reply Declaration of Assistant
Attorney General Stephen F. Gawlik ("Gawlik") (Doc.
No. 75) ("Gawlik Declaration"). Oral argument was
deemed unnecessary.

Based on the following, Defendants' motion for summary
judgment is GRANTED in part and DENIED in part.

### FACTS [2]

**\*2** Plaintiff's claims are based on separate incidents occurring on April 26, 2002 and June 4, 2002. Because Plaintiff's and Defendants' versions of the events concerning each incident vary greatly, and are critical to resolution of Defendants' motion, the court describes both.

### The April 26, 2002 Incident

Plaintiff alleges that while incarcerated at the Southport Correctional Facility ("Southport"), on April 26, 2002, Defendants Sgt. Furman, and Corrections Officers Bly, Carpenter, and Lanasa, subjected Plaintiff to excessive force by engaging in an unprovoked physical attack on Plaintiff, and that following the attack, Defendants Thurman, Bly, Carpender, Lanasa and Nurse Brink ("Brink") acted with deliberate indifference to Plaintiff's medical needs by failing to treat Plaintiff for injuries allegedly sustained as a result of the attack. First Claim for Relief, Amended Complaint at 4. According to Plaintiff, on the morning of April 26, 2002, Plaintiff was released from his prison cell to attend recreation, and Sgt. Furman proceeded to pat-frisk Plaintiff, and remarked that Plaintiff "like[d] to write, huh? Well, we are going to give you something to write about." *Id.* Plaintiff maintains that after the pat-frisk concluded, Plaintiff "was directed back on to the company," and when Plaintiff reached the "shower area" he was struck on the right side of his head by Sgt. Furman, causing Plaintiff to fall to the floor, where Defendants Furman, Bly, Carpenter and Lanasa kicked, punched and jabbed at Plaintiff with batons. *Id.* According to Plaintiff, he was handcuffed and restrained with a wrist chain during the incident. *Id.*

According to Plaintiff, after the incident, Defendants Bly and Carpenter dragged Plaintiff to his cell and placed him inside. Amended Complaint at 4. Plaintiff requested that his injuries, including a sore and painful right ear, lumps behind his right ear and on the back of his head, small cuts on his nose and hand, and bruising on his ribs, back, and legs, be treated, but Sgt. Furman responded "Yeah, right!," and no treatment was provided at that time. *Id.*

Later, while Defendant Losito was on rounds, Plaintiff described his injuries to Losito and requested to see the nurse. Amended Complaint at 4. Losito responded that "the nurse will be around with medication and as long as you ['re] still breathing [it's] not a[n] emergency." *Id.* Plaintiff never saw the nurse on April 26, 2002. *Id.* Rather, on April 27 or 28, 2002, Plaintiff informed Defendant Nurse Brink of his injuries and blood in his urine while Brink was distributing medications to the inmates. *Id.* at 5. Plaintiff maintains Brink did not believe Plaintiff and, instead, responded by calling Plaintiff a "trouble maker and liar." *Id.*

Defendants deny any force was used against Plaintiff on April 26, 2002. Rather, Defendants maintain that Plaintiff, during his daily exercise run on April 26, 2002, refused to comply with exercise procedures by repeatedly turning his head while undergoing a pat-frisk. As a result, Sgt. Furman ordered Plaintiff to stop turning his head and warned that Plaintiff's continued refusal to comply with proper exercise procedures would constitute an exercise refusal necessitating Plaintiff's return to his cell. Because Plaintiff continued to turn his head, he was placed in restraints and escorted back to his cell where the restraints were removed without incident.

**\*3** According to Defendants, Plaintiff was seen by Nurse Brink on April 28, 2002 during Brink's regular rounds. Brink maintains that at that time, Plaintiff complained that since the previous evening, he had been passing blood in his urine, but made no other complaints and exhibited no other signs or symptoms, and there was no indication that Plaintiff suffered from any serious ailment requiring immediate attention. Brink Declaration ¶ 4. Brink advised Plaintiff to increase his fluids intake and report any change in signs or symptoms, and also requested a urinalysis be ordered. *Id.* The urinalysis order was approved by Southport Medical Director Dr. Alves. and, on April 30, 2002, Plaintiff's urine sample was collected for urinalysis which showed blood, bacteria and increased white blood cell count indicative of a mild urinary tract infection ("UTI"). *Id.* ¶¶ 4-5. Follow-up urinalysis on samples collected from Plaintiff on May 7 and 13, 2002 established that by May 13, 2002, Plaintiff's urine was normal. *Id.* ¶ 6.

On April 30, 2002, Plaintiff was seen by Nurse Peters [3] in connection with complaints of problems with his right ear. Upon examination, Nurse Peters observed no bruising or swelling and scheduled an ear examination.

When Nurse Brink next saw Plaintiff on May 1, 2002, Plaintiff complained that he was unable to hear out of his right ear. Brink found no outward sign of injury and discussed the matter with staff from Southport's mental health unit, advising of Plaintiff's recent allegations of paranoia. Brink noted in Plaintiff's medical chart that Plaintiff would sporadically refuse his morning psychiatric medications and that an ear examination was pending.

On May 2, 2002, Nurse Brink, at the request of Southport's security staff, examined Plaintiff in connection with Plaintiff's complaint that he had recently been the subject of an excessive use of force, which revealed a mark on Plaintiff's nose, a right swollen ear, a bump on the back of Plaintiff's head, a sore right rib, bilateral flank soreness, and a mark between Plaintiff's fourth and fifth left fingers. Upon a complete physical examination of Plaintiff in his underwear, Nurse Brink observed only a 3 cm superficial abrasion on Plaintiff's nose, and a 2 cm superficial abrasion on Plaintiff's knuckle. Otherwise, Plaintiff had no swelling or trauma about his ears, his ear canals were healthy, there were no bumps or bruising on Plaintiff's head, his lungs were clear, Plaintiff ambulated without difficulty and had full range of motion in all extremities, digits were normal, all skin was intact, and Plaintiff required no medication.

**The June 4, 2002 Incident**

As to the incident Plaintiff claims occurred on June 4, 2002, Plaintiff alleges Sgt. Furman advised that Plaintiff was being moved from C-Block, 2-Company, 6-Cell to C-Block, 1-Company, 15-Cell, and while escorting Plaintiff to the new cell, remarked that such cell "was technically our of order, but that was where [Plaintiff] was being placed." Second Claim for Relief, Amended Complaint at 6. Plaintiff describes his new cell as "not in living condition," as the toilet did not flush, the sink's cold water did not work, although the hot water was on and would not stop running, the cell's floor was covered with water and grime, and the cell mattress was wet with water or urine. *Id.* Plaintiff maintains that upon informing Furman of the cell's conditions, Furman ignored Plaintiff and walked away. *Id.*

**\*4** According to Plaintiff, later that day, Defendant Murphy dropped two of Plaintiff's books into Plaintiff's cell. Amended Complaint at 6. When Plaintiff asked about his other personal property, including legal materials, bed sheets, letters, photographs, and other items, Murphy "just walked away." *Id.* Plaintiff also maintains that Murphy failed to provide Plaintiff with lunch, and when Plaintiff complained to Sgt. Furman about not receiving his luncheon meal, Furman acted as though he could not hear Plaintiff and walked away. *Id.*

Plaintiff asserts that the stress Defendants caused Plaintiff on June 4, 2002, "gave me a mental breakdown," such that after dinner, Plaintiff ate and smeared feces on his body, face and around his cell. Amended Complaint at 6-7. Plaintiff further maintains he slashed his wrist and forearm with a medication tube and that when he showed such wounds to Defendant Losito and requested help, Losito did nothing. *Id.* at 7. Defendants Losito and Nurse Hersh later stopped by Plaintiff's cell and, upon observing the blood and feces smeared on Plaintiff and around the cell, as well as the slash marks on Plaintiff's arms for which Plaintiff again requested help, Losito and Hersh laughed and Hersh stated "You want to kill yourself? Use your socks and hang yourself from the bars," and then walked away. *Id.*

On June 5, 2002, at 7:10 A.M., Nurse Peters stopped by Plaintiff's cell and advised that she was going to get Plaintiff some help. At 9:15 A.M. on June 5, 2002, two unidentified corrections officers and a sergeant removed Plaintiff, who was covered in feces and crying uncontrollably, from the cell and escorted to the infirmary. Plaintiff was never returned to the cell where the alleged actions on June 4th and 5th took place.

Defendants maintain that when Sgt. Furman placed Plaintiff in the new cell on June 4, 2002, Plaintiff did not inform Furman of any problems with the cell's conditions. Rather, according to Southport's logbook, [4] Plaintiff was placed in the new cell on June 4, 2002, at 2:30 P.M., after Plaintiff made threats against Defendant Murphy. The officer making rounds at 5:15 P.M. that same day observed that Plaintiff had wiped feces on the cell's walls. Southport's logbook indicates that on June 5, 2002, at 9:10 A.M., Mr. Militello, a mental health worker from the New York State Office of Mental Health, visited Plaintiff and, by 10:10 A.M. on June 5, 2002, Plaintiff had been transferred to Southport's infirmary.

According to Plaintiff's medical records, on June 4, 2002, Plaintiff was examined at 7:30 P.M., by Nurse Whedon [5] who noted that Plaintiff complained of a rash and dryness

on his lower legs. June 4, 2002 Medical Records, Weed Declaration Exh. A. On June 5, 2002, Plaintiff was transferred from Southport to the Elmira Correctional Facility ("Elmira").

According to Outpatient Psychiatric Progress Notes prepared by Militello and submitted by Plaintiff ("Outpatient Psychiatric Progress Notes"), Plaintiff's Exh. W, when Plaintiff was transferred to Elmira on June 5, 2002, Plaintiff exhibited anger, self-harm, threats to self-harm, was withdrawn, had regressed and had behavioral problems including scratching his wrists, and smearing feces on himself. Plaintiff was noted to have an extensive pyschiatric history. Plaintiff was diagnosed with schizophrenia and antisocial personality disorder, and was further noted with self-harm gestures, and tendencies toward exposing himself to females and violence. On June 24, 2003, Mr. H.E. Smith ("Smith"), Executive Director of Central New York Psychiatric Center filed a petition ("the Petition") in New York Supreme Court, Oneida County, seeking an order pursuant to New York Correction Law § 402, committing Plaintiff to a state hospital for the mentally ill. Plaintiff's Exh. X. According to Smith, the Petition was based on an examination of Plaintiff conducted by prison physicians [6] on June 23, 2002. *Id.*

### DISCUSSION

**1. Summary Judgment**

**\*5** Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a) and (b); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250-51 (1986); *Rattner v. Netburn,* 930 F.2d 204, 209 (2d Cir.1991). The court is required to construe the evidence in the light most favorable to the non-moving party. *Tenenbaum v. Williams,* 193 F.3d 58, 59 (2d Cir.1999) (citing *Anderson, supra,* 477 U.S. at 255; *Rattner,* 930 F.2d at 209. The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment. *Celotex,* 477 U.S. at 322; *see*

*Anderson,* 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.' Such a motion, whether or not accompanied by affidavits, will be 'made and supported as provided in this rule [FRCP 56],' and Rule 56(e) therefore requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex,* 477 U.S. at 323-24 (1986) (quoting Fed.R.Civ.P. 56). Thus, "as to issues on which the non-moving party bears the burden of proof, the moving party may simply point out the absence of evidence to support the non-moving party's case." *Nora Beverages, Inc. v. Perrier Group of America, Inc.,* 164 F.3d 736, 742 (2d Cir.1998). Once a party moving for summary judgment has made a properly supported showing as to the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor. *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995). Rule 56 further provides that

> [w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Fed.R.Civ.P. 56(e).

**\*6** Here, Plaintiff alleges Defendants violated his civil rights under 42 U.S.C. § 1983. Pursuant to § 1983, an individual may seek damages against any person who, under color of state law, subjects such individual to the deprivation of any rights, privileges, or immunities protected by the Constitution or laws of the United States. 42 U.S.C. § 1983. However, "Section 1983 'is not itself a source of a substantive rights,' but merely provides 'a method for vindication of federal rights elsewhere

conferred.' " *Albright v.. Oliver,* 510 U.S. 266, 271 (1994) (citing *Baker v. McCollan,* 443 U.S. 137, 144 n. 3 (1979)). Thus, "[t]he first step in any such claim is to identify the specific constitutional right allegedly infringed." *Id.* (citing *Graham v. Connor,* 490 U.S. 386, 394, (1989); and *Baker,* 443 U.S. at 140).

Based on the incident of April 26, 2002, Plaintiff claims violations of his Eight Amendment rights when Defendants Furman, Bly, Carpenter and Lanasa used excessive force on him, and when Defendants Furman, Bly, Carpenter, Lanasa and Brink acted with deliberate indifference to Plaintiff's medical needs. Amended Complaint at 5. Based on the incident of June 4, 2002, Plaintiff alleges violations of his Eighth Amendment rights against cruel and unusual punishment occurred when Defendant Sgt. Furman placed Plaintiff in an unsanitary cell and refused to resolve Plaintiff's complaints of not being served a meal and providing clean bedding, and Murphy withheld from Plaintiff food, clean bedding and Plaintiff's personal property. Amended Complaint at 7. Plaintiff further claims Losito and Hersh violated his Eighth Amendment rights by acting with deliberate indifference to Plaintiff's psychiatric and medical needs. *Id.* at 7-8. [7]

**2. Eighth Amendment**

Plaintiff's claims of excessive force, deliberate indifference to medical needs, and unsanitary conditions of confinement pertaining to the separate incidents on April 26, 2002 and June 4, 2002 all arise under the Eighth Amendment. In particular, the Eighth Amendment prohibits "cruel and unusual punishments" during imprisonment. U.S. Const. 8th amend.; *Wilson v. Seiter,* 501 U.S. 294, 296-97 (1991); *Romano v. Howarth,* 998 F.2d 101, 104 (2d cir.1993). Not every governmental action affecting the interests or well-being of a prisoner, however, is subject to Eighth Amendment protections. *Whitley v. Albers,* 475 U.S. 312, 319 (1986). Rather, only the unnecessary and wanton infliction of pain constitutes the cruel and unusual punishment forbidden by the Eighth Amendment. *Id.* Nevertheless, within the ambit of the Eighth Amendment are protections against the use of excessive force, deliberate indifference to an inmate's serious medical need, and inhumane conditions of confinement. *See Trammell v. Keane,* 338 F .3d 155, 162 (2d Cir.2003) (observing different tests for evaluating Eighth Amendment claims for excessive force, conditions of confinement, and denial of medical care).

**A. Excessive Force**

 **\*7** Defendants argue in support of summary judgment that despite Plaintiff's claims asserted in the Amended Complaint and by Plaintiff in his affidavit opposing summary judgment, there is a complete lack of any objective evidence supporting Plaintiff's assertion that on April 26, 2002, he was subjected to excessive force, resulting in injuries for which Plaintiff was subsequently denied medical treatment. Defendants' Memorandum at 3-9. In opposition to summary judgment, Plaintiff submits the affidavit of David Albelo ("Albelo") ("Albelo Affidavit"), an inmate who was also confined in Southport's C-Block on April 26, 2002, and who witnessed the incident. Albelo Affidavit, Plaintiff's Exh. A, ¶ 1-4.

In assessing an inmate's claims that prison officials subjected him to cruel and unusual punishment by using excessive force, courts must determine whether the prison officials acted "in a good-faith effort to maintain or restore prison discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillan,* 503 U.S. 1, 7 (1992). An inmate plaintiff claiming that prison officials subjected him to cruel and unusual punishment by use of excessive force must establish both an objective and subjective component of the claim. *Romano,* 998 F.2d at 105.

Objectively, a § 1983 plaintiff must establish that the alleged deprivation is sufficiently serious or harmful to reach constitutional dimensions. *Romano,* 998 F.S2d at 104, *see also Wilson,* 501 U.S. at 298. This objective component is "contextual and responsive to 'contemporary standards of decency.' " *Hudson,* 503 U.S. at 8. Thus, while a *de minimis* use of force will rarely suffice to state a constitutional claim, a plaintiff is not required to show that the application of force resulted in any serious injury. *Id.* at 9-10; *see also Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973) (noting that "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights."). An inmate's constitutional protections against excessive force by corrections officers "is nowhere nearly so extensive as that afforded by the common law tort action for battery ." *Johnson,* 481 F.2d at 1033; *Anderson v. Sullivan,* 702 F.Supp. 424, 426 (S.D.N.Y.1988).

In the instant case, Plaintiff has filed in opposition to summary judgment the affidavit of David Albelo ("Albelo") ("Albelo Affidavit"), an inmate who was also confined in Southport's C-Block on April 26, 2002, and who claims to have witnessed the incident. Albelo Affidavit, Plaintiff's Exh. A, ¶¶ 1-4. Albelo avers he observed Sgt. Furman strike Plaintiff in the side of the head, causing Plaintiff to fall to the floor, and then observed Furman, Bly, Carpenter and two other corrections officers punch and kick Plaintiff as he lay on the floor in handcuffs and chains. *Id.* ¶ 5. According to Albelo, he and other inmates screamed for the officers to stop assaulting Plaintiff, *id.* ¶ 6, but that "Plaintiff was then half dragged and half walked to his cell while officer Bly slapped him." *Id.* ¶ 7. Albelo further stated that he was concerned about Plaintiff's well-being and asked the "unit officer" to check on Plaintiff, but the unit officer told Albelo to "mind your business, it does not concern [ ] you." *Id.* ¶ 9.

**\*8** The statements contained in the Albelo Affidavit contradicts the statements made by Defendants in support of summary judgment in which Defendants, while admitting that Plaintiff was placed in handcuffs and chained, deny that any force was used in returning Plaintiff to his cell on the morning of April 26, 2002, following Plaintiff's refusal to comply with Sgt. Furman's order to stop turning his head while being pat-frisked in preparation for the exercise run. Furman Declaration ¶¶ 5-10; Bly Declaration ¶¶ 5-7; Carpenter Declaration ¶¶ 5-8.

Nor is the fact that Plaintiff's medical records are devoid of any evidence that Plaintiff was injured in the April 26, 2002 dispositive of the claim. Rather, an Eighth Amendment excessive force claim does not require any serious injury. *Hudson,* 503 U.S. at 8; *Johnson,* 481 F.2d at 1028. Furthermore, the record on this motion establishes that Plaintiff was not thoroughly examined in connection with his complaints following the April 26, 2002 incident until May 2, 2002, almost a week later, during which time more minor injuries would likely become less apparent. Had Plaintiff undergone a thorough examination on April 26, 2002, the two abrasions observed on May 2, 2002, including the 3 cm superficial abrasion on Plaintiff's nose, and the 2 cm superficial abrasion on Plaintiff's knuckle, would likely have appeared more palpable and thus more serious. As such, there is a material issue of fact as to the first prong of Plaintiff's excessive force claim, and the court next considers the second, subjective prong of the claim.

The subjective component of an Eighth Amendment excessive force claim requires that the defendants act malicious and with the intent to harm the inmate plaintiff. *Hudson,* 503 U.S. at 7; *Romano,* 998 F.2d at 105. To determine whether the defendants acted maliciously, the trier of fact should consider (1) the extent of the plaintiff's injuries; (2) the need for the application of force; (3) the correlation between the need for force and the amount of force used; (4) the threat reasonably perceived by the defendants; and (5) any efforts made by the defendants to temper the severity of a forceful response. *Whitley,* 475 U.S. at 321. Here, the record also establishes a material issue of fact as to whether Plaintiff was subjected to the use of any force in being returned to his cell on April 26, 2002 and, if so, whether the use of such force was reasonable.

Specifically, as discussed above, *supra,* at 5, Defendants admit that Plaintiff was both handcuffed and restrained with a wrist chain before being escorted to his cell on April 26, 2002, but deny any force was used against Plaintiff, in contrast to Plaintiff's allegations, corroborated by Albelo, that Defendants struck Plaintiff in the side of the head, knocking Plaintiff to the ground, and then continued to punch and kick plaintiff while he lay in on the floor, still restrained by handcuffs and the chain. Defendants' assertion that no force was used implies that any threat posed by Plaintiff was small, such that any use of force by Defendants could be disproportionate. It is significant that Defendants do not challenge the accuracy or authenticity of the Albelo Affidavit, which is both signed and notarized as required to be considered admissible evidence. This unresolved factual issue as to the subjective prong of Plaintiff's excessive force claim is not only material, but also sufficient to preclude summary judgment.

**\*9** Summary judgment on Plaintiff's excessive force claim arising from the April 26, 2002 incident is DENIED.

## B. Deliberate Indifference to Serious Medical Need

Defendants also maintain that the record contains no objective evidence supporting Plaintiff's alleged injuries resulting from Defendants alleged use of excessive force on April 26, 2002, or that Plaintiff was denied necessary medical treatment for any serious injury. *Id.* at 9-12. According to Defendants, the record also fails to contain

any evidence that on June 4, 2002, Plaintiff experienced a mental breakdown for which he was denied appropriate psychiatric care. *Id.* at 17-19.

"In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Estelle v. Gamble,* 429 U.S. 97, 104 (1976) (bracketed text in original)). A serious medical condition exists where "the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Chance,* 143 F.3d at 702. The standard for determining whether there has been an Eighth Amendment violation based on deliberate indifference to a prisoner's serious medical needs

> incorporates both objective and subjective elements. The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison officials acted with a sufficiently culpable state of mind.

*Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003) (citing *Estelle,* 429 U.S. at 104, and *Hathaway v. Coughlin,* 99 F.3d 550. 553 (2d Cir.1996)).

Denying or delaying access to medical care or intentionally interfering with prescribed treatment may constitute deliberate indifference. *Estelle,* 429 U.S. at 104; *see Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000) (holding dentist's outright refusal for one year to treat a cavity, a degenerative condition tending to cause acute and pain if left untreated, combined with imposition of an unreasonable condition on such treatment, could constitute deliberate indifference on the part of the prison dentist, precluding summary judgment in defendant's favor). Such delay in treatment violates the Eighth Amendment "whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards by intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle,* 429 U.S. at 104-05. Further, culpable intent requires the inmate establish both that a prison official "has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." *Hayes v. New York City Department of Corrections,* 84 F.3d 614, 620

(2d Cir.1996) (citing *Farmer v. Brennan,* 511 U.S. 825, 834-35 (1994). Nevertheless, neither "inadvertent failures to provide adequate medical care" nor "negligence in diagnosing or treating a medical condition" comprise Eighth Amendment violations. *Estelle,* 429 U.S. at 105-06 (holding medical malpractice does not become a constitutional violation merely because the victim is a prisoner); *Harrison,* 219 F.3d at 139 ("We agree that the mere malpractice of medicine does not amount to an Eighth Amendment violation."). Nor does a "mere disagreement" with a physician over the appropriate course of treatment arise to a constitutional violation, although in certain instances a physician may evince deliberate indifference by consciously choosing "an easier and less efficacious" treatment plan. *Chance,* 143 F.3d at 703.

**\*10** As to the objective prong, a sufficiently serious conditions is "a condition of urgency, one that may produce death, degeneration or extreme pain." *Hathaway,* 99 F.3d at 66. In the instant case, the record is devoid of any evidence establishing that Plaintiff, in connection with either incident, had any medical urgency that might produce death, degeneration or extreme pain. Rather, the record demonstrates that any injury inflicted on Plaintiff in connection with the April 26, 2002 incident was relatively minor, given that by the time Plaintiff underwent the thorough physical examination on May 2, 2002, only two small abrasions were discovered. As such, assuming, *arguendo,* that on April 26, 2002, Plaintiff did in fact suffer the alleged injuries, including soreness, pain in and a lump behind his right ear, lump on the back of his head, small abrasions on his nose and knuckle, and bruising to his back, ribs and legs, Amended Complaint at 4, such injuries do not constitute the requisite "serious medical condition" necessary to establish an Eight Amendment deliberate indifference claim. *Compare Hemmings v. Gorczyk,* 134 F.3d 104, 109 (2d Cir.1998) (reversing district court's grant of summary judgment in favor of defendants on inmate plaintiff's Eighth Amendment deliberate indifference to serious medical needs claim where inmate suffered from ruptured Achilles tendon, which remained swollen and painful, requiring plaintiff use crutches to walk, which was originally diagnosed as a bad sprain, yet defendants failed for two months to provide proper treatment despite fact that plaintiff's disabling condition was "easily observable"). That by May 2, 2002, such injuries had healed without any medical treatment further establishes

that the injuries were not likely to produce death, degeneration or extreme pain without urgent medical treatment. Additionally, that Plaintiff, on April 28, 2002, reported he was passing blood in his urine, yet failed at that time to make any other complaints, demonstrates that Plaintiff's claimed injuries had already sufficiently healed such that urgent treatment for them was never required. That Plaintiff received timely medical care in response to such complaint, including collecting a urine sample which, upon analysis, showed evidence of a mild UTI, rather than any trauma, further undermines Plaintiff's asserted denial of urgent medical care. The record thus fails to establish any factual issue which, if decided in Plaintiff's favor, could establish the objective prong of Plaintiff's deliberate indifference claim with regard to the April 26, 2002 incident.

The record is similarly deficient as to the June 4, 2002 incident. Specifically, although Plaintiff claims that he had a "mental breakdown" after he was placed in the allegedly unsanitary cell, which caused him to eat and smear feces on himself, and to attempt to slash his wrists with a medication tube, Amended Complaint, at 7, the record shows that Plaintiff was first observed to have wiped feces on himself and the walls of his cell at 5:15 P.M. on June 4, 2002, less than three hours after Plaintiff was moved to the cell. Prison Logbook, Furman Declaration Exh. A. At 7:10 P.M. that same day, Plaintiff was seen by Nurse Whedon in connection with Plaintiff's complaints of a rash and dryness on his lower legs. Weed Declaration ¶ 4 and Exh. A, Plaintiff's Ambulatory Health Record for June 4, 2002. In fact, two affidavits submitted by Plaintiff in opposition to summary judgment corroborate the fact that Plaintiff was seen by a nurse in the evening of June 4, 2002. *See* Plaintiff's Exhs. T (Affidavit of Inmate Bussey ("Bussey Affidavit")) and U (Affidavit of Inmate Douglas ("Douglas Affidavit")). [8] Significantly, Whedon did not note any injury to Plaintiff's wrists. Moreover, the very next morning, June 5, 2002, at 9:10 A.M., Plaintiff was seen by a mental health worker, Mr. Militello, who had Plaintiff transferred to the infirmary and then transferred to Elmira for reevaluation of Plaintiff's schizophrenia diagnosis because Plaintiff was exhibiting signs of mental illness. Furman Declaration ¶¶ 14-15; Outpatient Psychiatric Progress Notes, Plaintiff's Exh. W. Militello also reported that Plaintiff exhibited anger, was threatening to harm himself, had smeared feces on himself, and described Plaintiff as having "scratched wrists," Outpatient Psychiatric Progress Notes, but did

not report any physical or mental condition arising to a serious medical need for which treatment had been denied. Rather, the record establishes that Defendants realized in the evening of June 4, 2002 that Plaintiff was experiencing some mental issues for which help was provided the next morning. The record thus fails to establish any factual issue which, if decided in Plaintiff's favor, could establish the objective prong of Plaintiff's deliberate indifference claim with regard to the June 24, 2002 incident.

**\*11** Because Plaintiff has failed to establish the objective prong for his deliberate indifference claim as to either the April 26 or June 4, 2002 incident, the court need not address whether Plaintiff can establish the subjective prong as to either incident. Summary judgment as to Plaintiff's claim that Defendants acted with deliberate indifference to his serious medical needs is GRANTED as to Defendants.

## C. Conditions of Confinement

Defendants argue in support of summary judgment that the alleged unsanitary conditions of the cell to which Plaintiff was transferred on June 4, 2002, even if true, are insufficient to support Plaintiff's claims that he was subjected to cruel and unusual punishment in violation of the Eighth Amendment. Defendants' Memorandum at 13-15. Nor does Defendant Murphy's failure to serve Plaintiff lunch one day constitute any Eighth Amendment claim. *Id* . at 15-17. In opposition to summary judgment, Plaintiff submits the Bussey and Douglas Affidavits in which Southport inmates Bussey and Douglas corroborate Plaintiff's assertions that Plaintiff, upon being placed in a different cell on June 4, 2002, complained of the living conditions in the cell, or the fact that he was not served lunch, and that although Defendant Murphy dropped two of Plaintiff's books into Plaintiff's cell, Plaintiff's request for the rest of his personal belongings were ignored. Bussey Affidavit ¶¶ 3-6; Douglas Affidavit ¶¶ 3-6.

To establish an Eighth Amendment violation based on prison conditions, a plaintiff must demonstrate "that it is contrary to current standards of decency for anyone to be exposed against his will" to the challenged prison conditions. *Helling v. McKinney,* 509 U.S. 25, 35 (1993).

An Eighth Amendment claim based on prison conditions must satisfy

both an objective element-that the prison official's transgression was "sufficiently serious"-and an objective element-that the officials acted, or omitted to act, with a "sufficiently culpable state of mind," *i.e.,* with "deliberate indifference to inmate health or safety."

*Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir.2002) (quoting *Farmer,* 511 U.S. at 834).

As to the objective element, while the Constitution "does not mandate comfortable prisons," *Rhodes v. Chapman,* 452 U.S. 337, 346 (1981), prison inmates may not be denied "the minimal civilized measure of life's necessities." *Id.* at 347. The Supreme Court has held that the Eighth Amendment requires that inmates not be deprived of their "basic human needs-*e.g.,* food, clothing, shelter, medical care, and reasonable safety." *Helling,* 509 U.S. at 32 (internal citation and quotation omitted). "Nor may prison officials expose prisoners to conditions that 'pose an unreasonable risk of serious damage to [their] future health.' " *Phelps,* 308 F.3d at 185 (quoting *Helling,* 509 U.S. at 35). The Eighth Amendment's objective prong requires an inmate "prove that the conditions of his confinement violate contemporary standards of decency." *Id.*

**\*12** As to the subjective element, the Supreme Court has held that

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."

*Farmer,* 511 U.S. at 837.

The "deliberate indifference" element is equivalent to criminal law's reckless indifference standard. *Id.* at 839-40.

In the instant case, Plaintiff's Eighth Amendment claim fails to satisfy the objective element necessary to state a claim based on prison conditions. Although Plaintiff claims the cell to which he was moved on June 4, 2002 was dirty, the mattress was wet, no bedding was provided, the cell sink's cold water did not work, while the hot water continually ran, and Plaintiff missed receiving one meal, the amount of time for which Plaintiff endured such conditions, less than one full day, renders the claim without merit. *See Hutto v. Finney,* 437 U.S. 678, 687 (1978) ("the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards. A filthy, overcrowded cell and a diet of 'grue' *[sic]* might be tolerable for a few days and intolerably cruel for weeks and months."). As such, Defendant's motion for summary judgment is GRANTED as to Plaintiff's claim challenging the conditions of his confinement based on the June 4, 2002 incident.

**3. Deprivation of Property**

Although not asserted as such, Plaintiff's claim that upon being transferred to a different cell on June 4, 2002, Defendants failed to give Plaintiff his personal property is properly construed under the Fourteenth Amendment as asserting a deprivation of property without due process. Nevertheless, no claim under 42 U.S.C. § 1983 lies based on the negligent conduct of a state actor even though such conduct may result in deprivation of a property interest. *Daniels v. Williams,* 474 U.S. 327, 330-31 (1986). Further, even intentional, unauthorized deprivations of property by prison officials are not redressable pursuant to 42 U.S.C. § 1983 if "adequate state post-deprivation remedies are available." *Hudson v. Palmer,* 468 U.S. 517, 533 (1984). In New York, several adequate post-deprivation remedies are available such that even if Defendants either negligently or intentionally failed to provide Plaintiff with his personal property, no claim for relief under § 1983 lies.

Specifically, an administrative procedure for inmate personal property claims is provided by N.Y. Comp.Codes R. & Regs. Tit. 7, Pt. 1700. Plaintiff may also commence an action to recover the value of his lost property in New York Court of Claims. *See Butler v. Castro,* 896 F.2d 698, 700 (2d Cir.1990)(holding that New York court of claims presents adequate post-deprivation remedy which precludes § 1983 action only where alleged deprivation was result of random, unauthorized conduct rather than the result of operation of established state

procedure). Plaintiff alleges no state policy caused the alleged interference with his property. As such, Plaintiff may not sue under § 1983 to recover for deprivation of personal property. *Hudson,* 468 U.S. at 533.

**\*13** Summary judgment is thus GRANTED in favor of Defendants on Plaintiff's Fourteenth Amendment Due Process claim based on the June 4, 2002 incident.

### 4. Qualified Immunity

Alternatively, Defendants assert they are entitled to qualified immunity on all claims for damages. Defendants' Memorandum at 19-21. Plaintiff has not responded to this argument. Because the court is granting summary judgment on Plaintiff's claims alleging deliberate indifference to his serious medical needs and challenging the conditions of his confinement, as well as on Plaintiff's Fourteenth Amendment due process claim, the court addresses qualified immunity only as to Plaintiff's excessive force claim.

Qualified immunity shields law enforcement officials who perform discretionary functions from liability if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable prison official would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 806 (1982); *Washington Square Post No. 1212 v. Maduro,* 907 F.2d 1288, 1291 (2d Cir.1990). Even if the right at issue was clearly established, if it was objectively reasonable for the defendant to believe that his act did not violate the plaintiff's constitutional rights, the defendant may nevertheless be entitled to qualified immunity. *Saucier v. Katz,* 533 U.S.194, 201-02 (2001); *Anderson v. Creighton,* 483 U .S. 635, 641 (1987); *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 568-69 (2d Cir.1996); *Van Emrik v. Chemung County Dep't of Soc. Servs.,* 911 F.2d 863, 865-66 (2d Cir.1990); *Robison v. Via,* 821 F.2d 913, 920-21 (2d Cir.1987). "The availability of the defense depends on whether a reasonable officer could have believed his action to be lawful, in light of clearly established law and the information he possessed." *Weyant v. Okst,* 101 F.3d 845, 858 (2d Cir.1996) (internal quotation marks omitted).

A right is clearly established if (1) it was defined with reasonable specificity, (2) its existence has been affirmed by either the Supreme Court or the relevant court of appeals, and (3) a reasonable defendant official would have understood under the existing law that his acts were unlawful. *Brown v. City of Oneonta, N.Y. Police Dep't,*

106 F.3d 1125, 1131 (2d Cir.1997). If, however, it was objectively reasonable for the defendant to believe that his act did not violate the plaintiff's constitutional rights, the defendant may be entitled to qualified immunity. *Robison,* 821 F.2d at 920-21.

A defendant is entitled to summary judgment based on qualified immunity if the court finds that the asserted rights were not clearly established, or "if the defendant adduces[s] sufficient facts [such] that no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to the plaintiff ... could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not violate a federally protected right." *Robison,* 821 F.2d at 921 (internal quotation omitted). Stated another way, a defendant is entitled to qualified immunity under the objectively reasonable standard if "officers of reasonable competence could disagree" on the legality of the defendant's actions. *Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir.1995).

**\*14** Where, however, the objective reasonableness of an officer's actions depends on disputed facts, summary judgment based on qualified immunity is properly denied. *Rivera v. United States,* 928 F.2d 592, 607 (2d Cir.1991); *Brawer v. Carter,* 937 F.Supp. 1071, 1082 (S.D.N.Y.1996). Provided that no factual issues are disputed, the application of qualified immunity to the facts is a question of law for the court to decide. *Finnegan v. Fountain,* 915 F.2d 817, 821 (2d Cir.1990). Accordingly, as to Plaintiff's excessive force claim, the court must evaluate whether Defendants' actions, in light of clearly established law in existence as of April 26, 2002, violated Plaintiff's civil rights.

Prison inmates have a clearly established right to be free from the application of excessive force by prison employees. *Hudson,* 503 U.S. at 7. However, a prisoner does not have a clearly established right to be free from the use of force by corrections officers attempting to subdue the prisoner with regard to a physical altercation and whether Defendants' conduct violated a clearly established right is not dependent on whether identical conduct has been previously held to violate a prisoner's constitutional rights. *See Hope v. Pelzer,* 536 U.S. 730, 740-41 (2002) (for purposes of qualified immunity, notice that a corrections officer's conduct violates established law does not require facts of previous cases be materially or

fundamentally similar to situation in question, but that state of law at relevant time provides fair warning that conduct is unconstitutional).

Here, the same disputed issues of fact that preclude summary judgment on Plaintiff's excessive force claim also prevent the court from finding Defendants are qualifiedly immune from liability on such claim. Accordingly, determination of Defendants' qualified immunity defense must await a fact trier's resolution of the questions of fact presented. Summary judgment based on qualified immunity is DENIED.

## CONCLUSION

Based on the foregoing, Defendants' motion for summary judgment (Doc. No. 58) is DENIED in part and GRANTED in part. The action will proceed only on Plaintiff's Eighth Amendment excessive force claim asserted against Defendants Sgt. Furman, Bly, Carpenter and Lanasa based on the April 26, 2002 incident. The parties are directed to appear before the court on **April 18, 2007** at 10:30 A .M. to schedule a trial date. Defendants are directed to make arrangements for Plaintiff to participate in the conference by telephone.

SO ORDERED.

## All Citations

Not Reported in F.Supp.2d, 2007 WL 894218

Footnotes

1    Plaintiff incorrectly spells Carpenter's name as "Carpender".
2    Taken from the pleadings and motion papers filed in this action.
3    Nurse Peters is not a party to this action.
4    Copies of the relevant portions of Southport's logbook are attached as Exh. A to the Furman Declaration.
5    Nurse W hedon is not a party to this action.
6    The record does not specify whether such "physicians" included a psychiatrist.
7    Although Defendants assert as an affirmative defense that Plaintiff failed to exhaust administrative remedies for any of the instant claims, Answer filed by Defendants Sgt. Furman, Bly, Brink, Carpenter, and Losito (Doc. No. 22), ¶ 17; Answer filed by Defendants Hersh, Lanasa and Murphy (Doc. NO. 49) ¶ 18, Defendants have not moved for summary judgment on that ground. Further, it is unclear from the record whether Plaintiff has, in fact, exhausted his administrative remedies. *See* Amended Complaint, Inmate Grievance Program Superintendent Statement (advising Plaintiff his grievance was untimely and granting Plaintiff permission to appeal to the Superintendent's Office, but failing to disclose whether Plaintiff ever pursued such appeal). The court takes no position as to whether Defendants can now move for leave to amend the scheduling order to permit further dispositive motions as to the exhaustion issue after the cut-off date provided in the Scheduling Order (Doc. No. 53) for dispositive motions. Accordingly, for the purposes of the instant motion, no exhaustion of remedies defense is before the court.
8    Both Bussey and Douglas state that at 6:30 P.M. on June 24, 2002, Defendant Nurse Hersh, accompanied by C.O. Losito, stopped at Plaintiff's cell and while dispensing nighttime medications. Bussey Affidavit ¶ 10; Douglas Affidavit ¶ 10.

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.                    11

2004 WL 324898
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

William MINGUES, Plaintiff,
v.
C.O NELSON and C.O. Berlingame, Defendants.

No. 96 CV 5396(GBD).
|
Feb. 20, 2004.

**Synopsis**

**Background:** Inmate brought a § 1983 action asserting, inter alia, claims of excessive force during his wife's visit with him at the correctional facility.

**Holding:** On a defense motion to dismiss, the District Court, Daniels, J., held that the record established that the action was filed after the effective date of the Prison Litigation Reform Act (PLRA).

Motion granted.

West Headnotes (1)

[1] **Civil Rights**
👉 **Prisons and Jails;Probation and Parole**

Record established that inmate's § 1983 action was filed after the effective date of the Prison Litigation Reform Act of 1996 (PLRA), such that the inmate's failure to exhaust his administrative remedies precluded relief; examination of the initial complaint itself, on its face, unequivocally demonstrated that the inmate's subsequent allegation in his amended complaint that he filed the complaint in April of 1996 was patently false; there was no explanation offered that could reasonably support and account for the existence of May dates on the complaint. 42 U.S.C.A. § 1983; Civil Rights of Institutionalized Persons Act, § 7(a), 42 U.S.C.A. § 1997e(a).

68 Cases that cite this headnote

*MEMORANDUM DECISION AND ORDER*

DANIELS, J.

**\*1** This § 1983 action was originally commenced by the plaintiff,[1] a prisoner in New York State custody, and his wife claiming their civil rights were violated during the wife's visit with plaintiff at the correctional facility. Discovery in this matter has concluded. Previously, all claims asserted by plaintiff's wife were dismissed for failure to prosecute. Additionally, defendants' summary judgment motion was denied with respect to plaintiff's claims of excessive force,[2] and summary judgment was granted dismissing all of plaintiff's other claims. Defendants now seek to dismiss the remaining excessive force claims on the grounds they are barred by the Prisoner Litigation Reform Act of 1996 ("PLRA"), 42 U.S.C. § 1997e(a), as plaintiff failed to exhaust his administrative remedies.

Subdivision (a) of § 1997e provides, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This provision became effective on April 26, 1996. *Blisset v. Casey,* 147 F.3d 218, 219 (2d Cir.1998). The PLRA's exhaustion requirement does not apply retroactively to actions pending when the Act was signed into law. *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

There is no dispute that plaintiff did not avail himself of the existing and available prison grievance procedure. Plaintiff, however, argues he was not required to exhaust his administrative remedies because, as alleged in his amended complaint, "petitioners (sic) had already filed in April 10–12 of 1996," prior to the PLRA's April 26, 1996 enactment date.[3] (Am.Compl. § 2). In order to determine the date that the instant action was commenced, the date of the filing of the amended complaint relates back to the filing date of the original complaint. Fed.R.Civ.P. 15(c). The original complaint was signed and dated by plaintiff's

wife on May 8, 1996; it was stamped received by the Pro Se Office on May 10, 1996; and plaintiff's signature is dated May 13, 1996. [4]

The matter was referred to Magistrate Judge Pitman for a Report and Recommendation ("Report"). Although the magistrate judge found that the three earliest possible dates that the evidence demonstrates the complaint could have been filed, *i.e.*, May 8th, 10th, and 13th of 1996, were all beyond the PLRA enactment date, he nevertheless recommended that the motion to dismiss be denied based on plaintiff's allegation in the amended complaint that he filed the original complaint April 10–12 of 1996, prior to the April 26, 1996 enactment date. The magistrate judge found that, "[i]n light of the express allegation in the Amended Complaint that plaintiff commenced the action before April 26, 1996 and the absence of a clear record to the contrary, the requirement that disputed factual issues be resolved in plaintiff's favor for purposes of this motion requires that the motion be denied." (Report at 12–13).

**\*2** Defendants object to the Report's conclusion that there is a material issue of fact regarding the date the action was filed. Plaintiff's attorney did not file any objections. [5] The Court must make a *de novo* determination as to those portions of the Report to which there are objections. Fed.R.Civ.P. 72(b); 28 U.S.C. § 636(b)(1)(C). It is not required that the Court conduct a *de novo* hearing on the matter. *United States v. Raddatz,* 447 U.S. 667, 676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). Rather, it is sufficient that the Court "arrive at its own, independent conclusion" regarding those portions to which the objections were made. *Nelson v. Smith,* 618 F.Supp. 1186, 1189–90 (S.D.N.Y.1985) (quoting *Hernandez v. Estelle,* 711 F.2d 619, 620 (5th Cir.1983)). Accordingly, the Court, in the exercise of sound judicial discretion, must determine the extent, if any, it should rely upon the magistrate judge's proposed findings and recommendations. *Raddatz,* 447 U.S. at 676. The Court may accept, reject or modify, in whole or in part, the findings and recommendations set forth within the Report. Fed.R.Civ.P. 72(b); 28 U.S.C § 636(b)(1)(C). Where there are no objections, the Court may accept the Report provided there is no clear error on the face of the record. *Nelson v. Smith,* 618 F.Supp. at 1189; *see also Heisler v. Kralik,* 981 F.Supp. 830, 840 (S.D.N.Y.1997), *aff'd sub nom. Heisler v. Rockland County,* 164 F.3d 618 (2d Cir.1998).

Upon a *de novo* review, the Report's recommendation that the motion be denied is rejected by the Court. Section 1997e (a) requires that inmates exhaust all available administrative remedies prior to the commencement of a § 1983 action concerning prison conditions, and failure to do so warrants dismissal of the action. *Porter v. Nussel,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Scott,* 344 F.3d at 290. The exhaustion of one's administrative remedies, however, is not a jurisdictional requirement under the PLRA. *Richardson v. Goord,* 347 F.3d 431 (2d Cir.2003). A defendant may assert a non-exhaustion claim as an affirmative defense. *Jenkins v. Haubert,* 179 F.3d 19, 28–29 (2d Cir.1999). Since it is an affirmative defense, defendants bear the burden of proof in this regard. *See, McCoy v. Goord,* 255 F.Supp.2d 233, 248 (S.D.N.Y.2003); *Arnold v. Goetz,* 245 F.Supp.2d 527, 534–35 (S.D.N.Y.2003); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002). A motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), is an appropriate vehicle to be used by a defendant where the failure to exhaust is clear from the face of the complaint as well as any written instrument attached as an exhibit and any statements or documents incorporated by reference into the complaint. *See, Scott v. Gardner,* 287 F.Supp.2d 477, 485 (S.D.N.Y.2003) (citation omitted); *McCoy,* 255 F.Supp.2d at 249.

In the amended complaint, plaintiff alleges, in a conclusory manner, that he filed the original complaint before the effective date of the PLRA, sometime between April 10th and April 12th of 1996. [6] On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inference in plaintiff's favor. *Resnick v. Swartz,* 303 F.3d 147, 150–51 (2d Cir.2002) (citation omitted); *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995). Dismissal is only warranted where it appears without doubt that plaintiff can prove no set of facts supporting his claims that would entitle him to relief. *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). The court's consideration is not limiting solely to the factual allegations set forth in the amended complaint. Rather, the court may also consider documents attached to the complaint as exhibits or incorporated in it by reference, matters of which judicial notice may be taken, or to documents either in plaintiff's possession or of which he has knowledge of and relied on in bringing the action. *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993)

(citation omitted). The court is not bound to accept as true a conclusory allegation where the pleadings are devoid of any specific facts or circumstances supporting such an assertion. *DeJesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 70 (2d Cir.1996). Nor must the court "ignore any facts alleged in the complaint that undermine the plaintiff's claim." *Roots Partnership v. Lands' End, Inc.,* 965 F.2d 1411, 1416 (7th Cir.1992) (citation omitted).

**\*3** Plaintiff fails to allege any factual basis in support of his claim that he filed the initial complaint between April 10–12, 1996. The Court is not required to accept this statement as a well-pleaded factual allegation in light of the existing record which clearly demonstrates that such an allegation is not only factually unsupported by the clear evidence, but is factually impossible. Generally, an amended complaint supersedes the original complaint, and renders it of no legal effect. *In re. Crysen/Montenay Energy Co.,* 226 F.3d 160, 162 (2d Cir.2000). In plaintiff's amended complaint, he states that he is submitting the amended complaint in support of his original complaint. Hence, the original complaint is incorporated by reference in the amended complaint, and may be considered by the Court. Even if the initial complaint was not so incorporated, given the circumstances of this case, the Court would nevertheless consider it as it relates to the original date of filing. An examination of the initial complaint itself, on its face, unequivocally demonstrates that plaintiff's subsequent allegation in his amended complaint that he filed the complaint between April 10th and 12th of 1996 is patently false.

The original complaint refers to plaintiff's prison disciplinary hearing arising out of the same incident forming the basis of the present lawsuit. Generally, the disciplinary charges against plaintiff were in connection with an alleged conspiracy by him and his wife to commit grand larceny against inmate Robert Cornell. That hearing began on April 16, 1996, and concluded on April 19, 1996. (Defs.' Notice of Mot. for Summ. J. Ex. N, Transcript of Disciplinary Hr'g, conducted on April 16, 18–19, 1996.) Specifically, in the original complaint, plaintiff refers to the testimony given by this fellow inmate. [7] (Compl. at 8). That inmate testified on April 19th. (Hr'g. Tr. at 53–54, 57). Thus, plaintiff's claim that he filed the complaint between April 10–12, 1996, is absolutely impossible as the initial complaint refers to events occurring after that time period. Merely because

plaintiff boldly alleges in his amended complaint that he filed the original complaint between April 10th and 12th does not require this Court to turn a blind eye to plaintiff's prior pleadings demonstrating the absurdity of his claim. [8] *See, Silva Run Worlwide Ltd. v. Gaming Lottery Corp.,* 2001 WL 396521, \*1 (S.D.N.Y. April 19, 2001) (citations omitted) (A court should not "accept allegations that are contradicted or undermined by other more specific allegations in the complaint or by written materials properly before the court.").

Lawsuits by inmates represented by counsel are commenced when the complaint is filed with the court. *See,* Fed.R.Civ.P. 3, 5(e). For *pro se* litigants, who are not imprisoned and have been granted *in forum pauperis* relief, their complaints are deemed filed when received by the Pro Se Office. *See, Toliver v. County of Sullivan,* 841 F.2d 41 (2d Cir.1998). The complaint of a *pro se* prisoner, however, is deemed filed when he or she gives the complaint to prison officials to be mailed. *Houston v. Lack,* 487 U.S. 266, 270, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988); *Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993), *modified on other grounds,* 25 F.3d 81 (2d Cir.1994). The "prison mailbox" rule is designed to combat inmate litigants' dependence on the prison facility's mail system and their lack of counsel so as to assure the timely filing of their legal papers with the court. *Noble v. Kelly,* 246 F.3d 93, 97 (2d Cir.2001) (citations omitted). Given the difficulty in determining when a prisoner relinquishes control of the complaint to prison personnel, the date the plaintiff signed the original complaint is presumed to be the date plaintiff gave the complaint to prison officials to be mailed. *See e.g., Forster v. Bigger,* 2003 WL 22299326, \*2 (S.D.N.Y. Oct.7, 2003); *Hosendove v. Myers,* 2003 WL 22216809, \*2 (D.Conn. Sept.19, 2003); *Hayes v. N .Y.S. D.O.C. Officers,* 1998 WL 901730, \*3 (S.D.N.Y. Dec.28, 1998); *Torres v. Irvin,* 33 F.Supp.2d 257, 270 (S.D.N.Y.1998) (cases cited therein).

**\*4** In response to the Report and Recommendation, plaintiff asserts that, in April, the original complaint "was placed in the facility mail box." (Pl.'s Objection to Report at 1). However, it is uncontested that plaintiff's wife signed the complaint on May 8th; it was received by the Pro Se Office on May 10th; and plaintiff's signature is dated May 13th. There is no explanation offered that could reasonably support and account for the existence of these May dates on a complaint which

plaintiff falsely claims to have deposited to be mailed during the period of April 10th and April 12th. Had plaintiff mailed the complaint directly to the court prior to April 26th, it would have been impossible for the plaintiff's wife to have signed the document two days prior to the date that the Pro Se Office stamped it received on May 10th.[9] Moreover, absent evidence to the contrary, applying the mailbox rule would presume that plaintiff gave his complaint to prison officials on May 13, 1996, the date he signed it. *See, Johnson v. Coombe,* 156 F.Supp.2d 273, 277 (S.D.N.Y.2001) (quoting *Torres,* 33 F.Supp.2d at 270). Even if the Court gave plaintiff the benefit of the date plaintiff's wife signed the complaint, *i.e.,* the earliest date reflected on the filed complaint, it was still after the effective date of the PLRA. Hence, plaintiff is legally obligated to have pursued his prison grievance procedures prior to filing the instant action. The plaintiff has offered no explanation for the initial complaint's reference to events that occurred after the date he claims he filed it, the two May dates on which he and his former co-plaintiff wife signed the complaint, or the May date stamped received by the Pro Se Office. As the magistrate Judge observed:

> Apart from the allegation that certain events giving rise to the claims occurred on April 9, 1996, the Original Complaint contains no mention of dates in April, 1996. Mingues no where explains the contradiction between the signature dates on the Original Complaint and the allegations contained in Amended Complaint. (Report at 12).

New York state law provides a three tier grievance procedure applicable to plaintiff's claims of excessive force. *See,* N.Y. Correct. Law § 139 (McKinnney's 2003); N.Y. Comp.Codes R. & Regs. tit. 7, § 701.7 (2003); *Mendez v. Goord,* 2002 WL 31654855 (S.D.N.Y. Nov.21, 2002); *Rodriguez v. Hahn,* 209 F.Supp.2d 344 (S.D.N.Y.2002). Plaintiff has not denied knowledge of the grievance procedure at his institution, nor claimed that anything or anyone caused him not to file a grievance and completely pursue it through the administrative process.[10] The magistrate judge's determination that the defendants' Rule 12(b) motion should be denied because of an "absence of a clear record" contrary to plaintiff's express allegation in the amended complaint that he commenced the action before April 26, 1996 is erroneous. The Court could have *sua sponte* dismiss this action as the record is unmistakably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA. *See, Mojias v. Johnson,* 351 F.3d 606 (2003); *Snider v. Melindez,* 199 F.3d 108, 112–13 (2d Cir.1999). In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear.

**\*5** Accordingly, it is hereby

ORDERED that the Report and Recommendation is not adopted; and it is further

ORDERED that the defendants' motion to dismiss the complaint is granted.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 324898

---

Footnotes

1    Plaintiff and his wife were proceeding *pro se* when they filed the complaint and amended complaint. Thereafter, plaintiff obtained legal representation.

2    In the amended complaint, plaintiff alleges he was beaten, kicked and punched. (Am.Compl. § 6). In his original complaint, he had also claimed that he was whipped." (Compl. at 7, 8). Plaintiff testified at his deposition that he was slapped once in the face, punched about four or five times in the lower back, and a correctional officer then laid on top of him. (Mingues Dep. at 78–81). The incident, which took approximately thirty to forty seconds, caused plaintiff to suffer from back pain for an unspecified period of time. (*Id.* at 81, 86).

3    The amended complaint reads as follows:
> That the original complaint filed under and pursuant to Title 42 section 1983 and 1985 was made and submitted before this court in April of 1996, before the application of the Prisoner Litigation Reform Act of 1996 was signed into law. The Act was signed into law April 26, 1996 and petitioners had already filed in April 10–12 of 1996. (Am.Compl. § 2).

4    Plaintiff's wife application for *in forma pauperis* relief was signed and dated May 8, 1996, and it is stamped as received by the Pro Se Office on May 10, 1996. Plaintiff's signature, on his initial application for appointment of counsel, is dated May

13, 1996, and it is stamped as received by the Pro Se Office on May 10, 1996. Attached to plaintiff's application, is his signed Affirmation of Service, also dated May 13, 1996, wherein plaintiff declared under penalty of perjury that he served his application upon the Pro Se Office. Plaintiff alleges that "between April 17, 1996 until October 7, 1996," all visitation was suspended between him and his wife and that their "only form of communications was correspondence ." (Am.Compl. § 7).

5    Plaintiff himself filed objections which was not adopted by his counsel. Plaintiff objects to the magistrate judge's finding that an issue exists as to when plaintiff filed the complaint because plaintiff asserts he gave it to prison officials to be mailed in April. Additionally, plaintiff objects to the magistrate judge's suggestion that the defendants convert their motion to one for summary judgment asserting the same theory as set forth in the present motion. Since this Court finds that the instant motion is meritorious, the propriety of plaintiff personally submitting his own objections need not be address as those objections are moot.

6    In response to then Chief Judge Thomas P. Griesa's 1996 order dismissing this action, plaintiff filed an Application for Reconsideration, dated October 28, 1996, wherein he claims that "on April 12, 1996 this petitioner filed a 1983 civil suit ..." (Pl.'s Mot. for Recons. at 1).

7    In the complaint, plaintiff alleges "that at his S.H.U. hearing petitioner called as a witness Robert Cornell who stated that this petitioner Mingues nor his wife (co-petitioner) Narvaez ever took any money from him. (Compl. at 8).

8    At his deposition, plaintiff testified that he filed the initial complaint "[a]pproximately around June of 1996." (Mingues Dep. at 37–38).

9    The benefit of the mailbox rule does not apply where the plaintiff delivers the complaint to someone outside the prison system to forward to the court. *Knickerbocker v. Artuz,* 271 F.3d 35, 37 (2d Cir.2001).

10    In the original complaint, plaintiff stated he did not file a grievance, pursuant to the state's prisoner grievance procedure, "because this matter can not be dealt with by interdepartmental grievances." (Compl. at 2–3). In plaintiff's attorney's memorandum in opposition to the motion to dismiss, counsel contends that plaintiff is not required to file a grievance because the state's prison system provides extremely limited administrative remedies and money damages, which plaintiff seeks, are not available.

---

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2016 Thomson Reuters. No claim to original U.S. Government Works.    5

KeyCite Yellow Flag - Negative Treatment
Distinguished by Arnett v. Shojaie, C.D.Cal., November 8, 2011

2010 WL 1235591
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

James MURRAY, Plaintiff,

v.

R. PALMER; S. Griffin; M. Terry;
F. Englese; Sergeant Edwards; K.
Bump; and K.H. Smith, Defendants.

No. 9:03-CV-1010 (GTS/GHL).
|
March 31, 2010.

**Attorneys and Law Firms**

James Murray, Malone, NY, pro se.

Bosman Law Office, AJ Bosman, Esq., of Counsel, Rome, NY, for Plaintiff.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Timothy Mulvey, Esq., James Seaman, Esq., Assistant Attorneys General, of Counsel, Albany, NY, for Defendants.

***DECISION and ORDER***

Hon. GLENN T. SUDDABY, District Judge.

**\*1** The trial in this prisoner civil rights action, filed *pro se* by James Murray ("Plaintiff") pursuant to 42 U.S.C. § 1983, began with an evidentiary hearing before the undersigned on March 1, 2010, regarding the affirmative defense of seven employees of the New York State Department of Correctional Services-R. Palmer, S. Griffin, M. Terry, F. Englese, Sergeant Edwards, K. Bump, and K.H. Smith ("Defendants")-that Plaintiff failed to exhaust his available administrative remedies, as required by the Prison Litigation Reform Act, before filing this action on August 14, 2003. At the hearing,

documentary evidence was admitted, and testimony was taken of Plaintiff as well as Defendants' witnesses (Darin Williams, Sally Reams, and Jeffery Hale), whom Plaintiff was able to cross-examine through *pro bono* trial counsel. At the conclusion of the hearing, the undersigned indicated that a written decision would follow. This is that written decision. For the reasons stated below, Plaintiff's Second Amended Complaint is dismissed because of his failure to exhaust his available administrative remedies.

**I. RELEVANT LEGAL STANDARD**

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U .S.C. § 1997e. The PLRA was enacted "to reduce the quantity and improve the quality of prisoner suits" by "afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter v. Nussle,* 534 U.S. 516, 524-25, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In this regard, exhaustion serves two major purposes. First, it protects "administrative agency authority" by giving the agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of the agency's procedures." *Woodford v. Ngo,* 548 U.S. 81, 89, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). Second, exhaustion promotes efficiency because (a) "[c]laims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court," and (b) "even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration." *Woodford,* 548 U .S. at 89. "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532.

In accordance with the PLRA, the New York State Department of Correctional Services ("DOCS") has made available a well-established inmate grievance program. 7 N.Y.C.R.R. § 701.7. Generally, the DOCS Inmate Grievance Program ("IGP") involves the following three-

step procedure for the filing of grievances. 7 N.Y.C.R.R. §§ 701.5, 701.6(g), 701.7.[1] *First,* an inmate must file a complaint with the facility's IGP clerk within a certain number of days of the alleged occurrence.[2] If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee ("IGRC") has a certain number of days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within a certain number of days of receipt of the grievance, and issues a written decision within a certain number of days of the conclusion of the hearing. *Second,* a grievant may appeal the IGRC decision to the facility's superintendent within a certain number of days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within a certain number of days of receipt of the grievant's appeal. *Third,* a grievant may appeal to the central office review committee ("CORC") within a certain number of days of receipt of the superintendent's written decision. CORC is to render a written decision within a certain number of days of receipt of the appeal.

**\*2** Moreover, there is an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees. 7 N.Y.C.R.R. § 701.8. In the event the inmate seeks expedited review, he or she may report the misconduct to the employee's supervisor. The inmate then files a grievance under the normal procedures outlined above, but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the superintendent for review. Under the regulations, the superintendent or his designee shall determine immediately whether the allegations, if true, would state a "bona fide" case of harassment, and if so, shall initiate an investigation of the complaint, either "in-house," by the Inspector General's Office, or by the New York State Police Bureau of Criminal Investigations. An appeal of the adverse decision of the superintendent may be taken to the CORC as in the regular grievance procedure. A similar "special" procedure is provided for claims of discrimination against an inmate. 7 N.Y.C.R.R. § 701.9.

It is important to note that these procedural requirements contain several safeguards. For example, if an inmate could not file such a complaint within the required time period after the alleged occurrence, he or she could apply

to the facility's IGP Supervisor for an exception to the time limit based on mitigating circumstances. If that application was denied, the inmate could file a complaint complaining that the application was wrongfully denied.[3] Moreover, any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can-and must-be appealed to the next level, including CORC, to complete the grievance process.[4] There appears to be a conflict in case law regarding whether the IGRC's nonresponse must be appealed to the superintendent where the plaintiff's grievance was not assigned a grievance number.[5] After carefully reviewing this case law, the Court finds that the weight of authority appears to answer this question in the affirmative.[6] The Court notes that, if the plaintiff adequately describes, in his appeal to the superintendent, the substance of his grievance (or if the plaintiff attaches, to his appeal, a copy of his grievance), it would appear that there is something for the superintendent to review.

It is also important to note that DOCS has a *separate and distinct* administrative appeal process for inmate misbehavior hearings:

> A. For Tier III superintendent hearings, the appeal is to the Commissioner's designee, Donald Selsky, D.O.C.S. Director of Special Housing/Inmate Disciplinary Program, pursuant to 8 N.Y.C.R.R. § 254.8;
>
> B. For Tier II disciplinary hearings, the appeal is to the facility superintendent pursuant to 7 N.Y.C.R.R. § 253.8; and
>
> C. For Tier I violation hearings, the appeal is to the facility superintendent or a designee pursuant to 7 N.Y.C.R.R. § 252.6.

**\*3** "An individual decision or disposition of any current or subsequent program or procedure having a written appeal mechanism which extends review to outside the facility shall be considered nongrievable." 7 N.Y.C.R.R. § 701.3(e)(1). Similarly, "an individual decision or disposition resulting from a disciplinary proceeding ... is not grievable." 7 N.Y.C.R.R. § 701.3(e) (2). However, "[t]he policies, rules, and procedures of any program or procedure, including those above, are grievable." 7 N.Y.C.R.R. § 701.3(e)(3); *see also* N.Y. Dep't Corr. Serv. Directive No. 4040 at III.E.

Generally, if a prisoner has failed to follow each of the required three steps of the above-described grievance procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (citing *Porter,* 534 U.S. at 524). However, the Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004), *accord, Ruggiero,* 467 F.3d at 175. First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* [citations omitted]. Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* [citations and internal quotations omitted].

With regard to this third inquiry, the Court notes that, *under certain circumstances,* an inmate may exhaust his administrative remedies by raising his claim during a related *disciplinary proceeding. Giano v. Goord,* 380 F.3d 670, 678-79 (2d Cir.2004); *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004).[7] However, in essence, the circumstances in question include instances in which (1) the inmate reasonably believed that his "only available remedy" was to raise his claim as part of a tier disciplinary hearing,[8] *and* (2) the inmate articulated and pursued his claim in the disciplinary proceeding in a manner that afforded prison officials the time and opportunity to thoroughly investigate that claim.[9] Some district courts have found the first requirement not present where (a) there was nothing objectively confusing about the DOCS regulations governing the grievability of his claim,[10] (b) the inmate was specifically informed that the claim

in question was grievable,[11] (c) the inmate separately pursued the proper grievance process by filing a grievance with the IGRC,[12] (d) by initially alleging that he did appeal his claim to CORC (albeit without proof), the inmate has indicated that, during the time in question, he understood the correct procedure for exhaustion,[13] and/or (e) before and after the incident in question, the inmate pursued similar claims through filing a grievance with the IGRC.[14] Other district courts have found the second requirement not present where (a) the inmate's mention of his claim during the disciplinary hearing was so insubstantial that prison officials did not subsequently investigate that claim,[15] and/or (b) the inmate did not appeal his disciplinary hearing conviction.[16]

**\*4** Finally, two points bear mentioning regarding exhaustion. First, given that non-exhaustion is an affirmative defense, the defendant bears the burden of showing that a prisoner has failed to exhaust his available administrative remedies. *See, e.g., Sease v. Phillips,* 06-CV-3663, 2008 WL 2901966, \*4 (S.D.N.Y. July 25, 2008). However, once a defendant has adduced reliable evidence that administrative remedies were available to Plaintiff and that Plaintiff nevertheless failed to exhaust those administrative remedies, Plaintiff must then "counter" Defendants' assertion by showing exhaustion, unavailability, estoppel, or "special circumstances."[17]

Second, the Court recognizes that there is case law from within the Second Circuit supporting the view that the exhaustion issue is one of fact, which should be determined by a jury, rather than by the Court.[18] However, there is also case law from within the Second Circuit supporting the view that the exhaustion issue is one of law, which should be determined by the Court, rather than by a jury.[19] After carefully reviewing the case law, the Court finds that the latter case law-which includes cases from the Second Circuit and this District-outweighs the former case law.[20] (The Court notes that the latter case law includes cases from the Second Circuit and this District.)[21] More importantly, the Court finds that the latter cases are better reasoned than are the former cases. In particular, the Court relies on the reasons articulated by the Second Circuit in 1999: "Where administrative remedies are created by statute or regulation affecting the governance of prisons, ... the answer depends on the meaning of the

relevant statute or regulation." *Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999). The Court relies also on the several reasons articulated by Judge Richard A. Posner in a recent Seventh Circuit decision: most notably, the fact that the exhaustion-of-administrative-remedies inquiry does not address the merits of, or deadlines governing, the plaintiff's claim but an issue of "judicial traffic control" (i.e., what forum a dispute is to be resolved in), which is never an issue for a jury but always an issue for a judge. *See Pavey v. Conley,* 544 F.3d 739, 740-42 (7th Cir.2008) (en banc), *cert. denied,* --- U.S. ----, 129 S.Ct. 1620, 173 L.Ed.2d 995 (2009). The Court notes that the First, Third, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth and Eleventh Circuits appear to agree with the ultimate conclusion of the Second and Seventh Circuits that the exhaustion issue is properly decided by a judge, not a jury. [22]

## II. ANALYSIS

As an initial matter, Plaintiff argues that he exhausted his administrative remedies regarding the claims at issue in this action, by filing a grievance regarding those claims, and then appealing the non-response to that grievance all the way to CORC. Because the Court rejects this argument based on the evidence adduced at the hearing, the Court proceeds to an analysis of the three-step exhaustion inquiry established by the Second Circuit.

### A. Availability of Administrative Remedies

**\*5** New York prison inmates are subject to an Inmate Grievance Program established by DOCS and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* 96-CV-5396, 2004 WL 324898, at \*4 (S.D.N.Y. Feb.20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003), and *Snider v. Melindez,* 199 F.3d 108, 112-13 [2d Cir.1999] ). There are different circumstances under which the grievance procedure is deemed not to have been available to an inmate plaintiff. *Hemphill,* 380 F.3d at 687-88. For example, courts have found unavailability "where plaintiff is unaware of the grievance procedures or did not understand it or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Hargrove v. Riley,* 04-CV-4587, 2007 WL 389003, at \*8 (E.D.N.Y. Jan.31, 2007) (internal citations omitted). When testing the availability of administrative remedies in the face of claims that undue influence from prison workers has caused a plaintiff inmate to forego the formal grievance process,

courts employ an objective test, examining whether "a similarly situated individual of ordinary firmness [would] have deemed them available." *Hemphill,* 380 F.3d at 688 (quotations and citations omitted); *see Hargrove,* 2007 WL 389003, at \*8.

Here, after carefully considering the evidence submitted at the hearing in this action on March 1, 2010, the Court finds that administrative remedies were "available" to Plaintiff during the time in question. The Court makes this finding for the following four reasons.

First, in his sworn Complaint (which has the force and effect of an affidavit), Plaintiff stated, "Yes," in response to the question, "Is there a prisoner grievance procedure at this facility ." (Dkt. No. 1, ¶ 4.a.) [23] Second, both Darin Williams (the corrections officer in charge of the special housing unit during the relevant time period) and Sally Reams (the Inmate grievance program supervisor during the relevant time period) testified credibly, at the exhaustion hearing, that there was a working grievance program at Great Meadow Correctional Facility during the time in question. (Hearing Tr. at 10, 12, 14-21, 40-54.) Third, Plaintiff testified, at the exhaustion hearing that, during this approximate time period (the August to November of 2000), he filed at least three other grievances Great Meadow Correctional Facility, to which he received responses from the inmate grievance clerk, the Superintendent, and CORC. (*Id.* at 154, 157-58, 169-70; *see also* Hearing Exs. D-4, D-5, P-8, P-13, P-14.) [24] Fourth, the Court finds the relevant portions of Plaintiff's hearing testimony regarding the grievance at issue in this action to be incredible due to various omissions and inconsistencies in that testimony, and his demeanor during the hearing. (*Id.* at 127-34.) [25]

### B. Estoppel

After carefully considering the evidence submitted at the hearing in this action on March 1, 2010, the Court finds that Defendants did not forfeit the affirmative defense of non-exhaustion by failing to raise or preserve it, or by taking actions that inhibited Plaintiff's exhaustion of remedies. For example, Defendants' Answer timely asserted this affirmative defense. (Dkt. No. 35, ¶ 17.) Moreover, Plaintiff failed to offer any credible evidence at the hearing that *Defendant* s in any way interfered with Plaintiff's ability to file grievances during the time in question. (Hearing Tr. at 127-34, 157-58, 169-70.)

Generally, a defendant in an action may not be estopped from asserting the affirmative defense of failure to exhaust administrative remedies based on the actions (or inactions) of other individuals. [26]

**C. Special Circumstances**

**\*6** There are a variety of special circumstances that may excuse a prisoner's failure to exhaust his available administrative remedies, including (but not limited to) the following:

(1) The facility's "failure to provide grievance deposit boxes, denial of forms and writing materials, and a refusal to accept or forward plaintiff's appeals-which effectively rendered the grievance appeal process unavailable to him." *Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (noting that "[s]uch facts support a finding that defendants are estopped from relying on the exhaustion defense, as well as "special circumstances" excusing plaintiff's failure to exhaust");

(2) Other individuals' "threats [to the plaintiff] of physical retaliation and reasonable misinterpretation of the statutory requirements of the appeals process." *Clarke v. Thornton,* 515 F.Supp.2d 435, 439 (S.D.N.Y.2007) (noting also that "[a] correctional facility's failure to make forms or administrative opinions "available" to the prisoner does not relieve the inmate from this burden."); and

(3) When plaintiff tries "to exhaust prison grievance procedures[, and] although each of his efforts, alone, may not have fully complied, together his efforts sufficiently informed prison officials of his grievance and led to a thorough investigation of the grievance." *Hairston v. LaMarche,* 05-CV-6642, 2006 WL 2309592, at *8 (S.D.N.Y. Aug.10, 2006).

After carefully considering the issue, the Court finds that there exists, in this action, no "special circumstances" justifying Plaintiff's failure to comply with the administrative procedural requirements. Construed with the utmost of special leniency, Plaintiff's hearing testimony, and his counsel's cross-examination of Defendants' witnesses, raise the specter of two excuses for not having exhausted his available administrative

remedies before he (allegedly) mailed his Complaint in this action on August 14, 2003:(1) that exhaustion was not possible because of the administrative procedures that DOCS has implemented regarding inmate grievances; and/or (2) that an unspecified number of unidentified corrections officers (who are not Defendants in this action) somehow interfered with the delivery of his grievance and appeals. For example, Plaintiff testified at the exhaustion hearing that he handed his grievance and appeals to various corrections officers making rounds where he was being housed, and that, if his grievance and/or appeals were never received, it must have been because his letters were not properly delivered. (Hearing Tr. at 126-36.)

With regard to these excuses, the Court finds that, while these excuses could constitute special circumstances justifying an inmate's failure to exhaust his available administrative remedies in certain situations, [27] these excuses are not available to Plaintiff in the current action because, as stated in Part II.A. of this Decision and Order, the credible testimony before the Court indicates that Plaintiff did not hand his grievance and appeals to various corrections officers with regard to the claims in question. *See, supra,* Part II.A. of this Decision and Order. [28]

**\*7** For all these reasons, the Court finds that Plaintiff's proffered excuse does not constitute a special circumstance justifying his failure to exhaust his available administrative remedies before filing this action.

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's Second Amended Complaint (Dkt. No. 10) is *DISMISSED* **in its entirety without prejudice** for failure to exhaust his available administrative remedies before filing this action, pursuant to the PLRA; and it is further

**ORDERED** that the Clerk of the Court shall enter judgment for Defendants and close the file in this action.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1235591

## Footnotes

1    *See also White v. The State of New York,* 00-CV-3434, 2002 U . S. Dist. LEXIS 18791, at *6 (S.D.N.Y. Oct 3, 2002).

2    The Court uses the term "a certain number of days" rather than a particular time period because (1) since the three-step process was instituted, the time periods imposed by the process have changed, and (2) the time periods governing any particular grievance depend on the regulations and directives pending during the time in question.

3    *Groves v. Knight,* 05-CV-0183, Decision and Order at 3 (N.D.N.Y. filed Aug. 4, 2009) (Suddaby, J.).

4    7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g .,* DOCS Directive 4040 dated 8/22/03, ¶ VI.G. ("Absent [a time limit extension granted by the grievant], matters not decided within the time limits may be appealed to the next step."); *Pacheco v. Drown,* 06-CV-0020, 2010 WL 144400, at *19 & n. 21 (N.D.N.Y. Jan.11, 2010) (Suddaby, J.) ("It is important to note that any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process."), *accord, Torres v. Caron,* 08-CV-0416, 2009 WL 5216956, at *5 & n. 28 (N.D.N.Y. Dec.30, 2009) (Mordue, C.J.), *Benitez v. Hamm,* 04-CV-1159, 2009 WL 3486379, at *13 & n. 34 (N.D.N.Y. Oct.21, 2009) (Mordue, C.J.), *Ross v. Wood,* 05-CV-1112, 2009 WL 3199539, at *11 & n. 34 (N.D.N.Y. Sept.30, 2009) (Scullin, J.), *Sheils v. Brannen,* 05-CV-0135, 2008 WL 4371776, at *6 & n. 24 (N.D.N.Y. Sept.18, 2008) (Kahn, J.), *Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *15 & n. 46 (N.D.N.Y. June 20, 2008) (Hurd, J.), *McCloud v. Tureglio,* 07-CV-0650, 2008 WL 17772305, at *10 & n. 25 (N.D.N.Y. Apr. 15, 2008) (Mordue, C.J.), *Shaheen v. McIntyre,* 05-CV-0173, 2007 WL 3274835, at *14 & n. 114 (N.D.N.Y. Nov.5, 2007) (McAvoy, J.); *Nimmons v. Silver,* 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.); *Gill v. Frawley,* 02-CV-1380, 2006 WL 1742738, at *11 & n. 66 (N.D.N.Y. June 22, 2006) (McAvoy, J.) ("[A]n inmate's mere attempt to file a grievance (which is subsequently lost or destroyed by a prison official) is not, in and of itself, a reasonable effort to exhaust his administrative remedies since the inmate may still appeal the loss or destruction of that grievance."); *Walters v. Carpenter,* 02-CV-0664, 2004 WL 1403301, at *3 (S.D.N.Y. June 22, 2004) ("[M]atters not decided within the prescribed time limits must be appealed to the next level of review."); *Croswell v. McCoy,* 01-CV-0547, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him.").

5    *Compare Johnson v. Tedford,* 04-CV-0632, 616 F.Supp.2d 321, 326 (N.D.N.Y.2007) (Sharpe, J.) ("[W]hen a prisoner asserts a grievance to which there is no response, *and it is not recorded or assigned a grievance number,* administrative remedies may be completely exhausted, as there is nothing on record for the next administrative level to review.") [emphasis in original, and citations omitted] *with Waters v. Schneider,* 01-CV-5217, 2002 WL 727025, at *2 (S.D.N.Y. Apr.23, 2002) (finding that, in order to exhaust his available administrative remedies, plaintiff had to file an appeal with the superintendent from the IGRC's non-response to his grievance, of which no record existed).

6    *See, e.g., Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *16, 18 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) (finding that, in order to exhaust his available administrative remedies with regard to his grievance of August 30, 2000, plaintiff had to file an appeal with the superintendent from the IGRC's non-response to that grievance, which included a failure to acknowledge the receipt of the grievance and assign it a number); *Midalgo v. Bass,* 03-CV-1128, 2006 WL 2795332, at *7 (N.D.N.Y. Sept.26, 2006) (Mordue, C.J., adopting Report-Recommendation of Treece, M.J.) (observing that plaintiff was "requir[ed]" to seek an appeal to the superintendent, even though he never received a response to his grievance of April 26, 2003, which was never assigned a grievance number); *Collins v. Cunningham,* 06-CV-0420, 2009 WL 2163214, at *3, 6 (W.D.N.Y. July 20, 2009) (rejecting plaintiff's argument that his administrative remedies were not available to him where his grievance of March 20, 2004, was not assigned a grievance number); *Veloz v. New York,* 339 F.Supp.2d 505, 515-16 (S.D.N.Y.2004) (rejecting inmate's argument that the prison's grievance procedure had been rendered unavailable to him by the practice of prison officials' losing or destroying his grievances, because, *inter alia,* "there was no evidence whatsoever that any of [plaintiff's] grievances were filed with a grievance clerk," and he should have "appeal[ed] these claims to the next level once it became clear to him that a response to his initial filing was not forthcoming"); *cf. Hernandez v. Coffey,* 582 F.3d 303, 305, 309, n. 3 (2d Cir.2009) ("Our ruling in no way suggests that we agree with Hernandez's arguments regarding exhaustion or justification for failure

to exhaust [which included an argument that the Inmate Grievance Program was not available to him because, when he filed a grievance at the first stage of the Program, he received no response and his grievance was not assigned a grievance number].").

7    The Court recognizes that the Supreme Court's decision in *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), may have changed the law regarding possible exceptions to the exhaustion requirement (and thus the possibility that exhaustion might occur through the disciplinary process). Specifically, in *Woodford,* the Supreme Court held that the PLRA required "proper" exhaustion as a prerequisite to filing a section 1983 action in federal court. *Woodford,* 548 U.S. at 93. "Proper" exhaustion means that the inmate must complete the administrative review process *in accordance with the applicable procedural rules,* as a prerequisite to bringing suit in federal court. *Id.* at 88-103 (emphasis added). It is unclear whether *Woodford* has overruled any decisions that recognize "exceptions" to the exhaustion requirement. Out of special solicitude to Plaintiff, the Court will assume that *Woodford* has not overruled the Second Circuit's *Giano-Testman* line of cases.

8    *Giano,* 380 F.3d at 678 ("[W]hile Giano was required to exhaust available administrative remedies before filing suit, his failure to do so was justified by his reasonable belief that DOCS regulations foreclosed such recourse."); *Testman,* 380 F.3d at 696-98 (remanding case so that district court could consider, *inter alia,* whether prisoner was justified in believing that his complaints in the disciplinary appeal procedurally exhausted his administrative remedies because the prison's remedial system was confusing).

9    *Testman,* 380 F.3d at 696-98 (remanding case so that district court could consider, *inter alia.* whether prisoner's submissions in the disciplinary appeals process exhausted his remedies "in a substantive sense" by "afford[ing] corrections officials time and opportunity to address complaints internally"); *Chavis v. Goord,* 00-CV-1418, 2007 WL 2903950, at *9 (N.D.N.Y. Oct.1, 2007) (Kahn, J.) ("[T]o be considered proper, exhaustion must occur in both a substantive sense, meaning that prison officials are somehow placed on notice of an inmate's complaint, and procedurally, in that it must be presented within the framework of some established procedure that would permit both investigation and, if appropriate, remediation.") [citation omitted]. The Court joins the above-described two requirements in the conjunctive because the Second Circuit has recognized that mere notice to prison officials through informal channels, without more, does not suffice to satisfy the PLRA procedural exhaustion requirement. *See Macias v. Zenk,* No. 04-6131, 495 F.3d 37, at *43-44 (2d Cir.2007) (recognizing that *Woodford v. Ngo,* 548 U.S. 81 [2006], overruled *Braham v. Casey,* 425 F.3d 177 [2d Cir.2005], to the extent that *Braham* held that "informal complaints" would suffice to exhaust a claim).

10   *See, e.g., Reynoso v. Swezey,* 423 F.Supp.2d 73, 75 (W.D.N.Y.2006), *aff'd,* 238 F. App'x 660 (2d Cir.2007) (unpublished order), *cert. denied,* 552 U.S. 1207, 128 S.Ct. 1278, 170 L.Ed.2d 109 (2008); *Holland v. James,* 05-CV-5346, 2009 WL 691946, at *3 (S.D.N.Y. March 6, 2009); *Winston v. Woodward,* 05-CV-3385, 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008); *cf. Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *5 & n. 23 (N.D.N.Y. July 11, 2007) (McAvoy, J.) (reciting this point of law in context of failure to appeal grievance determination to CORC).

11   *See, e.g., Johnson v. Barney,* 04-CV-10204, 2007 WL 2597666, at *2 (S.D.N.Y. Aug.30, 2007); *Reynoso,* 423 F.Supp.2d at 75-76.

12   *See, e.g., Reynoso,* 423 F.Supp.2d at 75 ("There is no evidence that plaintiff was confused or misled about the proper method for raising his claims. In fact, the record shows exactly the opposite: plaintiff did file a grievance about the incident. He simply failed to appeal the denial of that grievance to CORC."); *Tapp v. Kitchen,* 02-CV-6658, 2004 WL 2403827, at *9 (W.D.N.Y. Oct.26, 2004) ("In the instant case, however, plaintiff does not and cannot claim to have believed that his only available remedy was to raise his complaint as part of his disciplinary hearing, since he also filed a grievance with the Inspector General, and also claims to have filed both an inmate grievance and a separate complaint with the facility superintendent."); *cf. Muniz,* 2007 WL 2027912, at *5 & n. 23 ("Plaintiff's Complaint alleges facts indicating that he believed it necessary to file a grievance with the Gouverneur C.F. IGRC and to appeal the denial of that grievance to the Gouverneur C.F. Superintendent. Why would he not also believe it necessary to take the next step in the exhaustion process and appeal the Superintendent's decision to CORC?").

13   *See, e.g., Petrusch v. Oliloushi,* 03-CV-6369, 2005 WL 2420352, at *5 (W.D.N.Y. Sept.30, 2005) ("[A]s to his grievance, which is the subject of this lawsuit, plaintiff does not appear to be contending that he believed the Superintendent's denial constituted exhaustion, since by initially claiming that he did appeal to CORC, albeit without proof, he has demonstrated his knowledge of the correct procedure for exhaustion.").

14   *See, e.g., Benjamin v. Comm'r N.Y. State DOCS,* 02-CV-1703, 2007 WL 2319126, at *14 (S.D.N.Y. Aug.10, 2007) ("Benjamin cannot claim that he believed that appealing his disciplinary proceeding was the only available remedy at his disposal in light of the numerous grievances he has filed during his incarceration at Green Haven [both before and after the incident in question]."), *vacated in part on other grounds,* No. 07-3845, 293 F. App'x 69 (2d Cir.2008).

**15**    *See, e.g., Chavis,* 2007 WL 2903950, at *9 ("The focus of a disciplinary hearing is upon the conduct of the inmate, and not that of prison officials.... While the mention of a constitutional claim during plaintiff's disciplinary hearing could potentially have satisfied his substantive exhaustion requirement by virtue of his having notified prison officials of the nature of his claims, he did not fulfill his procedural exhaustion requirement [under the circumstances due to his] ... mere utterance of his claims during the course of a disciplinary hearing .... [T]here is nothing in the record to suggest that when the issues of interference with plaintiff's religious free exercise rights or alleged retaliation for having voiced his concerns were in any way investigated by prison officials.") [citations omitted].

**16**    *See, e.g., Colon v. Furlani,* 07-CV-6022, 2008 WL 5000521, at *2 (W.D.N.Y. Nov.19, 2008) ("Colon was found guilty of harassment based on a letter that he wrote to defendant Bordinaro, concerning some of the events giving rise to his failure-to-protect claim, but it does not appear that he appealed that disposition.... While under some circumstances an inmate may be able to satisfy the exhaustion requirement by appealing from a disciplinary hearing decision ..., plaintiff did not do so here, and this claim is therefore barred under the PLRA.") [citations omitted]; *Cassano v. Powers,* 02-CV-6639, 2005 WL 1926013, at *5 (W.D.N.Y. Aug.10, 2005) ("[E]ven assuming plaintiff believed that his proper recourse was to raise [his] complaint at his disciplinary hearing, rather than using the Inmate Grievance Program, he did not exhaust that process. That is, plaintiff has not provided any evidence that he appealed his Tier III hearing conviction. Since plaintiff did not pursue even the disciplinary appeal process, he can not have made submissions in the disciplinary process that were sufficient, in a substantive sense, to exhaust his remedies under § 1997e(a).") [internal quotation marks and citation omitted].

**17**    *See Hemphill,* 380 F.3d at 686 (describing the three-part inquiry appropriate in cases where a prisoner plaintiff plausibly seeks to "counter" defendants' contention that the prisoner failed to exhaust his available administrative remedies under the PLRA); *Verley v. Wright,* 02-CV-1182, 2007 WL 2822199, at *8 (S.D.N.Y. Sept.27, 2007) ("[P]laintiff has failed to demonstrate that the administrative remedies were not, in fact, 'actually available to him.' "); *Winston v. Woodward,* 05-CV-3385, 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008) (finding that the plaintiff "failed to meet his burden under *Hemphill* of demonstrating 'special circumstances' "); *see also Ramirez v. Martinez,* 04-CV-1034, 2009 WL 2496647, at *4 (M.D.Pa. Aug.14, 2009) ("In order to effectively oppose defendants' exhaustion argument, the plaintiff has to make a showing in regard to each of his claims."); *Washington v. Proffit,* 04-CV-0671, 2005 WL 1176587, at *1 (W.D.Va. May 17, 2005) ("[I]t is plaintiff's duty, at an evidentiary hearing, "to establish by a preponderance of the evidence that he had exhausted his administrative remedies or that any defendant had hindered or prevented him from doing so within the period fixed by the Jail's procedures for filing a grievance.").

**18**    *See, e.g., Lunney v. Brureton,* 04-CV-2438, 2007 WL 1544629, at *10 n. 4 (S.D.N.Y. May 29, 2007) ("There is certainly case law that supports the view that exhaustion should be determined by the Court rather than by a jury. As the Supreme Court has recently affirmed, however, exhaustion is an 'affirmative defense,' much like a statute of limitations defense. Where there are disputed factual questions regarding an affirmative defense such as a statute of limitations defense, the Second Circuit has stated that 'issues of fact as to the application of that defense must be submitted to a jury.' Thus, it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court."); *Finch v. Servello,* 06-CV-1448, 2008 WL 4527758, at *8 n. 5 (N.D.N.Y. Sept.29, 2008) (McAvoy, J.) (citing *Lunney* and noting that "it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court").

**19**    *See, e.g., Harrison v. Goord,* 07-CV-1806, 2009 WL 1605770, at *7 n. 7 (S.D.N.Y. June 9, 2009) (recognizing that "[t]here is authority ... for the position that where questions of fact exist as to whether a plaintiff has exhausted administrative remedies, such fact questions are for the Court, rather than a jury, to decide ...."); *Amador v. Superintend. of Dept. of Corr. Servs.,* 03-CV-0650, 2007 WL 4326747, at *5 n. 7 (S.D.N.Y. Dec.4, 2007) ("It is unclear whether factual disputes regarding the exhaustion defense should ultimately be decided by the court or by a jury.... [T]here is ... case law ... supporting the view that exhaustion should be determined by the court and not a jury."), *appeal pending,* No. 08-2079-pr (2d Cir. argued July 15, 2009).

**20**    *See, e.g., Mastroianni v. Reilly,* 602 F.Supp.2d 425, 438 (E.D.N.Y.2009) (noting that the magistrate judge held an evidentiary hearing "on the issue of exhaustion"); *Sease v. Phillips,* 06-CV-3663, 2008 WL 2901966, *3 n. 2 (S.D.N.Y. July 25, 2008) (finding that "the better approach is for the judge, and not the jury, to decide any contested issues of fact relating to the defense of failure to exhaust administrative remedies."); *Amador,* 2007 WL 4326747, at *5 n. 7 ("[T]here is ... case law, which in my view is more persuasive and on point, supporting the view that exhaustion should be determined by the court and not a jury. I find it proper that this issue be decided by the court."); *Enigwe v. Zenk,* 03-CV-0854, 2006 WL 2654985, at *4 (E.D.N.Y. Sept.15, 2006) (finding that, at the summary judgment "stage of the proceedings, a genuine question of fact exists with respect to whether [plaintiff] should be excused from exhausting his administrative remedies with regard to claims relating to his confinement at MDC Brooklyn," and therefore "direct[ing] that a hearing

be held" before a judge, to resolve this issue); *Dukes v. S.H.U. C.O. John Doe # 1,* 03-CV-4639, 2006 WL 1628487, at *6 (S.D.N.Y. June 12, 2006) (ordering an "evidentiary hearing [before a judge] on the issue of whether prison officials failed to assign grievance numbers to [plaintiff's] grievances and, if so, whether that rendered further administrative remedies unavailable, estopped the Defendants from asserting non-exhaustion, or justified [plaintiff's] failure to appeal to the CORC"); *Mingues v. Nelson,* 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004) ("The Court could have *sua sponte* dismiss[ed] this action as the record is unmistakeably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA.... In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear."); *Roland v. Murphy,* 289 F.Supp.2d 321, 323 (E.D.N.Y.2003) "[W]hether the plaintiff has exhausted his administrative remedies is a question for the Court to decide as a matter of law." [internal quotation marks and citation omitted]; *Evans v. Jonathan,* 253 F.Supp.2d 505, 509 (W.D.N.Y.2003) ( "[W]hether the plaintiff has exhausted his administrative remedies is a question for the Court to decide as a matter of law.").

21    *See, e.g., Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999) ("Whether an administrative remedy was available to a prisoner in a particular prison or prison system, and whether such remedy was applicable to the grievance underlying the prisoner's suit, are not questions of fact. They either are, or inevitably contain, questions of law. Where administrative remedies are created by statute or regulation affecting the governance of prisons, the existence of the administrative remedy is purely a question of law. The answer depends on the meaning of the relevant statute or regulation."), *accord, Mojias v. Johnson,* 351 F.3d 606, 608-11 (2d Cir.2003) (citing relevant language from *Snider v. Melindez,* and later stating that a district court could *sua sponte* dismiss a prisoner's civil rights complaint for failure to exhaust his available administrative remedies if it gave him notice and an opportunity to be heard); *DeBlasio v. Moriarty,* 05-CV-1143, Minute Entry (N.D.N.Y. filed Dec. 9, 2008) (McCurn, J.) (indicating that judge held pre-trial evidentiary hearing on whether plaintiff had exhausted administrative remedies before filing action); *Pierre v. County of Broome,* 05-CV-0332, 2007 WL 625978, at *1 n. 1 (N.D.N.Y. Feb.23, 2007) (McAvoy, J.) (noting that "[t]he court held an evidentiary hearing on October 25, 2006 concerning the issue of whether Plaintiff had exhausted administrative remedies"); *Hill v. Chanalor,* 419 F.Supp.2d 255, 257-59 (N.D.N.Y. March 8, 2006) (Kahn, J.) (*sua sponte* dismissing a prisoner's civil rights complaint, pretrial, for failure to exhaust his available administrative remedies after it gave him notice and an opportunity to be heard); *Raines v. Pickman,* 103 F.Supp.2d 552, 555 (N.D.N.Y.2000) (Mordue, J.) ("[I]n order for the Court to dismiss for failing to exhaust administrative remedies, the Court must be shown that such a remedy exists for an inmate beating in the grievance context. This is an issue of law for the Court to determine.").

22    *See Casanova v. Dubois,* 289 F.3d 142, 147 (1st Cir.2002); *Hill v. Smith,* 186 F. App'x 271, 273-74 (3d Cir.2006); *Mitchell v. Horn,* 318 F.3d 523, 529 (3d Cir.2003); *Anderson v. XYZ Corr. Health Servs., Inc.,* 407 F.3d 674, 682-83 (4th Cir.2005); *Dillon v. Rogers,* No. 08-30419, 2010 WL 378306, at *7 (5th Cir. Feb. 4, 2010); *Taylor v. U.S.,* 161 F. App'x 483, 486 (6th Cir.2005); *Larkins v. Wilkinson,* 172 F.3d 48, at *1 (6th Cir.1998); *Husley v. Belken,* 57 F. App'x 281, 281 (8th Cir.2003); *Ponder v. Wackenhut Corr. Corp.,* 23 F. App'x 631, 631-32 (8th Cir.2002); *Wyatt v. Terhune,* 315 F.3d 1108, 1119-20 (9th Cir.2003), *cert. denied,* 540 U.S. 810 (2003); *Freeman v. Watkins,* 479 F.3d 1257, 1260 (10th Cir.2007); *Alloway v. Ward,* 188 F. App'x 663, 666 (6th Cir.2006); *Bryant v. Rich,* 530 F.3d 1368, 1373-76 (11th Cir.), *cert. denied,* --- U.S. ----, 129 S.Ct. 733, 172 L.Ed.2d 734 (2008).

23    The Court notes that, in his Complaint, Plaintiff also swore that his "grievance was denied." (Dkt. No. 1, ¶ 4.b.ii.) However, during the exhaustion hearing, Plaintiff testified that he never received a response to his grievance from any member of DOCS.

24    In addition, the documentary evidence adduced at the hearing establishes that, in actuality, Plaintiff filed ten other grievances during this time period (and several appeals from the denials of those grievances). The first of these grievances (Grievance Number GM-30651-00), filed on August 25, 2000, regarded Plaintiff's request for medications. (Hearing Exs. D-4, D-5.) The second of these grievances (Grievance Number GM-30691-00), filed on September 1, 2000, regarded Plaintiff's request for copies. (Hearing Ex. D-4.) The third of these grievances (Grievance Number GM-30729-00), filed on September 11, 2000, regarded the use of full restrains against Plaintiff. (*Id.; see also* Hearing Ex. P-14.) The fourth of these grievances, filed on October 19, 2000 (Grievance Number GM-30901-00), regarded Plaintiff's request for the repair of his cell sink. (Hearing Exs. D-4, D-5.) The fifth of these grievances (Grievance Number GM-30901-00), also filed on October 19, 2000, regarded Plaintiff's request for the clean up of his cell. (Hearing Ex. D-4.) The sixth of these grievances (Grievance Number GM-31040-00), filed on November 17, 2000, regarded the review of records. (*Id.*) The seventh of these grievances (Grievance Number GM-31041-00), also filed on November 17, 2000, regarded Plaintiff's request for medical attention. (*Id.;* see also Hearing Ex. P-13) The eighth of these grievances (Grievance Number GM-31048-00), filed on November 20, 2000, regarded the rotation of books. (Hearing Ex. D-14) The ninth of these grievances (Grievance

Number GM-31040-00), filed on November 27, 2000, regarded the review of records (and was consolidated with his earlier grievance on the same subject). (*Id.*) The tenth of these grievances (Grievance Number GM-31070-00), filed on November 27, 2000, regarded Plaintiff's eyeglasses. (*Id.*)

25  For example, Plaintiff was unable to identify the corrections officers to whom he handed his grievance and appeals for mailing. (*Id.* at 127-34.) Moreover, Plaintiff did not convincingly explain why the grievance and appeals at issue in this action did not make it through the mailing process, while his numerous other grievances and appeals did make it through the mailing process. (*Id.* at 154-171.) In addition, Plaintiff acknowledged that it was his belief, during this time period, that an inmate was not required to exhaust his administrative remedies in matters involving the use of excessive force; yet, according to Plaintiff, he decided to exhaust his administrative remedies on his excessive force claim anyway. (*Id.* at 148-49.)

26  *See Ruggiero v. County of Orange,* 467 F.3d 170, 178 (2d Cir.2006) (holding that defendants were not estopped from asserting the affirmative defense of non-exhaustion where the conduct plaintiff alleged kept him from filing a grievance-that he was not given the manual on how to grieve-was not attributable to the defendants and plaintiff "point[ed] to no affirmative act by prison officials that would have prevented him from pursuing administrative remedies"); *Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *19 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) ("I have found no evidence sufficient to create a genuine issue of triable fact on the issue of whether Defendants, *through their own actions,* have inhibited Plaintiff exhaustion of remedies so as to estop one or more Defendants from raising Plaintiff's failure to exhaust as a defense.") [emphasis in original]; *Shaheen v. McIntyre,* 05-CV-0173, 2007 WL 3274835, at *16 (N.D.N.Y. Nov.5, 2007) (McAvoy, J. adopting Report-Recommendation of Lowe, M.J.) (finding defendants not estopped from raising Plaintiff's non-exhaustion as a defense based on plaintiff's allegation "that [he] was inhibited (through non-responsiveness) by [ ] unnamed officials at Coxsackie C.F.'s Inmate Grievance Program (or perhaps the Grievance Review Committee), and Coxsackie C.F. Deputy Superintendent of Security Graham" because plaintiff's complaint and "opposition papers ... fail to contain any evidence placing blame on Defendants for the (alleged) failure to address his grievances and complaint letters"); *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at *16 (N.D.N.Y. Apr.24, 2006) (Hurd, J. adopting Report-Recommendation of Lowe, M.J.) (finding that defendants are not estopped from relying on the defense of non-exhaustion because "no evidence (or even an argument) exists that any Defendant ... inhibit[ed] Plaintiff's exhaustion of remedies; Plaintiff merely argues that a non-party to this action (the IGRC Supervisor) advised him that his allegedly defective bunk bed was not a grievable matter."); *cf. Warren v. Purcell,* 03-CV-8736, 2004 WL 1970642, at *6 (S.D.N.Y. Sept.3, 2004) (finding that conflicting statements [offered by a non-party]-that the prisoner needed to refile [his grievance] and that the prisoner should await the results of DOCS's investigation-estopped the defendants from relying on the defense on non-exhaustion, or "[a]lternatively, ... provided ... a 'special circumstance' under which the plaintiff's failure to pursue the appellate procedures specified in the IGP was amply justified."); *Brown v. Koenigsmann,* 01-CV-10013, 2005 WL 1925649, at *1-2 (S.D.N.Y. Aug.10, 2005) ("Plaintiff does not assert that Dr. Koeingsmann personally was responsible for [the failure of anyone from the Inmate Grievance Program to address plaintiff's appeal]. [However,] *Ziemba [v. Wezner,* 366 F.3d 161 (2d Cir.2004) ] does not require a showing that Dr. Koenigsmann is personally responsible for plaintiff's failure to complete exhaustion [in order for Dr. Koenigsmann to be estopped from asserting the affirmative defense of failure to exhaust administrative remedies], as long as someone employed by DOCS is. If that reading of Ziemba is incorrect, however, ... then the circumstances here must be regarded as special, and as justifying the incompleteness of exhaustion, since a decision by CORC is hardly something plaintiff could have accomplished on his own.").

27  *See, e.g., Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (noting that "refusal to accept or forward plaintiff's appeals ... effectively render[s] the grievance appeal process unavailable to him").

28  The Court notes that, even if Plaintiff did (as he testified) hand to a corrections officer for mailing a letter to the Superintendent on September 13, 2000, appealing from the IGRC's failure to decide his grievance of August 22, 2000, within nine working days (i.e., by September 5, 2000), it appears that such an appeal would have been filed two days too late under DOCS Directive 4040, which requires that appeal to be filed within four working days of the IGRC's failure to decide his grievance (i.e., by September 11, 2000). (*See* Hearing Tr. 127-34; Hearing Ex. P-1, at 5-7 [attaching ¶¶ V.A, V.B. of DOCS Directive 4040, dated 6/8/98].)

---

2007 WL 2071743
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Alvin PETERSON, Plaintiff,
v.
Sheryl MILLER, Nurse Practitioner;
and Nurse Admin. Tousignant,
Nurse Administrator, Defendants.

No. 9:04-CV-797.
|
July 13, 2007.

**Attorneys and Law Firms**

Alvin Peterson, East Elmhurst, NY, pro se.

Stephen M. Kerwin, Esq, Michael G. McCartin, Esq.,
Assts. Attorney General, of Counsel, Hon. Eliot Spitzer,
Hon. Andrew M. Cuomo, Attorney General of the State
of New York, Department of Law, Albany, NY, for
Defendants.

*DECISION and ORDER*

DAVID N. HURD, United States District Judge.

 **\*1** Plaintiff brought this civil rights action pursuant to 42
U.S.C. § 1983. By Report-Recommendation dated April
27, 2007, the Honorable David E. Peebles, United States
Magistrate Judge, recommended that the defendants'
motion for summary judgment be granted and that
plaintiff's complaint be dismissed in all respects. No
objections to the Report-Recommendation have been
filed.

Based upon a careful review of the entire file and
the recommendations of Magistrate Judge Treece, the
Report-Recommendation is accepted and adopted in
whole. *See* 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. The defendants' motion for summary judgment is
GRANTED; and

2. Plaintiff's complaint is DISMISSED in all respects.

IT IS SO ORDERED.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, U.S. Magistrate Judge.

Plaintiff Alvin Peterson, a former New York State prison
inmate who is proceeding *pro se* and *in forma pauperis,*
has commenced this action pursuant to 42 U.S.C. § 1983
complaining of the deprivation of his constitutional rights.
Plaintiff asserts that while incarcerated, he was denied
adequate medical treatment by the defendants, both of
whom were nurses at the facility in which he was confined
at the relevant times, for kidney pain and a foot rash, and
denied the migraine medication of his choice, in violation
of his Eighth Amendment right to be free of cruel and
unusual punishment.

Currently pending before the court is a motion by the
defendants for summary judgment dismissing plaintiff's
complaint, both on the merits and based upon qualified
immunity. Having carefully considered the record in light
of defendants' motion and finding that it presents no
genuine issue of material fact for trial, I recommend that
defendants' motion, which plaintiff has not opposed, be
granted.

I. *BACKGROUND* [1]
At the times relevant to his complaint, plaintiff was a
prison inmate entrusted to the custody of the New York
State Department of Correctional Services ("DOCS"),
and confined within the Clinton Correctional Facility
("Clinton"), located in Dannemora, New York. Plaintiff
was released from DOCS custody on July 7, 2004.

While at Clinton, plaintiff was treated over time for
a variety of medical ailments including, *inter alia,*
complaints of pain in the area of his kidney, a foot
rash condition which has on occasion been described
as athlete's foot, and migraine headaches. Among the
medical personnel at Clinton who have acted as plaintiff's
care providers are defendants Sheryl Miller, a nurse

practitioner, and Amy Tousignant, who at the relevant times served as a nurse administrator. [2]

### A. *Kidney Pain*

According to his medical records, plaintiff complained to prison medical personnel of pain, the origin of which is not disclosed, in his right flank or kidney area on eleven separate occasions between July 16, 2001 and October 28, 2003. Miller Decl. (Dkt. No. 25) ¶ 3. On November 30, 2001, plaintiff lodged his fourth such complaint, describing his symptoms as including a "dull pain." Miller Decl. (Dkt. No. 25) Exh. A at p. 128. Plaintiff was seen by a prison doctor several times for evaluation of his complaints of kidney pain, and was provided with Motrin to address his discomfort. *See, e.g., id.* at pp. 128, 133, 144, 171. X-rays taken in or about July of 2002 were reviewed by a consulting radiologist, Dr. M. Browman, M.D., D.A.B.R., who concluded that plaintiff had "no suspicious calcifications" and a normal bowel gas pattern. *Id.* at p. 92. Plaintiff's x-rays were characterized by Dr. Browman as "normal abdominal radiographs." *Id.*

### B. *Foot Rash*

 **\*2** The record, including plaintiff's complaint, reveals that Peterson suffered from a chronic foot rash condition over at least the last two and one-half years of his incarceration as a New York State inmate. *See, e.g.,* Complaint (Dkt. No. 1) ¶ 7. Early on, plaintiff's foot rash condition was treated principally with Hydrocortisone cream, administered on a minimum of fifteen occasions between August 9, 2001 and January 30, 2004. Miller Decl. (Dkt. No. 25) ¶ 8 and Exh. A at pp. 138-40, 155, 158. Plaintiff was also provided with Vitamin E lotion for his condition at least eight times during 2003 and 2004. *See, e.g., id.,* Exh. A at pp. 160-62, 166.

In addition to these nonprescription remedies, plaintiff was prescribed at least four different types of medication to help combat his foot condition. Miller Decl. (Dkt. No. 25) ¶ 9. On July 5, 2002, defendant Miller initially prescribed Selenium Sulfide (2.5% strength), a prescription medication used to treat tinea versicolor, a type of fungal infection of the skin. *Id.* ¶ 9. Plaintiff reported on August 29, 2002 that the Selenium Sulfide had completely relieved his itch, although he continued to experience a rash on his feet. Miller Decl. (Dkt. No. 25) Exh. A at p. 144. Three other prescription medications were subsequently administered

in an effort to control plaintiff's foot condition, including 1) Temovate, a medication designed to relieve skin itching and inflammation of moderate to severe degrees; 2) Itraconazole, a drug utilized to combat fungal infections including aspergillosis, blastomycosis, histoplasmosis, and fungal infection localized to the toenails and fingernails (onychomycosis); and 3) Lamisil, another anti-fungal prescription medication used to combat foot conditions. *Id.* ¶ 10 and Exh. A at pp. 186, 193.

### C. *Migraine Headache Medication*

The third element of plaintiff's deliberate medical indifference claim relates to the discontinuance of Fioricet, described as a strong, non-narcotic pain reliever used for relief of tension headache symptoms caused by muscle contractions in the head, neck and shoulder area. Miller Decl. (Dkt. No. 25) ¶ 12. The drug Fioricet contains butalbital, a sedative barbiturate, and acetaminophen, a non-aspirin pain reliever, as well as caffeine. *Id.*

Prison officials, including defendant Miller, prescribed Fioricet to the plaintiff on several occasions prior to March 29, 2004. *See, e.g.,* Miller Decl. (Dkt. No. 25) Exh. A at pp. 146, 153, 186. After learning on March 29, 2004 that plaintiff had accumulated four tablets of Fioricet on his person, while asking medical personnel for yet another two tablets of the same medication, and, upon further investigation, learning that another inmate locked in the same area as plaintiff had thirty Fioricet tablets stockpiled in his cell, security staff at Clinton requested that medical personnel discontinue providing the drug to the plaintiff. Miller Decl. (Dkt. No. 25) ¶ 13. Defendant Miller and other medical personnel complied, substituting instead a prescription for Motrin 600 mg, a pain reliever much more potent than the over-the-counter medication known by the same name, to address plaintiff's headaches. *Id.* ¶ 14 and Exh. A. at p. 191.

 **\*3** A month later, on May 4, 2004, defendant Miller prescribed Naproxen, a non-steroidal anti-inflammatory drug utilized for the management of moderate pain, fever, and inflammation through reduction of levels of prostaglandins, for plaintiff's migraine headaches. Miller Decl. (Dkt. No. 25) ¶ 15. Following complaints by the plaintiff that the Naproxen was not working well to control his migraine headaches, defendant Miller replaced that drug with Inderal, a medication specifically designed for the treatment of migraine headaches, among other ailments. *Id.* ¶ 16 and Exh. A at p. 193. Plaintiff continued

on the Inderal migraine medication until shortly before leaving DOCS custody. *Id.* at ¶ 16 and Exh. A at p. 197.

One of plaintiff's complaints concerns the failure of prison officials to resume his Fioricet as recommended by a cardiac consultant following its discontinuance. That portion of plaintiff's complaint relates to a consultation which occurred on June 2, 2004, at defendant Miller's recommendation, resulting in a report that the cardiologist "would [discontinue] Inderal & resume Norvasc 5 QD & Fioricet." [3] Miller Decl. (Dkt. No. 25) Exh. A at p. 87. That recommendation was not followed in light of the finding of security personnel at the facility regarding plaintiff's "saving" of Fioricet tablets for later use and suspected conveyance of Fioricet tablets to a fellow inmate. Miller Decl. (Dkt. No. 25) ¶ 18 and Exh. A at p. 187.

## II. *PROCEDURAL HISTORY*

After exhausting available administrative remedies, plaintiff commenced this action on July 8, 2004. Dkt. No. 1. Plaintiff's complaint asserts three separate causes of action, all of which relate to defendants' alleged failure to provide him with proper medical treatment for his various medical conditions. Named as defendants in the action are Nurse Practitioner Sheryl Miller, and Nurse Administrator Amy Tousignant. *Id.* ¶ 3. As relief, plaintiff seeks recovery of $750,000 in compensatory damages and $1,500,000 in punitive damages. *Id.*

On March 27, 2006, following the close of discovery, defendants moved seeking the entry of summary judgment dismissing plaintiff's complaint. Dkt. No. 25. In their motion, defendants argue that 1) plaintiff's deliberate indifference claim is legally deficient, based both on the lack of a showing that he suffered from a serious medical condition and his failure to establish that either of the defendants was deliberately indifferent to any such condition; 2) plaintiff has failed to demonstrate the personal involvement of defendant Tousignant in the matters complained of; and 3) in any event, both defendants are entitled to qualified immunity. *Id.* Defendants' motion, which plaintiff has not opposed, is now ripe for determination and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b). [4]

## III. *DISCUSSION*

### A. *Failure to Respond*
**\*4** The first issue to be addressed is the legal significance, if any, of plaintiff's failure to oppose defendants' summary judgment motion, and specifically whether that failure automatically entitles defendants to dismissal based upon their motion.

This court's rules provide that

> [w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown. N.D.N.Y.L.R. 7.1(b)(3).

While recognizing that *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, *see Jemzura v. Public Serv. Comm'n,* 961 F.Supp. 406, 415 (N.D.N .Y.1997) (McAvoy, C.J.), courts in this district have found it appropriate to grant a dispositive motion pursuant to Local Rule 7.1(b) (3) based upon a pro se plaintiff's failure to respond. *Robinson v. Delgado,* No. 96-CV-169, 1998 WL 278264, at \*2 (N.D.N.Y. May 22, 1998) (Pooler, D.J. & Hurd, M.J.); *Cotto v. Senkowski,* No. 95-CV-1733, 1997 WL 665551, at \*1 (N.D.N.Y. Oct. 23, 1997) (Pooler, D.J. & Hurd, M.J.); *Wilmer v. Torian,* 980 F.Supp. 106, 106-07 (N.D.N.Y.1997) (Pooler, D.J. & Hurd, M.J.). Before such an unopposed motion can be granted, however, the court must review the motion to determine whether it is facially meritorious. *See Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 231-32 (N.D.N.Y.2001) (Scullin, C.J.); *Leach v. Dufrain,* 103 F.Supp.2d 542, 545-46 (N.D.N.Y.2000) (Kahn, J.).

While a party's failure to properly oppose an adversary's dispositive motion thus does not assure that the motion, however lacking in merit, will be granted, that failure is not without consequences. By opting not to submit papers in opposition to the motion, plaintiff has left the facts

set forth in defendants' Local Rule 7.1(a)(3) Statement unchallenged. Courts in this district have uniformly enforced Local Rule 7.1(a)(3) and its predecessor, Local Rule 7.1(f), by deeming facts set forth in a statement of material facts not in dispute to have been admitted based upon an opposing party's failure to properly respond to that statement. [5] *See, e.g., Elgamil v. Syracuse Univ.,* No. 99-CV-611, 2000 WL 1264122, at *1 (Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)). I recommend that the court follow this well-established practice and, notwithstanding plaintiff's *pro se* status, accept defendants' assertion of facts as set forth in their Local Rule 7.1(a)(3) Statement as uncontroverted, in light of plaintiff's failure to respond to that statement, when reviewing defendants' motion for facial sufficiency.

B. *Summary Judgment Standard*

**\*5** Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material," for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing Anderson). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (stating that summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

C. *Eighth Amendment Claims*

Plaintiff asserts three causes of action in his complaint. First, plaintiff avers that defendants violated his Eighth Amendment rights when "they failed to provide adequate medical attention and treatment for two and one half years for his complaints of pain in his left kidney area, and rashes on his feet." Complaint (Dkt. No. 1) ¶ 7. Plaintiff next contends that defendants violated his Eighth Amendment rights by discontinuing the Fioricet migraine medication and failing to prescribe a beneficial medication. *Id.* Finally, the plaintiff claims that the defendants violated his Eighth Amendment rights by disregarding the order of the cardiologist to re-prescribe the Fioricet migraine medication. *Id.*

**\*6** Plaintiff's medical indifference claims are properly analyzed against the backdrop of a body of well-established Eighth Amendment jurisprudence. The Eighth Amendment prohibits the imposition of cruel and unusual punishments, including those that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102-03, 97 S.Ct. 285, 290-91 (1976) (quotations omitted). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A claim alleging that prison officials have violated the Eighth Amendment by their failure to provide adequate medical care must satisfy both an objective and a subjective requirement-the medical need must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference." *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, D.J. and Homer, M.J.). Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer*); *Waldo,* 1998 WL 713909, at * 2 (same).

1. *Serious Medical Need*
To establish a constitutionally cognizable claim of deliberate medical indifference under the Eighth Amendment, a plaintiff must initially allege a deprivation involving a medical need which is, in objective terms, " 'sufficiently serious.' " *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citing *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108 (1995). A medical need is serious for constitutional purposes if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A serious medical need can also exist where " 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' "; since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts. *Harrison v. Barkley,* 219 F.3d 132, 136-37 (2d Cir.2000) (quoting, *inter alia, Chance* ). Relevant factors in making this determination include injury that a " 'reasonable doctor or patient would find important and worthy of comment or treatment,' " a condition that " 'significantly affects' " a prisoner's daily activities, or causes " 'chronic and substantial pain.' " *Chance,* 143 F.3d at 701 (citations omitted); *LaFave v. Clinton County,* No. 00CV744, 2002 WL 31309244, at *2-3 (N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.), *adopted,* No. 00-CV-744, Dkt. No. 27 (N.D.N.Y. June 20, 2002) (Hurd, D.J.).

a. *Kidney Pain*
**\*7** According to his medical records, plaintiff complained to prison officials of pain in his kidney area over a period of two and one half years. Those records show that Peterson communicated those complaints to the medical staff, and as a result was seen on eleven occasions. Miller Decl. (Dkt. No. 25) ¶¶ 4, 6. Plaintiff described this pain as "dull pain." Miller Decl. (Dkt. No. 25) Exh. A at p. 128.

Having carefully reviewed plaintiff's medical records, I find that no reasonable factfinder could conclude that his complaints of back or kidney pain arose to a level of constitutional significance, demonstrating the requisite level of "death, degeneration, or extreme pain." *Hathaway,* 37 F.3d at 66; *see also Salaam v. Adams,* No. 03-CV-0517, 2006 WL 2827687, at * 10 (N.D.N.Y. Sept. 29, 2006) (Kahn, D.J. and Lowe, M.J.) (back pain that requires treatment with pain relievers and physical therapy was not a sufficiently serious medical need for purposes of the Eighth Amendment). Since at no time did plaintiff describe his pain in terms which would equate to "urgent," "debilitating," or "extreme", no reasonable factfinder could conclude that the condition constituted a sufficiently serious medical need to trigger the protections of the Eighth Amendment.

b. *Foot Rash*
Plaintiff alleges, and his medical records bear out, that over a lengthy period of time he registered multiple complaints regarding a foot rash condition. Those records, however, fail to suggest that the rash increased in severity over time or that because of it, plaintiff suffered from a condition capable of producing "death, degeneration, or extreme pain." *Hathaway,* 37 F.3d at 66. Indeed, plaintiff's records reflect that while the rash persisted, the itch associated with it was relieved by medication provided to the plaintiff. Miller Decl. (Dkt. No. 25) ¶ 9 and Exh. A at p. 144. Under these circumstances, once again, no reasonable factfinder could conclude that during the relevant period, plaintiff's foot condition rose to a level of constitutional significance. *See Smith v. Nash,* No. 04-CV-0074, 2006 WL 2806464, at *4-5 (N.D.N.Y. Sept. 28, 2006) (Kahn, D.J. and Homer, M.J.) (arthritis pain for which plaintiff was being treated with medication, and of which plaintiff did not complain of any pain, was not a sufficiently serious medical need).

c. *Migraine Headaches*
Plaintiff's complaint also claims a failure on the part of the defendants to properly medicate and otherwise treat his migraine headaches, causing him to needlessly suffer. Neither plaintiff's complaint nor his medical records are particularly informative as to the specifics regarding his migraine headaches, including their severity, duration, and degree. At most, plaintiff's medical records reveal that in March of 2004, plaintiff noted he "generally" suffered from headaches twice a week, and in April of 2004, his headaches were "bad" and generally started late at night. Miller Decl. (Dkt. No. 25) Exh. A at pp. 186, 189. While the court is therefore disadvantaged on this score, this particular issue is not appropriately resolved on summary judgment, since such a condition has, on occasion, been found by other courts to represent a sufficiently serious potential medical need as to survive a motion for summary judgment attacking the sufficiency of a plaintiff's showing in this regard. [6] *See, e.g., Moriarity v. Neubould,* No. 02CV1662, 2004 WL 288807, at *2 n. 2 (D.Conn. Feb. 10, 2004) (suggesting that plaintiff's migraine headaches constituted a sufficiently serious condition to warrant Eighth Amendment protection since they can be "extremely painful and debilitating"); *O'Bryan v. Sedgwick County,* No. 98-3308, 2000 WL 882516, at *5 (D. Kan. June 12, 2000) (assuming plaintiff's migraine headaches, for which he was prescribed medication, comprised a sufficiently serious medical need under the Eighth Amendment); *Medcalf v. State of Kansas,* 626 F.Supp. 1179, 1183 (D.Kan.1986) (finding that deceased prisoner, who consistently complained of severe headaches, nausea and vomiting, exhibited sufficiently severe medical symptoms for the court to conclude that administrator of prisoner's estate had stated a claim for relief under section 1983 and the Eighth Amendment).

2. *Deliberate Indifference*
**\*8** Deliberate indifference, in a constitutional sense, exists if an official knows of and disregards an excessive risk to inmate health or safety; the official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same).

It is well-established that mere disagreement with a prescribed course of treatment, or even a claim that negligence or medical malpractice has occurred, does not provide a basis to find a violation of the Eighth Amendment. *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 291-92; *Chance,* 143 F.3d at 703; *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.), *cert. denied,* 506 U.S. 1040, 113 S.Ct. 828 (1992). The question of what diagnostic techniques and treatments should be administered to an inmate is a "classic example of a matter for medical judgment"; accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle,* 429 U.S. at 107, 97 S.Ct. at 293; *Chance,* 143 F.3d at 703; *Rosales v. Coughlin,* 10 F.Supp.2d 261, 264 (W.D.N.Y.1998); *see also Perez v. Hawk,* 302 F.Supp.2d 9, 21 (E.D.N.Y.2004) (noting that "treatment of a prisoner's medication condition generally defeats a claim of deliberate indifference") (quotations omitted).

a. *Kidney Pain*
Plaintiff's medical records show that he complained of pain in the area of his kidney eleven times between July 16, 2001 and October 28, 2003. Miller Decl. (Dkt. No. 25) ¶ 3. Defendant was given Motrin to alleviate his discomfort, *see, e.g., id.,* Exh. A at pp. 128, 133, 144, 171, and was seen by a medical doctor on several of those occasions. Miller Decl. (Dkt. No. 25) ¶ 3 and Exh. A at pp. 133, 144, 171. As a general matter, the record fails to disclose any failure on the part of medical officials at Clinton to respond to his pain complaints.

Focusing on the involvement of defendant Miller, the record supports a finding that she was made aware of the plaintiff's kidney pain through plaintiff's complaints to her on July 5, 2002-a fact which she readily acknowledges. On that one and only occasion when defendant Miller saw the plaintiff regarding his pain complaints, she arranged for an outside radiologist to review x-rays of the plaintiff's back. Miller Decl. (Dkt. No. 25) ¶¶ 4, 5. Those x-rays were determined to be negative. *Id.* at ¶ 5. After the x-rays were taken, defendant Miller had no contact with the plaintiff regarding the condition. The record therefore fails to disclose any evidence from which a reasonable factfinder could conclude that defendant Miller was aware of but deliberately indifferent to plaintiff's kidney condition.

While the record discloses at least some minimal involvement on the part of defendant Miller in the treatment of plaintiff's kidney pain, there is no evidence from the record currently before the court of any involvement on the part of defendant Tousignant in connection with care or treatment for that complaint. Personal involvement of a defendant in an alleged constitutional deprivation is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

**\*9** Although plaintiff's complaint is silent on this issue, it may be that plaintiff asserts claims against defendant Tousignant in her administrative capacity as a nurse administrator. A supervisor, however, cannot be liable for damages under section 1983 solely by virtue of being a supervisor-there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. A supervisory official can, however, be liable in one of several ways: 1) the supervisor may have directly participated in the challenged conduct; 2) the supervisor, after learning of the violation through a report or appeal, may have failed to remedy the wrong; 3) the supervisor may have created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) the supervisor may have been grossly negligent in managing the subordinates who caused the unlawful event; or 5) the supervisor may have failed to act on information indicating that unconstitutional acts were occurring. *Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986). Even under this test the record fails to disclose any basis for finding defendant Tousignant liable with regard to plaintiff's kidney condition. Accordingly, I recommend that the portion of plaintiff's deliberate indifference claim against defendant Tousignant, related to the treatment of his kidney pain, be dismissed on this basis.

b. *Foot Rash*

The record reflects that both defendants were subjectively aware of plaintiff's foot rash. Plaintiff was seen on February 11, 2004 by defendant Tousignant, complaining of a rash on his feet. Tousignant Decl. (Dkt. No. 25) ¶ 4; Miller Decl. (Dkt. No. 25) Exh. A at p. 180. Defendant Tousignant reports that on that date she discussed with another nurse at the facility the care and treatment of plaintiff's foot condition, and was of the opinion that the treatment was appropriate. Tousignant Dec. (Dkt. No. 25) ¶ 4. While defendant Tousignant was aware of the plaintiff's foot rash condition, there was no evidence in the record demonstrating her deliberate indifference to that condition. I therefore recommend dismissal of plaintiff's foot rash indifference claim as against defendant Tousignant.

The record also reflects that defendant Miller was aware of, and indeed had a more active role in caring for, plaintiff's foot condition. The medical records associated with defendant Miller's care and treatment for that condition reflect significant efforts on her part, through administering of various prescription and non-prescription medications, to control plaintiff's condition and to relieve the itch associated with it. While plaintiff's quarrel appears to stem from his frustration over the inability to cure his rash condition, this without more fails to establish a constitutional violation. *See, e.g., Armour v. Herman,* No. 1:05CV295, 2005 WL 2977761, at *3 (N.D.Ind. Nov. 4, 2005) ("The Eighth Amendment does not require medical success ...."); *Ramos v. Artuz,* No. 00 Civ. 0149, 2003 WL 342347, at *9 (S.D.N.Y. Feb. 14, 2003) (indicating that an unsuccessful course of treatment does not support a finding of deliberate indifference); *see also Moolenaar v. Champagne,* No. 03-CV-1464, 2006 WL 2795339, at *7 (N.D.N.Y. Sept. 26, 2006) (Kahn, D.J. and Peebles, M.J.) (plaintiff's complaints of pain resulting from degenerative disc disease, a chronic ailment sustained by many individuals and treated with exercise, pain medication, and physical therapy, with which plaintiff was treated, did not give rise to a valid deliberate indifference claim). Based upon my review of the records associated with that defendant Miller's treatment, I am unable to discern any basis upon which a reasonable factfinder could conclude that defendant Miller was inattentive and deliberately indifferent to plaintiff's foot rash condition.

c. *Migraine Headaches*

The treatment administered by medical personnel with respect to plaintiff's migraines similarly belies any claim of deliberate indifference to his medical needs. It is true that both defendants were aware of plaintiff's prescription of Fioricet and his desire to continue with that medication. *See, e.g.,* Miller Decl. (Dkt. No. 25) ¶ 13; Tousignant Decl. (Dkt. No. 25) ¶ 5. Plaintiff's complaint in this regard stems from the failure to continue prescribing his pain medication of choice; that decision, however, was not made by the defendants, who instead were merely following directives from security personnel at the facility to discontinue the prescription drug in light of plaintiff's stockpiling and at least the suspected potential for having sold or given the drugs to fellow inmates. Such legitimate security concerns can provide a basis for discontinuing or denying a treatment, especially when, as in this case, adequate alternative measures are taken. *See, e.g., Kosilek v. Maloney,* 221 F.Supp.2d 156, 161 (D.Mass.2002) (stating that the duty of prison officials to protect the safety of both inmates and prison staff "is a factor that may properly be considered in prescribing medical care"); *Hawley v. Evans,* 716 F.Supp. 601, 604 (N.D.Ga.1989) (noting that as long as prison system abides by reasonable medical practices, whether to permit a prisoner to be treated with experimental drugs is within the discretion of the state officials, as "jail authorities have a legitimate security concern in limiting the exposure of inmates to drugs").

**\*10** In this instance, alternative efforts were taken by prison medical officials to address plaintiff's pain complaints. After termination of the Fioricet in or about late March, 2004, plaintiff was written a prescription for Motrin 600 mg, a strong pain reliever. Miller Decl. (Dkt. No. 25) ¶ 14 and Exh. A at p. 191. That was followed with a prescription on May 4, 2004 for Naproxen, another non-steroidal anti-inflammatory drug. Following a determination that the Naproxen was not working well enough to treat plaintiff's headaches, defendant Miller prescribed Inderal, a medication specifically designed for such purposes. Miller Decl. (Dkt. No. 25) ¶ 16 and Exh. A at p. 193.

In sum, plaintiff's medical records reflect that his migraine headaches were treated with three different prescription pain reliever medications. "[T]reatment of a prisoner's medical condition 'generally defeats a claim of deliberate indifference.' " *Perez,* 302 F.Supp.2d at 21 (quoting *Wells v. Franzen,* 777 F.2d 1258, 1264 (7th Cir.1985)). In this instance plaintiff's complaint represents nothing more than a disagreement with prison officials' choice of treatments, a matter which does not arise to a level of medical deliberate indifference. *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 291-92; *see also Chance,* 143 F.3d at 703. Accordingly, I find that plaintiff has not established medical deliberate indifference on the part of either of the defendants to his migraine medical condition. [7]

### IV. *SUMMARY AND RECOMMENDATION*

Plaintiff's complaint claims deliberate indifference on the part of defendants to three separate conditions, including pain in the region of his kidney, a foot rash, and migraine headaches. Because the first two of those three conditions are insufficiently serious, either separately or in combination, to trigger the Eighth Amendment's cruel and unusual punishment protections, I recommend dismissal of those claims on this basis. Additionally, having carefully reviewed the available records associated with plaintiff's medical treatment while an inmate at Clinton, I find no evidence from which a reasonable factfinder could conclude that either of the defendants was deliberately indifferent to plaintiff's medical conditions even assuming, *arguendo,* that they were sufficiently serious to implicate the Eighth Amendment. Finally, in light of my recommendations on the merits, I find it unnecessary to address defendants' additional argument that they are entitled to qualified immunity. [8]

Based upon the foregoing, it is hereby,

RECOMMENDED, that defendants' motion for summary judgment (Dkt. No. 25) be GRANTED, and that plaintiff's complaint be DISMISSED in all respects.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

**\*11** It is further ORDERED that the Clerk of the Court serve a copy of this report and recommendation upon the parties in accordance with the court's local rules.

## All Citations

Not Reported in F.Supp.2d, 2007 WL 2071743

Footnotes

1    In light of the procedural posture of this case, the following facts are presented in a light most favorable to the plaintiff, the non-moving party. *See Samuels v. Mockry,* 77 F.3d 34, 35 (2d Cir.1996). In this instance, the court's findings of fact are also informed by defendants' statement pursuant to Northern District of New York Local Rule 7.1(a)(3), the contents of which are assumed to be true as a result of plaintiff's failure to oppose defendants' motion. *See* pp. 9–11, *post.*

2    Defendant Tousignant, a registered nurse, is currently employed by the DOCS as Supervisor of Utilization Management and Quality Improvement. Tousignant Decl. (Dkt. No. 25) ¶ 1.

3    Norvasc is a medication used to treat high blood pressure and angina. Miller Decl. (Dkt. No. 25) ¶ 17.

4    A prior action brought by the plaintiff in this court pursuant to 42 U.S.C. § 1983 against various DOCS employees at Clinton, *Peterson v. Lacy, at al.,* 9:03-CV-1226 (DNH/RFT) (N.D.N.Y., filed 2003), was dismissed, on recommendation of United States Magistrate Judge Randolph F. Treece, on February 27, 2006, based upon plaintiff's failure to comply with the requirement that he notify the court of any change of address. 9:03-CV-1226, Dkt. Nos. 52, 54; *see also* Northern District of New York Local Rules 10.1(b)(2) and 41.2(b). In this case, plaintiff similarly has failed to notify the court of any change of address since his apparent release from DOCS custody. Based upon information received in connection with 9:03-CV-1226, the court has nonetheless adjusted its records to reflect a current address for the plaintiff in East Elmhurst, New York. It appears from correspondence forwarded in the *Peterson v. Lacy* case to the plaintiff at that address but returned as undeliverable, *see* 9:03-CV-1226, Dkt. No. 63, however, that plaintiff may have again moved without notifying the court and defendants' counsel of his change of circumstances, thereby making it impossible for the court to communicate with him regarding his action and, if true, providing an independent basis for dismissal of his complaint. *See* Northern District of New York Local Rules 10.1(b)(2) and 41.2(b).

5    Local Rule 7.1(a)(3) provides that "any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." *See* N.D.N.Y.L.R. 7.1(a)(3) (emphasis omitted).

6    Defendants have not argued that plaintiff's migraine headaches do not constitute a sufficiently serious medical condition to warrant the Eighth Amendment protections, and I have therefore not assumed otherwise.

7    The evidence reflects that defendant Tousignant did have at least minimal awareness of an involvement in the decision to discontinue his Fioricet medication and of plaintiff's quarrel with that determination. *See e.g.,* Tousignant Decl. (Dkt. No. 25) ¶ 5. I therefore recommend against dismissal of plaintiff's migraine headache claim as against defendant Tousignant on the independent basis of lack of personal involvement.

8    The first step in the qualified immunity analysis requires a threshold determination of whether plaintiff has facially established a constitutional violation. *Harhay v. Town of Ellington Bd. of Educ.,* 323 F.3d 206, 211 (2d Cir.2003). Only if the answer to that inquiry is in the affirmative must the court then turn its focus to whether the right in issue was clearly established at the time of the alleged violation, and if so whether it was objectively reasonable for the defendant to believe that his or her actions did not violate any such clearly established right. *Id.* (citing *Saucier v. Katz,* 533 U.S. 194, 201-02, 121 S.Ct. 2151, 2156 (2001)); *see also Poe v. Leonard,* 282 F.3d 123, 132-33 (2d Cir.2002).

**End of Document**                                                                                              © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 2639369
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

James PETTUS, Plaintiff,
v.
Jospeh McCOY, Superintendent,
Deputy Ryan, Defendants.

No. 9:04-CV-0471.
|
Sept. 13, 2006.

**Attorneys and Law Firms**

James Pettus, Comstock, NY, pro se.

Charles J. Quackenbush, New York State Attorney
General, The Capitol Albany, NY, for Defendants.

***DECISION and ORDER***

THOMAS J. McAVOY, Senior District Judge.

**\*1** Plaintiff commenced the instant action asserting
various violations of his constitutional rights arising out
of his placement at the Southport Correctional Facility.
In his Complaint, Plaintiff alleges that he was improperly
sent to the Special Housing Unit ("SHU") at a maximum
security facility and that being in SHU has put his life
in jeopardy. Currently before the Court is Defendants'
motion for summary judgment pursuant to Fed.R.Civ.P.
56 seeking dismissal of the Complaint in its entirety for
failure to exhaust administrative remedies.

## I. FACTS [1]

Plaintiff is an inmate in the custody of the New York
State Department of Correctional Services. Plaintiff
signed the instant Complaint on April 7, 2004. On
his Complaint form, Plaintiff indicated that there is
a grievance procedure available to him and that he
availed himself of the grievance procedure by filing a
complaint with the IGRC [2], followed by an appeal to
the superintendent of the facility, and then to the Central
Office Review Committee in Albany. The Complaint

indicates that Plaintiff is "waiting for response from
Albany." The Complaint was filed on April 27, 2004.

On April 12, 2004, prior to the filing of the instant
Complaint, Plaintiff filed a grievance relating to the issues
presented in this case. On April 19, 2004, the IGRC
recommended that Plaintiff's grievance be denied. Plaintiff
then appealed that decision to the facility Superintendent.
In the meantime, on April 27, Plaintiff commenced
the instant litigation. On May 3, 2004, after Plaintiff filed
the Complaint in this case, the Superintendent denied
Plaintiff's grievance. On May 5, 2004, Plaintiff appealed
the decision to the Central Office Review Committee in
Albany. On June 23, 2004, the Central Office Review
Committee denied Plaintiff's appeal. Plaintiff did not file
any other grievances in connection with the matters raised
in this lawsuit.

Defendants now move to dismiss on the ground that
Plaintiff commenced the instant action before fully
exhausting his available administrative remedies.

## II. DISCUSSION

The sole issue presented is whether Plaintiff was
required to complete the administrative process before
commencing this litigation. This issue has already been
addressed by the Second Circuit in *Neal v. Goord,* 267 F.3d
116 (2d Cir.2001). The issue in that case was "whether
plaintiff's complaint should have been dismissed despite
his having exhausted at least some claims during the
pendency of his lawsuit." *Id.* at 121. The Second Circuit
held that "exhausting administrative remedies after a
complaint is filed will not save a case from dismissal." *Id.*

In this case, Defendants have established from a
legally sufficient source that an administrative remedy
is available and applicable. *Mojias v. Johnson,* 351 F.3d
606, 610 (2d Cir.2003); *see also* 7. N.Y.C.R.R. § 701.1,
*et seq.* Plaintiff's Complaint concerns his placement in
SHU at a maximum security facility. These are matters
that fall within the grievance procedure available to
NYSDOCS inmates and are required to be exhausted
under the Prison Litigation Reform Act, 42 U.S.C. §
1997e. Plaintiff has failed to demonstrate any applicable
exception to the exhaustion requirement. Because Plaintiff
commenced the instant litigation prior to fully completing
the administrative review process, the instant Complaint
must be dismissed without prejudice. *Neal,* 267 F.3d 116.

### III. CONCLUSION

**\*2** For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and the Complaint is DISMISSED WITHOUT PREJUDICE. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 2639369

Footnotes

1    The following facts are taken from Defendants' statement of material facts submitted pursuant to N.D.N.Y.L.R. 7.1(a)(3). These facts are deemed admitted because they are supported by the record evidence and Plaintiff failed to submit an opposing statement of material facts as required by Rule 7.1(a)(3). Plaintiff was specifically advised by Defendants of his obligation to file an opposing statement of material facts and to otherwise properly respond to the motion for summary judgment.

2    Inmate Grievance Review Committee.

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

136 S.Ct. 1850
Supreme Court of the United States

Michael ROSS, Petitioner
v.
Shaidon BLAKE.

No. 15–339.
|
Argued March 29, 2016.
|
Decided June 6, 2016.

**Synopsis**

**Background:** Maryland inmate brought § 1983 action against correctional officers, alleging use of excessive force. One officer moved for summary judgment on the ground that inmate failed to exhaust his administrative remedies, as required by the Prison Litigation Reform Act (PLRA). The United States District Court for the District of Maryland, Alexander Williams, Jr., J., 2012 WL 5568940, granted the motion. Inmate appealed. The United States Court of Appeals for the Fourth Circuit, Gregory, Circuit Judge, 787 F.3d 693, reversed, and certiorari was granted.

**Holdings:** The Supreme Court, Justice Kagan, held that:

[1] a court may not excuse an inmate's failure to exhaust administrative remedies prior to bringing suit under the PLRA, even to take "special" circumstances into account, abrogating *Giano v. Goord*, 380 F.3d 670, and

[2] remand was required to determine if prison grievance process was "available" to inmate.

Vacated and remanded.

Justice Thomas filed opinion concurring in part and concurring in the judgment.

Justice Breyer filed opinion concurring in part.

West Headnotes (18)

**[1]    Prisons**
　　　 Exhaustion of Other Remedies

A prisoner need not exhaust administrative remedies prior to bringing suit under the PLRA if they are not "available." Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

7 Cases that cite this headnote

**[2]    Statutes**
　　　 Language

Statutory interpretation begins with the text.

Cases that cite this headnote

**[3]    Prisons**
　　　 Exhaustion of Other Remedies

A court may not excuse an inmate's failure to exhaust administrative remedies prior to bringing suit under the PLRA, even to take "special" circumstances into account; abrogating *Giano v. Goord*, 380 F.3d 670. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

3 Cases that cite this headnote

**[4]    Administrative Law and Procedure**
　　　 Exhaustion of administrative remedies

Judge-made exhaustion doctrines, even if flatly stated at first, remain amenable to judge-made exceptions.

Cases that cite this headnote

**[5]    Administrative Law and Procedure**
　　　 Exhaustion of administrative remedies

Courts have a role in creating exceptions to a statutory exhaustion provision only if Congress wants them to.

Cases that cite this headnote

[6] **Administrative Law and Procedure**
🔑 Exhaustion of administrative remedies

**Prisons**
🔑 Exhaustion of Other Remedies

Mandatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

2 Cases that cite this headnote

[7] **Prisons**
🔑 Exhaustion of Other Remedies

Under the PLRA, all inmates must exhaust all available remedies; exhaustion is no longer left to the discretion of the district court. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

2 Cases that cite this headnote

[8] **Statutes**
🔑 Presumptions

When Congress amends legislation, courts must presume it intends the change to have real and substantial effect.

Cases that cite this headnote

[9] **Statutes**
🔑 Particular Words and Phrases

Ordinary meaning of the word "available" is capable of use for the accomplishment of a purpose, and that which is accessible or may be obtained.

Cases that cite this headnote

[10] **Prisons**
🔑 Exhaustion of Other Remedies

Under the PLRA, an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of.

Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

3 Cases that cite this headnote

[11] **Prisons**
🔑 Exhaustion of Other Remedies

A prison administrative procedure is unavailable for purposes of the PLRA's exhaustion requirement when, despite what regulations or guidance materials may promise, it operates as a simple dead end— with officers unable or consistently unwilling to provide any relief to aggrieved inmates. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

3 Cases that cite this headnote

[12] **Prisons**
🔑 Exhaustion of Other Remedies

Some redress for a wrong is presupposed by the PLRA's requirement of an "available" administrative remedy; where the relevant administrative procedure lacks authority to provide any relief, the inmate has nothing to exhaust. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

Cases that cite this headnote

[13] **Prisons**
🔑 Exhaustion of Other Remedies

A prison administrative procedure is unavailable for purposes of the PLRA's exhaustion requirement when the administrative scheme is so opaque that it becomes, practically speaking, incapable of use; in this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

Cases that cite this headnote

[14] **Prisons**
🔑 Exhaustion of Other Remedies

When prison administrative rules are so confusing that no reasonable prisoner can use them, then they are no longer available for purposes of the PLRA's exhaustion requirement. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

Cases that cite this headnote

**[15]** **Prisons**
    **Exhaustion of Other Remedies**

When an administrative remedy is essentially "unknowable"—so that no ordinary prisoner can make sense of what it demands—then it is also unavailable; accordingly, exhaustion of administrative remedies under the PLRA is not required. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

1 Cases that cite this headnote

**[16]** **Prisons**
    **Exhaustion of Other Remedies**

A prison administrative procedure is unavailable for purposes of the PLRA's exhaustion requirement when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

3 Cases that cite this headnote

**[17]** **Federal Courts**
    **Particular cases**

Remand was required to determine if prison grievance process was "available" to Maryland inmate who claimed he was assaulted by a prison guard, so as to require inmate to exhaust that process before filing suit under the PLRA, where it could not be determined if investigation of the incident by the Maryland prison system's Internal Investigative Unit (IIU) foreclosed relief through the grievance process.

Cases that cite this headnote

**[18]** **Prisons**
    **Exhaustion of Other Remedies**

Courts may not engraft an unwritten "special circumstances" exception onto the PLRA's exhaustion requirement. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

Cases that cite this headnote

***1852** *Syllabus* [*]

**\*\*1** Two guards—James Madigan and petitioner Michael Ross—undertook to move respondent Shaidon Blake, a Maryland inmate, to the prison's segregation unit. During the transfer, Madigan assaulted Blake, punching him several times in the face. Blake reported the incident to a corrections officer, who referred the matter to the Maryland prison system's Internal Investigative Unit (IIU). The IIU, which has authority under state law to investigate employee misconduct, issued a report condemning Madigan's actions. Blake subsequently sued both guards under 42 U.S.C. § 1983, alleging excessive force and failure to take protective action. A jury found Madigan liable. But Ross raised (as an affirmative defense) the exhaustion requirement of the Prison Litigation Reform Act of 1995 (PLRA), which demands that an inmate exhaust "such administrative remedies as are available" before bringing suit to challenge prison conditions. § 1997e(a). Ross argued that Blake had filed suit without first following the prison's prescribed procedures for obtaining an administrative remedy, while Blake argued that the IIU investigation was a substitute for those procedures. The District Court sided with Ross and dismissed the suit. The Fourth Circuit reversed, holding that "special circumstances" **\*1853** can excuse a failure to comply with administrative procedural requirements—particularly where the inmate reasonably, even though mistakenly, believed he had sufficiently exhausted his remedies.

*Held* :

1. The Fourth Circuit's unwritten "special circumstances" exception is inconsistent with the text and history of the PLRA. Pp. 1855 – 1859.

(a) The PLRA speaks in unambiguous terms, providing that "[n]o action shall be brought" absent exhaustion of available administrative remedies. § 1997e(a). Aside from one significant qualifier—that administrative remedies must indeed be "available"—the text suggests no limits on an inmate's obligation to exhaust. That mandatory language means a court may not excuse a failure to exhaust, even to take "special circumstances" into account. When it comes to statutory exhaustion provisions, courts have a role in creating exceptions only if Congress wants them to. So mandatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion. See, *e.g., McNeil v. United States,* 508 U.S. 106, 113 S.Ct. 1980, 124 L.Ed.2d 21. Time and again, this Court has rejected every attempt to deviate from the PLRA's textual mandate. See *Booth v. Churner,* 532 U.S. 731, 121 S.Ct. 1819, 149 L.Ed.2d 958; *Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12; *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368. All those precedents rebut the Fourth Circuit's "special circumstances" excuse for non-exhaustion. Pp. 1855 – 1858.

(b) The PLRA's history further underscores the mandatory nature of its exhaustion regime. The PLRA replaced a largely discretionary exhaustion scheme, see *Nussle,* 534 U.S., at 523, 122 S.Ct. 983, removing the conditions that administrative remedies be "plain, speedy, and effective," that they satisfy federal minimum standards, and that exhaustion be "appropriate and in the interests of justice." The Court of Appeals' exception, if applied broadly, would resurrect that discretionary regime, in which a court could look to all the particulars of a case to decide whether to excuse a failure to exhaust. And if the exception were confined to cases in which a prisoner makes a reasonable mistake about the meaning of a prison's grievance procedures, it would reintroduce the requirement that the remedial process be "plain." When Congress amends legislation, courts must "presume it intends [the change] to have real and substantial effect." *Stone v. INS,* 514 U.S. 386, 397, 115 S.Ct. 1537, 131 L.Ed.2d 465. But the Court of Appeals acted as though no amendment had taken place. Pp. 1857 – 1859.

**\*\*2** 2. Blake's contention that the prison's grievance process was not in fact available to him warrants further consideration below. Pp. 1858 – 1862.

(a) Blake's suit may yet be viable. The PLRA contains its own, textual exception to mandatory exhaustion. Under § 1997e(a), an inmate's obligation to exhaust hinges on the "availab[ility]" of administrative remedies. A prisoner is thus required to exhaust only those grievance procedures that are "capable of use" to obtain "some relief for the action complained of." *Booth,* 532 U.S., at 738, 121 S.Ct. 1819.

As relevant here, there are three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief. First, an administrative procedure is unavailable when it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates. Next, an administrative scheme might be so opaque that it becomes, practically **\*1854** speaking, incapable of use—*i.e.,* some mechanism exists to provide relief, but no ordinary prisoner can navigate it. And finally, a grievance process is rendered unavailable when prison administrators thwart inmates from taking advantage of it through machination, misrepresentation, or intimidation. Pp. 1858 – 1860.

(b) The facts of this case raise questions about whether, given these principles, Blake had an "available" administrative remedy to exhaust. Ross's exhaustion defense rests on Blake's failure to seek relief through Maryland's Administrative Remedy Procedure (ARP) process, which begins with a grievance to the warden. That process is the standard method for addressing inmate complaints in the State's prisons. But Maryland separately maintains the IIU to look into charges of prison staff misconduct, and the IIU did just that here. Blake urged in the courts below that once the IIU commences such an inquiry, a prisoner cannot obtain relief through the ARP process. And in this Court, the parties have lodged additional materials relating to the interaction between the IIU and the ARP. Both sides' submissions, although scattershot and in need of further review, lend some support to Blake's account.

Blake's filings include many administrative dispositions indicating that Maryland wardens routinely dismiss ARP grievances as procedurally improper when parallel IIU investigations are pending. In addition, Blake has submitted briefs of the Maryland attorney general specifically recognizing that administrative practice. And Ross's own submissions offer some confirmation of

Blake's view: Ross does not identify a single case in which a warden considered the merits of an ARP grievance while an IIU inquiry was underway. On remand, the Fourth Circuit should perform a thorough review of such materials, and then address whether the remedies Blake did not exhaust were "available" under the legal principles set out here. Pp. 1860 – 1862.

**3** 787 F.3d 693, vacated and remanded.

KAGAN, J., delivered the opinion of the Court, in which ROBERTS, C.J., and KENNEDY, GINSBURG, ALITO, and SOTOMAYOR, JJ., joined. THOMAS, J., filed an opinion concurring in part and concurring in the judgment. BREYER, J., filed an opinion concurring in part.

**Attorneys and Law Firms**

Julia Doyle Bernhardt, Baltimore, MD, for Petitioner.

Zachary D. Tripp, for the United States as amicus curiae, by special leave of the Court, supporting the petitioner.

Paul W. Hughes, Washington, DC, for Respondent.

Patrick B. Hughes, Stephanie Lane–Weber, Dorianne A. Meloy, Assistant Attorneys General, Brian E. Frosh, Attorney General of Maryland, Thiruvendran Vignarajah, Deputy Attorney General, Julia Doyle Bernhardt, Matthew J. Fader, Deputy Chiefs of Litigation, Baltimore, MD, for Petitioner.

Jeffrey J. VanDam, Mayer Brown LLP, Chicago, IL, Reginald R. Goeke, Paul W. Hughes, Michael B. Kimberly, Catherine A. Bernard, John T. Lewis, Mayer Brown LLP, Washington, DC, for Respondent.

**Opinion**

Justice KAGAN delivered the opinion of the Court.

**[1]** The Prison Litigation Reform Act of 1995 (PLRA) mandates that an inmate exhaust "such administrative remedies as **\*1855** are available" before bringing suit to challenge prison conditions. 42 U.S.C. § 1997e(a). The court below adopted an unwritten "special circumstances" exception to that provision, permitting some prisoners to pursue litigation even when they have failed to exhaust available administrative remedies. Today, we reject that freewheeling approach to exhaustion as inconsistent with

the PLRA. But we also underscore that statute's built-in exception to the exhaustion requirement: A prisoner need not exhaust remedies if they are not "available." The briefs and other submissions filed in this case suggest the possibility that the aggrieved inmate lacked an available administrative remedy. That issue remains open for consideration on remand, in light of the principles stated below.

**I**

Respondent Shaidon Blake is an inmate in a Maryland prison. On June 21, 2007, two guards—James Madigan and petitioner Michael Ross—undertook to move him from his regular cell to the facility's segregation unit. According to Blake's version of the facts, Ross handcuffed him and held him by the arm as they left the cell; Madigan followed close behind. Near the top of a flight of stairs, Madigan shoved Blake in the back. Ross told Madigan he had Blake under control, and the three continued walking. At the bottom of the stairs, Madigan pushed Blake again and then punched him four times in the face, driving his head into the wall. After a brief pause, Madigan hit Blake one last time. Ross kept hold of Blake throughout the assault. And when the blows subsided, Ross helped Madigan pin Blake to the ground until additional officers arrived.

Later that day, Blake reported the assault to a senior corrections officer. That officer thought Madigan at fault, and so referred the incident to the Maryland prison system's Internal Investigative Unit (IIU). Under state law, the IIU has authority to investigate allegations of employee misconduct, including the use of "excessive force." Code of Md. Regs., tit. 12, § 11.01.05(A)(3) (2006). After conducting a year-long inquiry into the beating, the IIU issued a final report condemning Madigan's actions, while making no findings with respect to Ross. See App. 191–195. Madigan resigned to avoid being fired.

**4** Blake subsequently sued both guards under 42 U.S.C. § 1983, alleging that Madigan had used unjustifiable force and that Ross had failed to take protective action. The claim against Madigan went to a jury, which awarded Blake a judgment of $50,000. But unlike Madigan, Ross raised the PLRA's exhaustion requirement as an affirmative defense, contending that Blake had brought suit without first following

the prison's prescribed procedures for obtaining an administrative remedy. As set out in Maryland's Inmate Handbook, that process—called, not very fancifully, the Administrative Remedy Procedure (ARP)—begins with a formal grievance to the prison's warden; it may also involve appeals to the Commissioner of Correction and then the Inmate Grievance Office (IGO). See Maryland Div. of Correction, Inmate Handbook 30–31 (2007). Blake acknowledged that he had not sought a remedy through the ARP—because, he thought, the IIU investigation served as a substitute for that otherwise standard process. The District Court rejected that explanation and dismissed the suit, holding that "the commencement of an internal investigation does not relieve prisoners from the [PLRA's] exhaustion requirement." *Blake v. Maynard,* No. 8:09–cv–2367 (D.Md., Nov. 14, 2012), App. to Pet. for Cert. 38, 2012 WL 5568940, *5.

**\*1856** The Court of Appeals for the Fourth Circuit reversed in a divided decision. Stating that the PLRA's "exhaustion requirement is not absolute," the court adopted an extra-textual exception originally formulated by the Second Circuit. 787 F.3d 693, 698 (2015). Repeated the Court of Appeals: "[T]here are certain 'special circumstances' in which, though administrative remedies may have been available[,] the prisoner's failure to comply with administrative procedural requirements may nevertheless have been justified." *Ibid.* (quoting *Giano v. Goord,* 380 F.3d 670, 676 (C.A.2 2004)). In particular, that was true when a prisoner "reasonably"—even though mistakenly—"believed that he had sufficiently exhausted his remedies." 787 F.3d, at 695. And Blake, the court concluded, fit within that exception because he reasonably thought that "the IIU's investigation removed his complaint from the typical ARP process." *Id.,* at 700. Judge Agee dissented, stating that the PLRA's mandatory exhaustion requirement is not "amenable" to "[j]udge-made exceptions." *Id.,* at 703. This Court granted certiorari. 577 U.S. ——, 136 S.Ct. 614, 193 L.Ed.2d 495 (2015).

## II

**\*\*5** The dispute here concerns whether the PLRA's exhaustion requirement, § 1997e(a), bars Blake's suit. Statutory text and history alike foreclose the Fourth Circuit's adoption of a "special circumstances" exception

to that mandate. But Blake's suit may yet be viable. Under the PLRA, a prisoner need exhaust only "available" administrative remedies. And Blake's contention that the prison's grievance process was not in fact available to him warrants further consideration below.

### A

**[2]** Statutory interpretation, as we always say, begins with the text, see, *e.g., Hardt v. Reliance Standard Life Ins. Co.,* 560 U.S. 242, 251, 130 S.Ct. 2149, 176 L.Ed.2d 998 (2010)—but here following that approach at once distances us from the Court of Appeals. As Blake acknowledges, that court made no attempt to ground its analysis in the PLRA's language. See 787 F.3d, at 697–698; Brief for Respondent 47–48, n. 20 (labeling the Court of Appeals' rule an "extra-textual exception to the PLRA's exhaustion requirement"). And that failure makes a difference, because the statute speaks in unambiguous terms opposite to what the Fourth Circuit said.

Section 1997e(a) provides: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." As we have often observed, that language is "mandatory": An inmate "shall" bring "no action" (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies. *Woodford v. Ngo,* 548 U.S. 81, 85, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006); accord, *Jones v. Bock,* 549 U.S. 199, 211, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) ("There is no question that exhaustion is mandatory under the PLRA"). As later discussed, that edict contains one significant qualifier: the remedies must indeed be "available" to the prisoner. See *infra,* at 1858 – 1860. But aside from that exception, the PLRA's text suggests no limits on an inmate's obligation to exhaust—irrespective of any "special circumstances."

**[3]  [4]  [5]  [6]** And that mandatory language means a court may not excuse a failure to exhaust, even to take such circumstances into account. See **\*1857** *Miller v. French,* 530 U.S. 327, 337, 120 S.Ct. 2246, 147 L.Ed.2d 326 (2000) (explaining that "[t]he mandatory 'shall' ... normally creates an obligation impervious to judicial discretion"). No doubt, judge-made exhaustion doctrines,

even if flatly stated at first, remain amenable to judge-made exceptions. See *McKart v. United States,* 395 U.S. 185, 193, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969) ("The doctrine of exhaustion of administrative remedies ... is, like most judicial doctrines, subject to numerous exceptions"). But a statutory exhaustion provision stands on a different footing. There, Congress sets the rules —and courts have a role in creating exceptions only if Congress wants them to. For that reason, mandatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion. See, *e.g., McNeil v. United States,* 508 U.S. 106, 111, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("We are not free to rewrite the statutory text" when Congress has strictly "bar[red] claimants from bringing suit in federal court until they have exhausted their administrative remedies"). Time and again, this Court has taken such statutes at face value—refusing to add unwritten limits onto their rigorous textual requirements. See, *e.g., id.,* at 111, 113 S.Ct. 1980; *Shalala v. Illinois Council on Long Term Care, Inc.,* 529 U.S. 1, 12–14, 120 S.Ct. 1084, 146 L.Ed.2d 1 (2000); see also 2 R. Pierce, Administrative Law Treatise § 15.3, p. 1241 (5th ed. 2010) (collecting cases).

We have taken just that approach in construing the PLRA's exhaustion provision—rejecting every attempt to deviate (as the Fourth Circuit did here) from its textual mandate. In *Booth v. Churner,* 532 U.S. 731, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001), for example, the prisoner argued that exhaustion was not necessary because he wanted a type of relief that the administrative process did not provide. But § 1997e(a), we replied, made no distinctions based on the particular "forms of relief sought and offered," and that legislative judgment must control: We would not read "exceptions into statutory exhaustion requirements where Congress has provided otherwise." *Id.,* at 741, n. 6, 121 S.Ct. 1819. The next year, in *Porter v. Nussle,* 534 U.S. 516, 520, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002), the Court rejected a proposal to carve out excessive-force claims (like Blake's) from the PLRA's exhaustion regime, viewing that approach too as inconsistent with the uncompromising statutory text. And most recently, in *Woodford,* we turned aside a requested exception for constitutional claims. 548 U.S., at 91, n. 2, 126 S.Ct. 2378. Our explanation was familiar: "We are interpreting and applying" not a judge-made doctrine but a "statutory requirement," and therefore must honor Congress's choice. *Ibid.* [1] All those precedents rebut the

Court of Appeals' adoption of a "special circumstances" excuse for non-exhaustion.

**\*\*6** [7] So too, the history of the PLRA underscores the mandatory nature of its exhaustion regime. Section § 1997e(a)'s precursor, enacted in the Civil Rights of Institutionalized Persons Act (CRIPA), **\*1858** § 7, 94 Stat. 352 (1980), was a "weak exhaustion provision." *Woodford,* 548 U.S., at 84, 126 S.Ct. 2378. Under CRIPA, a court would require exhaustion only if a State provided "plain, speedy, and effective" remedies meeting federal minimum standards—and even then, only if the court believed exhaustion "appropriate and in the interests of justice." § 7(a), 94 Stat. 352. That statutory scheme made exhaustion "in large part discretionary." *Nussle,* 534 U.S., at 523, 122 S.Ct. 983. And for that reason (among others), CRIPA proved inadequate to stem the then-rising tide of prisoner litigation. In enacting the PLRA, Congress thus substituted an "invigorated" exhaustion provision. *Woodford,* 548 U.S., at 84, 126 S.Ct. 2378. "[D]iffer[ing] markedly from its predecessor," the new § 1997e(a) removed the conditions that administrative remedies be "plain, speedy, and effective" and that they satisfy minimum standards. *Nussle,* 534 U.S., at 524, 122 S.Ct. 983. Still more, the PLRA prevented a court from deciding that exhaustion would be unjust or inappropriate in a given case. As described earlier, see *supra,* at 1856 – 1857, all inmates must now exhaust all available remedies: "Exhaustion is no longer left to the discretion of the district court." *Woodford,* 548 U.S., at 85, 126 S.Ct. 2378.

[8] The PLRA's history (just like its text) thus refutes a "special circumstances" exception to its rule of exhaustion. That approach, if applied broadly, would resurrect CRIPA's scheme, in which a court could look to all the particulars of a case to decide whether to excuse a failure to exhaust available remedies. But as we have observed, such wide-ranging discretion "is now a thing of the past." *Booth,* 532 U.S., at 739, 121 S.Ct. 1819. And the conflict with the PLRA's history (as again with its text) becomes scarcely less stark if the Fourth Circuit's exception is confined, as the court may have intended, to cases in which a prisoner makes a reasonable mistake about the meaning of a prison's grievance procedures. Understood that way, the exception reintroduces CRIPA's requirement that the remedial process be "plain"—that is, not subject to any reasonable misunderstanding or disagreement. § 7(a), 94 Stat. 352. When Congress amends legislation, courts must "presume

it intends [the change] to have real and substantial effect." *Stone v. INS,* 514 U.S. 386, 397, 115 S.Ct. 1537, 131 L.Ed.2d 465 (1995). The Court of Appeals instead acted as though the amendment—from a largely permissive to a mandatory exhaustion regime—had not taken place. [2]

B

**\*\*7** **[9]** **[10]** Yet our rejection of the Fourth Circuit's "special circumstances" exception does not end this case—because the PLRA contains its own, textual exception to mandatory exhaustion. Under § 1997e(a), the exhaustion requirement hinges on the "availab[ility]" of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones. And that limitation on an inmate's duty to exhaust —although significantly different from the "special circumstances" test or the old CRIPA standard—has real content. As we explained in *Booth,* the ordinary meaning of the word "available" is " 'capable of use for the accomplishment of a purpose,' and that which 'is accessible or may be obtained.' " **\*1859** 532 U.S., at 737–738, 121 S.Ct. 1819 (quoting Webster's Third New International Dictionary 150 (1993)); see also Random House Dictionary of the English Language 142 (2d ed. 1987) ("suitable or ready for use"); 1 Oxford English Dictionary 812 (2d ed. 1989) ("capable of being made use of, at one's disposal, within one's reach"); Black's Law Dictionary 135 (6th ed. 1990) ("useable"; "present or ready for immediate use"). Accordingly, an inmate is required to exhaust those, but only those, grievance procedures that are "capable of use" to obtain "some relief for the action complained of." *Booth,* 532 U.S., at 738, 121 S.Ct. 1819.

To state that standard, of course, is just to begin; courts in this and other cases must apply it to the real-world workings of prison grievance systems. Building on our own and lower courts' decisions, we note as relevant here three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief. See Tr. of Oral Arg. 27–29 (Solicitor General as *amicus curiae* acknowledging these three kinds of unavailability). Given prisons' own incentives to maintain functioning remedial processes, we expect that these circumstances will not often arise. See *Woodford,* 548 U.S., at 102, 126 S.Ct. 2378. But when one (or more) does, an inmate's duty to exhaust "available" remedies does not come into play.

**[11]** **[12]** First, as *Booth* made clear, an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates. See 532 U.S., at 736, 738, 121 S.Ct. 1819. Suppose, for example, that a prison handbook directs inmates to submit their grievances to a particular administrative office—but in practice that office disclaims the capacity to consider those petitions. The procedure is not then "capable of use" for the pertinent purpose. In *Booth* 's words: "[S]ome redress for a wrong is presupposed by the statute's requirement" of an "available" remedy; "where the relevant administrative procedure lacks authority to provide any relief," the inmate has "nothing to exhaust." *Id.,* at 736, and n. 4, 121 S.Ct. 1819. So too if administrative officials have apparent authority, but decline ever to exercise it. Once again: "[T]he modifier 'available' requires the possibility of some relief." *Id.,* at 738, 121 S.Ct. 1819. When the facts on the ground demonstrate that no such potential exists, the inmate has no obligation to exhaust the remedy.

**\*\*8** **[13]** **[14]** **[15]** Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it. As the Solicitor General put the point: When rules are "so confusing that ... no reasonable prisoner can use them," then "they're no longer available." Tr. of Oral Arg. 23. That is a significantly higher bar than CRIPA established or the Fourth Circuit suggested: The procedures need not be sufficiently "plain" as to preclude any reasonable mistake or debate with respect to their meaning. See § 7(a), 94 Stat. 352; 787 F.3d, at 698–699; *supra,* at 1855, 1857 – 1859. When an administrative process is susceptible of multiple reasonable interpretations, Congress has determined that the inmate should err on the side of exhaustion. But when a remedy is, in Judge Carnes's phrasing, essentially "unknowable"—so that no ordinary prisoner can make sense of what it demands—then it is also unavailable. See *Goebert v. Lee County,* 510 F.3d 1312, 1323 (C.A.11 2007); *Turner v. Burnside,* 541 F.3d 1077, 1084 (C.A.11 2008) ("Remedies that rational inmates **\*1860** cannot be expected to use are not capable of accomplishing

their purposes and so are not available"). Accordingly, exhaustion is not required.

**[16]** And finally, the same is true when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation. In *Woodford,* we recognized that officials might devise procedural systems (including the blind alleys and quagmires just discussed) in order to "trip[ ] up all but the most skillful prisoners." 548 U.S., at 102, 126 S.Ct. 2378. And appellate courts have addressed a variety of instances in which officials misled or threatened individual inmates so as to prevent their use of otherwise proper procedures. As all these courts have recognized, such interference with an inmate's pursuit of relief renders the administrative process unavailable. [3] And then, once again, § 1997e(a) poses no bar.

**[17]** The facts of this case raise questions about whether, given these principles, Blake had an "available" administrative remedy to exhaust. As explained earlier, Ross's exhaustion defense rests on Blake's failure to seek relief through Maryland's ARP process, which begins with a grievance to the warden and may continue with appeals to the Commissioner of Correction and the IGO. See *supra,* at 1855 – 1856; Inmate Handbook, at 30–31. That process is the standard method for addressing inmate complaints in the State's prisons: The Inmate Handbook provides that prisoners may use the ARP for "all types" of grievances (subject to four exceptions not relevant here), including those relating to the use of force. *Id.,* at 30; see App. 312. But recall that Maryland separately maintains the IIU to look into charges of staff misconduct in prisons, and the IIU did just that here. See *supra,* at 1855. Blake urged in the courts below that once the IIU commences such an inquiry, a prisoner *cannot* obtain relief through the standard ARP process—whatever the Handbook may say to the contrary. See 787 F.3d, at 697; App. to Pet. for Cert. 38, 2012 WL 5568940, at *5. And in this Court, that issue has taken on new life. Both Blake and Ross (as represented by the Maryland attorney general) have lodged additional materials relating to the interaction between the IIU and the ARP. And *both* sides' submissions, although scattershot and in need of further review, lend some support to Blake's account—while also revealing Maryland's grievance process to have, at least at first blush, some bewildering features.

**\*\*9** Blake's filings include many administrative dispositions (gleaned from the records of other prisoner suits) indicating that Maryland wardens routinely dismiss ARP grievances as procedurally improper when **\*1861** parallel IIU investigations are pending. One warden, for example, wrote in response to a prisoner's complaint: "Your Request for Administrative Remedy has been received and is hereby dismissed. This issue has been assigned to the Division of Correction's Internal Investigative Unit (Case # 07–35–010621I/C), and will no longer be addressed through this process." Lodging of Respondent 1; see also, *e.g., id.,* at 18 ("Admin. Dismiss Final: This is being investigated outside of the ARP process by I.I.U."). In addition, Blake has submitted briefs of the Maryland attorney general (again, drawn from former prisoner suits) specifically recognizing that administrative practice. As the attorney general stated in one case: "Wilkerson filed an ARP request," but "his complaint already was being investigated by the [IIU], superceding an ARP investigation." *Id.*, at 23–24; see also, *e.g. id.,* at 5 (Bacon's grievance "was dismissed because the issue had been assigned to [the] IIU and would no longer be addressed through the ARP process"). [4]

And Ross's own submissions offer some confirmation of Blake's view. Ross does not identify a single case in which a warden considered the merits of an ARP grievance while an IIU inquiry was underway. See Tr. of Oral Arg. 6 (Maryland attorney general's office conceding that it had found none). To the contrary, his lodging contains still further evidence that wardens consistently dismiss such complaints as misdirected. See, *e.g.,* Lodging of Petitioner 15 (District Court noting that "Gladhill was advised that no further action would be taken through the ARP process because the matter had been referred to the [IIU]"). Indeed, Ross' materials suggest that some wardens use a rubber stamp specially devised for that purpose; the inmate, that is, receives a reply stamped with the legend: "Dismissed for procedural reasons.... This issue is being investigated by IIU case number: ____. No further action shall be taken within the ARP process." *Id.,* at 25, 32, 38; see Tr. of Oral Arg. 8–9 (Maryland attorney general's office conceding the stamp's existence and use).

**\*\*10** Complicating the picture, however, are several cases in which an inmate refused to take a warden's jurisdictional "no" for an answer, resubmitted his grievance up the chain to the IGO, and there received a ruling on the merits, without any discussion of the ARP/

IIU issue. We confess to finding these few cases perplexing in relation to normal appellate procedure. See *id.*, at 3–10, 13–15, 18–20 (multiple Justices expressing confusion about Maryland's procedures). If the IGO thinks the wardens wrong to dismiss complaints because of pending IIU investigations, why does it not say so and stop the practice? Conversely, if the IGO thinks the wardens right, how can it then issue merits decisions? And if that really is Maryland's procedure—that when an IIU investigation is underway, the warden (and Commissioner of Correction) cannot consider a prisoner's complaint, but the IGO can—why does the Inmate Handbook not spell this out? Are there, instead, other materials provided to prisoners that communicate **\*1862** how this seemingly unusual process works and how to navigate it so as to get a claim heard?

In light of all these lodgings and the questions they raise about Maryland's grievance process, we remand this case for further consideration of whether Blake had "available" remedies to exhaust. The materials we have seen are not conclusive; they may not represent the complete universe of relevant documents, and few have been analyzed in the courts below. On remand, in addition to considering any other arguments still alive in this case, the court must perform a thorough review of such materials, and then address the legal issues we have highlighted concerning the availability of administrative remedies. First, did Maryland's standard grievance procedures potentially offer relief to Blake or, alternatively, did the IIU investigation into his assault foreclose that possibility? Second, even if the former, were those procedures knowable by an ordinary prisoner in Blake's situation, or was the system so confusing that no such inmate could make use of it? And finally, is there persuasive evidence that Maryland officials thwarted the effective invocation of the administrative process through threats, game-playing, or misrepresentations, either on a system-wide basis or in the individual case? If the court accepts Blake's probable arguments on one or more of these scores, then it should find (consistent this time with the PLRA) that his suit may proceed even though he did not file an ARP complaint.

### III

**\*\*11** **[18]** Courts may not engraft an unwritten "special circumstances" exception onto the PLRA's exhaustion requirement. The only limit to § 1997e(a)'s mandate is the

one baked into its text: An inmate need exhaust only such administrative remedies as are "available." On remand, the court below must consider how that modifying term affects Blake's case—that is, whether the remedies he failed to exhaust were "available" under the principles set out here. We therefore vacate the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

Justice THOMAS, concurring in part and concurring in the judgment.

I join the Court's opinion except for the discussion of Maryland's prison-grievance procedures, *ante,* at 1854 – 1862, which needlessly wades into respondent Shaidon Blake's questionable lodgings of new documents in this Court. Those documents are not part of the appellate record. See Fed. Rule App. Proc. 10(a). We have "consistently condemned" attempts to influence our decisions by submitting "additional or different evidence that is not part of the certified record." S. Shapiro, K. Geller, T. Bishop, E. Hartnett, & D. Himmelfarb, Supreme Court Practice § 13.11(k), p. 743 (10th ed. 2013). Perhaps Blake's newfound documents are subject to judicial notice as public records. See Fed. Rule Evid. 201. But I would not take such notice for the first time in this Court. It appears that Blake had a chance to submit many of his documents to the lower courts and failed to do so. Taking notice of the documents encourages gamesmanship and frustrates our review. I would let the Court of Appeals decide on remand whether to supplement the record, see Fed. Rule App. Proc. 10(e), or take notice of Blake's lodgings.

Justice BREYER, concurring in part.

I join the opinion of the Court, with the exception that I described in **\*1863** *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). There, I agreed that "Congress intended the term 'exhausted' to 'mean what the term means in administrative law, where exhaustion means proper exhaustion.' " *Id.,* at 103, 126 S.Ct. 2378 (opinion concurring in judgment). Though that statutory term does not encompass "freewheeling" exceptions for any " 'special circumstanc[e],' " *ante,* at 1855, it does include administrative law's "well-established exceptions to exhaustion." *Woodford, supra,* at 103, 126 S.Ct. 2378

(opinion of BREYER, J.). I believe that such exceptions, though not necessary to the Court's disposition of this case, may nevertheless apply where appropriate.

**All Citations**

136 S.Ct. 1850, 2016 WL 3128839, 14 Cal. Daily Op. Serv. 5801, 26 Fla. L. Weekly Fed. S 205

Footnotes

\*   The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

1    We note that our adherence to the PLRA's text runs both ways: The same principle applies regardless of whether it benefits the inmate or the prison. We have thus overturned judicial rulings that imposed extra-statutory limitations on a prisoner's capacity to sue—reversing, for example, decisions that required an inmate to demonstrate exhaustion in his complaint, permitted suit against only defendants named in the administrative grievance, and dismissed an entire action because of a single unexhausted claim. See *Jones v. Bock,* 549 U.S. 199, 203, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). "[T]hese rules," we explained, "are not required by the PLRA," and "crafting and imposing them exceeds the proper limits on the judicial role." *Ibid.*

2    Of course, an exhaustion provision with a different text and history from § 1997e(a) might be best read to give judges the leeway to create exceptions or to itself incorporate standard administrative-law exceptions. See 2 R. Pierce, Administrative Law Treatise § 15.3, p. 1245 (5th ed. 2010). The question in all cases is one of statutory construction, which must be resolved using ordinary interpretive techniques.

3    See, *e.g., Davis v. Hernandez,* 798 F.3d 290, 295 (C.A.5 2015) ("Grievance procedures are unavailable ... if the correctional facility's staff misled the inmate as to the existence or rules of the grievance process so as to cause the inmate to fail to exhaust such process" (emphasis deleted)); *Schultz v. Pugh,* 728 F.3d 619, 620 (C.A.7 2013) ("A remedy is not available, therefore, to a prisoner prevented by threats or other intimidation by prison personnel from seeking an administrative remedy"); *Pavey v. Conley,* 663 F.3d 899, 906 (C.A.7 2011) ("[I]f prison officials misled [a prisoner] into thinking that ... he had done all he needed to initiate the grievance process," then "[a]n administrative remedy is not 'available' "); *Tuckel v. Grover,* 660 F.3d 1249, 1252–1253 (C.A.10 2011) ("[W]hen a prison official inhibits an inmate from utilizing an administrative process through threats or intimidation, that process can no longer be said to be 'available' "); *Goebert v. Lee County,* 510 F.3d 1312, 1323 (C.A.11 2007) (If a prison "play[s] hide-and-seek with administrative remedies," then they are not "available").

4    Blake further notes that in 2008, a year after his beating, Maryland amended one of its prison directives to state expressly that when the IIU investigates an incident, an ARP grievance may not proceed. See App. 367, Md. Div. of Correction, Directive 185–003, § VI(N)(4) (Aug. 27, 2008) (The Warden "shall issue a final dismissal of [an ARP] request for procedural reasons when it has been determined that the basis of the complaint is the same basis of an investigation under the authority of the [IIU]"); Brief for Respondent 17–18. According to Blake, that amendment merely codified what his submissions show had long been the practice in Maryland prisons. See *ibid.*

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 2827687
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Rasool SALAAM, Plaintiff,

v.

D. ADAMS, Facility Nurse; Susan A. Walsh, Facility
Nurse; R.A. Girdich, Superintendent, Defendants.

No. 9:03-CV-0517 (LEK/GHL).
|
Sept. 29, 2006.

**Attorneys and Law Firms**

Rasool Salaam, Auburn, NY, pro se.

Hon. Eliot L. Spitzer, Attorney General for the State of
New York, Risa L. Viglucci, Esq., Assistant Attorney
General, of counsel, Albany, NY, for Defendants.

*DECISION AND ORDER*

LAWRENCE E. KAHN, District Judge.

*\*1* This matter comes before the Court following a
Report-Recommendation filed on August 18, 2006, by the
Honorable George H. Lowe, United States Magistrate
Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3 of
the Northern District of New York. Report-Rec. (Dkt.
No. 44). After ten days from the service thereof, the Clerk
has sent the entire file to the undersigned, including the
objections by Plaintiff Rasool Salaam, which were filed on
September 11, 2006. Objections (Dkt. No. 45).

It is the duty of this Court to "make a de novo
determination of those portions of the report or specified
proposed findings or recommendations to which objection
is made." 28 U.S.C. § 636(b). "A [district] judge ...
may accept, reject, or modify, in whole or in part, the
findings or recommendations made by the magistrate
judge." *Id.* This Court has considered the objections and
has undertaken a de novo review of the record and has
determined that the Report-Recommendation should be
approved for the reasons stated therein.

Accordingly, it is hereby

ORDERED, that the Report-Recommendation (Dkt.
No. 44) is APPROVED and ADOPTED in its
ENTIRETY; and it is further

ORDERED, that Defendants' motion for summary
judgment (Dkt. No. 33) is GRANTED and the case is
DISMISSED IN ITS ENTIRETY; and it is further

ORDERED, that the Clerk serve a copy of this Order on
all parties.

IT IS SO ORDERED.

GEORGE H. LOWE, United States Magistrate Judge.

*REPORT-RECOMMENDATION*

This matter has been referred to me for Report and
Recommendation by the Honorable Lawrence E. Kahn,
United States District Judge, pursuant to 28 U.S.C. §
636(b) and Local Rule N.D.N.Y. 72.3(c). This is a *pro
se* civil rights action under 42 U.S.C. § 1983 by Inmate
Rasool Salaam ("Plaintiff") against three employees of
Upstate Correctional Facility ("Upstate C.F.")-Facility
Nurse Debra J. Adams, Facility Nurse Susan A.
Walsh, and Superintendent R.A. Girdich ("Defendants").
Generally, Plaintiff alleges that Defendants violated his
First and Eighth Amendment rights between September
of 2001 and May of 2003 by retaliating against him for
filing grievances and for practicing his religion, and by
being deliberately indifferent to his serious medical needs.
(Dkt. No. 6 [Am. Compl.].) Currently before the Court
is Defendants' motion for summary judgment. (Dkt. No.
33.) For the reasons discussed below, I recommend that
Defendants' motion for summary judgment be granted.

**I. BACKGROUND**

**A. Plaintiff's Amended Complaint**
Plaintiff's Amended Complaint alleges the following set
of events. On September 25 and 26, 2001, Plaintiff was
assaulted at Upstate C .F. As a result, he sustained
"off and on back pains." Plaintiff complained about
the back pains. Defendants Adams and Walsh provided
Plaintiff with pain killers and an "exercise sheet" for
his back problem. Despite taking the pain killers and
using the exercise sheet, Plaintiff continued to experience

pains in his lower back. Plaintiff complained of his continuing back pain, and asked to see a doctor. However, Defendants Adams and Walsh refused to let Plaintiff see a doctor.

**\*2** Over the course of the next year, Plaintiff regularly signed up for sick call to complain about his pain. However, Defendants Adams and Walsh continued to refuse to let Plaintiff see a doctor. In addition, in approximately May of 2002, Plaintiff started experiencing, and complaining about, gastrointestinal problems and resulting stomach pains. Defendant Adams denied Plaintiff adequate medical treatment for these problems. Plaintiff filed grievances alleging a denial of adequate medical care. The grievances were denied. They were then appealed to the office of Defendant Girdich.

Finally, on October 2, 2002, Plaintiff was seen by a doctor for his back problem. The doctor referred Plaintiff to a physical therapist. However, after approximately three therapy sessions, certain "infirmary escorts" stopped taking Plaintiff to his physical therapist. Plaintiff grieved his denial of physical therapy. In retaliation for making these grievances, Plaintiff was, at some point, taken off the "physical therapy list." In addition, Plaintiff's grievances were "taken out of [a] mail box" so that Plaintiff could not appeal the denial of those grievances to the Department of Correctional Services' Central Office Review Committee. Plaintiff grieved this "mail box" issue as well, bringing that grievance to the attention of (among others) the First Deputy Superintendent. However, Plaintiff continued to be retaliated against.

For example, in February of 2003, Defendants Adams and Walsh threatened Plaintiff with a misbehavior report if he continued to sign up for sick call on a daily basis. In addition, earlier, on January 28, 2003, Plaintiff was issued a false misbehavior report for allegedly calling Defendant Walsh a degrading name the day before. Similarly, on February 5, 2003, Plaintiff was issued a second false misbehavior report for allegedly breaking an "inhaler" the day before. As a result of these two false misbehavior reports, Plaintiff was placed on a restricted diet for 28 days.

Finally, Plaintiff was retaliated against based on his religion. Specifically, during the time in question, Plaintiff was practicing the religion of Islam. He was also a mental health patient, who had been taking Wellbutrin

which had been prescribed to "control his rage and/or emotions." From early November of 2002 to early December of 2002-the holy month of Ramadan-Plaintiff sincerely believed that he was prohibited by his religion from taking his medications from sunrise to sunset. As a result, he consulted with his psychologist, who informed him that she would direct the medical staff to give Plaintiff his medication before sunrise, at 6:00 a.m. However, during the month of Ramadan, Defendant Adams refused to comply with the order of Plaintiff's psychologist. In addition, Defendant Adams ordered the other nurses (including Defendant Walsh) not to comply with the order of Plaintiff's psychologist. Indeed, at some point during Ramadan, Defendants stopped Plaintiff from receiving his medication altogether. Plaintiff resumed receiving his medication at the end of Ramadan. However, at various times, including on March 23, 2003, and March 24, 2003, Defendants Adams and Walsh wrongfully denied Plaintiff the medication Neurontin, which he had been prescribed. (*See generally* Dkt. No. 6 [Plf.'s Am. Compl.].)

**\*3** Liberally construing Plaintiff's *pro se* civil rights allegations, as I must, I construe Plaintiff's Amended Complaint as asserting the following claims:

**(1)** a First Amendment **free-exercise-of-religion** claim against Defendants **Adams** and **Walsh** based on their alleged failure to change Upstate C.F.'s regular medication-delivery schedule for Plaintiff during the holy month of Ramadan in 2002 so that he could receive his medication either before sunrise or after sunset;

four First Amendment **retaliation** claims:

**(a)** one claim against Defendants **Adams** and **Walsh** based on their allegedly taking Plaintiff off the so-called "physical therapy list" in response to his grieving his denial of physical therapy;

**(b)** one claim against Defendants **Adams** and **Walsh** based on their alleged cessation of Plaintiff's medication delivery altogether during the holy month of Ramadan in 2002 in response to (i) his practicing of his religion and/or (ii) his filing of grievances alleging inadequate medical care; [1]

**(c)** one claim against Defendants **Adams** and **Walsh** based on their allegedly filing false misbehavior reports in response to his signing up for sick call (and

presumably complaining of various medical conditions) on a daily basis; and

**(c)** the final claim against Defendant **Girdich** based on his alleged failure to resolve Plaintiff's "mail box" complaint in response to his grieving his denial of physical therapy; and

**(3)** two Eighth Amendment claims for **deliberate indifference** to a serious medical need:

**(a)** the first claim against Defendants **Adams** and **Walsh** based on their allegedly refusing to let him see a doctor for his back pain between September of 2001 and October of 2002, denying him adequate treatment for his gastrointestinal problem and stomach pain starting in May of 2002, taking him off the "physical therapy list" for his back problem in the fall of 2002, depriving him of the medication Wellburtin during the holy month of Ramadan in 2002, and denying him the medication Neurontin in March of 2003; and

**(b)** the second claim against Defendant **Girdich** based on his alleged failure to resolve, in Plaintiff's favor, Plaintiff's grievances regarding his lack of access to a doctor for his back pain, his lack of adequate treatment for his stomach pain, and his "mail box" issue.

**B. Defendant's Motion**

Generally, Defendants base their motion for summary judgment on three grounds. First, they argue that Plaintiff has failed to establish a free-exercise claim under the First Amendment because (1) Plaintiff has not established that his psychologist ever in fact directed Defendants Adams and Walsh to give Plaintiff his medication before sunrise, (2) Plaintiff has not established that he ever complained to Defendants Adams or Walsh that the facility's normal medication schedule violated Ramadan, and (3) Plaintiff has not established that Ramadan prohibits the taking of medication between sunrise and sunset.

**\*4** Second, Defendants argue that Plaintiff has failed to establish an Eighth Amendment claim for deliberate indifference to a serious medical need because (1) he has failed to establish that his alleged medical condition (consisting of an alleged back problem, gastrointestinal disorder and psychological condition) constitutes a "serious medical need" for purposes of the Eighth Amendment, and (2) in any event, Plaintiff has failed

to establish that Defendants manifested the sort of intentional or reckless state of mind necessary to incur liability under the Eighth Amendment.

Third, Defendants argue that Plaintiff has failed to establish the personal involvement of Defendant Girdich in any of the alleged constitutional deprivations since supervisors such as Defendant Girdich can be personally involved in only certain circumstances, none of which are present under the facts established by the current record. (Dkt. No. 37 [Defs.' Mem. of Law].)

**II. SUMMARY JUDGMENT STANDARD**

Under Fed.R.Civ.P. 56(c), summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. [3]

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). [4] The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." [5] "A dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [6]

Imposed over this general burden-shifting framework is the generous perspective with which the Court generally views a *pro se* civil rights plaintiff's papers. [7] For example, where a civil rights plaintiff is proceeding *pro se,* and the defendant has filed a dispositive motion, generally the Court must construe the plaintiff's complaint and opposition papers liberally so as to raise the strongest arguments that they suggest. [8] Having said that, "[p]roceeding pro se does not otherwise relieve a [party] from the usual requirements to survive a motion for summary judgment ." [9]

## III. STATEMENT OF MATERIAL FACTS

Generally, the facts set forth in a movant's Rule 7.1(a)(3) Statement of Material Facts will be taken as true to the extent those facts are supported by the evidence in the record [10] and are not specifically controverted by the non-movant. [11] Thus, where the non-movant fails to respond to the movant's Rule 7.1 Statement of Material Facts, a district court has no duty to perform an independent review of the record to find proof of a factual dispute. [12]

**\*5** Here, Plaintiff has not responded to Defendants' Rule 7.1 Statement. [13] The closest he comes to responding to Defendants' Rule 7.1 Statement is through his submission of a document entitled "Affirmation of Opposition." [14] However, there are four problems with this document.

First, the document fails to "mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs," as required by Local Rule 7.1(a)(3) of the Local Rules of Practice for this Court. [15] Second, the document fails to "set forth a specific citation to the record where [any] factual issue[s] arise[ ]," as also required by Local Rule 7.1(a)(3). [16] Third, the document contains impermissible legal argument in violation of Local Rule 7.1(a)(3) (providing that the Rule 7.1 Response shall contain facts only). [17] (*See also* N.D.N.Y. L.R. 7.1(a)(2) (providing that "[a]n affidavit must not contain legal arguments.") Fourth, portions of the so-called "affirmation" are not even based on personal knowledge, as required by Rule 56(e) of the Federal Rules of Civil Procedure. [18]

These deficiencies in Plaintiff's response papers are especially conspicuous considering that Defendants specifically notified Plaintiff of the consequences of his failure to properly contradict the facts asserted by Defendants' in their motion. [19]

Under the circumstances, I decline to perform an independent review of the record to find proof of a factual dispute-although I take notice of any such proof of factual disputes that I discover during my necessary review of the record (e.g., my review of the record to confirm that Defendants' factual assertions in their Rule 7.1 Statement are supported by the record).

However, I note that, as indicated above, to be sufficient to create a factual issue, an affidavit must, among other things, be based "on personal knowledge." [20] An affidavit is not based on personal knowledge if, for example, it is based on mere "information and belief" or hearsay. [21] In addition, such an affidavit must not be conclusory. [22] An affidavit is conclusory if, for example, its assertions lack any supporting evidence or are too general. [23] Moreover, "[a]n affidavit must not present legal arguments." [24] Finally, even where an affidavit is based on personal knowledge and is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." [25]

## IV. ANALYSIS

### A. Whether Plaintiff Has Failed to Establish a First Amendment Claim

#### 1. Free-Exercise Claim Against Defendants Adams and Walsh

"Prisoners retain their right to religious freedom [under the First Amendment] even when incarcerated ... [and are] therefore entitled to a reasonable accommodation of [their] religious beliefs." [26] "To assess a free exercise claim, a court must determine (1) whether the practice asserted is religious in the [prisoner's] scheme of beliefs, and whether the belief is sincerely held; (2) whether the challenged practice of prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological objective." [27] The reason for the third consideration is the fact that the right of a prisoner to exercise his religion is balanced against "the interest of prison officials charged with the complex duties arising from administration of the penal system." [28]

**\*6** Here, I will assume for the sake of argument that (1) Plaintiff was a sincere believer in Islam, and (2) not taking medication during the day was a practice that was religious in nature in Plaintiff's "scheme of beliefs." [29] The problem with Plaintiff's claim, as Defendants correctly

point out, has to do with the extent to which the practice has infringed on Plaintiff's religious belief and the extent to which the practice furthers some legitimate penological objective.

Specifically, I find that the practice in question-which consisted of not making an exception to Upstate C.F.'s regular medication-delivery schedule-did not *infringe* on Plaintiff's religious beliefs under the circumstances. The sole medication of which Plaintiff was deprived during Ramadan, according to the evidence and his own allegations, consisted of one drug (Wellbutrin) . [30] Plaintiff does not adduce any evidence (or even assert an allegation) that his not taking Wellbutrin actually caused him to suffer any physical or psychological consequences, much less any consequences that were of such a magnitude as to *interfere* with his observance of Ramadan. [31] Moreover, the evidence shows, and Plaintiff appears to acknowledge, that he was *offered* Wellbutrin during the regular medication-delivery runs on the days in question (which generally occurred between approximately 6:20 a.m. and 7:25 a . m.) but that he *refused* to accept that medication. [32]

Even if the practice in question somehow infringed on Plaintiff's religious beliefs, I find that Upstate C.F. had a *legitimate penological interest* in maintaining its regular medication-delivery schedule under the circumstances. Upstate C.F. is a maximum-security prison housing approximately 1,500 inmates, with limited resources. I believe that it would be unreasonable and impractical to require a prison to deliver medications to its inmates on an "on-demand" basis, absent a showing of a *medical* need for such special treatment. I note, by the way, that the sole evidence in the record that I have found suggesting that someone from a psychiatric unit directed anyone to give Plaintiff Wellbutrin during the time in question consists of an ambiguous notation in a single medical record indicating a telephone conversation between someone at "psych" and someone in the Upstate C.F. medical department concerning the continuation of Plaintiff's twice-per-day Wellbutrin medication for the month of November in 2002. [33] However, this isolated medical record does not indicate whether a psychiatrist had directed that the Wellbutrin *must* be dispensed at 6:00 a.m. and 8:00 p.m. (for medical reasons) or whether those times were merely the *approximate* times on a standard morning and evening delivery schedule. Nor does the record

mention the words "sunrise," "sunset," or "Ramadan." Thus, I believe that it would be unreasonable to interpret that notation as either indicating a medical need for a special medication-delivery schedule or constituting a medical order for such special delivery. [34]

**\*7** Federal court cases arising from such circumstances appear to be rare. Indeed, I have found only one reported decision that addressed analogous circumstances, involving a Muslim prison inmate not wanting to receive medical treatment during the daytime hours of Ramadan, and requesting instead to receive that treatment before sunrise or after sunset. [35] As the court found in that case, I believe that no rational fact-finder could conclude, based on the record, that such circumstances constitute a violation of the inmate's First Amendment right to freely exercise his religion. [36]

Finally, even if the practice in question somehow infringed on Plaintiff's religious beliefs, and Upstate C.F. did not have a legitimate penological interest in maintaining its regular medication-delivery schedule under the circumstances, I would find that Plaintiff has not established that it was Defendants Adams and Walsh (and not someone else) who *caused* the constitutional deprivation in question. For example, in Plaintiff's grievance about the deprivation of medication, he alleged that it was a *male* nurse who had denied Plaintiff his medication. [37] Furthermore, he alleged that this male nurse worked the 2:00 p.m. to 10:00 p.m. shift at Upstate C.F. [38] In addition, the name of this male nurse apparently started with the letter "L." [39] However, both Defendants Adams and Walsh are *female* nurses whose name do not start with the letter "L." Moreover, Defendant Adams did not work the evening shift (but the morning shift) during the time in question. [40]

I note that, to the extent Plaintiff is not basing his free-exercise claim on events that occurred during the nursing staff's evening shift in December of 2002, but on events that occurred during the nursing staff's morning shift in November of 2002, he has failed to exhaust his administrative remedies, since his grievance complained about only the former events.

As a result, I recommend that the Court dismiss Plaintiff's First Amendment free-exercise claim against Defendants Adams and Walsh.

## 2. Retaliation Claims Against Defendants Adams and Walsh

Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment. [41] Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. [42] Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. [43] As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act. [44]

**\*8** To prevail on a First Amendment claim under [42 U.S.C. § 1983](), a Plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff-namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech or conduct and the adverse action-in other words, that the protected speech or conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. [45] Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. [46]

Here, as described above in Part I.A. of this Report-Recommendation, Plaintiff has asserted three distinct First Amendment retaliation claims against Defendants Adams and Walsh: (1) a claim based on their allegedly taking him off the physical therapy list in response to his grieving his denial of physical therapy; (2) a claim based on their alleged cessation of Plaintiff's medication delivery altogether during the holy month of Ramadan in 2002 in response to (i) his practicing of his religion and/or (ii) his filing of grievances alleging inadequate medical care; [47] and (3) a claim based on their allegedly filing false misbehavior reports in response to his signing up for sick call (and complaining of various medical conditions) on a daily basis.

I will assume for the sake of argument that Plaintiff was engaging in *protected speech or conduct* during the time of the events giving rise to Plaintiff's first and second claims. I will make that assumption, like the others, out of recognition of Plaintiff's special status as a pro se civil rights litigant, and in the interest of brevity.

The problem with Plaintiff's first and second claims has to do with the fact that (1) there is no evidence in the record that (1) Defendants Adams and Walsh (as opposed to some other correctional employee) took *adverse action* against Plaintiff or (2) even if there was evidence of such adverse action, there is no evidence in the record that there was a *causal connection* between Plaintiff's protected speech or conduct and the adverse action (i.e., there is no evidence that the adverse action was not taken for proper reasons).

For example, I find no evidence that Plaintiff was ever prematurely taken off a "physical therapy list" in the fall of 2002, or that any such premature removal of Plaintiff's name from such a list was effected by Defendants Adams or Walsh. [48] Rather, it appears that Plaintiff's physical therapy was discontinued on January 17, 2003, by his physical therapist. [49] Indeed, Plaintiff does not even specifically allege that Defendants Adams or Walsh *caused* his name to be removed from the "therapy list"; rather, he alleges that, "[a]fter about three weeks of therapy, the infirmary escorts started to deprive the plaintiff of his therapy." [50] Moreover, Plaintiff's allegation that the removal of his name from the "therapy list" was in retaliation for his having filed grievances is, in addition to being entirely conclusory, not even based on personal knowledge. Specifically, Plaintiff alleges, "Upon information and belief, [he] was taken of [sic] the physical therapy list, because of and/or out of retaliation of [sic]

the grievances and complaints about being deprived of his physical therapy." [51]

**\*9** Similarly, I find no evidence in Plaintiff's medical records that the Upstate C.F. medical staff stopped trying to give Plaintiff Wellbutrin during the holy month of Ramadan in 2002; indeed, the record evidence is to the contrary. [52] Nor have I found any evidence that any such cessation was effected by Defendants Adams or Walsh. Even if there was evidence of such a denial of Wellbutrin by Defendants Adams or Walsh, I find no evidence that it was the practice of Plaintiff's religion-and not his refusal to accept medication during the prison's regular delivery runs-that *caused* him to be taken off the medication-delivery list. Similarly devoid of evidence is Plaintiff's allegation that the alleged denial of medication was caused by his having previously filed grievances. [53]

Finally, with respect to Plaintiff's third claim, I find that Plaintiff has no First Amendment right to sign up for sick call, much less to sign up for sick call on a daily basis for needless reasons. [54] Even if he had such a First Amendment right, I find no evidence that any misbehavior reports filed against him in January and/or February of 2003 were false, or that there was any causal connection between the filing of those misbehavior reports and Plaintiff's engaging in protected conduct or speech.

As a result, I recommend that the Court dismiss Plaintiff's First Amendment retaliation claims against Defendants Adams and Walsh. I note that, although Defendants do not specifically address, in their memorandum of law, Plaintiff's retaliation claims (presumably due to the fact that those claims are difficult to discern as articulated by Plaintiff), the Court can, and should, *sua sponte* dismiss those claims as without merit. *See* 28 U.S.C. § 1915(e) (2)(B) (ii), (iii) ("[T]he court shall dismiss the case at any time if the court determines that ... the action ... is frivolous ... [or] fails to state a claim on which relief may be granted...."); Fed.R.Civ.P. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction over the subject matter, the court shall dismiss the action.").

### 3. Retaliation Claim Against Defendant Girdich

Plaintiff's retaliation claim against Defendant Girdich stems from his failure to resolve, in Plaintiff's favor, his "mail box" complaint in response to Plaintiff's prior grievances regarding a denial of physical therapy. Based on the current record, I find that Plaintiff has adduced no evidence that (1) there was any adverse action taken against him by anyone much less Defendant Girdich (i.e., through a knowing and reckless refusal to resolve the "mail box" issue and the alleged interference with Plaintiff's right to file grievances), or (2) even if there was such adverse action, there was a causal connection between Plaintiff's filing of previous grievances regarding a denial of physical therapy and the alleged adverse action taken by Defendant Girdich. Indeed, Plaintiff's allegation that the removal of his grievances in his mail box was caused by his filing of grievances (rather than being caused simply by a mistake or negligence) is, in addition to being entirely conclusory, not even based on personal knowledge. [55]

**\*10** As a result, I recommend that the Court dismiss Plaintiff's First Amendment retaliation claims against Defendant Girdich.

### B. Whether Plaintiff Has Failed to Establish an Eighth Amendment Claim of Deliberate Indifference to a Serious Medical Need

Defendants recite the correct legal standard that governs Plaintiff's claim of inadequate medical care under the Eighth Amendment. (Dkt. No. 37 at 3-5 [Defs.' Mem. of Law].) Generally, to prevail on such a claim, Plaintiff must show two things: (1) that Plaintiff had a sufficiently serious medical need; and (2) that Defendant was deliberately indifferent to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

### 1. Serious Medical Need

Here, I find that Plaintiff has adduced no evidence of a medical need that was sufficiently serious under the Eighth Amendment. Plaintiff has alleged that, during the relevant time period, he suffered from one or more of the following ailments: (1) an injury to his lower back, which caused intermittent back pain requiring pain relievers and physical therapy; (2) a gastrointestinal problem that caused stomach pains; and (3) a psychological problem requiring Wellbutrin and/or Neurontin. [56] However, there is no evidence that, even when considered together, these conditions were sufficiently serious for purposes of the Eighth Amendment.

For example, Plaintiff's medical records indicate that, during the days and weeks following the alleged assault on him on September 25, 2001, Plaintiff did not exhibit any signs of injury (such as bruising, marks, distress, diminution in range of motion, x-rays indicating a fracture, etc.); moreover, any complaints of pain communicated by Plaintiff to medical staff were sporadic and moderate or mild in nature (i.e., not characterized by Plaintiff as "severe," "extreme," "agonizing," "excruciating," etc.). [57]

Moreover, while Plaintiff's medical records do indicate that, in approximately May of 2002, Plaintiff complained about gastrointestinal problems apparently associated with a previous high-fiber diet that Plaintiff had been following (e.g., "gas," "spitting up," and "vomiting"), the records indicate that the complaints were, again, sporadic in nature and not of such severity as to be "urgent." [58] See *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (standard contemplates "a condition of urgency, one that may produce death, degeneration or extreme pain") [citation omitted].

Under the current record, I find that no reasonable fact-finder could conclude that Plaintiff was, during the relevant time period, afflicted with a medical condition that was so serious as to implicate the Eighth Amendment.

### 2. Deliberate Indifference

Even if Plaintiff had adduced evidence of a sufficiently serious medical need, he has adduced no evidence that Defendants Adams, Walsh or Girdich acted with the sort of *criminal recklessness* necessary to impose on them liability under 42 U.S.C. § 1983. [59] Indeed, the available evidence is to the contrary. The evidence indicates that the medical staff at Upstate C.F. adequately treated Plaintiff for his injuries. [60] Even if the medical staff at Upstate C.F. did not adequately treat Plaintiff, there is no evidence that either Defendant Adams or Defendant Walsh had anything to do with such inadequate treatment, since those two Defendants did not work the cell block in which Plaintiff was housed during the time in question. [61]

**\*11** At most, Plaintiff is alleging there may have been a difference of opinion between the medical staff at Upstate C.F. and Plaintiff, [62] or *conceivably* a hint of negligence on

the part of someone on the medical staff at Upstate C.F. However, neither a difference of opinion or negligence would be enough to make any staff member (much less Defendants Adams or Walsh) liable to Plaintiff under the Eighth Amendment [63] As the Second Circuit has explained,

> It must be remembered that the State is not constitutionally obligated, much as it may be desired by inmates, to construct a perfect plan for [medical] care that exceeds what the average reasonable person would expect or avail herself of in life outside the prison walls. [A] correctional facility is not a health spa, but a prison in which convicted felons are incarcerated. Common experience indicates that the great majority of prisoners would not in freedom or on parole enjoy the excellence in [medical] care which plaintiff[ ] understandably seeks.... We are governed by the principle that the objective is not to impose upon a state prison a model system of [medical] care beyond average needs but to provide the minimum level of [medical] care required by the Constitution.... The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves.... The essential test is one of medical necessity and not one simply of desirability.
> *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986) [internal quotations and citations omitted].

As a result, I recommend that the Court dismiss Plaintiff's Eighth Amendment claim for deliberate indifference to a serious medical need.

### C. Whether Plaintiff Has Established the Personal Involvement of Defendant Girdich in any of the Alleged Constitutional Deprivations

A defendant's personal involvement in alleged unlawful conduct is a prerequisite for a finding of liability in a Section 1983 action. *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987). Supervisory officials such as prison superintendents are personally involved in a constitutional violation only if: (1) they directly participated in that violation; (2) they failed to remedy that violation after learning of it through a report or appeal; (3) they created, or allowed to continue, a policy or custom under which the violation occurred; (4) they were grossly negligent in managing subordinates who caused the violation; or (5) they exhibited deliberate indifference to the rights of inmates by failing to act on information

indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323-324 (2d Cir.1986) (setting forth four prongs).

Here, Plaintiff acknowledges that "Defendant Superintendent Girdich did not have any direct part in the infraction[s]" at issue. (Dkt. No. 39, ¶ 3.A. [Plf.'s "Affirmation of Opposition"].) Rather, argues Plaintiff, Defendant Girdich was involved in the infractions because he was the "over seer of the prison." (*Id.*) As a result, reasons Plaintiff, "[w]hen complaints get sent to his office it is his job to review the complaint, investigate the complaint and try to rectify the complaint." (*Id .*) Here, argues Plaintiff, although several complaints and grievances were sent by Plaintiff to Defendant Girdich's office, those complaints and grievances were never "rectified" by Defendant Girdich. (*Id.*)

**\*12** In this way, Plaintiff alleges and/or argues that Defendant Girdich is personally involved in the alleged constitutional deprivations through the *second* and *fifth* forms of personal involvement described above, namely that Defendant Girdich "failed to remedy [the] violation after learning of it through a report or appeal," and/or that he "exhibited deliberate indifference to the rights of [Plaintiff] by failing to act on information indicating that the violation was occurring."

Several problems exist with Plaintiff's theory of liability against Defendant Girdich. First, Plaintiff has adduced no evidence that he ever sent any complaint letters directly to Defendant Girdich. [64] Second, even if Plaintiff had adduced evidence that he sent complaint letters directly to Defendant Girdich, Plaintiff has adduced no evidence

indicating that Defendant Girdich ever read any of the complaint letters. [65] Third, the only grievance contained in the record (Grievance No. UST-14199-02) was decided by Upstate C.F.'s First Deputy Superintendent, not by Defendant Girdich . [66] Indeed, Plaintiff appears to acknowledge the lack of involvement by Defendant Girdich when he alleges that his grievance about his "mail box" issue was brought to the attention of the First Deputy Superintendent (rather than alleging that it was brought to the attention of Defendant Girdich). [67]

As a result, I recommend that, in the alternative, the Court dismiss Plaintiff's claims against Defendant Girdich due to his lack of personal involvement in the alleged constitutional deprivations.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 33) be *GRANTED.*

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Svcs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 2827687

---

Footnotes

1       (*See* Dkt. No. 6, ¶ 45 [Plf.'s Am. Compl., alleging, "The medication then stoped [sic] being given to me, until I was interviewed by the psychologist."].)

2       A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

3       *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

4       *See also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986).

5       *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).

6       *Ross v. McGinnis,* 00 Civ. 0275, 2004 WL 1125177, *8 (W.D.N.Y. March 29, 2004) [internal quotations omitted] [emphasis added].

7    *See Haines v. Kerner,* 404 U.S. 519, 520-21 (1972) (*per curiam*) (*pro se* civil rights action); *Ortiz v. Cornetta,* 867 F.2d 146, 148 (2d Cir.1989) (*pro se* civil rights action); *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 467 (S.D.N.Y.1998) (*pro se* civil rights action), *aff'd in part, vacated in part on other grounds,* 205 F.3d 1324 (2d Cir.2000) (unpublished decision).

8    *See Weixel v. Bd. of Ed. of City of New York,* 287 F.3d 138, 146 (2d Cir.2002) (motion to dismiss in civil rights case); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (motion for summary judgment in civil rights case); *Thomas v. Irving,* 981 F.Supp. 794, 799 (W.D.N.Y.1997) (motion for summary judgment in civil rights case).

9    *Bussa v. Aitalia Line Aeree Italiane S.p.A.,* 02-CV-10296, 2004 WL 1637014, at *4 (S.D.N.Y. July 21, 2004) [citations omitted], *accord, Durran v. Selsky,* 251 F.Supp.2d 1208, 1211 (W.D.N.Y.2003) [citations omitted]. For example, although "[t]he work product of *pro se* litigants should be generously and liberally construed, ... [a *pro se* litigant's] failure to allege either specific facts or particular laws that have been violated renders [an] attempt to oppose defendants' motion ineffectual." *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994).

10   *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243-245 (2d Cir.2004) ("If the evidence submitted in support of the motion for summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.... [I]n determining whether the moving party has met this burden ..., the district court may not rely solely on the statement of undisputed material facts contained in the moving party's Rule 56.1 statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [citation omitted]; *see, e.g ., Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) ("In this case, [the plaintiff] did not file a statement of undisputed facts in compliance with Local Rule 7.1(a)(3). Consequently, the court will accept the *properly supported* facts contained in the defendants' 7.1 statement.") [emphasis added].

11   *See* Local Rule 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."*).

12   *See Amnesty Am. v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N.Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

13   (Dkt. No. 36.)

14   (Dkt. No. 39.)

15   Specifically, the document does not "affirm" or "deny" any of Defendants' factual assertions; nor do the document's paragraphs match Defendants' paragraphs. (*Compare* Dkt. No. 36 [Defs.' Rule 7.1 Statement, containing thirteen paragraphs] *with* Dkt. No. 39 [Plf.'s "Affirmation in Opposition," containing six paragraphs].)

16   (*See* Dkt. No. 39, ¶¶ 1, 2, 5, 6, 7 [Plf.'s "Affirmation in Opposition," containing absolutely no record citations], ¶ 3 [vaguely referring to Plaintiff's "complaint file" and "grievance file], ¶ 4 [vaguely referring to Plaintiff's "medical files"; and referring to affidavit of Defendant Adams but not citing in support of any dispute of fact].)

17   (*See, e.g.,* Dkt. No. 39, ¶¶ 5, 6 [Plf.'s "Affirmation in Opposition," citing case law].)

18   (*See, e.g.,* Dkt. No. 39, ¶ 3.B. [Plf.'s "Affirmation in Opposition," asserting that Defendant Girdich "had first hand knowledge of the problems" in question but not citing any evidence in support of Plaintiff's inference that Defendant Girdich read any of Plaintiff's complaints].)

19   (Dkt. No. 34 [Defs.' Rule 56.2 Notice].)

20   Fed.R.Civ.P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to the matters stated therein."); *see also U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.,* 44 F.3d 1082, 1084 (2d Cir.1995) [citations omitted], *cert. denied sub nom, Ferrante v. U.S.,* 516 U.S. 806 (1995).

21   *See Patterson,* 375 F.3d at 219 ("[Rule 56(e)'s] requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'... [Furthermore, the Rule's] requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavits also means that the affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial."); *Sellers v. M .C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988) ("[Defendant's] affidavit states that it is based on personal knowledge *or* upon information and belief.... Because there is no way to ascertain which portions of [Defendant's]

affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is insufficient under Rule 56 to support the motion for summary judgment."); *Applegate v. Top Assoc., Inc.,* 425 F.2d 92, 97 (2d Cir.1970) (rejecting affidavit made on "suspicion ... rumor and hearsay"); *Spence v. Maryland Cas. Co.,* 803 F.Supp. 649, 664 (W.D.N.Y.1992) (rejecting affidavit made on "secondhand information and hearsay"), *aff'd,* 995 F.2d 1147 (2d Cir.1993).

22    *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); Patterson, 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate,* 425 F.2d at 97 (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

23    *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

24    N.D.N.Y. L.R. 7.1(a)(2).

25    *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-555 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,* 136 Fed. Appx. 383 (2d Cir.2005) (unreported decision).

26    *Jackson v. Mann,* 196 F.3d 316, 320 (2d Cir.1999).

27    *Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.1988); *see also Ford v. McGinnis,* 352 F.3d 582, 588-596 (2d Cir.2003) (not deciding question of whether "substantial burden" requirement is contained among elements of First Amendment free-exercise claim); *accord, McEachin v. McGinnis,* 357 F.3d 197, 203 (2d Cir.2004); *Shakur v. Selsky,* 319 F.3d 106, 120 (2d Cir.2004).

28    *Ford,* 352 F.3d at 588; *Burgess v. Friedmann,* 05-CV-0379, 2005 U.S. Dist. LEXIS 38423, at *7-8 (N.D.N.Y. Dec. 22, 2005) (Mordue, J.); *see also Turner v. Safley,* 482 U.S. 78, 89 (1987); *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995); *Giano v. Senkowski,* 54 F.3d 1050, 1053 (2d Cir.1995); *Young v.. Coughlin,* 866 F.2d 567, 570 (2d Cir.1989); *Farid,* 850 F.2d at 925.

29    I note that I assume these two facts despite my suspicions of their veracity. For example, I question Plaintiff's claimed belief that the Ramadan fasting requirement contains an exception only for those who are threatened with death, as opposed to those who are merely "ill." *See The Quran,* 2:184-185 (making exceptions for those who are "ill or traveling").

30    (*See* Dkt. No. 6, ¶¶ 37-38 [Plf.'s Am. Compl.]; Dkt. No. 35, Ex. A [Affirm. of Risa L. Viglucci, attaching Plf.'s medical records, specifically Plf.'s "Ambulatory Health Record" dated 11/2/02, 11/3/02, 11/6/02, 11/10/02, 11/30/02 and his "Refusal of Medical Examination and/or Treatment" forms dated 11/4/02, 11/11/02, 11/12/02, indicating that the only drug that Plf. was refusing was Wellbutrin].)

31   (*See generally* Dkt. No. 6, ¶¶ 34-47 [Plf.'s Am. Compl., alleging that he "practic[ed] the religion of Islam during the month of Ramadan in 2002, and not alleging that he was prevented from practicing that religion]; Dkt. No. 35, Ex. A [Affirm. of Risa L. Viglucci, attaching Plf.'s medical records, specifically Plf.'s "Ambulatory Health Records" from 11/1/02 to 11/30/02, indicating that Plf. was experiencing only gas and skin rash during time in question].)

32   (*See* Dkt. No. 6, ¶¶ 39, 41, 42, 45 [Plf.'s Am. Compl.]; Dkt. No. 35, Exs. A-B [Affirm. of Risa L. Viglucci, attaching (1) Plf.'s "Ambulatory Health Records" dated 11/2/02 indicating refusal at 7:00 a.m., 11/3/02 indicating refusal at 7:25 a.m., 11/6/02 indicating refusal at 6:20 a.m., 11/10/02 indicating refusal at some point in the morning, 11/22/02 indicating refusal at 6:35 a.m., 11/27/02 indicating refusal at 6:25 a.m., 11/30/02 indicating refusal at 7:00 a.m., and 12/14/05 indicating that plaintiff "has been refusing meds for some time," (2) Plf.'s "Refusal of Medical Examination and/or Treatment" forms dated 11/4/02, 11/11/02, 11/12/02 indicating that he refused Wellbutrin offered to him at 7:00 a.m. on those dates, and (3) CORC's appellate decision of Plf.'s Grievance No. UST-14199-02, stating that its investigation indicates that Plf.' refused his medication from 12/1/02 to 12/16/02].)

33   (Dkt. No. 35, Ex. 1 [Affirm. of Risa L. Viglucci, attaching Plf.'s medical records, specifically Plf.'s "Ambulatory Health Record" dated 11/1/02]; *see also* Dkt. No. 6, ¶¶ 43, 44 [Plf .'s Am. Compl., implicitly assuming, conclusorily, that such an order had been issued and communicated to Defendants Adams and Walsh].)

34   (Dkt. No. 35, Ex. B, Adams Affid., ¶¶ 6-7 [stating, "I was not aware, nor did a review of plaintiff's medical records disclose any doctor's order requiring that plaintiff's medication be provided before sunup during Ramadan.... Further, I have reviewed plaintiff's medical records, and find no such order is contained in his records."].)

35   *See Ballard v. Woodard,* 641 F.Supp. 432, 436-437 (W.D.N.C .1986) (First Amendment free-exercise claim by Muslim inmate against prison officials based on their refusal, during Ramadan, to alter prison's tuberculosis-testing schedule, which involved injecting antigens into inmate's arm during the daytime, even though inmate had informed prison officials that he would be willing to receive the injection after sundown).

36   *See Ballard,* 641 F.Supp. at 436-437 (granting summary judgment to prison officials with respect to inmate's free-exercise claim).

37   (Dkt. No. 35, Ex. B [Affirm. of Risa L. Viglucci, attaching attaching Plf.'s Grievance No. UST-14199-02, dated 12/2/02, which alleged that "I asked the nurse for my med's [sic]. *He* said Salaam your [sic] not getting shit anymore."] [emphasis added].)

38   (Dkt. No. 35, Ex. B [Affirm. of Risa L. Viglucci, attaching attaching Plf.'s Grievance No. UST-14199-02, dated 12/2/02, which alleged that "The 2-10 shift nurse has refused to give me my medication 3 time [sic] in a row."].)

39   (Dkt. No. 35, Ex. B [Affirm. of Risa L. Viglucci, attaching CORC's appellate decision of Plf.'s Grievance No. UST-14199-02, referring to the nurse of whom Plaintiff complains as "Nurse L ..."].)

40   (Dkt. No. 35, Ex. B, Adams Affid., ¶ 8 [stating, "In that my shift is from 6:00 a.m. to 2:00 pm. I would only have been involved with providing his 6:00 a.m. medication."].)

41   *See Gill v. Pidlypchak,* 389 F.3d 379, 380-81 (2d Cir.2004).

42   *See Gill,* 389 F.3d at 381-383.

43   *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983).

44   *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkewicz v. Sorema N.A.,* 534 U.S. 506 (2002).

45   *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U . S. 274, 287 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d. Cir.2001] ).

46   *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

47   (*See* Dkt. No. 6, ¶ 45 [Plf.'s Am. Compl., alleging, "The medication then stoped [sic] being given to me, until I was interviewed by the psychologist."].)

48   (*See generally* Dkt. No. 35, Ex. A [Affirm. of Risa L. Viglucci, attaching Plf.'s medical records dated 10/1/02 to 1/1/03, not containing or referring to such a physical therapy list]; *see also* Dkt. No. 6, ¶ 13 [Plf.'s Am. Compl., indicating that his allegation that he was placed on an actual "physical therapy waiting list" was based "upon information and belief"].)

49   (Dkt. No. 35, Ex. B, Smith Aff., ¶ 9.)

50   (Dkt. No. 6, ¶ 15 [Plf.'s Am. Compl.].)

51   (Dkt. No. 6, ¶ 16 [Plf.'s Am. Compl.].)

52   (*See* Dkt. No. 6, ¶ 45 [Plf.'s Am. Compl., asserting conclusorily that the medication stopped coming at some point during the month of Ramadan]; Dkt. No. 35, Ex. A [Affirm. of Risa L. Viglucci, attaching Plf.'s "Ambulatory Health Record" dated 11/30/02 indicating that he refused Wellbutrin on that date, which was near the end of the holy month of Ramadan]; Dkt. No. 35, Ex. A [Affirm. of Risa L. Viglucci, attaching Plf.'s medical records, specifically Plf.'s "Refusal of Medical

Examination and/or Treatment" forms dated 11/4/02, 11/11/02, 11/12/02, indicating that prison treated such refusals by Plaintiff as limited to only a day-by-day basis].)

53 Setting aside the lack of evidentiary support for this allegation, I note that this allegation appears inconsistent with Plaintiff's grievance about the issue, in which he alleged not that this denial of medication was a form of retaliation based on Plaintiff's prior grievances but that this denial was a form of retaliation based merely on "a personal hate." (Dkt. No. 35, Ex. B [Affirm. of Risa L. Viglucci, attaching Plf.'s Grievance No. UST-14199-02, dated 12/2/02].)

54 *See Rahman v. Stephenson,* 626 F.Supp. 886, 887-888 (W.D.Tenn.1986) (inmate did not have a First Amendment right to have his name placed on a prison sick call roster even where the prison's refusal to place the inmate's name on the roster was due to the prison's refusal to acknowledge the "name" that the inmate was attempting to use, which was the inmate's adopted religious name).

55 (Dkt. No. 6, ¶ 18 [Plf.'s Am. Compl.].)

56 (*See generally* Dkt. No. 6 [Plf.'s Am. Compl.].)

57 (Dkt. No. 35, Ex. A [Affirm. of Risa L. Viglucci, attaching Plf.'s medical records, specifically Plf.'s Ambulatory Health Records dated 9/25/01, 9/26/01, 9/27/01, 9/28/01, 9/29/01, 10/4/01, 106/01, 10/8/01, 10/9/01, 10/14/01, 10/16/01, 10/24/01, 10/28/01, 10/29/01,11/2/01, 11/3/01, 11/7/01, etc.].)

58 (Dkt. No. 35, Ex. A [Affirm. of Risa L. Viglucci, attaching Plf.'s medical records, specifically Plf.'s Ambulatory Health Records dated 45/10/02, 5/14/02, 5/20/02, 5/22/02, 5/23/02, 5/24/02, 5/26/02, 5/27/02, 5/29/02, etc.].)

59 *See Farmer v. Brennan,* 511 U.S. 825, 827 (1994) ( "[S]ubjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as interpreted in our cases, and we adopt it as the test for "deliberate indifference" under the Eighth Amendment."); *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) ("The required state of mind [for a claim of deliberate indifference to a serious medical need under the Eighth Amendment is] equivalent to criminal recklessness...."); *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ("The subjective element requires a state of mind that is the equivalent of criminal recklessness....").

60 For example, the evidence indicates that, in approximately May of 2002, when Plaintiff complained about gastrointestinal problems (e.g., gas), Plaintiff received nearly constant medical attention for that condition. (Dkt. No. 35, Ex. A [Affirm. of Risa L. Viglucci, attaching Plf.'s medical records, specifically Plf.'s Ambulatory Health Records dated 45/10/02, 5/14/02, 5/20/02, 5/22/02, 5/23/02, 5/24/02, 5/26/02, 5/27/02, 5/29/02, etc.]; *see also* Dkt. No. 35, Ex. B, Smith Aff., ¶¶ 5-8 [generally describing medical staff's treatment of Plaintiff].)

61 (Dkt. No. 35, Ex. B, Affid. of Def. Adams, ¶ 5.)

62 (*See, e.g.,* Dkt. No. 6, ¶¶ 7, 50-51 [Plf.'s Am. Compl., indicating a disagreement between Plf. and Defs. Adams and Walsh regarding their treatment of his back problem, and a disagreement with Def. Adams regarding whether mental health medication goes "out of stock"]; Dkt. No. 39, ¶ 4.A. [Plf.'s Affirm. of Opp., stating, "The exams conducted by medical staff are only personal opinions of medical staff.... The exams was [sic] not professional...."].)

63 *See Estelle v. Gamble,* 429 U.S. 97, 106 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation.").

64 I note that, although Plaintiff's Amended Complaint refers to an "inclosed [sic] affidavit of support to and froms [sic] to IGRC and the Superintendent telling them to appeal all grievances to C.O.R.C. and responce [sic] also grievances and appeals [sic]," I can find no such attachment to Plaintiff's Amended Complaint (or any such affidavit or "enclosure" in the docket). (Dkt. No. 6, ¶ 12 [Plf.'s Am. Compl.].) Moreover, although Plaintiff's "Affirmation of Opposition" asserts that Plaintiff sent complaints to Defendant Girdich, that vague assertion is devoid of such details as the dates on which the communications were sent, a description of the issues raised in the communications, or even a description of the precise nature of the communications (e.g., whether it was a letter, grievance appeal, etc.). (Dkt. No. 39, ¶ 3.B. [Plf.'s Affirm. of Opp.].) As a result, Plaintiff's assertion is entirely conclusory and insufficient to create a dispute of material fact sufficient to defeat a motion for summary judgment. (*See, supra,* Part III of this Report-Recommendation.).

65 (*See, e.g.,* Dkt. No. 6, ¶ 15 [Plf.'s Am. Compl., assuming, without indicating any personal knowledge, that Def. Girdich read Plaintiff's complaints].)

66 (Dkt. No. 35, Ex. B [Affirm. of Risa L. Viglucci, attaching Superintendent's Decision of Plf.'s Grievance No. UST-14199-02, dated 12/24/02, signed by Deputy Superintendent].)

67 (Dkt. No. 6, ¶ 19 [Plf.'s Am. Compl.].)

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

2002 WL 31040370
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Maurice SAMUELS, Plaintiff,

v.

Donald SELSKY, Glenn Goord, Paul Cecilia, Javier
Iurrue, G. Schwartzman, Dennis Bliden, Jeffery
McCoy, and Christopher P. Artuz, Defendants.

No. 01CIV.8235(AGS).
|
Sept. 12, 2002.

OPINION & ORDER

SCHWARTZ, District J.

I. Introduction

 **\*1**  Maurice Samuels alleges that while incarcerated at
the Green Haven Correctional Facility, [1] prison officials
searched his cell and confiscated a number of documents
which were deemed to be "subversive" and contraband.
Samuels claims that the materials, including theological
textbook excerpts, were of a Christian nature and were
used in a course he taught in the prison through the New
York Theological Seminary. Samuels' alleged possession
of these documents led to a misbehavior report and a
subsequent disciplinary hearing, for which Samuels was
sentenced to 180 days in keeplock and 180 days' loss
of packages, commissary privileges, and telephone use.
Samuels also alleges that instead of being punished as
per his disciplinary hearing, he was sentenced to a more
severe punishment, 180 days in a special housing unit
which entailed Samuels' being locked in his cell for twenty-
three hours per day. On the basis of the allegedly unlawful
sanctions to which he was subjected, Samuels has filed
the instant action pursuant to 42 U.S.C. § 1983 alleging
violations of, *inter alia,* his First Amendment and due
process rights, and seeks equitable relief and damages.
Defendants have filed a motion to dismiss the action
pursuant to FED. R. CIV. P. 12(b)(1) and (6), and argue
that they enjoy qualified immunity barring this suit. For
the reasons set forth below, defendants' motion is granted
in part and denied in part.

II. Factual Background [2]
Maurice Samuels is currently an inmate at the Sullivan
Correctional Facility. Since being incarcerated, Samuels
has taken a keen interest in religion. He identifies himself
as a member of the Five Percent Nation of Gods
and Earths. [3]  While confined at Sing Sing, he received
a degree of Master of Professional Studies in Prison
Ministry through the New York Theological Seminary
("NYTS"). *See* Complaint Pursuant to U.S.C.A. Section
1983 ("Complaint"), at 4; Exhibit ("Ex.") A. Upon
completion of his studies with the NYTS, Samuels was
transferred to the Green Haven Correctional Facility. [4] At
Green Haven, Samuels was assigned a clerk's position in
therapeutic "Reality and Pain Program." He subsequently
redesigned the program, creating the "Reality and Pain
Therapeutic Counseling Program." *See* Complaint, at 4.
During this period he also served as a volunteer inmate
instructor in the Black Studies program, and was later
assigned as a clerk in Green Haven's Senior Counselor's
Office, where he helped create a program for sex offenders.
*See id.* at 4.

The NYTS later began a certificate program in Christian
Ministry in conjunction with Marist College at Green
Haven. Samuels was invited to teach several courses
for the program, including a course entitled "World
Views and Values" and another entitled "Introduction to
Theology and Methods." *See* Complaint, at 4; Ex. E, at
12. Samuels is listed on the "Faculty and Administration"
page of the Certificate in Ministry Program brochure. *See*
Ex. E, at 10. In designing his theology course, Samuels,
in conjunction with Professor Mar Peter-Raoul (currently
the Chair of the Department of Philosophy and Religious
Studies at Marist College), prepared a syllabus which
included the following:

 **\*2**  a. This is an introductory approach to contemporary
Christian Theology, there will be a broad range of material
provided for the student so that they [sic] may see
the evolution of Christian Theology and Contemporary
Theologies, active in the world today.

b. The course is divided into different sessions (1) What is
Theology; (2) Philosophy & Theology; (3) Contemporary
Theology; (4) Political and Liberation Theology; (5)
Feminist/Womanist Theology; and (6) Black & Third
World Theology.

c. This is done so that the student can examine the evolution of Christian Theology and Contemporary Theologies, and arrive at the next step in the process, i.e. explore the [sic] how to do theology.

d. This introduction to theology course will be taught from a [sic] interdisciplinary and non-traditional approach.

Complaint, at 5. This syllabus was approved by the appropriate authorities from NYTS, Marist College, and the Department of Corrections ("DOCS"). *See id.* at 5.

The central issue in this case involves a search of Samuels' cell. On September 15, 1999, another member of the Five Percent Nation of Gods and Earths who was involved in the NYTS program was disciplined for allegedly possessing a pamphlet entitled "Awake" or "Awaken" which addressed topics such as racism in the criminal justice system and abuses of the Rockefeller drug laws. *See* Complaint, at 6. On October 19, 1999, the assistant inmate director for the NYTS certificate program was interrogated about the program and why some of its members were also members of the Five Percent Nation of Gods and Earths. At the time, Samuels was housed in the inmate honor block housing Unit and taught a pre-G.E.D. and adult basic education class in the morning and afternoon and taught his theology class in the evening. *See* Complaint, at 6. According to defendants, Sergeant Schwartzman, a member of the prison staff, received a report from a confidential informant that Samuels was a leader of a protest planned to occur around January 1, 2000 ("Y2K protest").[5] On October 20, 1999, Schwartzman ordered correction officers Williams and Kelly to search Samuels' cell. Samuels states that the confiscated materials included Marist College and NYTS course handouts for the certificate program, previously published material from the NYTS and Marist College, notes from newspaper articles, a manuscript Samuels had been working on since first attending the NYTS, and Kairos statements.[6] *See* Complaint, at 7. According to the Cell Search Report, contraband was found which consisted of a "folder of papers containing subversive material." Ex. G. On the same day, an Inmate Misbehavior Report was completed. *See* Ex. H. The rule violations are listed as 104.12 (action detrimental to the order of the facility) and 113.23 (contraband). *See id.* The narrative section of the Inmate Behavior Report states:

On the above date [10/20/99] and time while conducting a cell search on cell D-1-21 which houses inmate Samuels, Maurice 85A0184 the following contraband was found and recovered;

**\*3** (1) Folder of papers containing subversive material These papers speak about inmate [sic] uniting together to fight against opositions [sic] such as the N.Y. parole system and other dept. of correction [sic] programs.

This material is consistant [sic] with information recieved [sic] that inmate Samuels has been active in urging others to participate in a demonstration on or about Jan. 1, 2000, which led to his cell being searched.

Ex. H. The form is signed by G. Williams, a correction officer, and G. Schwartzman. The documents are not identified, nor is there an explanation of why they were considered "subversive." Samuels repeatedly asked prison authorities to identify the "subversive" documents without success. *See, e.g.,* Exhibits ("Exs.") J, K, M, N, V, 7, 9. Defendants have not furnished the confiscated papers for the Court, and make no representation as to what documents were found in Samuels' cell or why they are considered "subversive." Samuels states that the materials seized by the prison officials is not literature pertaining to the Five Percent Nation of Gods and Earths but Christian ministry materials he used in teaching his class and which had previously been approved by the NYTS and prison authorities. *See* Complaint, at 5. Samuels also states that newspaper clippings and a manuscript he had been working on since 1986 were taken. *See* Affidavit [of Maurice Samuels] in Support of Opposition Motion ("Samuels Aff."), at ¶¶ 7-9.

Samuels was immediately placed in keeplock status pending a hearing on the misbehavior report. *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint ("Motion Brief"), at 3. Under DOCS rules, Samuels was entitled to an employee assistant to assist in his defense of the charges set forth in the misbehavior report.[7] An Assistant Selection Form was provided to Samuels, which instructed Samuels to select three people, one of whom would be assigned to him based on availability. *See* Ex. I. Samuels selected Hanna, Lawrence, and Schwartzman as his three choices. *See id.* Instead, Paul Cecilia was assigned to Samuels. *See* Motion Brief, at 3. Samuels alleges that instead of assisting him in the preparation of his case, Cecilia proceeded to

interrogate Samuels, asking him if he was in contact with Green Party candidate (formerly "Grandpa Munster") Al Lewis, whether he had any letters from him, whether he had any letters from outside organizations involved in prison reform, whether he was involved in any planned Y2K protest, and what the "Kairos" document was. *See* Complaint, at 8. Samuels further alleges that Cecilia did not explain the charges contained in the misbehavior report and failed adequately to conduct an investigation on Samuels' behalf. [8] Cecilia signed an Assistant Form on October 25, 1999, at 12:53 pm, indicating that he had interviewed witnesses, assisted as requested, and reported back to Samuels. *See* Ex. J. However, on October 26, Green Haven officials requested a one-day extension to hold a disciplinary hearing on the basis that the "assistant is trying to speek [sic] to with witiness [sic]." Ex. L. The extension was granted by "Alternate User 999SHURXR for 999SHU." *See id.* The name of the grantor is not listed on the computer printout.

**\*4** The "Tier III" disciplinary hearing was held on October 27, 1999. [9] At the hearing, two inmates and Dr. George W. Webber testified on Samuels' behalf (Webber testified by telephone). Webber is the director of the Certificate Program and president emeritus of the NYTS. Sgt. Schwartzman testified against Samuels. *See* Ex. O. Samuels also submitted a written brief for the hearing. *See* Ex. M. Samuels was found guilty of "demonstration" and "contraband" on November 9, 1999. The hearing officer, Javier Irurre, [10] summarized his findings as follows:

Statement of Evidence Relied Upon: Papers & hand written papers retrieved from your cell show statements inciting revolt and prison unrest. Confidential tape shows similarity between statements made in papers you have written and others in your possession with statements found in written material belonging other [sic] inmates inciting the so called Y2K revolt.
Confidential tape and testimony at the hearing establish a link between the statements in papers found in your cell and phamphlets [sic] circulating among prison population urging to strike in Y2K.

Reason for Disposition: Inciting revolt can not be tolerated in a correctional setting.

Ex. P. Samuels was punished with 180 days of keeplock, 180 days of loss of packages, 180 days of loss of commissary privileges, and 180 days of loss of phone privileges. *See* Ex. P; Complaint, at 11. The hearing officer did not impose special housing unit placement. *See* Ex. P; Complaint, at 11. The Court has not been furnished with a transcript of the hearing or of the "confidential tape" referred to by Irurre.

Samuels alleges that his due process rights were violated at the misbehavior hearing. He alleges that he failed to receive a timely hearing, that he received inadequate assistance from the employee assistant assigned to him (Cecilia), and that Dr. Mar Peter-Raoul was not permitted to testify on Samuels' behalf. *See* Complaint, at 9, 11. Samuels also protests the fact that the misbehavior report never specifies exactly what Samuels did to constitute "demonstration." *See id.* at 11. No written record was apparently made stating the reasons Dr. Peter-Raoul was not permitted to testify. Dr. Peter-Raoul later wrote a lengthy letter addressed to defendants Bliden, McCoy, and Irurre in which she explained the nature of the Kairos documents and stated her desire to serve as a witness for Samuels. *See* Complaint, at 10.

On November 8, 1999 (one day before Irurre found Samuels guilty of demonstration and contraband), Samuels submitted a detailed written brief to First Deputy Superintendent Dennis Bliden and "Jeff Macoy" [sic] on November 8, 1999, requesting that his misbehavior report be dismissed. *See* Ex. N. While waiting for a response to his letter, Samuels was transferred to the Upstate Correctional Facility, a special housing unit facility, where he was housed for 180 days. [11] *See* Complaint, at 11; Motion Brief, at 4; Plaintiffs' [sic] Memorandum of Law in Opposition to Defendants' Motion ("Opposition Brief"), at 27. Neither Samuels nor defendants provides an explanation as to why Samuels was transferred to the special housing unit facility. Jeff McKoy (listed in the caption as Jeffery McCoy) wrote to Samuels on November 12, 1999, advising him that he lacked the authority to overturn a Tier III disposition. *See* Ex. R. Bliden wrote to Samuels on November 18, 1999, stating that any appeal Samuels wished to file had to be directed to the Commissioner in Albany. He stated that "[u]ntil such time as we receive a decision from [Albany], I will not modify the disposition." Ex. U.

**\*5** As per Deputy Superintendent Bliden's instructions, Samuels submitted a seventeen-page letter to Donald Selsky, the Director of the Inmate Disciplinary Program,

in Albany. *See* Ex. V. In the course of his letter to Selsky, Samuels voices his procedurally and substantively-based arguments for dismissing his misbehavior adjudication. Selsky affirmed the November 9, 1999 hearing on January 6, 2000 on behalf of Glenn Goord, the Commissioner. [12] *See* Ex. 6. Samuels filed a request for a "time-cut" from the determination of the Superintendent on February 28, 2000. *See* Ex. 6. Prisoners' Legal Services of New York ("PLS") sent a letter to Selsky on March 2, 2000, asking him to reconsider his decision. On April 27, 2000, PLS sent a supplemental request for reconsideration, this time outlining in detail the legal bases for which Samuels' disciplinary charges should be withdrawn (by this point, Samuels had already served the imposed penalty; the letter asks Selsky to reverse the disciplinary hearing and expunge the disciplinary charges). *See* Ex. 9. Selsky did not alter his January 2000 decision. Samuels then appealed to the New York State Supreme Court, apparently by means of an Article 78 proceeding. The court, Canfield J., concluded that Samuels' appeal raised a substantial evidence question that could not be resolved by "reference to the objections in point of law." Decision and Order dated October 13, 2000. The court then transferred the matter to the Appellate Division, Third Judicial Department pursuant to N.Y. C.P.L.R. 7804(g). [13] *See id.*

Samuels then filed the instant action pursuant to 42 U.S.C. § 1983 based on defendants' alleged violations of his due process, First Amendment, and other constitutional rights, seeking equitable relief as well as compensatory and punitive damages. [14] The defendants move to dismiss the complaint pursuant to FED. R. CIV. P. 12(b)(1) (lack of subject matter jurisdiction) and (6) (failure to state a claim upon which relief can be granted). For the reasons set forth below, defendants' motion is granted in part and denied in part.

## III. Legal Standard

### A. *Pro Se* Complaints

The Second Circuit has repeatedly held that *pro se* complaints must be read more leniently than those prepared by lawyers. Recently, the Second Circuit noted that a "*pro se* complaint should not be dismissed unless 'it appears beyond doubt that the plaintiff[ ] can prove no set of facts in support of [his] claim[s] which would entitle [him] to relief.'" *Weixel v. Board of Educ. of the City of New York,* 287 F.3d 138,

145 (2d Cir.2002) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). Moreover, when considering a motion to dismiss a *pro se* complaint, "courts must construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." *Weixel,* 287 F.3d at 146 (quoting *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (internal quotation marks omitted)). The Second Circuit has also emphasized that a liberal reading of a *pro se* complaint is especially important when the complaint alleges civil rights violations. *See Weixel,* 287 F.3d at 146; *Weinstein v. Albright,* 261 F.3d 127, 132 (2d Cir.2001). Consequently, Samuels' allegations must be read so as to "raise the strongest arguments that they suggest." *Weixel,* 287 F.3d at 146 (quoting *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (internal quotation marks omitted)).

### B. Motions to Dismiss Pursuant to FED. R. CIV. P. 12(b)(1) & (6)

**\*6** Defendants move to dismiss the complaint pursuant to FED. R. CIV. P.12(b)(1) and (6). The standard of review for dismissal on either basis is identical. *See, e.g., Moore v. PaineWebber, Inc.,* 189 F .3d 165, 169 n. 3 (2d Cir.1999); *Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997). In either case, a court must assume as true factual allegations in the complaint and construe the complaint in the light most favorable to the plaintiff. *See, e.g., York v. Association of Bar of City of New York,* 286 F .3d 122, 125 (2d Cir.2002); *Shipping Fin. Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998). While the question of subject matter jurisdiction goes to the power of the court to hear a case, the issue on a motion to dismiss is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *York,* 286 F.3d at 125 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)).

## IV. Legal Analysis

### A. Exhaustion of Administrative Remedies

#### 1. Legal Standards Governing Exhaustion of Administrative Remedies

Lawsuits by prisoners are governed by 42 U.S.C. § 1997e, which holds in part:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal

law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

Under this section, where a prisoner brings an action in a district court before exhausting all available administrative remedies, the action must be dismissed. A unanimous Supreme Court has recently interpreted the term "prison conditions" expansively, requiring an exhaustion of all available administrative remedies whether the inmate suit concerns a general prison condition (i.e., quality of food) or a discrete incident specific to one prisoner (i.e., excessive force). *See Porter v. Nussle,* 122 S.Ct. 983 (2002). The Court also held that the exhaustion requirement applies regardless of whether the administrative remedies are "plain," "speedy," or "effective," and also applies when the prisoner "seeks relief not available in grievance proceedings" such as monetary damages. *Id.* at 988.

As a preliminary matter, defendants concede that Samuels has exhausted all administrative remedies concerning his due process violations. *See* Defendants' Supplemental Memorandum of Law and Reply Memorandum of Law in Further Support of Their Motion to Dismiss ("Reply Brief"), at 9. Defendants' concession is apparently based on DOCS Directive No. 4040, which holds that:

> [T]he individual decisions or dispositions of the following are not grievable: [...] Media Review, disciplinary proceedings, inmate property claims (of any amount) and records review (Freedom of Information Requests, expunction). However, the policies, rules, and procedures of any of these programs or procedures may be the subject of a grievance.

**\*7** As noted above, Samuels unsuccessfully appealed his case within the prison facility and later to defendant Selsky in Albany, who denied it and denied reconsideration thereof.

Defendants argue, however, that "if a claim is incidental to a disciplinary determination [...] the fact that the disciplinary charge itself has been appealed does not excuse the failure to file a grievance." Reply Brief, at 9. Defendants thus seek to sever the alleged due process violations (for which Samuels has exhausted all administrative remedies) from several closely related claims-Samuels' claims protesting the confiscation of his papers, his transfer to the special housing unit, and DOCS policy regarding the Five Percent Nation of Gods and Earths (for which defendants argue Samuels has failed to exhaust all administrative remedies). *See* Reply Brief, at 9.

2. Confiscation of Documents

Defendants allege that the confiscation of the religious material is a matter separate from the underlying disciplinary hearing. While Samuels directly appealed his disciplinary adjudication, he concedes that he did not bring any complaint in the inmate grievance program. *See* Complaint, at 1. Defendants argue that Samuels' claim alleging the confiscation of religious material must therefore be dismissed because he failed to exhaust administrative remedies. *See* Reply Brief, at 9-10. Defendants represent that confiscation of religious documents from a cell is a grievable matter. The Court notes, however, that in similar cases inmates have been told that such confiscations are not grievable. *See, e.g., Allah v. Annucci,* 97 Civ. 607, 1999 U.S. Dist. LEXIS 7171, at \*2-\*3 (W.D.N.Y. Mar. 25, 1999) (plaintiff filed an inmate grievance protesting confiscation of religious material and was told such a seizure was not grievable).

As a preliminary matter, there is considerable confusion regarding exactly which documents were confiscated. Samuels has sought these documents numerous times; defendants have not made the documents available to him or to the Court. Initially, defendants stated that "Plaintiff specifically alleges in his compliant that the defendants confiscated a pamphlet called 'Awake'." Motion Brief, at 8. Later, defendants state that it is "unclear from plaintiff's complaint and response whether the pamphlet 'Awake' was confiscated from him or another." Yet since defendants conducted the search and confiscation of the materials from Samuels' cell, they should know whether "Awake" was confiscated from Samuels' cell. Nonetheless, they claim ignorance. Samuels himself makes his position clear: "material taken from Plaintiff [sic] cell [...] was not [...] Awake." Complaint, at 2. In a later brief, he writes "Complainant NEVER POSSESSED a pamphlet entitled "Awake." Opposition Brief, at 3 (emphasis in original).

In any event, it is clear that certain religiously-oriented documents were confiscated from Samuels' cell. Samuels seeks, *inter alia,* punitive and compensatory damages he claims to have suffered through defendants' alleged violation of his rights, including his First Amendment rights. *See* Complaint, at 13. Defendants argue that Samuels "never appealed any grievance relating to the confiscation of religious material" to the Inmate Grievance Program, citing an affidavit of Thomas G. Eagen ("Eagen Aff."), the Director of DOCS's Inmate Grievance Program, dated March 13, 2002. While this may be true, Samuels did protest the confiscation of documents in his direct appeal to Bliden and McKoy and later to Selsky. *See* Exs. N, V, 9. These appeals were denied.

**\*8** As noted, it is factually unclear whether seizures of religious materials may be grieved through the Inmate Grievance Program. However, even if such seizures are grievable, Samuels' alleged failure to exhaust all administrative remedies as required by 42 U.S .C. § 1997e(a) goes only to the narrow issue of the confiscation *qua* confiscation-the damage Samuels suffered from the loss of his property (such as the property value of the books). The main confiscation issue put forward by Samuels is not the confiscation in and of itself, but the confiscation insofar as it was the basis for the misbehavior adjudication. [15] This issue was already effectively grieved by Samuels through his direct appeal of his misbehavior determination, which *per se* implicated the confiscation of documents. Defendants argue nonetheless that any confiscation that took place is separate from the disciplinary hearing and thus must be separately grieved. The Court does not agree.

Disputes stemming from a disciplinary hearing are properly appealed directly and not through the Inmate Grievance Program. To the extent that the confiscation issue is a constituent element of the misbehavior adjudication, Samuels need not file an administrative grievance because he already sought review of the matter on his direct appeal. The recent case of *Flanagan v. Maly,* 99 Civ. 12336(GEL), 2002 WL 122921 (S.D.N.Y. Jan. 29, 2002),* is instructive. In *Flanagan,* the plaintiff brought two separate claims-one stemming from inadequate access to medical and legal resources, and one stemming from an alleged due process violation in a disciplinary hearing. The court found that the plaintiff had not exhausted all administrative remedies with regard to medical and

legal access because he failed to utilize the Inmate Grievance Program. With regard to the disciplinary hearing, however, the court held that utilization of the grievance procedures was unnecessary because the plaintiff had already appealed the issues directly:

> To require [plaintiff] to file an administrative grievance in these circumstances would be absurd, and Congress cannot have intended such a requirement. When an inmate challenges the procedure at a disciplinary hearing that resulted in punishment, he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal. Pursuit of the appellate process that the state provides fulfills all the purposes of the exhaustion requirement of [§ 1997e(a) ] [16], by giving the state an opportunity to correct any errors and avoiding premature federal litigation. Once the alleged deprivation of rights has been approved at the highest level of the state correctional department to which an appeal is authorized, resort to additional internal grievance mechanisms would be pointless.

*Flanagan,* 2002 WL 122921, at *2. While the issue referred to in *Flanagan* was a due process defect in the disciplinary hearing (not at issue here because defendants concede that Samuels exhausted all available administrative remedies), the underlying point, that issues directly tied to the disciplinary hearing which have been directly appealed need not be appealed again collaterally through the Inmate Grievance Program, is applicable to the confiscation issue. Moreover, the confiscation in the instant case is part and parcel of the misbehavior adjudication-unlike the medical claim made in *Flanagan* which was divorced from the due process claim.

**\*9** Defendants rely on a single case in support of their contention that the confiscation issue and the disciplinary hearing issue are wholly separate, *Cherry v. Selsky,* 99

Civ. 4636(HB), 2000 U.S. Dist. LEXIS 9451 (S.D.N.Y. July 7, 2000). It is not completely clear which section of the opinion defendants are citing, because no pinpoint citation is given. In *Cherry,* Judge Baer held that the filing of a false misbehavior report by a corrections officer is a grievable matter. *See id.* at *21. However, *Cherry* is readily distinguishable from the instant case because in *Cherry,* the plaintiff had "not brought a claim with respect to the due process afforded him at his disciplinary hearing [...]." *Id.* at *15. In contrast, Samuels makes this claim. As a consequence, the due process violations, including the allegedly wrongful confiscation (to the extent it led to the misbehavior adjudication) may be appealed directly.

Consequently, while Samuels has not exhausted his administrative remedies with regard to the injuries he suffered from the confiscation *alone,* he has exhausted his administrative remedies with regard to the injuries he suffered from the confiscation inasmuch as the confiscation of the religious materials serves as the basis for the disciplinary hearing. [17]

### 3. Special Housing Unit Confinement

Defendants similarly argue that Samuels' claim of retaliatory confinement in a special housing unit is barred because he failed to exhaust all available administrative remedies. [18] It is not entirely clear whether Samuels is making an argument based on retaliation. On one hand, he states that "Plaintiff [sic] claim is not on issue of retaliation." Samuels Aff., at ¶ 4. Elsewhere, he argues that "Plaintiff should not need to fear imposition of [special housing unit] confinement because they [sic] have engaged in prison litigation and/or prison reform activity [...]." Opposition Brief, at 25. As noted above, after being sentenced, Samuels was apparently transferred to a special housing unit for 180 days, which involves confinement for twenty-three hours per day.

Defendants represent to the Court that confinement to a special housing unit is ordinarily grievable. *See* Reply Brief, at 11. Samuels failed to bring this grievance to the Inmate Grievance Program. However, Samuels argues, and defendants do not contest, that Samuels was transferred to the special housing unit as punishment for his misbehavior adjudication, even though he was sentenced to 180 days of keeplock. Consequently, his appeal of his misbehavior adjudication necessarily implicates his sentence-not only his *de jure* punishment

of 180 days of keeplock, 180 days' loss of telephone, package, and commissary privileges, but also his *de facto* punishment of 180 days of special housing unit confinement. *See Flanagan,* 2002 WL 122921, at *2. The transfer to a special housing unit potentially implicates due process concerns. *See, e.g., Tookes v. Artuz,* 00 Civ. 4969, 2002 WL 1484391, at *3 (S.D.N.Y. July 11, 2002) (noting that in the Second Circuit, confinement in a special housing unit for more than 101 days generally implicates a liberty interest protected by the Due Process Clause).

### 4. DOCS Policy Regarding the Five Percent Nation of Gods & Earths

**\*10** Samuels makes an oblique reference to the fact that DOCS has treated members of the Five Percent Nation of Gods and Earths unfairly and partially. *See* Opposition Brief, at 3. To the extent that Samuels has a claim regarding DOCS's treatment of members of the Five Percent Nation, it is not directly tied to his disciplinary hearing and has not been grieved through the Inmate Grievance Program. Moreover, he has not taken issue with DOCS policies regarding the Five Percent Nation in his appeal. Consequently, this issue is dismissed with prejudice.

### 5. Dismissal of Action

Defendants argue that because Samuels seeks to assert certain unexhausted claims, "the entire action should be dismissed," irrespective of the fact that some claims are (as defendants concede) exhausted. Reply Brief, at 11. Defendants point to no binding precedent in support of this contention. The only New York case cited by defendants is *Radcliffe v. McGinns,* 00 Civ. 4966 (LMM), 2001 U.S. Dist. LEXIS 15528 (S.D.N.Y. Sept. 27, 2001). However, *Radcliffe* does not support defendants assertion that dismissal of some unexhausted claims mandates the dismissal of all claims, because in that case the claims were unexhausted as to *all* defendants. On that basis, the *Radcliffe* court dismissed all claims without prejudice. This Court thus does not find that dismissal of the exhausted claims is warranted.

### B. Due Process

### 1. Samuels Pleads a Valid Due Process Claim

Defendants argue that Samuels does not plead a valid due process claim, claiming that Samuels does not identify

a liberty interest, protected by the Due Process Clause, of which he was deprived. *See* Motion Brief, at 9. Defendants state that "[other] then [sic] allege that he was sentenced to keeplock and transferred to Upstate, plaintiff does not allege any facts that distinguishes [sic] the disciplinary sentence from general prison population conditions." [19] *Id.* at 9. Defendants cite *Walker v. Goord,* 98 Civ. 5217(DC), 2000 U.S. Dist. LEXIS 3501, at *22 (S.D.N.Y. Mar. 22, 2000) for the proposition that a complaint that merely alleges that a plaintiff was housed in a special housing unit does not state a due process claim. *See* Motion Brief, at 10. In fact, *Walker* 's ruling is not so sweeping. In *Walker,* the court held that to establish a liberty interest, a prisoner "must establish that the restraint imposed creates an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." ' *Walker,* at *21 (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)). The court also reiterated the Second Circuit's holding that there is no "bright-line rule regarding the length or type of sanction" necessary. *Walker,* at *21 (citation omitted). The prisoner must also establish that the state has granted its inmates a protected liberty interest in remaining free from that confinement or restraint. *Id.* at *21.

 **\*11** Samuels is able to meet this burden. The deprivation of liberty Samuels suffered was onerous. He was moved from the inmate honor block housing unit to keeplock and then to a special housing unit. *See supra* note 11. Moreover, unlike the plaintiff in *Walker,* Samuels identifies the length of time he was punished (180 days). *See Walker,* at *22. In light of these facts, and given the length of his confinement, Samuels has met the *Sandin* test cited above. *See Tookes v. Artuz,* 00 Civ. 4969, 2002 WL 1484391, at *3 (S.D.N.Y. July 11, 2002). Additionally, the requirement of an appealable hearing, with certain procedural safeguards, *see infra,* indicates that the state has granted inmates a protected liberty interest in remaining free from keeplock and special housing unit placement.

Due process requirements for a prison disciplinary hearing are "in many respects less demanding than those for criminal prosecutions." *Espinal v. Goord,* 180 F.Supp.2d 532, 537 (S.D.N.Y.2002) (quoting *Edwards v. Balisok,* 520 U.S. 641, 647 (1997)). At the same time, "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Duamutef v. Hollins,* 297 F.3d 108, 112 (2d Cir.2002) (citation omitted). With

respect to Tier III hearings such as the one at issue here, the Fourteenth Amendment requires that:

(1) the inmate receive at least twenty-four hours written notice of the disciplinary charges against him;

(2) the inmate be permitted to call witnesses and present evidence "when permitting him to do so would not be unduly hazardous to institutional safety or correctional goals";

(3) the inmate be judged by a fair and impartial hearing officer;

(4) the disciplinary conviction be supported by some evidence; and

(5) the inmate be provided with a written statement of fact findings that support the disposition as well as the reasons for the disciplinary action taken.

*Espinal,* 180 F.Supp.2d at 538 (citing *Wolff v. McDonnell,* 418 U.S. 539, 563-69 (1974)) (internal citations omitted)).

2. Whether Samuels Received the Process Due Him
Defendants concede that Samuels was entitled to the aforementioned rights under *Wolff. See* Reply Brief, at 13. They argue, however, that Samuels received all the procedural safeguards due him. Before analyzing defendants points in detail, the Court notes the paucity of the record before it. While Samuels has provided nearly fifty exhibits, defendants have provided only a two-page affidavit by Inmate Grievance Program Director Thomas G. Eagen dated March 13, 2002, attached to which is a nine-line computer printout of what purports to be Samuels' grievance file. Defendants have failed to submit, *inter alia,* a transcript of the disciplinary hearing, a transcript or audio recording of the confidential witness statements, a written basis for the rejection of Samuels' witnesses, or a copy of the documents that were supposedly seized from Samuels' cell. While the Court is cognizant of the fact that the instant motion is not one for summary judgment, without these and other documents, it is difficult for this Court fully to evaluate the merits of the parties' arguments. More troubling is the fact that this is apparently not the first time an inmate has been sentenced to a special housing unit on the basis of evidence which has not been preserved for judicial review. Indeed, in *Cherry v. Selsky,* 99 Civ. 4636, 2000 U.S. Dist. LEXIS 9451, at *9-

*12 (S.D.N.Y. July 7, 2000), a case cited by defendants, the court noted that on more than one occasion, Selsky was forced to reverse his previous decision denying an inmate's appeal because the "record of [the disciplinary] hearing was incomplete and the 'confidential tape' was 'unavailable for judicial review.' " *Id.* at *9 (citation omitted). On the occasion cited by the *Cherry* court, the inmate's record was expunged, but only after the plaintiff had served 125 days in a special housing unit. *See id.* at *9.

a. Witnesses

**\*12** Samuels argues that his due process rights were violated because he was not permitted to call Dr. Peter-Raoul as a witness at his disciplinary hearing. *See* Complaint, at 9; Ex. V, at 2. Defendants state, without explanation, that "it is clear that the proffered testimony would have been irrelevant and redundant." Motion Brief, at 13. The Court agrees with defendants that the right of an inmate to call witnesses in his defense is not limitless. Nevertheless, prison authorities' failure to allow an inmate to call a witness may be grounds for reversal, where the authorities fail to justify their actions. *See Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998). In this case, Dr. Peter-Raoul was apparently the author of some or all of the "subversive" materials and had close ties to the theological seminary program at the prison. According to Samuels, she also "assisted plaintiff with his course syllabus and provided much of the material utilized" therein. Complaint, at 9. She was therefore in a unique position to explain the appropriateness and relevance of the materials allegedly possessed by Samuels, who had in fact argued that the materials in question were issued to him through the NYTS program with the authorization of prison officials. *See, e.g.,* Complaint, at 5, Ex. V, at 2. The misbehavior hearing record sheet states that, "if any witness is denied [the opportunity to testify,] form 2176 explaining the reason for that determination must be given to the inmate and included as part of the record." Ex. O. No such form was filled out, and nowhere in the record do defendants explain or justify their exclusion of Dr. Peter-Raoul. *See* Ex. Q. Due process rights may be violated where prison authorities fail "without rational explanation" to obtain a witness requested by an inmate during a disciplinary hearing. *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998). Defendants' failure to justify their exclusion of Dr. Peter-Raoul potentially gives rise to a due process violation. [20] Dismissal is therefore inappropriate.

b. Confidential Informant

Samuels also protests the fact that he was not furnished with statements of the confidential informant, and argues that the record is insufficient to permit an assessment of the reliability of the informant's testimony. The Second Circuit has noted that "even if due process does require a hearing officer to conduct an independent assessment of the informant's credibility, that 'would not entail more than some examination of indicia relevant to credibility rather than wholesale reliance upon a third party's evaluation of that credibility.' " *Espinal v. Goord,* 180 F.Supp.2d 532, 540 (S.D.N.Y.2002) (quoting *Russell v. Scully,* 15 F.3d 219, 223 (2d Cir.1993)). In the instant case, the lack of a full record does not permit the Court to determine whether Irurre, the presiding officer at the Tier III hearing, made the required "examination of indicia relevant to the credibility of the confidential informant[ ], whether by an independent assessment or otherwise." *Espinal,* 180 F.Supp.2d at 540. Consequently, dismissal is inappropriate, because it is uncertain whether Samuels' punishment was supported by constitutionally sufficient evidence.

c. Assistance Provided by the Employee Assistant

**\*13** Samuels claims that his employee assistant, Cecilia, violated his due process rights by, *inter alia,* failing to explain the charges against Samuels, failing to provide Samuels with documentary evidence relating to the charges in the misbehavior report, failing to make a written record of the questions he asked the interviewees, failing to record the testimony of the witnesses he allegedly interviewed for Samuels, failing to interview the confidential informant on Samuels' behalf, and failing to interview one of the three witnesses requested by Samuels. *See* Complaint, at 9; Opposition Brief, at 22. Samuels also complains that his employee assistant did not assist in his defense but instead interrogated him about his alleged links to prison reform activists. *See* Ex. V, at 5-6.

Defendants concede that inmates have a limited right to assistance in misbehavior proceedings. *See Silva v. Casey,* 992 F .2d 20, 22 (2d Cir.1993) (per curiam). While defendants are correct in asserting that inmates do not have the right to appointed or retained counsel at a misbehavior hearing, *see Wolff v. McDonnell,* 418 U.S. 539, 570 (1974), they do have a right to assistance in "certain circumstances [in which they] will be unable to 'marshal evidence and present a defense' [...]." *Silva,*

[992 F.2d at 22](). Such situations include where the inmate is confined pending a superintendent's hearing. *See* [N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1(a)(4)](). The Green Haven Notice of Assistance form given to Samuels specifically states that an "inmate shall have the opportunity to pick an employee from established lists of persons who shall assist the inmate when a Misbehavior Report has been issued against the inmate if [...] [t]he inmate is keeplocked or confined to a special housing unit and is unable to prepare his defense." Ex. J. In the instant case, Samuels was entitled to an employee assistant because he was keeplocked immediately after the search of his cell and was unable to prepare his defense.

As noted, Samuels makes broad assertions as to the deficiency of his employee assistant. *See* Ex. V, at 3-8. Based on Samuels' factual assertions, it is possible that employee assistant Cecilia failed to provide even the "limited" assistance to which Samuels is entitled. [21] Such a failure potentially implicates Samuels' due process rights. *See* [Ayers v. Ryan, 152 F.3d 77, 80-81 (2d Cir.1998)](). Because the instant motion requires that the Court accept Samuels' allegations as true, dismissal is inappropriate.

### d. Actions of the Hearing Officer

With respect to the hearing officer, Irurre, Samuels makes a variety of claims, including the fact that Irurre prohibited Samuels from calling various witnesses and that he was partial. The Court has not been furnished with a copy of the hearing transcript. Because Samuels' claims potentially implicate constitutional rights, and because any holding on this issue requires that the Court make factual determinations, dismissal is inappropriate.

### e. Timeliness of the Hearing

**\*14** Samuels claims that his due process rights were violated because his misbehavior hearing was held eight days after Samuels was confined following the search of his cell. Where an inmate is confined pending a disciplinary hearing (as was the case here), the hearing must be held within seven days of the confinement unless a later date is authorized by the commissioner or his designee. *See* [N.Y. Comp.Codes R. & Regs. tit. 7, § 251-5.1(a)](). In this case, Samuels' rights were not violated. The search took place on October 20, 1999, and the hearing occurred on October 27, 1999. Under [§ 251-5.1](), the date of the incident is generally excluded. *See, e.g.,* [Harris v. Goord, 702 N.Y.S.2d 676 (N.Y.App. Div.3d]()

[Dep't 2000)]() (holding that the fourteen-day period in [§ 251-5.1(b)](), which runs from the date of the writing of a misbehavior report, is calculated by excluding the day the report is written). Thus, Samuels' hearing was held within seven days of his detention. Moreover, as Samuels admits, prison officials sought and received permission to begin the hearing on October 27, 1999, as per the requirements of [§ 251-5.1(a)](). *See* Ex. L. For these reasons, Samuels' claim with regard to the timeliness of his hearing is dismissed.

### f. Notice

Defendants reject Samuels' argument that he received inadequate notice of the charges against him. It is unclear from the record what notice Samuels received, either before or during the disciplinary hearing. While the Court is cognizant of the fact that inmates are entitled to fewer due process rights than other citizens, it is possible to read Samuels' allegations as presenting a valid due process claim. The Court notes, for instance, that inmate rule 104.12 provides that "[i]nmates shall not lead, organize, participate, or urge other inmates to participate in work-stoppages, sit-ins, lock-ins, or other actions which may be detrimental to the order of the facility." [N.Y. Comp.Codes R. & Regs. tit. 7, § 270.2(B)(5)(iii)](). The Appellate Division has held that possession of threatening materials alone does not violate the rule because the inmate must actually lead, organize, participate, or urge other inmates to participate, and not merely intend to do so. *See, e.g.,* [Abdur-Raheem v. Goord, 665 N.Y.S.2d 152, 153 (N.Y.App. Div. 4th Dep't 1997)](). While Samuels may have possessed the documents, it is unclear whether he received any notice of how he allegedly led, organized, or participated in (or urged others to participate in) a prohibited activity. Because the determination hinges on a factual determination, dismissal is inappropriate.

### C. Retaliation

Samuels alleges that his misbehavior adjudication was based on the prison authorities' perception that members of the NYTS were behind the planned Y2K protest. *See* Complaint, at 3-6. Samuels alleges that the materials seized were not subversive and were of a Christian nature. Defendants move to dismiss the retaliation argument, arguing that the prison authorities' decision is entitled to deference. While this may be true, such deference is inappropriate on a motion to dismiss, particularly given the paucity of the record. Without, for example,

a transcript of the hearing, a transcript of the testimony of the confidential informant, or a copy of the allegedly subversive documents, the Court cannot blindly defer to the prison authorities. Consequently, dismissal is inappropriate. Defendants also argue that "even if it was improper to discipline plaintiff for possession of contraband, the evidence of plaintiff's involvement in the unauthorized demonstration provided a valid non-retaliatory basis for the disciplinary sanction and transfer." Reply Brief, at 19. This argument is incorrect for two reasons. First, the argument ignores the fact that the contraband documents and testimony of the confidential informant provide the basis for the prison authorities' finding that Samuels was involved in the demonstration. None of these documents is in the record before the Court; thus deference is inappropriate. Second, this argument ignores the fact that Samuels' punishment was ultimately based on the fact that he had violated two rules. His prison file reflects a guilty adjudication on two counts; also, had Samuels been disciplined for violating only one rule, his penalty would likely have been less.

**D. Personal Involvement**

**\*15** Defendants correctly note that liability of supervisory officials under 42 U.S.C. § 1983 may not be premised on the doctrine of *respondeat superior. See, e.g., Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002); *Emblen v. Port Auth. of New York/New Jersey,* 00 Civ. 8877(AGS), 2002 WL 498634, at \*10 (S.D.N.Y., Mar. 29, 2002). Consequently, a defendant's personal involvement in the alleged constitutional violation is required. *See, e.g., Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 690-95 (1978). Such personal involvement may be proven in a number of ways:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates

by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). The Court examines the alleged personal involvement of each defendant in turn.

1. Donald Selsky

Defendants concede Donald Selsky, Director, Special Housing/Inmate Disciplinary Program, was personally involved in the alleged due process violations cited by Samuels. The Court notes that Selsky, acting "on behalf of the commissioner," reviewed and affirmed Samuels' superintendent's hearing and denied Samuels' appeal. Ex. 6, V.

2. Glenn Goord

Defendants argue that Glenn Goord, DOCS Commissioner, has no personal involvement in this case, and that the only link to him in this action is a newspaper article. *See* Reply Brief, at 20-21. This is incorrect, however, since the denial of Samuels' appeal was written by Selsky on behalf of Goord. As noted, defendants concede Selsky's involvement. Goord had a duty to supervise his subordinate who purportedly acted in his name. [22] Without further evidence, the Court cannot say as a matter of law that Goord was not personally involved, since personal involvement can include gross negligence "in supervising subordinates who committed the wrongful acts." *Colon,* 58 F.3d at 873.

3. Paul Cecilia

Defendants concede Paul Cecilia's personal involvement.

4. Javier Irurre

Defendants concede Javier Irurre's personal involvement.

5. Sergeant Schwartzman

Defendants concede Sergeant Schwartzman's personal involvement.

6. Dennis Bliden

Defendants allege that Samuels never argues that Bliden had the ability to remedy the alleged constitutional violation. However, Bliden wrote to Samuels in response to his appeal of the misbehavior adjudication, stating, "You may appeal this hearing to the Commissioner in Albany. Until such time as we receive a decision from this office, *I will not modify the disposition.*" Ex. U (emphasis added). Significantly, Bliden did not state that he *could* not modify the disposition but stated that he *would* not. This provides at least *prima facie* evidence that Bliden had the authority to overturn the disposition. While further facts may reveal this to be untrue, at this stage dismissal is inappropriate.

### 7. Jeffery McKoy

 **\*16** Samuels fails to provide any support for McKoy's personal involvement in this action. Indeed, in responding to one of Samuels' appeals, McKoy wrote that "I do not have the authority to overturn Tier 3 dispositions." Ex. R. McKoy does not appear to have been complicit in any alleged deprivation of Samuels' rights, and, in contrast to Bliden, he plainly lacked the authority to overturn the misbehavior adjudication. Consequently McKoy was not personally involved in the matter and all claims against him are dismissed.

### 8. Christopher P. Artuz

Christopher P. Artuz is Green Haven's Superintendent. Samuels states that his involvement stems from his failure to respond to a note sent to him. Although the note to Artuz does not appear to be in the record before the Court, it is referenced in a note from Bliden to Samuels. *See* Ex. T ("This is in response to your memo of November 12, 1999 to Superintendent Artuz"). Samuels also alleges that Artuz failed to respond when contacted by Dr. Peter-Raoul and Dr. Webber, who sought to intervene on Samuels' behalf. *See* Opposition Brief, at 27. While it is not clear that Artuz was personally involved, the question of Artuz's involvement in this matter is a factual question. In such cases, dismissal should be denied. As the Second Circuit noted in *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986), "even if [the prison superintendent] did not actively affirm the conviction on administrative appeal, we cannot say, on this record, that as Superintendent [of the prison] he was not directly responsible for the conduct of prison disciplinary hearings [...]."

### E. Qualified Immunity

Defendants move to dismiss this action based on the qualified immunity of defendants. As defendants correctly point out, government employees are generally immune from liability for civil damages "when their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Duamutef v. Hollins,* 297 F.3d 108, 111 (2d Cir.2002) (citation omitted). As a preliminary matter, it should be noted that qualified immunity is only a defense to claims for money damages and are not a defense for equitable relief or injunctions. *See, e.g., Charles W. v. Maul,* 214 F.3d 350, 360 (2d Cir.2000). To the extent that Samuels seeks equitable relief, defendants' potential claims of qualified immunity are no bar.

The Court is unable to determine at this time whether the remaining defendants are entitled to qualified immunity in this case. The reason is that without having basic documentary evidence, including a transcript of the disciplinary hearing, a transcript of the testimony of the confidential informant, and the documents allegedly seized from Samuels' cell, the Court cannot determine whether these defendants violated Samuels' clearly established constitutional or statutory rights. Because it is a fact-intensive question, it cannot be disposed of at this stage.

### V. Conclusion

 **\*17** For the reasons set forth above, defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) and (6) is DENIED with respect to defendants Selsky, Goord, Cecilia, Irurre, Schwartzman, Bliden, and Artuz. Defendants' motion is GRANTED with respect to Jeffery McKoy, and with respect to the issue of DOCS policy regarding the Five Percent Nation of Gods and Earths and with regard to the timeliness of Samuels' misbehavior hearing.

SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2002 WL 31040370

## Footnotes

1    Defendants repeatedly state that the events giving rise to this action arose while Samuels was incarcerated at the Great Meadow Correctional Facility. Samuels states that the events in question happened at the Green Haven Correctional Facility. Moreover, Samuels' evidence, including the Inmate Disciplinary Report (Exhibit H), the Disciplinary Hearing Record Sheet (Exhibit O), and the Superintendent Hearing Disposition Report (Exhibit P) all note the Green Haven Correctional Facility. In light of the above, the Court determines that defendants' position that the events occurred at Great Meadow is incorrect. The Green Haven Correctional Facility is located in Dutchess County in the Southern District, while Great Meadow is located in Washington County in the Northern District. Defendants make no argument regarding the Court's jurisdiction with respect to the location of the events in question.

2    Unless otherwise indicated, the facts set forth below are gleaned from Samuels' submissions, because on a FED. R. CIV. P. 12(b)(1) or (6) motion, the adjudicating court must assume as true factual allegations made in the complaint. Defendants concede this fact. *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint, at 4. It should also be noted that Samuels brings this action *pro se.* As such, it is sometimes difficult to understand fully his contentions. Accordingly, the Court reads the (sometimes confusing) factual allegations in the light most favorable to Samuels.

3    The website of the University of Chicago's Divinity School provides a good summary of the beliefs of the adherents of the Five Percent Nation of Gods and Earths, commonly known as the "Five Percenters." *See* Jonathan Moore, *The Five Percenters: Racist Prison Gang or Persecuted Religion?,* SIGHTINGS, May 21, 1999, *available at* http://divi nity.uchicago.edu/sightings/archive_1999/sightings-052199.html. The name of the group stems from its belief that only five percent of people are aware of and teach the truth. The term "Gods" refers to black male members; "Earths" refer to black female members. The group was founded by Clarence 13X, who left the Nation of Islam in 1964. According to Moore, "[m]any of the theological accoutrements of Black Muslim belief remain: many read the Qur'an and Elijah Muhammad's writings (especially his "Message to the Black Man"), and they hold to the exclusive divinity of black men." *Id.* (The Moore article, not part of the record, is provided for background purposes only). Samuels has included two pages outlining the differences between the Nation of Gods and Earths and similar black Muslim groups-the Nation of Islam and the Temple of Islam. *See* Exhibit B.

4    *See supra* note 1.

5    While denying a link to the Y2K protest, Samuels provides some background on the matter. According to Samuels, DOCS created a program at Green Haven through the Corcraft Industry Division Program known as the Recreational Cell Building Project ("Project"). The Project initially used inmate volunteers to build Inmate Recreational Cells at recently constructed S-Facilities (special housing institutions). According to Samuels, because of poor working conditions, low wages, and other factors, inmates increasingly refused to volunteer for the Project and sought other work assignments. Samuels alleges that DOCS personnel then began using the disciplinary process to systematically force inmates to work in the Project. *See* Complaint, at 3. Samuels also alleges that prison officials specifically targeted members of the NYTS and the Five Percent Nation of Gods and Earths for compelled work participation in the Project. *See id.* at 4. The planned Y2K protest, in which Samuels claims to have played no role, was intended to protest the program as well as prison conditions generally.

6    The Kairos Statements (referred to by Samuels as "Karios Statements") are critiques of traditional church dogma. The most famous Kairos statement originated as a critique of alleged church complicity in the white *apartheid* regime in South Africa.

7    *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1 (2002):(a) An inmate shall have the opportunity to pick an employee from an established list of persons who shall assist the inmate when a misbehavior report has been issued against the inmate if [...] (4) the inmate is confined pending a superintendent's hearing [...].

8    Samuels cites a number of failures on Cecilia's behalf: he failed to turn over documentary evidence relating to the charges against Samuels, he failed to provide a written record of the questions he was supposed to ask Samuels' witnesses, he failed to record the testimony of the witnesses interviewed on Samuels' behalf, he failed to explain exactly what material that was confiscated constituted contraband, and he failed to interview the confidential informant to determine his existence or credibility. *See* Complaint, at 9.

9    Tier III hearings are held for "the most serious violations of institutional rules." *Walker v. Bates,* 23 F.3d 652, 654 (2d Cir.1994).

10    The name "Javier Irurre" appears on the Hearing Disposition form. *See* Ex. P. Samuels spells the name "Iurrue," *see* Complaint, at 9, while defendants in turn use two spellings for the name-"Iurre" and "Iurrue *See* Motion Brief, at 3. The

Court uses the "Irurre" spelling found on the Hearing Disposition form, apparently in Javier Irurre's own handwriting, and on the Tier III assignment form signed by Superintendent Artuz. *See* Appendix 7.

11    Placement in a special housing unit involves confinement for twenty-three hours per day. The inmates assigned to special housing units receive virtually no programming, no congregate activities, and very little natural light. Reading materials are severely restricted, as are visits. *See* Ex. 16, at 5-6 (THE NEW YORK STATE SENATE DEMOCRATIC TASK FORCE ON CRIMINAL JUSTICE REFORM, CRIMINAL JUSTICE REFORM: A TIME THAT'S COME (2001)).

12    Prisoners' Legal Services of New York cite the date as January 20, 2000. *See* Ex. 7; Samuels cites the date as January 20, 1999. *See* Ex. 6.

13    No Appellate Division decision on the matter is in the record. However, defendants' argument on the exhaustion of remedies focuses on administrative remedies and not on this potential deficiency.

14    In his complaint, Samuels also alleged an Eighth Amendment violation stemming from his treatment during a trip to and from his brother's funeral. This claim was dismissed by order of Judge Mukasey dated September 4, 2001.

15    The real damage suffered by Samuels was, *inter alia,* his 180 days in keeplock (and later a special housing unit).

16    The district court mistakenly cites the provision as " § 1997a(e)," a nonexistent section.

17    The confiscation of Samuels' documents is not an ancillary issue unrelated to the disciplinary hearing (as was Samuels' Eighth Amendment argument, *see supra* note 14). Instead, the allegedly improper confiscation of materials is part and parcel of the disciplinary proceeding. The primary harm suffered by Samuels of the confiscation was not the value of the documents seized (which is never mentioned by Samuels) but the fact that the confiscation of allegedly harmless materials led to his confinement in keeplock and later in a special housing unit for 180 days.

18    There are two separate retaliation issues at play in this action. The first, discussed here, is Samuels' claim of retaliatory confinement in a special housing unit. The second, discussed below, is Samuels' claim that the misbehavior adjudication itself was a form of retaliation for the NYTS's opposition to the Cell Building Project. *See supra* note 5.

19    As noted *supra,* Samuels was also sentenced to 180 days' loss of packages, telephone, and commissary privileges.

20    Samuels also appears to allege that Cecilia, his employee assistant, was not permitted to testify on Samuels' behalf, and that Schwartzman testified outside Samuels' presence. *See* Ex. V, at 4; Plaintiffs' Supplemental Memorandum of Law and Reply Memorandum of Law in Further Support of Plaintiffs' Motion to Stay Complaint, at 8.

21    By statute, the "assistant's role is to speak with the inmate charged, to explain the charges to the inmate, interview witnesses and to report the results of his efforts to the inmate. He may assist the inmate in obtaining documentary evidence or written statements which may be necessary. The assistant may be required by the hearing officer to be present at the disciplinary or superintendent's hearing." N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.2. While failure to adhere to regulations does not itself give rise to a claim under 42 U.S.C. § 1983, it may constitute evidence of a constitutional deprivation. *See, e.g., Duckett v. Ward,* 458 F.Supp. 624, 627 (S.D.N.Y.1978).

22    Whereas the doctrine of *respondeat superior* involves the legal assignment of liability to a supervisor for the acts of a subordinate, the instant case involves a subordinate who claims to be (and legally is) acting in the name of his supervisor.

**End of Document**        © 2016 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag - Severe Negative Treatment
Report and Recommendation Adopted in Part, Rejected in Part by
Tapp v. Tougas, N.D.N.Y., September 18, 2008

2008 WL 4371766
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Sean TAPP, Plaintiff,
v.
R. TOUGAS, et al., Defendants.

Civil Action No. 9:05-CV-01479 (NAM/DEP).
|
Aug. 11, 2008.

**Attorneys and Law Firms**

Sean Tapp, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Steven H. Schwartz, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

 **\*1** Plaintiff Sean Tapp, a former New York prison inmate who is now apparently in the custody of Pennsylvania officials, has commenced this civil rights action pursuant to 42 U.S.C. § 1983 against Donald Selsky, who at the relevant times served as an Assistant Commissioner of the New York State Department of Correctional Services ("DOCS"), and various other employees of the department including four corrections officers, a sergeant, a nurse, a hearing officer, and a guidance counselor, complaining of several constitutional violations alleged to have occurred during the time of his confinement in New York. In his complaint, as amended, plaintiff asserts claims stemming from a series of events precipitated by an altercation between himself and several corrections officers. Plaintiff maintains that he was assaulted by corrections workers without provocation, denied adequate medical care for injuries sustained during the course of the conflict, and subjected to a lengthy period of disciplinary special housing unit ("SHU") confinement

as a result of the incident, purportedly without first having been afforded the procedural safeguards guaranteed under the Fourteenth Amendment. As relief, *inter alia,* plaintiff seeks a mandatory injunction directing the restoration of good time credits forfeited as a result of the incident and directing his release from prison, termination of all defendants' employment with the DOCS, and recovery of $15 million in compensatory and punitive damages.

Now that pretrial discovery has concluded, the defendants have moved for summary judgment requesting dismissal of plaintiff's claims, arguing that they are substantively deficient, and further asserting their entitlement to qualified immunity. In addition to opposing defendants' motion, plaintiff has since cross-moved for summary judgment on the issue of liability, based substantially upon the allegations as set forth in his complaint.

Despite the existence of what at first blush appear to be conflicting accounts of the circumstances surrounding plaintiff's excessive force claim, having surveyed the record I am convinced that no reasonable factfinder could credit plaintiff's version and find in his favor with respect to that claim. Additionally, discerning the existence of no genuine issues of material fact surrounding plaintiff's remaining claims, including for deliberate medical indifference, the issuance of a false misbehavior report, and violation of his procedural due process rights, and similarly concluding that no reasonable factfinder could rule in plaintiff's favor for any of those claims, I recommend that defendants' summary judgment motion be granted in its entirety, and plaintiff's cross-motion addressing those claims correspondingly be denied.

I. *BACKGROUND* [1]
At the times relevant to his claims, the plaintiff was entrusted to the custody of the DOCS and designated to the Great Meadow Correctional Facility ("Great Meadow"), a maximum security prison facility located in Comstock, New York. *See generally* Amended Complaint (Dkt. No. 19) ¶ 3; *see also* Brown Aff. (Dkt. No. 50-5) Exh. A at 60:21-22 (hereinafter cited as "Tapp Dep. (Dkt. No. 50-6) at ___."). On June 24, 2005, while waiting in a line in the Great Meadows B-block for a call out slip permitting him to go to the library, and later to a scheduled religious service, plaintiff was involved in a physical conflict with correctional officers at the Great Meadow facility. *See*

Amended Complaint (Dkt. No. 19) ¶¶ 4-5, 7-9. It is that incident, together with events which followed, which form the underpinnings for plaintiff's claims in this action.

**\*2** Neither Tapp nor the defendants dispute the fact that a physical altercation, initially involving only the plaintiff and Corrections Officer R. Tougas, but with later intervention by other corrections officers, occurred on the date in question. The parties' respective versions of the controlling events, however, are sharply contradictory, particularly as relates to the issue of who initiated the confrontation. While both sides agree that the plaintiff attempted to go to the front of a relatively lengthy line of inmates awaiting call outs passes, accustomed as he was to having his daily library pass already written and awaiting him, and that the plaintiff was ordered by Corrections Officer Tougas to return to the back of the line but ignored that directive, it is at this point that the parties' versions of the relevant events diverge.

Defendants assert that upon moving ahead of the other inmates also awaiting call out slips, Tapp was given a direct order by Corrections Officer Tougas to return to his place in line and, when he refused to obey that directive and instead uttered expletives directed toward that officer, was ordered to return to his cell-an instruction which he also ignored. Tougas Decl. (Dkt. No. 50-24) ¶¶ 6-10. After Tapp refused a further order to place his hands on the cat walk bars, instead assuming an offensive fighting stance, raising his clenched fist and lunging at the officer, a struggle ensued between the two. *Id.* ¶¶ 10-17. After signaling an alert in an attempt to gain control of the situation, with the assistance of Corrections Officer Sharrow, another defendant in the action, Tougas was ultimately able to force the plaintiff to lie face down on the floor, at which point mechanical restraints were applied by a third corrections officer, defendant Rando, and plaintiff was transported to the facility hospital for examination, strip frisked, and then taken to the facility SHU. *Id.* ¶¶ 16-17; Sharrow Decl. (Dkt. No. 50-22) ¶¶ 4-10 and Exh. A; *see also* Rando Decl. (Dkt. No. 50-18) ¶ 4. While at the prison infirmary plaintiff was examined by defendant Santini-Correa, who did not observe any injuries to the plaintiff, nor did he complain of any during her examination. Santini-Correa Decl. (Dkt. No. 50-8) ¶¶ 5-11 and Exh. A. During that examination, Nurse Santini-Correa wiped dried blood which did not appear to be his from the plaintiff's back. *Id.*

Plaintiff's sworn submissions recite a significantly different version of the relevant events. While acknowledging that he ignored a directive from Corrections Officer Tougas, and at one point instructed the officer to "shut the f__k up[,]" plaintiff maintains that after a verbal exchange between the two defendant Tougas "outright attacked" him, "banging [his] head against cell bars while he pulled on inmate & repeatedly punched [him] in the face, body & head for no apparent reason." Amended Complaint (Dkt. No. 19) ¶ 4; *see also* Tapp Dep. (Dkt. No. 50-6) at 66-72. While acknowledging that he punched defendant Tougas in the mouth during the course of the encounter, Tapp also asserts that it was only after he was punched and his shirt was pulled over his head, adding that he did so in an effort to defend himself. *Id.* Plaintiff also asserts that other corrections employees responded to an alert concerning the incident and continued to assault him and that defendant Michael, a corrections sergeant, stood idly by and refused to intercede on his behalf. Tapp Dep. (Dkt. No. 50-6) at 72-73.

**\*3** According to Tapp, once he was subdued and mechanical restraints were applied, he was escorted to the infirmary by defendant Rando who, along the way, intentionally stepped on his leg chains causing him to experience pain in his Achilles tendon. Tapp Decl. (Dkt. No. 50-6) at 75-76. Upon his arrival at the facility hospital, plaintiff claims to have complained of pain in his wrist, back, right shoulder, and groin and having requested medical attention for his injuries. *Id.* at 88. Plaintiff further maintains that as a result of the incident he experienced blood in his urine, but that at the directive of defendant Michael, Nurse Santini-Correa "refused to note actual injuries of plaintiff such as swollen testicles, blood in urine & stool, lower back pain, bruises to [plaintiff's] wrist & face while she prevented co-workers from seeing [plaintiff] at sick call for" his injuries. Amended Complaint (Dkt. No. 19), at ¶¶ 5-6.

On the date of the incident, plaintiff was issued a misbehavior report charging him with multiple violations of prison disciplinary rules stemming from the altercation, including assault on staff (Rule 100.11), engaging in violent conduct (Rule 104.11), creating a disturbance (Rule 104.13), violating a direct order (Rule 106.10), and failure to comply with frisk and search procedures (Rule 115.10) . [2] *See* Amended Complaint (Dkt. No. 19) ¶ 4; Tougas Decl. (Dkt. No. 50-24) ¶ 19 and Exh. A; Harvey Decl. (Dkt. No. 50-10) ¶ 5 and Exh. A, p. 9. A Tier III

superintendent's hearing was convened at Great Meadow to address the charges set forth in the misbehavior report, beginning on July 1, 2005 and ending two weeks later on July 15, 2005; presiding at that hearing was Andrew Harvey, a Commissioner's Hearing Officer ("CHO") employed by the DOCS. [3] Harvey Aff. (Dkt. No. 50-10) ¶¶ 3-6 and Exh. A. In preparation for that hearing, following the filing of charges, plaintiff was offered a list of DOCS employees available to aid in preparation for the hearing and was assigned defendant Melanie Jones, a DOCS Guidance Specialist at the facility and his designated first choice, as his assistant. Amended Complaint (Dkt. No. 19) ¶ 12; Jones Decl. (Dkt. No. 50-14) ¶¶ 2-3 and Exh. A. In his amended complaint plaintiff asserts that defendant Jones conspired with others at the prison to deprive him of "everything that [he] was entitled too [sic] by due process of law." Amended Complaint (Dkt. No. 19) ¶ 12. Plaintiff's submissions, however, fail to identify any document or information obtained by defendant Jones that was withheld from him.

In a declaration filed in support of defendants' summary judgment motion, defendant Jones advises that she met with the plaintiff on a total of three occasions to prepare for the impending disciplinary hearing. Jones Decl. (Dkt. No. 50-14) ¶ 4. According to Jones, during those meetings plaintiff requested numerous documents, and asked that she interview four witnesses identified by him. *Id.* ¶ 5. Upon interviewing those witnesses, defendant Jones ascertained that three of the four would agree to testify and secured a written statement from the fourth inmate declining plaintiff's request to testify on his behalf. *Id.* ¶ 5 and Exh. A. In addition, defendant Jones obtained most of the documents requested by the plaintiff, and advised him that other requested information could not be provided by prison officials. *Id.* ¶ 6. Among the documents withheld by prison officials from defendant Jones, as plaintiff's assistant, were Corrections Officer Tougas' medical records. *Id.* ¶ 7 and Exh. A.

**\*4** Defendant Jones explained her inability to obtain certain records to the plaintiff and informed him that in her role as his assistant she did not control what documents would be made available to the plaintiff, consistent with institutional security concerns and privacy interests. *Id.* ¶¶ 8-9. Defendant Jones also informed the plaintiff of his right to request additional information, either at the hearing or through other avenues. *Id.* ¶ 7.

At the conclusion of the hearing defendant Harvey found plaintiff guilty of all charges set forth in the misbehavior report, imposing a penalty which included eighteen months of disciplinary SHU confinement, with a corresponding loss of package, commissary and telephone privileges, and additionally recommending a twelve month loss of good time credits. [4] Harvey Aff. (Dkt. No. 50-10) ¶ 18 and Exh. A at pp. 3-4.

CHO Harvey's determination, including the penalty imposed, was upheld following plaintiff's appeal of that decision to defendant Donald Selsky, formerly an Assistant DOCS Commissioner and the Director of Special Housing and Inmate Disciplinary Programs for the agency. Selsky Decl. (Dkt. No. 50-20) ¶¶ 2, 7 and Exh. A. Plaintiff opted not to avail himself of the right to commence a proceeding in New York State Supreme Court under Article 78 of the N .Y. Civil Practice Law and Rules further challenging that disciplinary determination.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on November 29, 2005, and later filed an amended complaint-the operative pleading now before the court-on April 11, 2006. [5] *See* Dkt. Nos. 1, 19. In his complaint, as amended, plaintiff asserts multiple constitutional violations relating to the events occurring on and after June 24, 2005 at Great Meadow including, *inter alia,* the use of excessive force and the failure to protect him from injury, deliberate indifference to his injuries, the deprivation of procedural due process, and denial of equal protection. [6],[7] Named as defendants in plaintiff's amended complaint, apparently both in their official capacities and as individuals, are various DOCS employees, including Assistant Commissioner Selsky; Sergeant Michael; CHO Harvey; Corrections Officers Tougas, Wilson, Rando, and Sharrow; and Nurse Santini-Correa. Amended Complaint (Dkt. No. 19) at ¶¶ 4-12.

On February 20, 2008, following the close of discovery, the defendants filed a motion seeking summary judgment dismissing plaintiff's complaint in its entirety. *See generally* Defendants' Motion (Dkt. No. 50). In their motion defendants offer a variety of grounds for dismissal of plaintiff's claims, asserting deficiency of plaintiff's claims for violations of the Eighth Amendment, plaintiff's due process rights, and medical indifference. *Id.* Defendants also argue that plaintiff has not raised

a cognizable constitutional question pertaining to the allegedly false misbehavior report issued by defendant Tougas, that this court lacks subject matter jurisdiction to decide plaintiff's due process claim based upon his failure to first invalidate the hearing results, and that they are entitled to qualified immunity. *Id.* In response, plaintiff has opposed defendants' motion and cross-moved for summary judgment, offering substantially the same arguments as those found in his complaint. [8] *See generally* Plaintiff's Motion (Dkt. No. 56).

**\*5** The parties' motions are now ripe for determination, and have been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* FED. R. CIV. P. 72(b).

III. *DISCUSSION*

*A. Summary Judgment Standard*

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material," for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. FED. R. CIV. P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

*B. Excessive Force*

**\*6** The centerpiece of plaintiff's complaint is his claim of being beaten on June 24, 2005, initially by Corrections Officer Tougas, and later by others including Corrections Officers Wilson, Rando, and Sharrow, and that Sergeant Michael failed to intervene to protect him from injury. This component of plaintiff's civil rights claim implicates potential violations of the right of a sentenced prison inmate to be free from cruel and unusual punishment, as guaranteed under the Eighth Amendment.

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citations and quotations omitted); *Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). The lynchpin inquiry in deciding claims of excessive force against prison officials is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S.Ct. 995, 998 (1992) (applying *Whitley* to all excessive force claims); *Whitley,* 475 U.S. at 320-21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d

Cir.1973) (Friendly, J.), *cert. denied sub nom., John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462 (1973)). Analysis of claims of cruel and unusual punishment requires both objective and subjective examinations. *Hudson,* 503 U.S. at 8, 112 S.Ct. at 999; *Wilson v. Seiter,* 501 U.S. 294, 298-99, 111 S.Ct. 2321, 2324 (1991); *Griffen,* 193 F.3d at 91.

The objective prong of the inquiry is contextual, and relies upon "contemporary standards of decency." *Hudson,* 503 U.S. at 8, 112 S.Ct. at 999-1000 (quoting *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 290 (1976)). When addressing this component of an excessive force claim under the Eighth Amendment calculus, the court can consider the extent of the injury suffered by the inmate plaintiff. While the absence of significant injury is certainly relevant, it is not dispositive. *Hudson,* 503 U.S. at 7, 112 S.Ct. at 999. The extent of an inmate's injury is but one of the factors to be considered in determining a prison official's use of force was "unnecessary and wanton"; courts should also consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085 (citing *Johnson,* 481 F.2d at 1033). Under *Hudson,* even if the injuries suffered by a plaintiff " 'were not permanent or severe,' " a plaintiff may still recover if " 'the force used was unreasonable and excessive.' " *Corselli v. Coughlin,* 842 F.2d 23, 26 (2d Cir.1988) (quoting *Robinson v. Via,* 821 F.2d 913, 924 (2d Cir.1987)).

Turning to the subjective element, to prevail the plaintiff must establish that defendants acted with a sufficiently culpable state of mind. *Davidson v. Flynn,* 32 F.3d 27, 30 (2d Cir.1994) (citing *Hudson,* 503 U.S. at 8, 112 S.Ct. at 999). That determination is informed by four factors, including 1) the need for application of force; 2) the relationship between that need and the amount of force used; 3) the threat reasonably perceived by the responsible officials; and 4) any efforts made to temper the severity of a forceful response. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085. The principal focus of this inquiry "turns on 'whether force was applied in a good faith effort to maintain discipline or maliciously and sadistically for the very purpose of causing harm.' " *Whitley,* 475 U.S. at 320-21, 106 S.Ct. at 1085 (quoting *Johnson,* 481 F.2d at 1033).

**\*7** The portion of defendants' motion addressing whether plaintiff was subjected to a level of force which a reasonable factfinder could conclude was unlawful, considered against this backdrop, presents a close case. Because the versions of the relevant events offered by the various participants are sharply contradictory, it could be argued that defendants' motion invites the court to make a credibility determination, something which courts are generally loathe to do on motion for summary judgment. *See Snyder v. Goord,* 9:05-cv-01284, 2007 WL 957530, at \*9 (N.D.N.Y.2007) (McAvoy, S.J).

In this instance, however, the evidence now before the court overwhelmingly establishes that the incident and resulting injuries to the participants was precipitated by the plaintiff and his admitted failure to comply with lawful directives of C.O. Tougas and his admonition to that corrections officer that he should "shut the f__k up."[9] Tapp Dep. (Dkt. No. 50-6) at 66. Coupled with these factors is the stark contrast presented by evidence of the injuries suffered by the two primary participants. Corrections Officer Tougas, who the plaintiff admitted punching, received an injury during the conflict which required twelve stitches to repair. Tougas Decl. (Dkt. No. 50-24) ¶ 20; Tapp Dep. (Dkt. No. 50-6) at p. 69. By comparison the plaintiff, who contends that he was beaten, punched, dragged, and stomped on by Corrections Officer Tougas, with the assistance of Corrections Officers Wilson, Sharrow and Rando, suffered little if any injury despite the alleged participation of four corrections officers, as evidenced by both the sworn declaration of Nurse Santini-Correa, who examined him shortly after the incident, a videotape of plaintiff's escort following the incident, and photographs taken of him on that day. *See* Santini-Correa Decl. (Dkt. No. 50-8) ¶¶ 5-10; *see also* Dkt. No. 50-12. This evidence, augmented by a hearing officer's finding, following a disciplinary hearing at which plaintiff was provided due process, that it was the plaintiff who in fact assaulted staff members, including Corrections Officer Tougas, on the date in question, and the fact that at least on two prior occasions plaintiff was subjected to lengthy periods of disciplinary SHU confinement for having assaulted other DOCS staff members, convinces me that no reasonable factfinder could credit plaintiff's version and determine that the force applied by the corrections officers involved in the incident, including Corrections Officer Tougas, to control the situation and restore the safety and security of the institution, was unlawfully excessive.[10] *See Jeffreys v. City of New York,*

426 F.3d 549, 555 (2d Cir.2005) (in circumstances where the record is lacking in support of plaintiff's contradictory and incomplete statements, summary judgment may be appropriate upon the basis that no reasonable factfinder could credit plaintiff's version of the relevant events); *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 470 (S.D.N.Y.1998) (same); *see also Panetta v. Crowley,* 460 F.3d 388, 394 (2d Cir.2006) (noting that "[j]udgment as a matter of law is appropriate if no reasonable factfinder could have viewed the evidence as supporting plaintiff's claim"). Accordingly, I recommend dismissal of plaintiff's Eighth Amendment claim against Corrections Officer Tougas, Wilson, Michael, Rando and Sharrow as a matter of law.

*C. Deliberate Indifference*

**\*8** Liberally construed, plaintiff's amended complaint also appears to assert deliberate indifference on the part of the defendants to his injuries following the June 24, 2005 incident. Amended Complaint (Dkt. No. 19) ¶¶ 6-7. While this aspect of plaintiff's complaint appears to focus principally on the actions of Nurse Santini-Correa, in his motion for summary judgment plaintiff seems to expand that claim, though without disclosing specifics, explaining that it is also being asserted against defendant Jones, his assigned hearing assistant, and Sergeant Michael. *See* Defendants' Motion for Summary Judgment (Dkt. No. 56) at p. 1. In their motion, defendants also seek dismissal of this cause of action.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus, the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious"

from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference." *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at \*2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M .J.); *see also generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at \*2 (same).

In order to state a medical indifference claim under the Eighth Amendment, a plaintiff must allege a deprivation involving a medical need which is, in objective terms, " 'sufficiently serious.' " *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citing *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108 (1995). A medical need is serious for constitutional purposes if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A serious medical need can also exist where " 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' "; since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts. *Harrison v. Barkley,* 219 F.3d 132, 136-37 (2d Cir.2000) (quoting, *inter alia, Chance* ). Relevant factors informing this determination include whether the plaintiff suffers from an injury that a " 'reasonable doctor or patient would find important and worthy of comment or treatment,' " a condition that " 'significantly affects' " a prisoner's daily activities, or causes " 'chronic and substantial pain.' " *Chance,* 43 F.3d at 701 (citation omitted); *LaFave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at \*2-3 (N.D .N.Y. Apr. 3, 2002) (Sharpe, M.J.).

**\*9** Deliberate indifference, in a constitutional sense, exists if an official knows of and disregards an excessive risk to inmate health or safety; the official must "both be aware of facts from which the inference could be drawn

that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same).

It is well-established that mere disagreement with a prescribed course of treatment, or even a claim that negligence or medical malpractice has occurred, does not provide a basis to find a violation of the Eighth Amendment. *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 201-02; *Chance,* 143 F.3d at 703; *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.), *cert. denied,* 506 U.S. 1040, 113 S.Ct. 828 (1992). The question of what diagnostic techniques and treatments should be administered to an inmate is a "classic example of a matter for medical judgment"; accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle,* 429 U.S. at 107, 97 S.Ct. at 293; *Chance,* 143 F.3d at 703; *Rosales v. Coughlin,* 10 F.Supp.2d 261, 264 (W.D.N.Y.1998).

Plaintiff alleges in his complaint that as a result of the incident, he suffered from "swollen testicles, blood in urine & stool, lower back pain, bruises to [his] wrist & face" which defendant Santini-Correa allegedly refused to note, as well as cuts to his wrists, a shoulder "pop," numbness in his right shoulder, left thumb, and both wrists, as well as a rash on his wrists. [11] Amended Complaint (Dkt. No. 19) ¶¶ 6-8. Noticeably absent from plaintiff's complaint is any indication that these conditions gave rise to extreme pain, degeneration, or death. [12] Even crediting plaintiff's allegations concerning these injuries, it does not appear that plaintiff has set forth a "sufficiently serious" condition to support a claim for either deliberate or medical indifference. *See Peterson v. Miller,* No. 9:04-CV-797, 2007 WL 2071743, at *7 (N.D.N.Y. July 13, 2007) (noting that a "dull pain" in plaintiff's back and persistent rash on plaintiff's foot did not raise a constitutional issue) (Hurd, D.J. and Peebles, M.J) (citing *Hathaway,* 37 F.3d at 66; *Salaam v. Adams,* No. 03-CV-0517, 2006 WL 2827687, at *10 (N.D.N.Y. Sept. 29, 2006)); *see also Ford v. Phillips,* No. 05 Civ. 6646, 2007 WL 946703, at *12 & n. 70 (S.D.N.Y. Mar. 27, 2007) (finding that plaintiff's allegations of bruises, abrasions, and blood in his urine for a few weeks did not constitute a sufficiently serious condition giving rise to a medical indifference claim).

Moreover, even assuming the existence of a serious medical need, the record now before the court is also lacking in any evidence from which a reasonable factfinder could conclude that any of those three defendants implicated in this claim, and in particular Nurse Santini-Correa, was deliberately indifferent to his medical needs. At best, plaintiff appears to assert a claim of negligence or malpractice against Nurse Santini-Correa for failure to treat his injuries; such a claim, however, is not cognizable under the Eighth Amendment. *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 201-02; *Chance,* 143 F.3d at 703; *Ross,* 784 F.Supp. at 44. As for the other defendants, the record is devoid of any evidence to suggest their awareness of, and deliberate indifference to, plaintiff's allegedly serious medical needs.

**\*10** In sum, because plaintiff has established neither the existence of a serious medical need nor defendants' subjective, deliberate indifference to any such need, his medical indifference claim is subject to dismissal as a matter of law.

### D. *False Misbehavior Report*

One of the claims in this action is predicated upon plaintiff's contention that the misbehavior report issued by Corrections Officer Tougas, following the June 24, 2005 incident, was fabricated. In their motion, defendants seek dismissal of this claim as lacking in merit.

As defendants correctly note, the mere allegation that a false misbehavior report has been issued against an inmate, standing alone, does not implicate constitutional considerations. *Boddie v.. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997); *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied,* 485 U .S. 982, 108 S.Ct. 1273 (1988)). Proof that a false misbehavior report has been issued in response to an inmate having engaged in activity protected under the First Amendment, however, may suffice to support a claim of unlawful retaliation. *See Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988).

A thorough canvas of the record in this case, including plaintiff's amended complaint, fails to reveal any evidence tending to suggest that the misbehavior report issued in this case was in retaliation for Tapp having engaged in protected activity. Because plaintiff has not raised any further allegations concerning the allegedly false misbehavior report, any constitutional claims associated with it are subject to dismissal as a matter of law.

E. *Procedural Due Process*

A second major theme of plaintiff's amended complaint surrounds the procedures which followed the issuance of the June 24, 2005 misbehavior report. Plaintiff contends that during the course of the ensuing disciplinary proceedings he was denied procedural due process, and that assigned hearing officer was biased.[13] Those involved in this cause of action include defendants Harvey, the hearing officer; Jones the corrections employee assigned to assist the plaintiff; and Selsky, the Assistant DOCS Commissioner who upheld the hearing determination on appeal. Defendants also seek dismissal of this claim as a matter of law.

To successfully state a claim under 42 U.S.C. § 1983 for the denial of procedural due process arising out of a disciplinary hearing, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient process. *See Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000) (citations omitted); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir.1996). The allegation that as a result of the disciplinary hearing at issue plaintiff was subjected to eighteen months of disciplinary confinement in a facility SHU suffices to establish the deprivation of a liberty interest and trigger the due process protections of the Fourteenth Amendment. *See Palmer v. Richards,* 364 F.3d 60, 64 n. 2 (2d Cir.2004) (citing *Welch v. Bartlett,* 196 F.3d 389, 394 n. 4 (2d Cir.1999)); see also *Alvarez v. Coughlin,* No. 94-CV-985, 2001 WL 118598, at *6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.)).

**\*11** The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well-established; the contours of the requisite protections were discussed in some detail in the Supreme Court's decision in *Wolff v. McDonnell,* 418 U.S. 539, 564-67, 94 S.Ct. 2963, 2978-80 (1974). Under *Wolff,* the constitutionally mandated due process requirements include 1) written notice of the charges; 2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 4) in some circumstances, the right to assistance in

preparing a defense. *Wolff,* 418 U.S. at 564-67, 94 S.Ct. at 2978-80; *see also Eng v. Coughlin,* 858 F.2d 889, 897-98 (2d Cir.1988). In addition, in order to pass muster under the Fourteenth Amendment a hearing officer's disciplinary determination must garner the support of at least "some evidence." *Superintendent v. Hill,* 472 U.S. 445, 105 S.Ct. 2768 (1985).

The record now before the court convincingly establishes that plaintiff received the requisite due process during the course of the disciplinary proceedings against him. The record discloses, and the plaintiff does not dispute, that he received written notice of the charges against him, as well as a written determination from the hearing officer, following the hearing, outlining his findings.

One of the issues raised in support of his due process argument is plaintiff's contention that he was precluded from presenting witnesses on his behalf. Undeniably, under *Wolff* and its progeny an inmate must be afforded the right to call witnesses and present evidence in his or her defense "when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." 418 U.S. at 566, 94 S.Ct. at 2979. Due process requires that the hearing officer explain why any witnesses requested were not allowed to testify. *Ponte,* 471 U.S. at 497, 105 S.Ct. at 2196; *Fox v. Coughlin,* 893 F.2d 475, 478 (2d Cir.1990) (citing *Ponte* ); *Parris v. Coughlin,* No. 90-CV-414, 1993 WL 328199, at *5 (N.D.N.Y. Aug. 24, 1993) (Hurd, M.J) (same). These reasons may be provided at the disciplinary hearing itself, or by presenting testimony in the course of a later constitutional challenge. *Ponte,* 471 U.S. at 497, 105 S.Ct. at 2196; *Parris,* 1993 WL 328199, at *6 (citing *Ponte* ). The burden is not upon the inmate to prove the official's conduct was arbitrary and capricious, but rather upon the official to prove the rationality of his or her position. *Fox,* 893 F.2d at 478 (citing *Ponte* ); *Parris,* 1993 WL 328199, at *6 (citing *Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30-31 (2d Cir.1991)).

In this case the record discloses that the plaintiff was permitted to call all of the witnesses necessary to present a meaningful defense to the charges. At the outset of the hearing plaintiff requested the presence of four inmate witnesses, one of whom refused to testify after which plaintiff advised the hearing officer that he did not wish to pursue securing testimony from him in any event. Jones Decl. (Dkt. No. 50-14) Exh. A; Harvey Decl. (Dkt. No. 50-10) Exh. A at pp. 1-2. The remaining three witnesses

were permitted to testify on behalf of the plaintiff. Harvey Decl. (Dkt. No. 50-10) Exh. A at pp. 17-27. While the plaintiff later announced his intention to call twelve additional witnesses, and the hearing officer permitted him to select four-all of whom, when contacted, indicated their refusal to testify-plaintiff subsequently advised CHO Harvey that he did not find it necessary to call other witnesses all of whom would have repeated versions of events already given by himself and his other witnesses. [14] Harvey Decl. (Dkt. No. 50-10) Exh. C at pp. 41-47.

**\*12** Under these circumstances it appears that CHO Harvey had a rational basis to conclude that calling the additional requested witnesses would have been cumulative and unnecessary. Similarly, it appears that the hearing officer had a reasonable basis to conclude that calling the witnesses who had refused to testify would be futile. *Dumpson v. Rourke,* No. CIVA96CV621, 1997 WL 610652, at *5 (N.D.N.Y. Sept. 26, 1997) (Pooler, D.J.) (citing *Silva v. Casey,* 992 F.2d 20, 21-22 (2d Cir.1993)). "Clearly, if a witness will not testify if called, it cannot be a 'necessity' to call him." *Silva,* 992 F.2d at 22; *see also Wolff,* 418 U.S. at 568-69, 94 S.Ct. at 2981 (recognizing discretion of prison officials to decline to call as witnesses fellow inmates who do not wish to testify). Regarding the two witnesses who refused to testify with an explanation, a hearing officer has no power to force an inmate to testify, and when an inmate refuses, the hearing officer need not call that witness. *Silva,* 992 F.2d at 21-22; *Dumpson,* 1997 WL 610652, at *5 (citing *Greene v. Coughlin,* No. 93 Civ. 2805, 1995 WL 60020, at *14 (S.D.N.Y. Feb. 10, 1995) (hearing officer need not make independent evaluation of the basis for refusal to testify). Finally, with regard to the plaintiff's eight additional witnesses who would have stated "basically ... the same thing," Harvey clearly had a rational basis to refuse to call these witnesses as their testimony would be unnecessarily repetitive. Thus, neither defendant Harvey or Jones took part in any improper denial of plaintiff's right to call witnesses to testify in his behalf.

It appears that the plaintiff finds fault with the aid rendered by the selected hearing assistant, Melanie Jones. The Fourteenth Amendment requires only that prison officials provide an inmate accused of a disciplinary infraction, in some though not necessarily all circumstances, meaningful assistance in preparing a defense. *Eng v. Coughlin* 858 F.2d 889, 897 (2d Cir.1988) (holding that in some circumstances, "[p]rison authorities

have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges"). The assistant acts as a *"surrogate*-to do what the inmate would have done were he able." *Silva,* 992 F.2d at 22 (emphasis in original). An assistant also may not act in bad faith in aiding a prisoner in mounting a defense. *Id.* The law does not require that the assistant assigned be a trained lawyer or that the assistant be held to a standard of competent representation guaranteed to criminal defendants under the Sixth Amendment. *Contrast Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052 (1984) (outlining the contours of the right to effective assistance of counsel guaranteed to criminal defendants). Despite plaintiff's protestations regarding the adequacy of her aid, the record discloses that defendant Jones provided him with capable assistance in preparing for the hearing, and that she met with the plaintiff on three occasions, interviewed the witnesses which he designated, and obtained a significant amount of the materials requested by him. *See generally* Jones Decl. (Dkt. No. 50-14) ¶¶ 3-9. Having carefully reviewed the record, I find no basis to conclude that plaintiff was not afforded the meaningful assistance guaranteed under *Wolff.*

**\*13** Although plaintiff does not place significant emphasis on this element, the due process provision of the Fourteenth Amendment requires that a hearing officer's disciplinary determination be supported by "some evidence." *See Hill,* 472 U.S. at 447, 105 S.Ct. at 2770; *Morales v. Woods,* No. 9:06-CV-15, 2008 WL 686801, at *6 (N.D.N.Y. Mar. 10, 2008) (McAvoy, S.J.) (citations omitted). Based upon a careful review of the record developed during the course of plaintiff's disciplinary proceeding, I conclude that no reasonable factfinder could determine that the hearing officer's decision in this case was not supported by the requisite modicum of evidence.

A focal point of plaintiff's due process argument relates to alleged bias on the part of the hearing officer. The fact that the hearing officer appointed to address the charges against Tapp was a DOCS employee, as is normally the case, does not disqualify him from serving as a hearing officer or in and of itself provide reason to question his objectivity. Prison disciplinary hearing officers are not held to the same standard of neutrality as are adjudicators in other types of controversies. *See Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996). Such a hearing officer must

only to be sufficiently impartial so as to avoid "a hazard of arbitrary decision making," *Wolff,* 418 U.S. at 571, 94 S.Ct. at 2982, and is deserving of a presumption of honestly and integrity. *Winfrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464 (1985); *Rivera v. Senkowski,* 62 F.3d 80, 86 (2d Cir.1995). Based upon thorough review of the record associated with the disciplinary proceeding, I am unable to discern any basis from which a reasonable factfinder could conclude that CHO Harvey was biased or partial. Simply stated, plaintiff's bald allegation of bias, representing little more than sheer speculation on his part, is insufficient to overcome the presumption of impartiality. *See Lebron v. Artus,* No. 06-CV-0532, 2008 WL 111194, at *15 (W.D.N.Y. Jan. 09, 2008).

In sum, because the record firmly discloses that plaintiff was afforded all of the process to which he was entitled prior to the imposition of disciplinary SHU confinement, I recommend dismissal of plaintiff's due process claim against defendants Harvey, Jones and Selsky. [15]

F. *Equal Protection*
In his amended complaint, plaintiff incants that he was denied equal protection by the defendants. Neither plaintiff's amended complaint nor his motion papers, however, articulates the basis for that claim.

The Equal Protection Clause directs state actors to treat similarly situated people alike. *See City of Cleburne, Texas v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254 (1985). To prove a violation of the Equal Protection Clause, a plaintiff must demonstrate that he or she was treated differently than others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class. *See Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) (citing, *inter alia, McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 1767 (1987)). The plaintiff must also show that the disparity in treatment "cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not reasonably related to [any] legitimate penological interests." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) (quoting *Shaw v. Murphy,* 532 U.S. 223, 225, 121 S.Ct. 1475 (2001) (internal quotation marks omitted)).

**\*14** Because plaintiff has offered no proof that he was the subject of an improper classification, nor has

he adduced any evidence of either invidious motivation for defendants' actions or discriminatory motivation, I recommend summary dismissal of plaintiff's equal protection claim.

G. *Conspiracy*
Also embedded within plaintiff's complaint, when liberally construed, is a claim that the defendants conspired to deprive him of his civil rights.

In a doctrine rooted in the conspiracy provision of section one of the Sherman Antitrust Act, 15 U.S.C. § 1, and which, although developed in the context of business entities, since inception has been expanded to apply to business corporations and public entities as well, the intra-corporate conspiracy doctrine provides that with exceptions not now presented, an entity cannot conspire with one or more of its employees, acting within the scope of employment, and thus a conspiracy claim conceptually will not lie in such circumstances. *See, e.g., Everson v. New York City Transit Auth.,* 216 F.Supp.2d 71, 75-76 (E.D.N.Y.2002); *Griffin-Nolan v. Providence Washington Ins. Co.,* No. 5:05CV1453, 2005 WL 1460424, at *10-11 (N.D.N.Y. June 20, 2005) (Scullin, C.J.). In this instance plaintiff alleges that the various defendants named conspired to deprive him of his civil rights. Since those conspiracy claims are asserted against officers, agents or employees of the DOCS, each acting within the scope of his or her employment, they are precluded by virtue of the intracorporate conspiracy doctrine. *See Little v. City of New York,* 487 F.Supp.2d 426, 441-42 (S.D.N.Y.2007) (citations omitted); *Lewis v. Goord,* No. 9:06-CV-504, 2008 WL 902179, at *4 (N.D.N.Y. Mar. 31, 2008) (Scullin, S.J.).

IV. *SUMMARY AND RECOMMENDATION*
The plaintiff in this action has advanced an array of constitutional claims arising out of an incident occurring on June 24, 2005, alleging the use of excessive force by prison officials, the failure to adequately address the injuries resulting from the incident, and due process deprivations associated with the disciplinary proceedings which ensued. Having carefully reviewed plaintiff's amended complaint, I conclude that no reasonable factfinder could credit plaintiff's version of the incident, and determine that defendants did not violate his rights by exerting unnecessary force against him, in violation of the Eighth Amendment. Similarly, I find that plaintiff

has not alleged or proven the existence of a serious medical need associated with injuries stemming from the incident, nor has he offered evidence tending to establish the defendants' subjective indifference to his medical needs, and therefore cannot support a medical indifference claim under the Eighth Amendment. Lastly, I find that while plaintiff was deprived of a liberty interest by virtue of the disciplinary proceedings against him, he received the requisite procedural due process guaranteed under the Fourteenth Amendment during the course of that deprivation. Accordingly, finding no other cognizable constitutional claim asserted in his amended complaint and supported by evidence in the record now before the court, I conclude that no reasonable factfinder could find liability on the part of one or more of the named defendants on any of plaintiff's claims, and therefore recommend dismissal of his complaint in its entirety as a matter of law. [16] Accordingly, it is hereby

**\*15** RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 50) be GRANTED, and plaintiff's complaint in this action be DISMISSED its entirety; and is further

RECOMMENDED that in light of this determination, plaintiff's motion for summary judgment (Dkt. No. 56) be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

### All Citations

Not Reported in F.Supp.2d, 2008 WL 4371766

### Footnotes

1   In light of the procedural posture of the case, the following recitation is drawn from the record now before the court, with all inferences drawn, and ambiguities resolved, in favor of the plaintiff. *See Wells-Williams v. Kingsboro Psychiatric Ctr.,* No. 03-CV-134, 2007 WL 1011545, at \*2 (E.D.N.Y. Mar. 30, 2007) (citations omitted). To the extent that the parties' versions of the relevant events differ, those discrepancies will be noted.

2   Plaintiff maintains that this misbehavior report was falsely written by defendant Tougas and deliberately fashioned to make it appear as if the plaintiff caused the incident by punching Tougas and resisting restraint. *See* Amended Complaint (Dkt. No. 19), at ¶ 4.

3   The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the Special Housing Unit (SHU). Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998).

4   Despite plaintiff's apparent belief otherwise, a Tier III superintendent's hearing officer is not empowered to make a final determination regarding forfeiture of good time credits; such determinations are left to the appropriate facility time allowance committee ("TAC"). *See Dawes v. Kelly,* No. 01CV6276, 2005 WL 2245688, at \*3, 8 (W.D.N.Y. Sep. 14, 2005). Inmate claims regarding improperly withheld good time credits are not appropriately brought under 42 U.S.C. § 1983, the court having no power in such a case to direct that an inmate be released from custody, but instead must be pursued by means of habeas petitions brought pursuant to 28 U.S.C. §§ 2241 and/or 2254. *See generally Peralta v. Vasquez,* 467 F.3d 98, 104-05 (2d Cir.2006); *see also Jenkins v. Duncan,* No. 9:02-CV-0673, 2003 WL 22139796, at \*2-3 (N.D.N.Y. Sep. 16, 2003) (Sharpe, D.J.).

5   From a review of the court's records it appears that the amendment was prompted by a court order dated March 28, 2006 directing the filing of an amended complaint naming Corrections Officer Wilson as an additional defendant before that officer could be served as a defendant. Dkt. No. 10.

6   The introductory portion of plaintiff's complaint makes reference to supplemental jurisdiction over state law tort claims pursuant to 28 U.S.C. § 1367. *See* Amended Complaint (Dkt. No. 19) ¶ 2. The body of plaintiff's complaint, however, does

not assert any such claims, which in any event could well be precluded under N.Y. Corrections Law § 24. *See Ierardi v. Sisco,* 119 F.3d 183, 186-88 (2d Cir.1997).

7     In his motion for summary judgment plaintiff addresses additional claims not included in his complaint, including discrimination, violation of his right to free speech, and lost property. *See generally* Plaintiff's Motion (Dkt. No. 56). Because those matters are raised for the first time on motion for summary judgment, and they are not included within his amended complaint, the court will not address these additional claims. *See, e.g., Caidor v. Potter,* No. 5:02-CV-1486, 2007 WL 2847229, at *8 (N.D.N.Y. Sep. 26, 2007) (Mordue, C.J.) (refusing to hear a claim raised for the first time in a summary judgment motion).

8     Although the plaintiff devotes a portion of his motion submission to discussion of his efforts to exhaust administrative remedies, because the defendants have not raised failure to exhaust as an affirmative defense there is no need to address the issue in this report and recommendation. *See* Plaintiff's Brief (Dkt. No. 56) at Argument, Point 2; *see also* Schwartz Decl. (Dkt. No. 61) at ¶¶ 3-4.

9     While the plaintiff apparently believed that Corrections Officer Tougas' directive that he return to the end of the line was somehow unreasonable, that belief did not legitimize Tapp's acknowledged failure to comply with that directive. *See Kalwasinski v. Artuz,* No. 02 CV 2582, 2003 WL 22973420, at *3 (S.D .N.Y.2003). As one court has noted,

> Under New York law, "inmates are not free to choose which orders to obey and which to ignore. *Farid v. Coombe,* 236 A.D.2d 660, 653 N.Y.S.2d 715, 716 (App.Div.1997). This is true even where the inmate feels that the order infringes upon his or her rights. "Inmates may not refuse to obey orders issued by correction officers, even if the orders appear to be without authority or to infringe upon the inmate's constitutional rights." *Keith v. Coombe,* 235 A.D.2d 879, 880, 653 N.Y.S.2d 401 (N.Y.App.Div.1997). The penological rationale for this is clear. "The threat to prison security would be manifest were we to allow inmates to decide for themselves which orders to obey and which to ignore as violative of their rights and to act accordingly." *Rivera v. Smith,* 63 N.Y.2d 501, 516, 483 N.Y.S.2d 187, 472 N.E.2d 1015 (1984).
>
> *Kalwasinski v. Artuz,* 2003 WL 22973420, at *3.

10    The incident at Great Meadow was not the first involving an altercation between the plaintiff and corrections officers. In 1996, while at the Attica Correctional Facility, plaintiff was found guilty of charges related to an alleged assault upon one or more corrections officers and was sentenced to serve three years of disciplinary confinement in the Attica SHU. *See* Tapp Dep. (Dkt. No. 50-6) at 53:3-55:22. Similarly, in 2000, while incarcerated at the Wende Correctional Facility, plaintiff became involved in a confrontation with a corrections officer, again receiving a penalty which included disciplinary confinement of between eighteen months and two years following a hearing to address the matter. *Id.* at 55:24-58:13.

11    In his summary judgment motion plaintiff also raises, for the first time, a claim that he was denied an asthma inhaler. *See* Plaintiff's Statement of Undisputed Facts (Dkt. No. 56) at § 5. Because the first mention of any issue pertaining to plaintiff's asthma medication has occurred at this late stage in the case, I recommend against expansion of his indifference cause of action to encompass this claim. *See, e.g., Caidor,* 2007 WL 2847229, at *8.

12    In his motion for summary judgment plaintiff now asserts that his back condition has been "diagnosed as chronic serious pain," and speculates as to his physical ability to have children in the future. *See* Plaintiff's Motion (Dkt. No. 56), at p. 6; Plaintiff's Statement of Undisputed Facts (Dkt. No. 56), at § 9. It is also noted that while plaintiff's ambulatory record entry for "6/24/05" reveals "[n]o injuries noted or voiced" by the plaintiff, an entry made a day later reveals that Nurse Santini-Correa observed "dry abrasion[s]" on plaintiff's wrist and upper extremities, along with numbness of his left thumb and two big toes, all of which appear to be injuries that plaintiff "want[ed] ... noted in [his] chart." *See* Plaintiff's Ambulatory Record (Dkt. No. 56-4), Exhs. 21-22. These matters are far too speculative and attenuated from the incident in question to constitute serious medical needs arising from the June 24, 2005 incident.

13    Plaintiff also argues that the hearing did not comply with governing State requirements, in that it was not commenced within seven days of the filing of charges and did not end within the required fourteen days, and additionally because extensions were not properly sought and validly granted. Amended Complaint (Dkt. No. 19) ¶ 10. This portion of plaintiff's due process claim implicates only state procedural requirements which if violated nonetheless would not support a federal constitutional claim under section 1983. *See, e.g., Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.1987). To the extent that federal due process considerations are called into play, it appears that plaintiff's disciplinary hearing did occur within the "reasonable time" required by federal law. *See Green v. Bauvi,* 46 F.3d 189, 195 (2d Cir.1995); *see also* Harvey Declaration (Dkt No. 50-10) at §§ 7-9 (explaining that the hearing could not start until one day after the applicable state requirement of seven days due to a high volume of cases and that a six-day extension was granted due to the unavailability of defendant Tougas and certain of plaintiff's witnesses to testify).

14   In addition to the inmate witnesses CHO Harvey also permitted plaintiff to call to elicit further testimony from Corrections Officers Walcak and Tougas. Harvey Decl. (Dkt. No. 50-10) Exh. C. at pp. 41-47.

15   In light of this determination, I find it unnecessary to address defendants' alternative argument, to the effect that plaintiff's section 1983 surrounding the disciplinary proceeding are precluded under *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364 (1994) and *Edwards v. Balisok,* 520 U.S. 641, 117 S.Ct. 1584 (1997). As was previous noted, however, plaintiff may not necessarily be precluded from pursuing section 1983 claims surrounding his disciplinary proceeding under *Edwards* and *Heck,* despite not having first secured reversal of that determination, provided that he agrees to forego any potential habeas corpus claim challenging the loss of good time credits which resulted from the recommendation made following that hearing. *See Peralta,* 467 F.3d at 104-05.

16   In light of this determination, I find it unnecessary to address the additional issue of qualified immunity, also raised by the defendants in support of their motion. *See Saucier v. Katz,* 533 U.S. 194, 201-02, 121 S.Ct. 2151 (2001).

---

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 4371762
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Sean TAPP, Plaintiff,
v.
R. TOUGAS, C.O.; C.O. Wilson; M.E. B.
Santini-Correan; C.O. J. Rando; Sgt. Michael;
C.O. Sharrow; Mr. Harvey, Hearing Officer;
Donald Selsky; and Ms. Jones, Defendants.

No. 9:05-CV-1479.
|
Sept. 18, 2008.

**Attorneys and Law Firms**

Sean Tapp, pro se.

Hon. Andrew M. Cuomo, Attorney General of the
State of New York, Steven H. Schwartz, Esq., Assistant
Attorney General, Albany, NY, for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Hon. NORMAN A. MORDUE, Chief Judge.

 **\*1** Plaintiff, formerly an inmate in the custody of New
York State Department of Corrections, brings this civil
rights action pursuant to 42 U.S.C. § 1983, claiming in
his amended complaint (Dkt. No. 19) that he was assaulted
by corrections officers, denied adequate medical care for
injuries sustained during the course of the altercation,
and subjected to a lengthy period of disciplinary special
housing unit ("SHU") confinement as a result of the
incident without having been afforded procedural due
process.

Defendants move (Dkt. No. 50) for summary judgment.
Plaintiff cross-moves (Dkt. No. 56) for summary
judgment. The motions were referred to United States
Magistrate Judge David E. Peebles pursuant to 28
U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c). Magistrate
Judge Peebles has issued a thorough Report and
Recommendation recommending that this Court grant
defendants' motion, deny plaintiff's motion, and dismiss
the action.

Plaintiff interposes specific objections to numerous
aspects of Magistrate Judge Peebles' Report and
Recommendation. Pursuant to 28 U.S.C. § 636(b)(1)(C),
this Court reviews de novo those parts of a report and
recommendation to which a party specifically objects.
Where only general objections are filed, the Court reviews
for clear error. See Brown v. Peters, 1997 WL 599355,\*2-
\* 3 (N.D.N.Y.), af'd without op., 175 F.3d 1007 (2d
Cir.1999). Failure to object to any portion of a report
and recommendation waives further judicial review of the
matters therein. See Roldan v. Racette, 984 F.2d 85, 89 (2d
Cir.1993).

The Court adopts all factual and legal recitations in the
Report and Recommendation. The Court has conducted
de novo review of all issues to which plaintiff interposes
objections, and adopts Magistrate Judge Peebles' analysis
and recommendation with respect to all issues except
the recommendation that summary judgment be granted
dismissing the excessive force claim against defendants
Tougas, Wilson, Rando, Michael, and Sharrow.

The Court adopts Magistrate Judge Peebles' recitation of
the law and facts with respect to the excessive force claim.
The Court agrees with his observation that the question of
whether to grant summary judgment to defendants on this
issue is a close one; however, in the Court's view, plaintiff's
testimony at his deposition and the disciplinary hearing,
and the supporting testimony of his inmate witnesses at
the disciplinary hearing, are sufficient to raise questions of
fact on this claim. [1]

The Court also rules that the application of the doctrine
of qualified immunity does not warrant dismissal of the
excessive force claims against defendants Tougas, Wilson,
Rando, Michael, and Sharrow. Accepting plaintiff's
allegations as true for purposes of this motion, these
defendants could not reasonably have believed their
actions were consistent with plaintiff's Eighth Amendment
rights. See Anderson v. Creighton, 483 U.S. 635, 639-40
(1987).

It is therefore

 **\*2** ORDERED that defendants' motion (Dkt. No. 50)
for summary judgment is denied with respect to plaintiff's
excessive force claim against defendants Tougas, Wilson,

Rando, Michael, and Sharrow, and otherwise granted; and it is further

ORDERED that plaintiff's cross motion (Dkt. No. 56) for summary judgment is denied in its entirety; and it is further

ORDERED that the case will proceed to trial solely on the issue of excessive force; and it is further

ORDERED that the Report and Recommendation is rejected insofar as it recommends summary judgment dismissing plaintiff's claim of excessive force, and is otherwise accepted and adopted in all respects.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 4371762

Footnotes

1       Given his recommendation of dismissal, Magistrate Judge Peebles did not address whether plaintiff's excessive force claim might be barred under the rule in *Edwards v. Balisok* that a prisoner's section 1983 claim is not cognizable where, if successful, it would necessarily implicate the invalidity of a disciplinary determination affecting the length of his confinement. 520 U.S. 641, 645-48 (1997). It is not clear on this record that the *Edwards* rule would preclude plaintiff in the instant case from proceeding on his section 1983 excessive force claim, because it is not clear that a jury determination that defendants used excessive force in subduing plaintiff would necessarily implicate the invalidity of the disciplinary determination that he was guilty of violent conduct, creating a disturbance, an assault on staff, refusing a direct order, and refusing a search and frisk. *See, e.g., Sales v. Barizone,* 2004 WL 2781752, *13-14 (S.D.N.Y. Dec. 2, 2004). Further, plaintiff's excessive force claim is based in part on events occurring after the events that were the subject of the disciplinary charge. Specifically, plaintiff and other inmates allege that the corrections officers continued to beat plaintiff after they had subdued him, even after they had placed him in handcuffs and leg irons. A finding in plaintiff's favor on these allegations would not affect the validity of the disciplinary determination. Moreover, the record does not clearly establish plaintiff's present custodial status on his New York sentence; if he has served his full sentence, *habeas corpus* is no longer an available remedy, and the *Edwards* rule would not bar the section 1983 claim. *See Huang v. Johnson,* 251 F.3d 65, 74-75 (2d Cir.2001). Accordingly, the *Edwards* rule does not warrant summary judgment in defendants' favor.

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 4806457
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Ronnie THAXTON, Plaintiff,

v.

A. SIMMONS, Corrections Officer, Upstate
Correctional Facility, Bush, Corrections Officer,
Upstate Correctional Facility, K. Garneau, Nurse,
Upstate Correctional Facility, John Doe, Corrections
Officer, Upstate Correctional Facility, Defendants.

No. 9:10–CV–1318 (MAD/RFT).
|
Sept. 9, 2013.

**Attorneys and Law Firms**

Ronnie Thaxton, Ossining, NY, pro se.

Office of the New York State Attorney General,
Christopher W. Hall, AAG, of Counsel, Albany, NY, for
Defendants.

Hon. Eric T. Schneiderman, Attorney General of
the State of New York, Christopher W. Hall, Esq.,
Assistant Attorney General, of Counsel, Albany, NY, for
Defendants.

**MEMORANDUM–DECISION AND ORDER**

MAE A. D'AGOSTINO, District Judge.

**I. INTRODUCTION**

**\*1** *Pro se* plaintiff, Ronnie Thaxton, brought this civil
rights action pursuant to 42 U.S.C. § 1983 alleging (1)
Defendant Simmons retaliated against Plaintiff because
of past grievances he filed, (2) Defendants Bush and Doe
deprived Plaintiff of nutritional meals, and (3) Defendant
Garneau violated Plaintiff's First and Eighth Amendment
rights by his deliberate indifference to Plaintiff's serious
medical needs. *See* Dkt. No. 60 at 1. Defendants have
moved for summary judgment on the grounds that (1)
Plaintiff failed to exhaust the available administrative
remedies regarding his claims against Defendants Bush
and Garneau, (2) Defendants Bush and Simmons were

not personally involved in the claimed constitutional
violations, and (3) Plaintiff did not suffer a serious
injury to support his medical deliberate indifference claim
against Defendant Garneau. *See* Dkt. No. 50–5. In a May
23, 2013 Report–Recommendation and Order, Magistrate
Judge Treece recommended that Defendants' motion for
summary judgement be granted.

Currently before the Court are Plaintiff's objections to
Magistrate Judge Treece's Report–Recommendation and
Order.

**II. BACKGROUND**

Plaintiff's claims arose from events between January 12,
2009, and April 28, 2009, while he was in the custody
of the New York State Department of Corrections and
Community Supervision ("DOCCS") as an inmate in the
Upstate Correctional Facility ("Upstate C.F."). *See* Dkt.
No. 50–1 at ¶ 1.

On January 12, 2009, Plaintiff filed a grievance,
which the parties have agreed implicated Defendant
Simmons, complaining about receiving his meals later
than other prisoners. *See id.* at ¶¶ 2–3. On April 6,
Defendant Simmons delivered Plaintiff's evening meal
which contained several strands of hair. *See id.* Plaintiff
complained to Defendant Simmons about the hair and
he promptly gave Plaintiff another tray of food. *See* Dkt.
No. 50–3 at 25.[1] Plaintiff did not see anyone place the
hair in his meal, did not see Defendant Simmons remove
the plastic wrap from the meal, and Defendant Simmons
stated that he had not "played" with Plaintiff's food. *See
id.* at 26, 28. Plaintiff contends that Defendant Simmons
placed the hair in the food as a means of retaliating against
him for the January 12 grievance. *See id.* at 31.

On April 28, 2009, Defendants Bush and Doe served
Plaintiff his evening meal containing a piece of metal in
his sardines. *See* Dkt. No. 50–1 at ¶¶ 16–17, 25. Defendant
Doe did not touch the food and only delivered Plaintiff
his Kool–Aid and hot water. *See* Dkt. No. 50–3 at 39.
Plaintiff did not see Defendant Bush tamper with the food
and discovered the piece of metal when he bit into his
sardine sandwich. *See id.* at 38. Plaintiff "noticed drops of
blood in the food" after the piece of metal cut his mouth,
at which point he called for medical attention. *See id.* at 45.

Defendant Nurse Garneau and Sergeant Lombard came to Plaintiff's cell within twenty minutes of his request for medical attention. *See id.* at 34. Defendant Garneau did not inspect Plaintiff's mouth, but stated that there was not much damage and that Plaintiff should not "be a cry baby." *See id.* at 34. Plaintiff's bleeding completely stopped within an hour and was not "actually a cut anymore" within three or four days. *See id.* at 50. Plaintiff experienced slight difficulty eating and sleeping directly after the incident, but was able to get the "right amount" of food and sleep. *See id.* at 54, 56. Plaintiff requested sick call at the Attica Correctional Facility ("Attica C.F.") about a week after the incident. *See id.* at 54. There, he saw another nurse and a dentist and neither reported any lasting injuries or effects from the incident. *See id.*

**\*2** In a May 23, 2013 Report–Recommendation and Order, Magistrate Judge Treece recommended that the Court grant Defendants' motion for summary judgment and close this case. *See* Dkt. No. 60. In his objections to the Report–Recommendation and Order, Plaintiff generally just reiterates arguments he made in opposing the motion for summary judgment. *See* Dkt. No. 61. Specifically, Plaintiff presents the following arguments: (1) the metal placed in his sardine sandwich deprived him of the "minimal civilized measures of life's necessities which was nutritionally adequate food that is 'prepared' and 'served' under conditions which do not present imminent danger to health and well being of inmates who consume it;" (2) Defendant Garneau violated his Eighth Amendment rights when she refused to examine or treat his injuries; and (3) that the injury to his mouth lasted approximately thirty days and he was prescribed Tylenol for the injury, which shows that it was more than a *de minimis* injury. *See* Dkt. No. 61 at 2–4.

## III. DISCUSSION

### A. Standard of review

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error.

O'Diah v. Mawhir, No. 9:08–CV–322, 2011 WL 933846, \*1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendation made by the magistrate judge." 28 U.S.C. § 636(b)(1).

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36–37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)(e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers,* 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2502, 2513–14, 91 L.Ed.2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.,* 322 F.3d 139, 143 n. 5 (2d Cir.2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

**\*3** "[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal

education. *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (qquoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)). "However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment. *See id.* at 295 (citing *Showers v. Eastmond,* 00 CIV. 3725, 2001 WL 527484, * 1 (S.D.N.Y. May 16, 2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence" is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Cary v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

**B. Exhaustion**

The Prison Litigation Reform Act ("PLRA") states that "no action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U .S.C. § 1997e(a). This exhaustion requirement applies to all suits brought by inmates regarding aspects of prison life. *See Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

New York State has a three-step administrative review process. First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC") which reviews and investigates the formal complaint before issuing a written determination. *See* N.Y. COMP.CODES R. & REGS. tit. 7, § 701.5(b). Second, if the IGRC decision is appealed, the superintendent of the facility issues a decision after reviewing the IGRC's determination. *See id.* at § 701.5(c). Third, if the superintendent's decision is appealed, the final administrative decision is made by the Central Office Review Committee ("CORC"). *See id.* at § 701.5(d). If all three of these levels of review are exhausted, then the prisoner may seek relief in federal court pursuant to § 1983. *See Bridgeforth v. Bartlett,* 686 F.Supp.2d 238, 239 (W.D.N.Y.2010) (citing *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)).

In determining whether a prisoner has failed to exhaust all available administrative remedies, the Second Circuit has instructed the district courts to consider:

> "(1) whether administrative remedies were actually available, (2) whether the defendants

forfeited their right to raise the affirmative defense or by their own actions precluded the plaintiff from using administrative grievance procedures, and (3) whether special circumstances have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements."

**\*4** *Singh v. Goord,* 520 F.Supp.2d 487, 495–96 (S.D.N.Y.2007) (quoting *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).

In the current case, Defendants claim that Plaintiff failed to exhaust all available administrative remedies in his claims against Defendants Bush and Garneau for meal tampering and deliberate indifference because he did not file a timely grievance with the IGRC. *See* Dkt. No. 50–5 at 10. Plaintiff contends that he filed a timely grievance and that special circumstances prevented him from complying with the administrative procedural requirements. *See* Dkt. No. 54 at 11–13.

Plaintiff claims that on April 29, 2009, he filed a grievance for both incidents and sent the superintendent a letter describing the events. Plaintiff has provided a copy of both the grievance and the letter to support his claim. *See* Dkt. No. 55 at 4–5, 8–9. On June 1, 2009, Plaintiff followed up his grievance by requesting an update on its status and received notice on June 8 stating "there is no grievance on file" concerning his complaints allegedly filed on April 29, and that "[Plaintiff's] complaint is being returned to [him] to file at [his] present facility." *See id.* at 7. On June 16, 2009, Plaintiff filed another grievance with the IGRC at Lakeview Correctional Facility about the April 28 incidents which was denied because of untimely service. *See id.* at 8, 10. Plaintiff then appealed this decision to the superintendent, who affirmed the IGRC decision. *See id.* at 10. On June 22, Plaintiff made a final appeal to the CORC who affirmed the superintendent's decision. *See id.* at 13.

While an untimely grievance does not properly exhaust available administrative remedies under the PLRA, a question of fact exists as to whether Plaintiff never filed his initial grievance on April 29, as Defendants claim, or that, as Plaintiff claims, he filed a timely grievance that was lost or tampered with by Defendants. Such

credibility assessments are to be resolved by a trier of fact. Accordingly, the Court finds that a material issue of fact exists as to whether Plaintiff's failure to exhaust administrative remedies should be excused due to special circumstances. Therefore, Defendants' motion for summary judgment is **DENIED** on exhaustion grounds.

## C. Personal Involvement

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Further, in regards to § 1983, "the doctrine of *respondeat superior* cannot be applied ... to satisfy the prerequisite of personal involvement." *Kinch v. Artuz,* No. 97 CIV. 2419, 1997 WL 576038, *2 (S.D.N.Y. Sept.15, 1997).* Therefore, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal,* 556, U.S. 662, 676 (2009).

### 1. Defendant Simmons

**\*5** Plaintiff contends that, on April 6, Defendant Simmons delivered him a tray of food covered with hair in retaliation for a grievance Plaintiff had previously filed. Plaintiff did not see Defendant Simmons place hair on the food or see him remove the plastic wrap from the food. *See* Dkt. No. 50–3 at 26. According to Plaintiff, Defendant Simmons stated that he did not play with Plaintiff's food, and if he did, "[Plaintiff] would know it." *See id.* Plaintiff further testified that "the only reason why I held [Simmons] responsible is because he's the one that's giving me the tray." *See id.* at 28.

Based upon the evidence presented, no rational juror could conclude that Defendant Simmons was personally involved in tampering with Plaintiff's food on April 6 merely because he served the food that day. Therefore, Defendants' motion for summary judgment on this matter is **GRANTED,** and Plaintiff's claim against Defendant Simmons is **DISMISSED.**

### 2. Defendant Bush

Similar to the claims against Defendant Simmons, Plaintiff claims Defendant Bush contaminated his food by placing a piece of metal in the meal served on April 28. *See id.* at 38. Plaintiff testified that Defendant Bush

delivered his meal on this date, but Plaintiff did not see Defendant Bush tamper with the food. *See id* . Plaintiff assumed Defendant Bush was responsible for the metal because of "the relationship of ... the officers and when I told him that I had the metal in there, the smirk, the look that he had, that's what made me think he purposely put it in there, because he was smirking like it was a joke or something." *See id.*

Based upon the evidence presented, no rational juror could conclude that Defendant Bush was personally involved in contaminating Plaintiff's food simply because he delivered the meal and then "smirked" after Plaintiff complained of the metal. Therefore, Defendants' motion for summary judgment on this claim is **GRANTED,** and Plaintiff's claim against Defendant Bush is **DISMISSED.**

## D. Deliberate Indifference

In order for a plaintiff to effectively state an Eighth Amendment claim for denial of adequate medical care, he must demonstrate that the prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). This does not mean that every prisoner that has not received adequate medical attention has an Eighth Amendment claim, but rather the alleged conduct must be "repugnant to the conscience of mankind" and constitute "an unnecessary and wanton infliction of pain." *Id.* at 105–06.

The deliberate indifference standard for denial of medical care requires demonstration of (1) a sufficiently serious depravation, and (2) deliberate indifference with a "sufficiently culpable state of mind." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citation omitted). The first element is an objective standard to assess the seriousness of a prisoner's medical condition. *See Brock v. Wright,* 315 F.3d 158, 162 (2d Cir.2003) (citation omitted). This standard includes consideration of "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.' " *Id.* (quoting *McGuckin v. Smith,* 974 F.2d 1050, 1059–60 (9th Cir.1992)) (other citation omitted). The Second Circuit has recognized that dental injuries may require unique attention due to the likelihood of continuing pain and discomfort, however, "not all claims regarding improper dental care

will be constitutionally cognizable." *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998). While the decision of whether or not to treat a prisoner's injury may rely on an assessment of its seriousness at the moment it occurs, "in most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Smith v. Carpenter,* 316 F.3d 178, 187 (2d Cir.2003).

**\*6** The second element of the deliberate indifference standard is a subjective test requiring the plaintiff to show that the defendant acted with the requisite culpable state of mind. This state of mind is similar to criminal recklessness and requires "something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

In this case, it is uncontroverted that Defendant Garneau responded to Plaintiff's cell after he cut his mouth biting into a piece of metal on April 28, 2009. It is also uncontroverted that Defendant Garneau did not inspect Plaintiff's mouth and told him not to "be a cry baby." *See* Dkt. No. 50–3 at 34. Plaintiff testified that he experienced "pain in [his] teeth" and that, while he "was not leaking blood, [he] was cut, you know in the mouth." *See id.* at 49. The bleeding in Plaintiff's mouth completely stopped within one hour and the cut healed without medical attention within three or four days. *See id.* at 50. Plaintiff experienced some mild difficulty eating and sleeping directly after the incident but was still able to get the "right amount" of food and sleep. *See id.* at 54, 56. About a week after the incident, when Plaintiff requested sick call, his injury was "no longer a cut" and a subsequent examination by a dentist revealed no dental injuries. *See id.* at 54.

While Plaintiff claims that his injury was sufficiently serious to require medical care, "[t]he mere fact that plaintiff disagrees with defendants about the nature of his condition does not give rise to a genuine issue of material fact." *Tindal v. Goord,* 530 F.Supp.2d 465, 467 (W.D.N.Y.2008) (citing *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998)). Based on the evidence presented, no reasonable juror could conclude that Plaintiff's injury, which stopped bleeding within an hour and completely healed on its own accord within three or four days,

was objectively a sufficiently serious injury. Since the Court finds that Plaintiff did not suffer a sufficiently serious medical injury, the Court need not determine if Defendant Garneau's actions of ignoring medical complaints and calling Plaintiff a "cry baby" rise to the requisite culpable state of mind of deliberate indifference. Therefore, Defendants' motion for summary judgment on this claim is **GRANTED** and the claims against Defendant Garneau are **DISMISSED.**

### E. Defendant Doe

In Plaintiff's October 31, 2010 complaint, he named a John Doe Defendant. While the Court has reminded Plaintiff several times that he must ascertain the true identity of, and serve the Doe Defendant, Plaintiff has failed to do so. Rule 4 of the Federal Rules of Civil Procedure states that the plaintiff is responsible for service of the summons and complaint on each defendant within 120 days of filing the complaint. *See* FED. R. CIV. P. 4(c)(1), (m). The Northern District of New York requires that the plaintiff must effectuate service within sixty days. The Court may, upon motion or its own initiative, dismiss a case without prejudice as to any defendant that has not been properly served. *See id.* at 4(m). Since Plaintiff has failed to timely identify and serve the John Doe Defendant and no valid cause of action has been asserted, all claims against Defendant John Doe are **DISMISSED.**

### IV. CONCLUSION

**\*7** After carefully considering Magistrate Judge Treece's Report–Recommendation, Plaintiff's objections thereto, and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Treece's May 23, 2013 Report–Recommendation and Order is **ADOPTED** in its entirety for the reasons stated therein; and the Court further

**ORDERS** that Defendants' motion for summary judgment is **GRANTED** in its entirety; and the Court further

**ORDERS** that the Defendant John Doe is **DISMISSED** due to Plaintiff's failure to timely identify and serve him; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum–Decision and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED.**

*REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Ronnie Thaxton brings this civil rights action, pursuant to 42 U.S.C. § 1983, alleging that (1) Defendant Simmons retaliated against him for grievances Plaintiff filed against him, (2) Defendants Bush and Doe deprived him of nutritional meals, and (3) Defendant Garneau was deliberately indifferent to his serious medical needs, in violation of his First and Eighth Amendment rights. *See* Dkt. No. 1, Compl. [1] Defendants have moved for Summary Judgment on the grounds that (1) Plaintiff failed to exhaust his administrative remedies regarding his claims against Defendants Bush and Garneau, (2) Defendants Simmons and Bush were not personally involved in any constitutional violations, and (3) Plaintiff did not suffer a sufficiently serious injury to support his medical deliberate indifference claim against Defendant Garneau. *See generally* Dkt. No. 50–5, Defs.' Mem. of Law. We recommend that Defendants' Motion be **GRANTED.**

**I. STANDARD OF REVIEW**

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "When a

party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

**\*8** To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

## II. DISCUSSION

### A. Summary of Facts

The following facts are uncontroverted.

Plaintiff's claims arise out of events which occurred while he was an inmate at Upstate Correctional Facility ("UCF"), in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). Dkt. No. 50–1, Defs.' Statement of Material Facts Pursuant to Local Rule 7.1(A)(3) (hereinafter "Defs.' 7.1 Statement"), at ¶ 1; *see generally* Compl.

On January 12, 2009, Plaintiff filed a grievance, complaining that he was getting his meals later than other prisoners; although not mentioned by name, it is agreed by the parties that this grievance implicated Defendant Simmons. Defs.' 7.1 Statement at ¶¶ 2 & 3. On April 6, Plaintiff found several strands of hair in the evening meal that Defendant Simmons had delivered to him. He talked to Defendant Simmons about the hair and Defendant Simmons stated that he had not "played" with Plaintiff's food, and if he had that Plaintiff "would know it." *Id.* at ¶¶ 7–10. Plaintiff did not see Defendant Simmons tamper with his meal. *Id.* at ¶ 13. After Plaintiff complained, Defendant Simmons gave him another food tray. *Id.* at ¶ 15.

**\*9** On April 28, 2009, Defendants Bush and Doe served Plaintiff his dinner meal. *Id.* at ¶¶ 16 & 25. Plaintiff later found a piece of metal in his food when he bit into his sardine sandwich. *Id.* at ¶ 17. Plaintiff "noticed drops of blood in the food," and requested medical attention. *Id.* at ¶¶ 17 & 31. Defendant Bush then left to get a sergeant and a nurse. *Id.* at ¶ 23. Plaintiff did not see Defendant Bush nor Defendant Doe tamper with his meal. *Id.* at ¶¶ 20 & 25.

Thereafter, Defendant Nurse Garneau and Sergeant Lombard [2] appeared at Plaintiff's cell. *Id.* at ¶ 27. Plaintiff requested that Defendant Garneau examine his mouth, to which Defendant Garneau stated that "she did not see much damage," that Plaintiff should not "be a cry baby," and then "walked off" without examining Plaintiff's mouth. *Id.* at ¶¶ 29–30.

### B. Exhaustion

The Prison Litigation Reform Act ("PLRA") provides, in pertinent part, that "no action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) (citations omitted). Exhaustion is similarly required even if the prisoner asserts futility as an excuse. *See Booth v. Churner,* 531 U.S. 731, 741 n. 6 (2001) (refusing to "read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise") (cited in *Marvin v. Goord,* 255 F.3d 40, 43 (2d Cir.2001)). Accordingly, the exhaustion requirements apply even where the grievance process does not permit an award of money damages and the prisoner seeks only money damages, provided the grievance tribunal has the authority to take some responsive action. *See Thomas v. Wright,* 2002 WL 31309190, at \*5 (N.D.N.Y. Oct.11, 2002) (citing *Booth v. Churner,* 531 U.S. 731 (2001)).

In New York State, the administrative remedies consist of a three-step review process. First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC"), a committee comprised of both inmates and facility employees. [3] N.Y. COMP.CODES R. & REGS. tit. 7, § 701.5(b). The IGRC reviews and investigates the formal complaints and then issues a written determination. *Id.* Second, if the IGRC decision is appealed, the superintendent of the facility reviews the IGRCs determination and issues a decision. *Id.* at § 701.5(c). Finally, if the superintendent's decision is appealed, the Cental Office Review Committee ("CORC") makes the final administrative determination. *Id.* at § 701.5(d). Only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to § 1983 in federal court. *Bridgeforth v. .Bartlett,* 686 F.Supp.2d 238, 239 (W.D.N.Y.2010) (citing, *inter alia, Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)); *see also Neal v. Goord,* 267 F.3d 116, 121 (2d Cir.2001),

*overruled on other grounds by* Porter v. Nussle, 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12.

 **\*10** In determining whether a prisoner has failed to exhaust all available administrative remedies, the Second Circuit has instructed district courts to ask: "(1) whether administrative remedies were actually available, (2) whether the defendants forfeited their right to raise the affirmative defense or by their own actions precluded the plaintiff from using administrative grievance procedures, and (3) whether special circumstances have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements." Singh v. Goord, 520 F.Supp.2d 487, 495–96 (S.D.N.Y.2007) (quoting Hemphill v. New York, 380 F.3d 680, 686 (2d Cir.2004)).

Here, Defendants argue that Plaintiff's claims against Defendant Bush, for meal tampering, and Defendant Garneau, for deliberate indifference, were not properly exhausted because Plaintiff failed to timely file a grievance regarding the events of April 28, 2009. Defs.' Mem. of Law at pp. 8–11. Plaintiff alleges that certain special circumstances justify his failure in this regard. Dkt. No. 54, Pl.'s Mem. of Law, at pp. 5–7. Because we find that a material issue of fact exists as to whether Plaintiff's failure to exhaust should be excused, we recommend that Defendants' Motion for Summary Judgment be **DENIED** on exhaustion grounds.

Plaintiff's claims against Defendants Bush and Garneau arise out of Plaintiff's allegations that on April 28, 2009, Defendant Bush put metal in his food in which he bit into causing him to injure his mouth, and that thereafter, Defendant Garneau refused to treat his injury. *See* Compl. at ¶ 6, pp. 3–4. Plaintiff claims that on April 29, 2009, he grieved both of these issues and sent the superintendent a letter describing these events. Pl.'s Mem. of Law at p. 5. In support of this claim Plaintiff has produced a copy of both the grievance and the letter. *See* Dkt. No. 55, Pl.'s Exs., at (unnumbered) pp. 4–5, Lt., dated Apr. 28, 2009, & Grievance, dated Apr. 28, 2009. Defendants maintain that no such grievance was ever filed. Defs.' Mem. of Law at pp. 9–10; Dkt. No. 50–4, Grievance R.

On or about May 3, Plaintiff was transferred to Attica Correctional Facility ("ACF"). Dkt. No. 50–3, Ronnie Thaxton Dep., dated Aug. 3, 2012, at p. 50. On June 1, 2009, Plaintiff wrote to UCF's Superintendent inquiring about the status of his April 28, 2009,

grievance. *Id.* at (unnumbered) p. 3, Lt., dated June 1, 2009. On June 8, 2009, while Plaintiff was incarcerated at Lakeview Correctional Facility ("LCF"), Plaintiff received a response to his June 1 letter, informing him that "there is no grievance on file ... with a written date of 4/28/09 concerning metal being put in your food .... [and that i]n accordance with [DOCCS] Directive # 4040 .... your complaint is being returned to you to file at your present facility." *Id.* at (unnumbered) p. 7, Mem., dated June 8, 2009. On June 15, 2009, Plaintiff filed a grievance at LCF about the incidents which occurred on April 28, 2009, and further complainied that his grievance was tampered with in retaliation for previous grievances he filed. That grievance was rejected as untimely. It is uncontroverted that Plaintiff appealed the determination that his June 15, 2009 grievance was untimely through each and every level of administrative appeal that was available to him. *Id.* at (unnumbered) pp. 8–13; Dkt. No. 50–4, Grievance R.; Defs.' Mem. of Law at pp. 8–11; Pl.'s Mem. of Law at pp. 5–7.

 **\*11** Although it is true that filing an untimely grievance does not properly exhaust an issue for purposes of the PLRA, *see* Woodford v. Ngo, 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), a question of fact exists as to whether or not Plaintiff actually filed a timely grievance on April 29, 2009, and whether it was lost or tampered with by Defendants. If Defendants lost or tampered with Plaintiff's April 29 grievance, then this Court would be inclined to recommend that Defendants' actions bar them from asserting the affirmative defense of exhaustion. *See* Singh v. Goord, 520 F.Supp.2d at 495–96. However, given that both sides have produced documentary evidence, in order to reach such a determination we would have to make credibility assessments that would be improper at the summary judgment stage. *See* Scott v. Coughlin, 344 F.3d at 287–89. Because such a determination can only be made by a trier of fact, we recommend that Defendants' Motion for Summary Judgment be **DENIED** on this ground.

### C. Personal Involvement

Plaintiff claims that Defendant Simmons put hair in his food on April 6, 2009, in retaliation for a grievance that he filed against Defendant Simmons on January 12, 2009, and that Defendant Bush deprived him of adequate nutrition by giving him a tray of food contaminated with a

piece of metal on April 28, 2009. Compl. at ¶ 7, Third and Fourth Causes of Action. Defendants argue that Plaintiff cannot prove that Defendant Simmons or Defendant Bush were personally involved in either incident. Defs.' Mem. of Law at pp. 5–7.

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz,* 1997 WL 576038, at *2 (S.D.N.Y. Sept.15, 1997) (citing *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted). Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal,* 556 U.S. 662, 676, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

### i. Defendant Simmons

Plaintiff claims that on April 6, Defendant Simmons delivered him a tray of food that was covered in hair. Compl. at ¶ 6, p. 1. According to Plaintiff's Deposition testimony, the meals at UCF are served in styrofoam containers that are assembled in the kitchen, completely wrapped in cellophane, and then brought to the inmates in their cells on a cart. The cellophane is then removed from the styrofoam and the meal is given to the inmate through the feed up slot in the cell door. Thaxton Dep. at pp. 25–26. It is uncontroverted that on April 6, the cellophane wrapper was removed from Plaintiff's meal before it was given to him, however, it is also uncontroverted that Plaintiff did not see Defendant Simmons either remove the cellophane wrapper nor tamper with his food. *Id .* at p. 26–27. Plaintiff alleges that he confronted Defendant Simmons, asking him why "it seems like he always had an attitude and a problem when dealing with [his] food," and Defendant Simmons stated "I don't play with your food. I wouldn't play with your food. If I did, you would know it." *Id.* at p. 19. Plaintiff testified that "the only reason why I held him responsible is because he's the one that's giving me the tray." *Id.* at p. 27.

**\*12** Based upon the evidence presented, no rational juror could conclude that Defendant Simmons tampered

with Plaintiff's food on April 6, 2009, merely because he happened to deliver it that day and made a statement denying he had done so. Therefore, we recommend that Defendant Simmons be **DISMISSED.**

### ii. Defendant Bush

Likewise, based on the record, no reasonable juror could conclude that Defendant Bush contaminated Plaintiff's food with a piece of metal on April 28, 2009. Just as above, it is uncontroverted that Plaintiff did not see Defendant Bush tamper with his food. Thaxton Dep. at pp. 36–37. Moreover, when asked how he knows that Defendant Bush was responsible for placing the piece of metal in his food, Plaintiff admitted that he assumed Defendant Bush was responsible "because of his reaction with the smirk on his face." *Id.* at p. 37. And stated further that "I believe it because the relationship of you, know, the officers and when I told him that I had the metal in there, the smirk, the look that he had, that's what made me think he purposely put it in there, because he was smirking like it was a joke or something." *Id.*

Because no rational juror could conclude that Defendant Bush was personally involved in contaminating Plaintiff's food merely because Defendant Bush delivered Plaintiff's meal and then smirked at Plaintiff, we recommend that Defendant Bush be **DISMISSED.**

### D. Eighth Amendment

Plaintiff claims that Defendant Garneau was deliberately indifferent to his serious medical needs in contravention of the Eighth Amendment when she failed to examine or treat him for injuries he claims he sustained after biting into a piece of metal concealed in his anchovy sandwich. Compl. at ¶ 7, Second Cause of Action. Defendants argue that Plaintiff cannot establish such a claim because he did not suffer from a sufficiently serious medical condition. Defs.' Mem. of Law at pp. 11–13. We agree.

To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience

of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06).

To state a claim for denial of medical care, a prisoner must demonstrate (1) a serious medical condition and (2) deliberate indifference. *Farmer v. Brennan,* 511 U.S. 825, 834–35, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Hathaway v. Coughlin ("Hathaway I"),* 37 F.3d 63, 66 (2d Cir.1994). The first prong is an objective standard and considers whether the medical condition is sufficiently serious. The Second Circuit has stated that a medical need is serious if it presents "a condition of urgency that may result in degeneration or extreme pain ." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal quotation marks and citation omitted). Among the relevant factors to consider are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individuals' daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong,* 143 F.3d at 702 (quoting *McGuckin v. Smith,* 974 F.2d 1050, 1059–60 (9th Cir.1992)). The second prong is a subjective standard requiring a plaintiff to demonstrate that the defendant acted with the requisite culpable mental state similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *Hathaway I,* 37 F.3d at 66. A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan,* 511 U.S. at 836. This requires "something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835; *see also Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) (citing *Farmer* ). Further, a showing of medical malpractice is insufficient to support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong,* 143 F.3d at 702 (quoting *Hathaway v. Coughlin ("Hathaway II"),* 99 F.3d 550, 553 (2d Cir.1996)); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citations omitted).

**\*13** It is uncontroverted that Defendant Garneau responded to Plaintiff's cell on April 28, 2009, in response to his claims that he had injured his mouth by biting down on a piece of metal concealed in his food. It is also uncontroverted that she neither examined the inside of Plaintiff's mouth nor provided him with any treatment. With regards to the extent of his injury Plaintiff maintains that while "I was not leaking blood, I was cut, you know in the mouth. It was a little bit on the side of my jaw and it was more to my teeth. The pain in [his] teeth was more actually than the blood was." And that, within an hour the bleeding stopped. Thaxton Dep. at p. 49. Thereafter, Plaintiff experienced some continuing pain, an inability to eat on the right side of his mouth, paranoia, and some sleeplessness. *Id.* at pp. 52–55. Three or four days after the incident, Plaintiff was transferred to Attica Correctional Facility ("ACF"). *Id.* at p. 50. Plaintiff did not request sick call between April 28 and the day that he was transferred to ACF. By the time he requested sick call at ACF, about a week after April 28, his injury was "no longer a cut," and he was given Tylenol. *Id.* at pp. 49–51 & 53.

Although we certainly do not countenance ignoring the medical complaints of inmates as merely the petulant whining of a "cry baby," it is clear that the Constitution is not invoked every time a prison nurse chooses not to immediately treat a broken lip or cut tongue. While Plaintiff's injury may have been painful, no rational juror could conclude that an injury which healed on its own in a matter of days was objectively sufficiently serious to sustain an Eighth Amendment deliberate indifference claim. Therefore, we recommend that Defendants' Motion for Summary Judgment be **GRANTED** as to this claim.

### E. Defendant Doe

In his Complaint, filed on October 31, 2010, Plaintiff named a John Doe Defendant. *See generally* Compl. However, to date, and despite multiple reminders by this Court,[4] Plaintiff has failed to identify the Doe Defendant. Under FED. R. CIV. P. 4(c)(1) and 4(m), the plaintiff is responsible for service of the summons and complaint for each defendant within 120 days of the filing of the complaint.[5] Failure to properly serve any defendant in accordance with the Federal Rules will result in the court, upon motion or on its own initiative, to dismiss the case without prejudice as to that defendant. *Id.* at 4(m). Because Plaintiff has failed to timely identify and serve

the John Doe Defendant, and because as outlined above, no cognizable cause of action is asserted herein, we recommend dismissal of all claims asserted against him. *Cooks v. Delpiano,* 2008 WL 4186337, at *1 n. 1 (N.D.N.Y. Sept.10, 2008); *Pravada v. City of Albany,* 178 F.R.D. 25, 26 (N.D.N.Y.1998).

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Summary Judgment (Dkt. No. 50), be **GRANTED in its entirety;** and it is further

 **\*14 RECOMMENDED,** that the Doe Defendant be dismissed due to Plaintiff's failure to timely identify and serve him; and it is further

**RECOMMENDED,** that, in light of the above recommendations, this matter be closed; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs. .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

### All Citations

Slip Copy, 2013 WL 4806457

### Footnotes

1    To avoid confusion, any time the Court references a specific page number for a document on the docket, the Court will cite to the page number assigned by the Court's electronic filing system.

1    Plaintiff's Complaint contained additional claims and Defendants. However, the claims and Defendants outlined above are all that remain after the Court's initial review of the Complaint and Defendants' Motion to Dismiss. *See* Dkt. Nos. 6, Mem.-Dec. and Order, dated Mar. 29, 2011, & 31, Rep.-Rec. and Order, dated Jan. 5, 2012.

2    Sergeant Lombard was dismissed as a Defendant in this action. Dkt. No. 32.

3    The IGRC is a five-member body consisting of two voting inmates, two voting staff members, and a non-voting chair (who may be an inmate, staff member of volunteer). N.Y. COMP.CODES R. & REGS tit.7, § 701.4.

4    This Court has specifically directed, or reminded, Plaintiff of his obligation to ascertain the true identity of, and serve the Doe Defendant on at least four separate occasions. *See* Dkt. Nos. 6, Order, dated Mar. 29, 2011, at pp. 9–10, 31, Rep.-Rec., dated Jan. 5, 2012, at p. 7 n. 6, & 32, Order, dated Feb. 2, 2012, at p. 5; *See also* Text Order, dated June 14, 2012.

5    Under the Local Rules for the Northern District of New York, a plaintiff must effectuate service within sixty (60) days. N.D.N.Y.L .R. 4.1(b)

**End of Document**      © 2016 Thomson Reuters. No claim to original U.S. Government Works.